## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MARK SCHAND, MIA SCHAND, MARK SCHAND JR., QUINTON SCHAND, and KIELE SCHAND,

Plaintiffs,

v.

CITY OF SPRINGFIELD, HAMPDEN COUNTY, CITY OF HARTFORD, Former Springfield Police Detectives ELMER MCMAHON, LEONARD SCAMMONS, RAYMOND P. MUISE, MICHAEL REID, JOSEPH ASSAD, JAMES FLEURY, PAUL MCNULTY, as well as-yet unknown officers JOHN AND JANE DOES 1 THROUGH 10 and as-yet unknown supervisors, JOHN AND JANE DOES 11 THROUGH 20,

Defendants.

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW Plaintiffs Mark Schand, Mia Schand, Mark Schand, Jr., Quinton Schand, and Kiele Schand, by their attorneys, White & Case LLP, and complaining of the City of Springfield, Hampden County, the City of Hartford, Former Springfield Police Detectives Elmer McMahon, Leonard Scammons, Raymond P. Muise, Michael Reid, Joseph Assad, James Fleury, Paul McNulty, as well as other as-yet unknown officers and supervisors acting under color of state law, allege as follows:

## PRELIMINARY STATEMENT

1.      What are 27 years of a man's life worth?  This lawsuit seeks an answer to this question.

2.      As a direct result of doctored and suppressed police reports, coerced and unreliable witness statements, improper identification procedures, and a general pattern of blatant disregard for the law on the part of the Defendants, Plaintiff Mark Schand ("Plaintiff") spent 27 years in prison for a murder, assault, and robbery he did not commit.  Arrested in 1986 at age 21, Plaintiff was wrongfully convicted and sentenced to life in prison without the possibility of parole.

3.      Plaintiff continued to assert his innocence for nearly three decades.  Through persistence and a dogged determination to reveal the truth, Plaintiff eventually obtained proof of egregious misconduct by the Defendants.

4.      Plaintiff moved for a new trial based on newly discovered evidence in 2013.  The Commonwealth of Massachusetts (the "Commonwealth") joined in the motion to vacate his conviction.  That motion was granted on October 4, 2013, and the Commonwealth *nolle prossed* all of the indictments against Plaintiff on October 16, 2013.

5.      Among other misdeeds set forth in this Complaint, the Springfield Police Department ("SPD") and Hampden County District Attorney's Office violated Plaintiff's constitutional rights by improperly obtaining witness identifications in an effort to fabricate Plaintiff's guilt.  The City of Springfield and the SPD also withheld and doctored key exculpatory evidence.  These constitutional violations facilitated the presentation of the false evidence to a jury, which resulted in the erroneous conviction of Plaintiff.

6.      The egregious constitutional violations described herein did not just affect Plaintiff. His family, including his wife, Mia Schand, and his three sons, Mark Schand, Jr., Quinton

Schand, and Kiele Schand (the "Family Plaintiffs"), were all forced to spend decades without their husband and father.  Plaintiff was forced to miss weddings, funerals, births, graduations, birthdays, and other monumental life events, and yet his family stayed by his side in hope that justice would prevail.

7.     While they can never regain the 27 years that were taken from them as a result of the misconduct described herein, Plaintiff and the Family Plaintiffs are entitled, pursuant to 42 U.S.C. §§ 1983 and 1988 and state law, to monetary damages for the extraordinary injuries suffered as a result of Plaintiff's wrongful arrest, prosecution, conviction, and 27-year imprisonment.

## JURISDICTION AND VENUE

8.     This action is brought pursuant to, inter alia, 42 U.S.C. § 1983, to redress the deprivation, under color of law, of Plaintiff's rights as secured by the United States Constitution.

9.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

10.     Venue is proper under 28 U.S.C. § 1391(b), as the events giving rise to the claims asserted herein occurred in this district and numerous Defendants reside in this district.

## THE PARTIES

11.     At all times relevant to this Complaint, Plaintiff was a resident of the City of Hartford, Connecticut.  At the time of the arrest giving rise to this action, Plaintiff was living in Hartford.

12.     Defendant City Of Springfield is located in the County of Hampden, and is a municipal corporation of the Commonwealth.

13.     Defendant City Of Hartford is located in the County of Hartford, State of Connecticut.

14.     Defendant Hampden County is located in Massachusetts and is a county within the Commonwealth.

15.     Upon information and belief, at all times relevant to this Complaint, Defendant Elmer McMahon was employed as a Lieutenant with the SPD and was head of the Springfield homicide squad in 1986.

16.     Upon information and belief, at all times relevant to this Complaint, Defendant Leonard Scammons was employed as a Detective with the SPD.

17.     Upon information and belief, at all times relevant to this Complaint, Defendant Raymond Muise was employed as a Detective with the SPD.

18.     Upon information and belief, at all times relevant to this Complaint, Defendant Michael Reid was employed as a Detective with the SPD.

19.     Upon information and belief, at all times relevant to this Complaint, Defendant Joseph Assad was employed as a Detective with the SPD.

20.     Upon information and belief, at all times relevant to this Complaint, Defendant James Fleury was employed by the SPD.

21.     Upon information and belief, at all times relevant to this Complaint, Defendant Paul McNulty was employed as a Detective with the SPD.

22.     Upon information and belief, at all times relevant to this Complaint, Ronald Faggaini was employed as a Detective with the HPD and was the main contact with the SPD regarding the investigation of Plaintiff.  Detective Faggaini is deceased.

23.     Defendants McMahon, Scammons, Muise, Reid, Assad, Fleury, and McNulty are herein referred to collectively as the "Individual Defendants."

24.     Upon information and belief, at all times relevant to this Complaint, Francis Bloom was employed as an Assistant District Attorney ("ADA") with the Hampden County District Attorney's Office.  ADA Bloom was disciplined by the Board of Bar Overseers for dishonesty in his conduct of criminal prosecutions around the time he was prosecuting Plaintiff.  On December 16, 1987, one month after Plaintiff's trial, Bloom fabricated a three-page confession and forged the signatures of suspects.  The Supreme Judicial Court publicly censored Bloom, calling his conduct "outrageous" and "reprehensible."

25.     Defendants John and Jane Does 1 through 10, whose identities are currently unknown, represent individuals acting under color of state law who had personal involvement in the investigation of Plaintiff (the "Doe Defendants").

26.     Defendants John and Jane Does 11 through 20, whose identities are currently unknown, represent those employees who supervised certain Defendants and had personal involvement in the investigation of Plaintiff (the "Supervisory Doe Defendants").

27.     Each of the foregoing Defendants in Paragraphs 16-23 and 26-27 are sued in their individual capacities, and all acted under color of law and within the scope of their employment in engaging in the actions alleged in this Complaint.

## FACTS

### I.
### Shooting at the After Five Lounge
### (The "After Five Shooting")

28.     Shortly after 11 p.m. on September 2, 1986, Charles "Heavy" Stokes and his brother, David Stokes (together, the "Stokes Brothers"), were engaged in a drug deal with two men, Anthony Cooke and Michael Hosten, outside of the After Five Lounge in Springfield, Massachusetts.  A number of other people were congregating on the streets and sidewalks

outside the Lounge.

29.     While Mr. Cooke and Mr. Hosten were talking with the Stokes Brothers, several unidentified young men approached the Stokes Brothers and inquired about buying drugs.

30.     As Charles Stokes showed the unidentified young men some drugs he had for sale, one of the unidentified men lunged at the Stokes Brothers, evidently in an effort to steal either jewelry or drugs from them.

31.     Anthony Cooke grabbed the lunging man, but was immediately shot in the shoulder by one of the unidentified men.

32.     Mr. Cooke, Mr. Hosten, and the Stokes Brothers then turned and fled the scene, while the unidentified gunman kept firing at them.

33.     While attempting to flee, Charles Stokes tripped and fell, at which point the gunman robbed him and fled.

34.     During the melee, bystander Victoria Seymour, a 25-year old woman who as at the After Five Lounge with her friends Willie Darko and Michael Bernard, was shot in the back.

35.     Ms. Seymour died hours later.

## II.
## The Police Investigation

### A.  Inconsistent Eyewitness Reports

36.     As part of their investigation of the After Five Shooting, the SPD began interviewing eyewitnesses who had been at the scene.

37.     The SPD initially interviewed four eyewitnesses: Mr. Charles Stokes, Mr. Anthony Cooke, Mr. Michael Bernard, and Mr. Michael Hosten.   These witnesses gave varying descriptions of the assailant.

38.     On the night of the shooting, Officer Anthony Gladden of the SPD interviewed Mr. Charles Stokes, who had been robbed during the melee.  Mr. Stokes stated that his assailant was a black male wearing blue jeans and a white T-shirt.

39.     Also on the night of the shooting, Defendant Scammons and SPD Detective Milton Doty interviewed Mr. Anthony Cooke, who was one of the participants in the drug deal precipitating the After Five Shooting.  Mr. Cooke identified the man who had robbed Charles Stokes as black man with a medium to dark complexion, about 5 feet 9 inches tall, and with a slender to medium build.

40.     In another interview with SPD Detectives on September 3, 1986—one day after the After Five Shooting—Mr. Cooke stated that the man who had shot him had been a dark black male, about 5'11 and 165 pounds.  Mr. Cooke further stated that the assailant had an Afro and had been wearing a white warm-up jacket, blue jeans, and white leather sneakers.

41.     On September 3, 1986, Defendants Reid and Assad interviewed eyewitness Michael Hosten, who was also one of the participants in the drug deal.  Mr. Hosten stated that the assailant appeared to be around 30 years old and was wearing a brown or beige jacket.

42.     Also on September 3, 1986, Defendant Scammons and Detective Doty interviewed eyewitness Michael Bernard, who stated that he was standing outside the After Five Lounge on the evening of the After Five Shooting when he saw a man try to grab a bag from Charles Stokes. Mr. Bernard stated that Mr. Stokes took the bag and ran away, at which time the assailant shot at Mr. Stokes three or four times.  Mr. Bernard told police that Charles Stokes fell in the street, and the shooter then took the bag from Mr. Stokes.  Mr. Bernard did not provide a physical description of the assailant.

**B.  The Pizza King Incident**

43.  On September 3, 1986, Defendants Reid and Assad interviewed 16-year-old Lavon Dixon and 15-year-old Al Chase (also known as Jermaine Bush).  Messrs. Chase and Dixon had been overheard at a local package store publicly discussing the fact that they had information relevant to the After Five Shooting, leading police to question them.

44.  Upon questioning by the SPD, Mr. Dixon and Mr. Chase indicated that they had been in a Pizza King restaurant in Springfield on the night of the After Five Shooting when six men came in to the restaurant inquiring about a gold chain that one of the men claimed had been stolen from him after a Run DMC concert two days earlier.  Upon information and belief, this gold chain was similar to one that the unidentified gunman (or one of his companions) attempted to steal from the Stokes Brothers during the After Five Shooting.

45.  Mr. Chase described the man who inquired about the gold chain as appearing to be 20 years old, 5'7", and well-built with black hair worn in braids.  The man was wearing a brown and white striped short-sleeve shirt, blue pants, and blue sneakers.  He was also wearing sunglasses with brown frames and lenses and gold trim on each side.

46.  Mr. Dixon told police that four of these men then left the Pizza King in a blue and grey van with Connecticut license plates, and two of the men left in a separate car.

47.  Mr. Chase also indicated that one of the men who had been inquiring about the stolen chain at the Pizza King on the night of the After Five Shooting had driven a grey customized van with Connecticut license plates.

**C.  Additional Witnesses Connect the Gunman to a Van with Connecticut Plates**

48.  On September 3, 1986, Defendant McMahon, an SPD Lieutenant, interviewed Mr. Richard Ramsey, who lived near the After Five Lounge.  Mr. Ramsey stated that he had just

arrived home on the night of the After Five Shooting when he heard three gunshots outside. When Mr. Ramsey went outside to investigate, he saw three men run from the area near the After Five Lounge to a blue van without any windows on the side, except for the driver's window.  He also saw at least two men run from the area near the After Five Lounge to a blue or black car that was parked in front of the van.  Both vehicles took off at a high speed.

49.     On September 18, 1986, Defendants McNulty and Fleury, SPD detectives, interviewed Ms. Tonya Polon who lived near the After Five Lounge.  Ms. Polon stated that she had been sitting on her front porch on the night of the shooting.  She stated that said she had seen a silver or light blue van with a white stripe driving away from the area of the shooting on the night of the After Five Shooting.  In a subsequent December 19, 1986 statement, Ms. Polon described the van as silver-blue with a white line running on the side and with a ladder on the back, a window on the top and a bubble on the side.

50.     Upon information and belief, this information led the SPD to focus their investigation and search for the perpetrator of the After Five Shooting in nearby Hartford, Connecticut.

### III.
### The Improper Photographic Arrays Leading up to Plaintiff's Arrest

51.     As a part of their investigation, the SPD began to show photo arrays of potential suspects to various witnesses who had been at the After Five Shooting or had witnessed events related to the shooting.

52.     With respect to all of the photo arrays shown to witnesses, the SPD only recorded which photographs that witnesses identified as a possible match for the perpetrator.  The SPD did not keep records of all of the photographs that were shown to witnesses in the first instance, nor did the SPD record non-identification responses by witnesses.

### A.  Hartford Police Department Polaroid Photographs of Plaintiff

53.     In early-to mid-September 1986, after the After Five Shooting, an unknown HPD officer stopped Plaintiff in Hartford and directed him to go to the Hartford Police Station because of an alleged vehicle infraction relating to Plaintiff's motorcycle.

54.     While at the Hartford police station, unknown HPD officers took three color Polaroid photographs of Plaintiff.

55.     Two of the Polaroids showed Plaintiff facing forward, and one Polaroid showed Plaintiff facing to the right.  In all three Polaroids, Plaintiff was wearing large glasses known as "Gazelles" and large chains around his neck, with his hair braided in corn rows.

56.     These three Polaroids are the only photographs of Plaintiff taken by the HPD that depict Plaintiff wearing Gazelles glasses.

57.     The Polaroids were not dated and did not include any other identifying information.

58.     The Polaroids were not taken in connection with an arrest of Plaintiff.  Plaintiff was released shortly after HPD officers had taken the Polaroids of him.

59.     In addition to the Polaroids, the HPD had two sets of photographs of Plaintiff from prior arrests for unrelated incidents.

60.     At the hearing on Plaintiff's first motion for new trial in 1992, Defendant Muise of the SPD testified that he obtained the color Polaroids of Plaintiff from the HPD shortly around the time of Plaintiff's arrest for the After Five Shooting on October 29, 1986.

61.     Defendant Muise also testified that any photographs of Plaintiff that were shown to witnesses prior to his arrest in late October 1986 would not have included these Polaroids, because the use of these single-profile pictures would have been unfair and suggestive (unlike mugshots, which combine photographs from multiple profiles).

62.    However, several witnesses, including Lavon Dixon, Al Chase, Michael Bernard, Michael Hosten, and Willie Darko, all recalled having been shown Polaroids of Plaintiff as part of the photographic arrays they were shown.   Many of these witnesses recalled seeing the Polaroids of Plaintiff well before October 29, 1986.

**B.  The SPD Obtain Six or Seven Photographs of Hartford Men Known to be Active in Springfield**

63.    On September 17, 1986, Defendants Assad and Scammons interviewed Kenneth Whitted.  Mr. Whitted was a Springfield resident whom the SPD believed had knowledge of recent altercations between Springfield men and Hartford men in the Springfield area.

64.    Mr. Whitted had been involved in prior altercations with men from Hartford, including in an incident outside Antonio's Grinders in Springfield with a Hartford man with braided hair.

65.    Defendants Assad and Scammons removed Mr. Whitted from York Street House of Corrections in Springfield and transported him to Hartford, Connecticut.  Defendants Scammons and Assad were assisted in their interview of Mr. Whitted by HPD Detective Ronald Faggaini.

66.    In Hartford, Mr. Whitted was shown several mugshot books and asked to identify any Hartford men with whom he had had previous confrontations in Springfield.

67.    Two pictures of Plaintiff were included in the photographs shown to Mr. Whitted.

68.    After several hours of reviewing photos, Mr. Whitted identified six or seven photographs, including one of an individual named Tracy Turman, as possibly being the man with braided hair with whom he had had a confrontation outside of Antonio's Grinders in Springfield.

69.    Mr. Whitted did not identify Plaintiff during this interview.

70.     Defendant Scammons' notes regarding the September 17 visit to the HPD did not describe the photographs picked out by Mr. Whitted or mention Mr. Whitted by name.

71.     No police records were kept or provided to indicate what photographs were shown to Mr. Whitted.

72.     However, the SPD used the six or seven photographs selected by Mr. Whitted in initial photo arrays shown to witnesses of the After Five Shooting.

**C.  The First September 18 Photo Array – Lavon Dixon**

73.     On September 18, 1986, Defendants Scammons and Reid again interviewed one of the teenage witnesses from the Pizza King incident, Mr. Lavon Dixon.  Defendants Scammons and Reid showed Mr. Dixon photo arrays in an attempt to have him identify the persons he saw at Pizza King on the night of the After Five Shooting.

74.     During that interview, Mr. Dixon identified two individuals with the last names Pruitt and Syms as possibly being at the Pizza King on the night of the shooting.

75.     The police report by Defendants Reid and Scammons documenting this interview with Mr. Dixon, including Mr. Dixon's identification of two individuals other than Plaintiff as persons involved in the Pizza King incident, was not provided to defense counsel for Plaintiff at any time before trial.

**D.  The Second September 18 Photo Array – Anthony Cooke**

76.     Also on September 18, 1986, after interviewing Mr. Dixon, Defendants Scammons and Reid interviewed Mr. Anthony Cooke, who had been shot during the After Five Shooting.

77.     Defendants Scammons and Reid showed Mr. Cooke pictures of individuals obtained from the HPD.

78.     Mr. Cooke did not identify any of the men in the photographs as the person who had shot him during the After Five Shooting.

79.     As with Mr. Whitted's interview the previous day, no records were kept to indicate what photos were shown to Mr. Dixon or Mr. Cooke.

**E.  The SPD Obtain Approximately 30 Photographs of Hartford Men from HPD**

80.     On September 23, 1986, the SPD obtained approximately 30 additional photographs of Hartford men from the HPD and began to show these photographs to witnesses.

81.     The photographs supplied to the SPD by the HPD had been selected by HPD Detective Faggaini, based on his understanding of individuals who were involved in the trafficking and selling of narcotics in the greater Hartford area.

82.     Upon information and belief, photographs of Plaintiff were among this group of approximately 30 photographs.

83.     The SPD made no record of the photos that it received from the HPD on September 23, 1986.

**F.  The September 23 Photo Array – Anthony Cooke**

84.     On September 23, 1986, Defendants McNulty and Fleury interviewed Mr. Cooke again and showed him the additional photographs obtained from the HPD.

85.     Unlike the first time he reviewed a photographic array from the police, this time Mr. Cooke identified several persons involved in the After Five Shooting.  Mr. Cooke identified Antonio Schand (Plaintiff's brother) as having been among the group of men who approached him on the night of the After Five Shooting, with 60 – 70% certainty.  He also identified Plaintiff with less certainty, but Mr. Cooke noted in response to being shown the picture of Plaintiff, who had braided corn rows at the time, that he did not remember any person at the After Five

Shooting as having braided corn rows.

86.     Mr. Cooke did not positively identify anyone (and did not sign the back of any pictures, as was common practice in the SPD for any positive identifications) in response to being shown photographs on September 23, 1986, and said that he would have to see individuals in person before he could positively identify anyone.

87.     Defendants McNulty and Fleury did not record what photographs were shown to Mr. Cooke during the September 23, 1986 interview.

88.     The activity report written by Defendants McNulty and Fleury describing the meeting with Mr. Cooke and his reactions to the September 23 photo array was not furnished to defense counsel before or during Plaintiff's trial.

### G.  The First September 24 Photo Array – Lavon Dixon and Al Chase

89.     On September 24, 1986, Defendants Scammons and Reid again interviewed the two teens from the Pizza King, Mr. Dixon and Mr. Chase, showing them a large number of photographs obtained from the HPD.  Each witness was shown the photos separately.

90.     Unlike the first time they reviewed a photographic array from the police, this time the teens positively identified potential persons involved in the Pizza King incident.

91.     During the interview with Mr. Chase, Mr. Chase identified Plaintiff with 90% certainty as the black male with braided hair who had approached him at the Pizza King on the night of the After Five Shooting.

92.     Contrary to Defendant Muise's testimony that he did not obtain the Polaroids of Plaintiff until late October and did not show them to witnesses because the use of the Polaroids would have been unduly suggestive, Mr. Chase testified at Plaintiff's trial that Plaintiff was wearing Gazelle glasses in the pictures shown to him.  The only set of photographs available to

the SPD that showed Plaintiff wearing glasses were the Polaroids that the HPD had taken of Plaintiff in early September.

93.     Mr. Chase also identified Anthony Atkins, with 50% certainty, as one of the other black males who had been at the Pizza King.

94.     During the SPD interview with Mr. Dixon, Mr. Dixon indicated he was 50% sure that Plaintiff was one of the men he saw in the Pizza King on the night of the After Five Shooting.

95.     Mr. Dixon also identified a photograph of Mr. Atkins and said he was 30 to 40% sure that Mr. Atkins was one of the men whom Mr. Dixon had seen in the Pizza King on the night of the After Five Shooting.

96.     There is no record of what photographs were shown to Mr. Dixon and Mr. Chase on September 24, 1986.

**H.  The Second September 24 Photo Array – Kenneth Whitted**

97.     Following their interviews with Messrs. Chase and Dixon, Defendants Scammons and Reid interviewed Kenneth Whitted.

98.     There is no record of what photographs were shown to Mr. Whitted on September 24, 1986, though Defendants Scammons and Reid showed Mr. Whitted the same photo array they had shown Messrs. Chase and Dixon on September 24.

99.     Thus, Mr. Whitted saw the same photo array that included the Polaroid of Plaintiff wearing Gazelle glasses and large chains around his neck, contrary to Defendant Muise's testimony that he did not obtain these Polaroids until late October and did not show them to witnesses because use of the Polaroids would have been unduly suggestive.

100.    During the interview, Mr. Whitted positively identified Plaintiff as the black male who had been in Springfield and who had previously had a confrontation with men from

Springfield.

**I.   The Third September 24 Photo Array – Charles Stokes**

101.   On September 24, 1986, after interviewing Mr. Dixon and Mr. Chase, SPD Defendants Scammons and Reid interviewed Charles Stokes, who had been robbed during the After Five Shooting.

102.   During this September 24, 1986 interview, Charles Stokes was shown the same photo array that had been shown to Chase, Dixon, and Whitted on the same day.

103.   This was the same photo array that included the Polaroid of Plaintiff wearing Gazelle glasses and large chains around his neck.  Defendant Muise testified that he did not obtain these Polaroids until late October and did not show them to witnesses, as the use of the Polaroids would have been unduly suggestive.

104.    Charles Stokes indicated with 30 to 40% certainty that the photo of Plaintiff and another individual, Tracy Turmon, looked similar to his assailant.

105.   No contemporaneous record was made of what photographs were shown to Charles Stokes on September 24, 1986.

**J.   The October 24 Photo Array – Michael Bernard**

106.   On October 24, 1986, Defendant Scammons and Detective Doty again interviewed Michael Bernard, who had witnessed the After Five Shooting.  During the interview, Defendant Scammons and Detective Doty showed Mr. Bernard approximately 30 photographs.

107.   Two photographs of Plaintiff were among the approximately 30 photographs shown to Mr. Bernard.

108.   One of the two photos of Plaintiff shown to Mr. Bernard was one of the Polaroids of Plaintiff taken in September, contrary to Defendant Muise's testimony that he did not obtain

these Polaroids until October 29 and did not show them to witnesses because the use of the Polaroids would have been unduly suggestive.

109.     From the photographs, Mr. Bernard identified Plaintiff as the shooter outside of the After Five Lounge on the night of September 2, 1986,

110.     There is no complete record of what photographs were shown to Mr. Bernard on October 24, 1986, how the photos were displayed, or what was said to him with regard to the photo array.

111.     Plaintiff was arrested on October 29, 1986, on the basis of Mr. Bernard's identification of him as the assailant behind the After Five Shooting.

### K. The Fabricated Recollection and Testimony of a Single Photo Array Used After October 24, 1986

112.     In their testimony at Plaintiff's trial, Defendants Scammons and Muise testified that, beginning on October 24, 1986 (following Michael Bernard's positive identification of Plaintiff), the SPD used the same eight or nine photographs for all photo arrays shown to individuals interviewed in connection with the After Five Shooting.

113.     Defendant Muise testified that all of the photographs in the arrays after October 24 were mugshots.

114.     The testimony was false: repeated witness testimony indicates that SPD detectives used at least one Polaroid picture of Plaintiff wearing Gazelles in several arrays shown to witnesses.  Separately, there was at least one array that included two photographs of Plaintiff.

115.     There is no contemporaneous record of the photographic arrays after October 24 to support Defendant Scammons' or Muise's testimony about the composition of the arrays.

116.     Furthermore, there is no record of which photographs were used in the photo arrays shown in the numerous interviews with Messrs. Dixon, Chase, Cooke, Whitted, Bernard, and the

Stokes Brothers, that occurred prior to October 24, 1986.

**L. The Improperly Suggestive October 30, 1986  Photo Array – Michael Hosten**

117.    On October 30, 1986, Defendants Reid and Muise conducted another interview of Mr. Hosten, who had been a participant in the drug deal on the night of the After Five Shooting.

118.    At this interview with the SPD, Defendants Reid and Muise showed Mr. Hosten a Polaroid of Plaintiff wearing Gazelle glasses and large chains around his neck, and told Mr. Hosten that Plaintiff had shot Ms. Seymour.

119.    The Polaroid of Plaintiff was then inserted into a stack of photographs, and Mr. Hosten was then asked to select from that stack of photographs the photograph of the individual who shot Ms. Seymour.

120.    In addition to the Polaroid, the photographic array shown to Mr. Hosten contained another picture of Plaintiff – a prior mugshot.

121.    Mr. Hosten selected a photograph of Plaintiff, the man he had been told by the SPD was the man who shot Ms. Seymour.

122.    Defendants Reid and Muise told Mr. Hosten that he had identified Plaintiff and that if Mr. Hosten cooperated, "they would take care of [him] and make all of [his] cases disappear."

123.    After Mr. Hosten made the requested identification of Plaintiff to Defendants Reid and Muise, ADA Bloom came into the room where Mr. Hosten was being interviewed and asked Mr. Hosten to confirm his identification of Plaintiff.

**M. The December 31, 1986 Photo Array – Willie Darko**

124.    On December 31, 1986, Defendant Scammons and Detective Doty questioned Willie Darko, who had been at the scene of the After Five Shooting and had seen a man with a gun standing over Charles Stokes.

125.    Defendants showed Mr. Darko an array of photographs and asked him if he could identify that man he had seen standing over Charles Stokes with the gun on the night of the After Five Shooting.

126.    Mr. Darko selected a mugshot of Plaintiff.  He signed the back of the mugshot photograph.

127.    Mr. Darko subsequently testified that there were two photographs of Plaintiff in the photographic array he was shown by police that day, including a color Polaroid picture of Plaintiff.

## IV.
## Plaintiff's Arrest

128.    Plaintiff was arrested on October 29, 1986, in connection with the shootings at the After Five Lounge by HPD police officers outside of his home in Hartford, Connecticut.

129.    A warrant for Plaintiff's arrest, issued by the Springfield District Court, had been obtained by Defendant Muise on the strength of Mr. Bernard's October 24 identification of Plaintiff as the assailant at the After Five Shooting.

130.    Plaintiff was Mirandized by Defendant McMahon.

131.    Defendants McMahon, Reid, and Muise from the SPD, along with ADA Bloom, interrogated Plaintiff at the HPD immediately following his arrest.

132.    During the course of the October 29, 1986 interrogation, Plaintiff stated that he had only been in Springfield once in his life and was not present at the time of the After Five Shooting.  He also further denied any knowledge of the murder of Ms. Seymour or any drug-related incidents between men in Hartford and Springfield.  When shown color Polaroids of himself wearing Gazelle glasses and of the blue and grey van connected with the shooting, Plaintiff stated that he had only worn those glasses once in his life (on the day that the HPD took

photographs of him) and that he had never driven a van in his life.

133.    Plaintiff waived rendition in the belief that his misidentification would be quickly established and that he would be released.  Instead, on December 4, 1986, Plaintiff was indicted with the first-degree murder of Victoria Seymour, along with the robbery of Charles Stokes and the assault of Mr. Cooke.

## VI.
## The SPD Conducts an Unduly Suggestive Line-Up

134.    After Plaintiff was arrested, the SPD began assembling a line-up as part of its investigation.  Plaintiff and his attorney, Roy Anderson, independently requested that the police stage a line-up.

135.    On December 15, 1986, Defendant McMahon and ADA Bloom staged an in-person lineup for Messrs. Dixon, Chase, and Charles Stokes at the SPD headquarters at 130 Pearl Street in Springfield.

136.    Mr. Cooke was not present at the December 15 line-up, but was subsequently shown a photograph of the December 15 line-up on January 16, 1987.

137.    The line-up constructed by the SPD on December 15, 1986, consisted of two police officers, two Hampden County jail inmates, one man who was being held in the police lock-up, and Plaintiff.

138.    Compared to the other participants in the line-up, Plaintiff was younger and had a smaller build.  Several participants had moustaches, which Plaintiff did not have.  Furthermore, several of the participants did not resemble the witnesses' descriptions of the assailant.

139.    Plaintiff was the only person whose photograph the witnesses to the December 15 line-up had seen prior to that day.

140.    By December 15, both Messrs. Chase and Dixon had already seen the Polaroids of Plaintiff.

141.    In addition, Plaintiff was the only person in the line-up whom Mr. Cooke and Charles Stokes did not already know.

142.    Messrs. Dixon, Chase, and Cooke identified Plaintiff from the December 15 line-up.

143.    Charles Stokes identified Plaintiff at the December 15 line-up with 55% certainty.

## VII.
## The Grand Jury Hearing

144.    On December 15, 1986, a hearing was held before the Hampden County Grand Jury.

145.    ADA Bloom appeared for the Commonwealth and called eight witnesses, including Dr. Thomas Duval Smith (the medical examiner), Charles Stokes, Defendant McMahon, Defendant Muise, Anthony Cooke, Michael Hosten, SPD Officer Anthony Gladden, and Detective Doty.

146.    Charles Stokes testified that the man who had robbed him on the night of the After Five Shooting was a black man in his late twenties with his hair braided in corn rows.

147.    Anthony Cooke confirmed that he had identified Plaintiff in a photo array shown to him by police on September 23, and that in this photograph Plaintiff had braided hair.  Mr. Cooke neglected to mention that during his September 23 interview, he told police that he did not remember any braided corn rows on the assailant who robbed Charles Stokes.

148.    Michael Hosten testified that the police presented him with a photo array containing six to eight pictures of black men with hair braided in corn rows and that out of these pictures, he identified the picture of Plaintiff as the individual whom he saw rob Mr. Charles Stokes.  The Grand Jury was not aware that Mr. Hosten identified Plaintiff only as a result of the unduly suggestive conduct of Defendants Reid, Muise, and ADA Bloom, or that these Defendants

21

agreed to drop pending charges against Mr. Hosten in exchange for his identification of Plaintiff.

149.    The Grand Jury returned an indictment of Plaintiff for the murder of Victoria Seymour and the robbery of Charles Stokes.

## VIII.
## The Trial

150.    Plaintiff was tried for robbery and murder from November 9-20, 1987.

151.    By the time Plaintiff was tried, the Commonwealth had six witnesses who claimed they saw Plaintiff shoot Mr. Cooke, rob Charles Stokes, and fire the shot that killed Ms. Seymour.

152.    Among those witnesses were the four men involved in the drug deal at the time of the After Five Shooting: Mr. Cooke, the Stokes Brothers (Charles and David), and Mr. Hosten, all of whom identified Plaintiff as the gunman.

153.    Mr. Cooke, the Stokes Brothers (Charles and David), and Mr. Hosten were all friends and criminal associates from the same neighborhood.

154.    The Commonwealth was aware, but did not disclose, that Mr. David Stokes was under the control and influence of his older brother, Mr. Charles Stokes.

155.    Additionally, two other men who were at the scene and who were friends of the victim, Willie Darko and Michael Bernard, also identified Plaintiff as the shooter at trial, though they gave accounts of the After Five Shooting that conflicted with the testimony of Mr. Cooke, the Stokes Brothers, and Mr. Hosten.

156.    Each of Mr. Cooke, the Stokes Brothers, and Mr. Hosten indicated that Charles Stokes ran away when one of the unidentified men revealed a gun, and that the man chased Charles Stokes down a street by the After Five Lounge.

157.    Mr. Darko testified that Charles Stokes was not chased by the unidentified man, but rather slowly backed away while a man with a gun approached him.

158.    Mr. Cooke and David Stokes both testified that they saw two men with guns.

159.    Charles Stokes, Mr. Darko and Mr. Bernard testified to seeing only one gunman.

160.    The two teenage witnesses from the Pizza King, Mr. Dixon and Mr. Chase, also testified at trial that they saw Plaintiff at the Pizza King in Springfield near the scene of the After Five Shooting immediately prior to the shooting on September 2, 1986.

161.    Another witness, Mr. Whitted, testified that he had seen Plaintiff in Springfield on prior occasions.  Mr. Whitted's testimony was offered to rebut an alleged statement that Plaintiff made to ADA Bloom, Defendant McMahon, and Defendant Muise when he was arrested that he had only been to Springfield one time prior to the night of the Shooting.

162.    On November 20, 1987, Plaintiff was convicted of all charges and sentenced to his natural life in prison.

## IX.
## The Improper Withholding of Exculpatory Evidence

163.    During the course of their investigation, the SPD acquired extensive exculpatory evidence demonstrating Plaintiff's innocence, but withheld this evidence from Plaintiff, thus hampering the ability of Plaintiff's counsel to conduct a proper defense of his case.

### A. The Improperly Withheld September 24, 1986 SPD Report of Interview with Charles Stokes

164.    In his September 24, 1986 interview with Defendants Scammons and Reid, Charles Stokes described his assailant as approximately 30 years old.  Mr. Stokes also indicated that his assailant had bad teeth.  Defendant Scammons recorded this information in a police report documenting the interview with Charles Stokes (the "Stokes Interview Report").

165.    Plaintiff was 21 years old and did not have bad teeth at the time of the After Five Shooting.  Plaintiff had a very distinctive gold front tooth, which no eyewitness mentioned as a feature of the assailant in any interviews with the police until the spring of 1987, well after Plaintiff's arrest.

166.    The exculpatory Stokes Interview Report, including the description of the assailant, was never disclosed to Plaintiff's defense before or during his trial for murder.

167.    In fact, the copy of Stokes Interview Report that actually was disclosed to Plaintiff's defense counsel was intentionally missing the second page, and the first page of the copy had been doctored to appear as if that was the only page of the report.

168.    A complete copy of the exculpatory Stokes Interview Report was found by Defendant Reid several years after Plaintiff's trial and conviction, hidden away in a locked drawer in the office of Defendant McMahon.

### B. The Improperly Withheld October 15, 1986 Hartford Police Department Report on the Arrest of Randy Weaver

169.    On October 15, 1986, HPD Officers Nicholas Russo and J. Cunningham arrested Randy Weaver of Hartford, Connecticut, in a blue and grey van matching the description of the van observed at the scene of the After Five Shooting.

170.    A handwritten note on the arrest report of Mr. Weaver (the "First Weaver Report"), submitted by Officers Russo and Cunningham (and addressed to HPD Detective Faggaini), indicated that Mr. Weaver wore similar glasses and hairstyle as Plaintiff.

171.    Officers Russo and Cunningham also noted that they would hold the van for Detective Faggaini if he instructed them to do so.

172.    Upon information and belief, the HPD forwarded the First Weaver Report to the SPD.

173.    However, upon information and belief, the SPD failed to disclose the First Weaver Report to the Commonwealth.

174.    Accordingly, this exculpatory arrest report and accompanying annotation were not produced to Plaintiff's attorneys in connection with his trial.

175.    Plaintiff did not learn of the First Weaver Report until it was produced in connection with the 1990 trial of Plaintiff's brother, Roger Schand, for his alleged involvement in the After Five Shooting.

### C. The Improperly Withheld Hartford Police Department Report Suggesting that Randy Weaver Was the Perpetrator of the After Five Shooting

176.    At some point after Plaintiff was arrested on October 29, 1986, an anonymous informant told HPD Sergeant Robert W. Taylor that Randy Weaver was responsible for the After Five Shooting.

177.    Sergeant Taylor recorded this tip in a written report (the "Second Weaver Report"), and indicated he would forward the report to the SPD.  Upon information and belief, Sergeant Taylor did in fact forward the Second Weaver Report to the SPD.

178.    According to the anonymous informant as recorded in the Second Weaver Report, Randy Weaver had been boasting that he was responsible for the homicide for which Plaintiff had been arrested.

179.    The Second Weaver Report also indicated that Randy Weaver had his hair braided in corn rows, but had cut his hair after the shooting.

180.    At Plaintiff's trial, eyewitness Michael Bernard testified that Mr. Weaver was in the vicinity during the After Five Shooting and was armed.

181.    The SPD failed to disclose the Second Weaver Report to Plaintiff's defense counsel.

182.    Plaintiff did not learn about the Second Weaver Report suggesting an alternative perpetrator of the After Five Shooting until it was produced in connection with the 1990 trial of Plaintiff's brother, Roger Schand, in connection with his alleged involvement in the After Five Shooting.

## X.
## Motion for New Trial

183.    In 1990, Plaintiff's brother, Roger Schand, was charged for his alleged involvement in the shooting at the After Five Lounge.

184.    According to Hampden County prosecutors handling the case, Roger Schand was with Plaintiff on the night of the After Five Shooting.

### A. The Prosecutor in the Roger Schand Case Discloses Previously Withheld Exculpatory Evidence

185.    In connection with Roger Schand's trial, the Commonwealth produced previously withheld evidence exonerating Plaintiff, including the First Weaver Report and the Second Weaver Report, to Roger Schand's attorneys.

186.    This evidence had not been disclosed to Plaintiff's attorneys in his 1987 trial.

187.    A mistrial was declared in the trial of Roger Schand in 1991 after the Stokes Brothers—who, according to the Commonwealth, had previously identified Roger Schand as being with Plaintiff at the After Five Shooting—refused to testify.

188.    After the mistrial, the charges against Roger Schand were dismissed.

### B.  Plaintiff Moves for New Trial

189.    Based on the withheld exculpatory evidence produced in the trial of Roger Schand, Plaintiff's appellate attorneys, John and Linda Thompson, filed a motion for new trial in 1991, claiming that the police reports disclosed as part of Roger Schand's trial were evidence of an

alternate suspect that the Commonwealth had improperly failed to disclose to Plaintiff's trial attorney.

190.    The motion for new trial was supported by the fact that Charles Stokes recanted his identification of Plaintiff in a July 7, 1989 hand written affidavit.

191.    The motion for new trial was also supported by the fact that the SPD withheld reports that showed that the procedures employed by the SPD to obtain an identification of Plaintiff by the Stokes Brothers, Mr. Cooke, and several others were flawed and improper.

192.    At a hearing in February 1992, on Plaintiff's motion for a new trial, Charles Stokes officially recanted his identification of Plaintiff.  Mr. Stokes stated that he had identified Plaintiff in exchange for the Commonwealth's agreement to release his girlfriend, Denita Eddy, in connection with unrelated charges.

193.    At the February 1992 hearing, Mr. Stokes also testified that following his initial identification of Plaintiff in 1987, he was arrested and charged with assault and battery, and that he and ADA Bloom discussed Mr. Stokes receiving a suspended sentence in return for Mr. Stokes' false testimony identifying Plaintiff at trial.

194.    Plaintiff's motion for new trial was denied, and the Massachusetts Supreme Judicial Court upheld the decision in 1995.

## XI.
## Newly Discovered Evidence

195.    Following the denial of Plaintiff's motion for new trial, his appellate defense counsel continued to work for years to procure evidence of Plaintiff's innocence, including recantations from several key witnesses who had identified Plaintiff at trial as the assailant who had robbed Charles Stokes and shot Victoria Seymour.

196.    Plaintiff's counsel worked in part with Centurion Ministries ("Centurion"), a private, non-profit Princeton, New Jersey-based Innocence Project organization that investigates wrongful convictions.  Centurion Ministries began investigating the evidence in Plaintiff's case in 2009.

### A.  Michael Hosten Recants His Testimony

197.    In 2006, Mr. Hosten, who had been part of the drug deal at the After Five Shooting, recanted his testimony identifying Plaintiff as the gunman, stating that he had identified Plaintiff in the October 30, 1986 photo array, before the Grand Jury, and again at trial, in order to receive favorable treatment in connection with criminal charges pending against him.

198.    Mr. Hosten admitted that, during his 1987 trial testimony, he was facing charges for armed robbery, assault and battery on an SPD police officer, possession of a Class A controlled substance with intent to distribute, breaking and entering in a motor vehicle and wonton damage to property, and a pending indictment for possession of burglarious implements.

199.    In his 2006 affidavit, Mr. Hosten stated that in September or October of 1986, he, the Stokes Brothers, and Anthony Cooke were all held at the York Street Jail, and each was concerned that he was facing a possible prison sentence.  According to Mr. Hosten, he, Charles Stokes, and Mr. Cooke all agreed to provide an identification of the gunman in the After Five Shooting in exchange of dismissal of their pending cases.

### B.  Anthony Cooke Recants His Testimony

200.    During an interview with an employee of Absolute Security Detective Agency in February 1999, and in an interview with Centurion in 2010, Mr. Cooke, who had been shot during the After Five Shooting, also recanted his testimony and identification of Plaintiff.

201.    Mr. Cooke told the Centurion investigators that he did not know who had shot him.

202.    Mr. Cooke further stated that he did not see Plaintiff at the After Five Lounge or anywhere in that area on the night of September 2, 1986, when he had been shot.

203.    Mr. Cooke told his interviewers in 1999, and again in 2010, that he identified Plaintiff as a means of avoiding being sent to prison.

204.    At the time of Plaintiff's trial, Mr. Cooke had been arrested on a breaking and entering charge and was facing a possible jail sentence of six to eight years.  At the 2013 motion for new trial, Mr. Cooke testified that while being held in jail, he had heard that giving information in connection with the shooting—and specifically, identifying Plaintiff as the assailant—would be a "get out of jail card."

205.    In his 1999 and 2010 interviews, Mr. Cooke stated that in exchange for a written statement identifying Plaintiff as the gunman, ADA Bloom offered Mr. Cooke a suspended sentence in connection with the breaking and entering charges pending against him.

206.    In his 2013 testimony, Mr. Cooke further indicated that his reduced sentence would not be entered until after Plaintiff's trial.  Mr. Cooke understood that a disposition had to be arrived at in Plaintiff's case before Mr. Cooke's plea arrangement would be entered.

**C.  Charles Stokes Recants His Testimony Again**

207.    Charles Stokes recanted his identification of Plaintiff at the 1992 Motion for New Trial.  In addition, in a 2010 interview with Centurion, Mr. Stokes confirmed that he had received probation instead of jail time in exchange for his testimony at Plaintiff's trial.

208.    Each of Messrs. Cooke, Stokes, and Hosten falsely identified Plaintiff in order to obtain leniency on charges that were pending against them at the time.

### D. Kenneth Whitted Recants His Testimony

209.    During a 2010 interview with Centurion, Mr. Whitted recanted his testimony that he had seen Plaintiff in Springfield prior to the After Five Shooting.

210.    Mr. Whitted stated in his 2010 interview that he had felt that the district attorney and police were "pushing" him to identify Plaintiff as the Hartford individual that he had seen in Springfield on prior occasions.

211.    In a 2013 interview and a subsequent letter, Mr. Whitted indicated that he believed his identification of Plaintiff was mistaken and that Plaintiff had a similar appearance to another man whom he had seen in Springfield prior to the After Five Shooting.

### E. "Lost" Police Report of Interview with Randy Weaver Which Implicates Weaver and Exonerates Plaintiff

212.    Centurion investigators also uncovered evidence that on the night of the After Five Shooting, Randy Weaver had been in Springfield with several other men from the Hartford area.

213.    Two days before the After Five Shooting, on August 31, 1986, Randy Weaver and Martin Smith had been at the Sass Lounge in Springfield, and an unidentified man had ripped a gold chain off Mr. Weaver's neck.  Weaver chased the unidentified man toward the vicinity of the After Five Lounge unsuccessfully.

214.    On the night of the After Five Shooting, Randy Weaver, Martin Smith, Lonnie Keith, and Tyron Bridges drove from Hartford to Springfield in order try to find the gold chain that had been taken from Weaver.

215.    In his 2010 and 2012 interviews with Centurion and in a 2013 affidavit, Mr. Weaver stated that he, Mr. Smith, Mr. Keith, and Mr. Bridges went to the Pizza King on the night of the After Five Shooting, where Weaver asked several customers about Mr. Weaver's gold chain. They left the Pizza King and drove to the After Five Lounge, and were present when After Five

Shooting occurred.

216.    Mr. Weaver, Mr. Smith, and Mr. Keith all told Centurion that they knew Plaintiff and knew that he was not present in Springfield at any time on the day of the After Five Shooting.

217.    Mr. Weaver also stated that, after Plaintiff was arrested, two HPD Detectives interviewed him regarding the After Five Shooting, and also took photographs of him and his van.

218.    Mr. Weaver told the HPD Detectives that he was in Springfield within the vicinity of the After Five Lounge on the night of the murder and that Plaintiff was not with him in Springfield that night.   Notes taken by the HPD Detectives of this interview with Mr. Weaver were not disclosed to Plaintiff's defense counsel and have never been located.

219.    In a January 2013 affidavit and at the evidentiary hearing on Plaintiff's 2013 motion for new trial, Mr. Weaver confirmed, under oath, that in September 1986 he owned a bluish gray van with custom side windows and which was registered in Connecticut.   This van matched the description of the van provided by witnesses who had seen the vehicle speed off from the After Five Shooting.   Mr. Weaver further testified that he was present at the After Five Shooting; that he knew Plaintiff; and that Plaintiff was not at the After Five Shooting.   He also confirmed that he told this information to the HPD, who took pictures of his van and stated that they would convey the information to the SPD.

**F.  Identification of New Suspect Tracy Fisher**

220.    Counsel for Plaintiff also determined that Tracy Fisher, a man who was seen at the Pizza King with Mr. Weaver just prior to the After Five Shooting, was a potential suspect.

221.    Mr. Fisher was interviewed by an investigator in 1999, and again by investigators from Centurion Ministries in 2009 and 2012.

222.    Mr. Fisher said that he had followed Mr. Weaver on the night of the After Five Shooting in the hope of obtaining cocaine.

223.    Mr. Fisher admitted that he grabbed at a bag of cocaine from Charles Stokes during the After Five Shooting—one of the actions which precipitated the shooting of Mr. Cooke and Ms. Seymour.

224.    Mr. Fisher, who was interviewed in prison where he was serving a 50-year sentence for a separate 1987 murder conviction in Connecticut, denied that he was the gunman in the After Five Shooting.

225.    Mr. Fisher knew Plaintiff, and confirmed that Plaintiff was not in the vicinity of the After Five Lounge on the night of the shooting.

226.    Mr. Fisher refused to provide a sworn statement that Plaintiff was not present at the After Five Shooting, because he admittedly did not want to jeopardize himself with a possible threat of prosecution.

227.    The Stokes Interview Report from September 1986, along with police reports subsequently obtained by Centurion investigators, show that initial descriptions of the gunman indicated he was about 30 years old and had bad or "rotten" teeth.  At the time of the After Five Shooting, Plaintiff was 21 and had a distinctive front gold tooth.

228.    A the time of the After Five Shooting, Mr. Fisher was 28 years old and previously had suffered serious damage to his teeth when he was shot by a police officer.  Mr. Fisher matched the description of the shooter at the After Five Shooting.

## XII.
## The 2013 Motion for New Trial

229.    In 2013, Plaintiff's attorneys, John and Linda Thompson, with the assistance of Centurion, filed a motion for new trial based on newly discovered evidence.

230.    The 2013 motion alleged that 1986 Stokes Interview Report, in which Mr. Stokes identified his assailant as 30 years old with bad or "rotten" teeth, and the First and Second Weaver Reports, were withheld from Plaintiff's defense counsel.

231.    The 2013 motion for new trial was supported by the fact that the December 15, 1986 line-up in was comprised of individuals personally known to the witnesses, with the exception of Plaintiff, and that the police had orchestrated the line-up so that Plaintiff would be selected.

232.    The motion for new trial was also supported by the fact that the SPD did not use a consistent array of photographs in their interviews with witnesses.

233.    The motion was also supported by the fact that several key witnesses had repudiated their trial testimony identifying Plaintiff as the assailant and had admitted that they had only identified Plaintiff in exchange for leniency on pending charges against them.

234.    Over several days in August and September, 2013, Hampden Superior Court Judge C. Jeffrey Kinder heard testimony on Plaintiff's motion.  At the evidentiary hearing, Randy Weaver, Tracy Fisher, and Martin Sailor, three individuals from Hartford who had not testified previously in the case each testified that (i) he knew Plaintiff in September 1986; (ii) he was present at the After Five Shooting; and (iii) Plaintiff was not present at the After Five Shooting.

235.    At the 2013 evidentiary hearing, Al Cooke also recanted his trial testimony identifying Plaintiff as the person who shot him at the After Five Shooting.

236.     On October 4, 2013, Hampden District Attorney Mark G. Mastroianni filed a brief indicating that the County did not oppose Plaintiff's motion for new trial.  The same day, Judge Kinder granted Plaintiff's motion for new trial on the basis of newly discovered evidence.

237.    After serving 27 years in prison, Plaintiff was released from custody on October 4, 2013.

238.    The Commonwealth issued a *nolle prosequi* on October 16, 2013, stating that the amount of time since the date of the offense, the availability of the witnesses, and continued examination of newly discovered evidence did not allow for continued prosecution.

## DAMAGES

239.    The actions of the Defendants set forth herein unlawfully deprived Plaintiff of his civil rights under the United States Constitution and the laws of the State of Connecticut and the Commonwealth of Massachusetts.

240.    In serving nearly three decades behind bars, Plaintiff was wrongfully deprived of virtually his entire adult life up until the time of his release.  Plaintiff must now attempt to make a life for himself outside of prison without the benefit of the decades of life experiences which ordinarily equip adults for that task.

241.    Although Plaintiff has been out of prison since October 2013, he has had difficulty maintaining gainful employment, largely due to the stigma associated with his vacated murder conviction.  Having been incarcerated for most of his adult life, Plaintiff does not have the benefit of education, training, or the professional experience necessary to equip him for the task of finding long-term employment.

242.    Additionally, the emotional pain and suffering caused by losing 27 years in the prime of life is extreme.  During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to share holidays, births of four grandchildren, funerals, weddings, graduations, and other life events with loved ones, the opportunity to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

243.    In addition to other physical ailments, Plaintiff suffered a life-threatening brain aneurysm during the time of his incarceration and continues to suffer the after-effects of this medical condition.

244.    Plaintiff has suffered tremendous injury, including physical suffering and extreme emotional distress, all proximately caused by Defendants' misconduct.

245.    Family Plaintiff Mia Schand was deprived of the companionship, relationship, and support of a spouse for almost 27 years.   She missed out on the opportunity to share with her husband holidays, births, funerals and other life events with loved ones.   She was forced to become the sole source of financial and emotional support for her and Plaintiff's biological son Kiele on a day-to-day basis.   Despite the burden of working full time and being the sole source of support for her family, Mia spent countless hours commuting to the various prisons in which Plaintiff was incarcerated throughout Massachusetts.   She visited Plaintiff on a weekly basis, spending as much time with him as permissible.   She spent over $25,000 of her own money on private investigators to help uncover the truth of Plaintiff's innocence.   She also suffered the stigma of being married to a convicted murderer.

246.    Family Plaintiffs Mark Schand, Jr, Quinton Schand, and Kiele Schand were deprived of the companionship, relationship, support, and guidance of their father for almost 27 years. They were without a father for most, if not all, of their childhood, adolescent, and young adult years.   They could not receive any financial and emotional support from their father on a day-to-day basis.   They missed out on opportunities to share with their father holidays, births, school achievements, graduations, sporting events, and other life events that one might normally expect children to share with their fathers.   They also suffered the stigma of having a convicted murderer as a father.

## 42 U.S.C. § 1983 CLAIMS

## COUNT I

### 42 U.S.C. § 1983 Claim by Plaintiff For Unduly Suggestive, Biased, and Otherwise Improper Identification Procedures in Violation of the Fourteenth Amendment Against Defendants Reid, Muise, McMahon, Scammons, McNulty, And Fleury

247.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

248.    "A defendant has a due process right to identification procedures meeting a certain basic standard of fairness." Commonwealth v. Dougan, 377 Mass. 303 (Mass. 1979).

249.    "Criminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." Gregory v. City of Louisville, 444 F.2d 725, 746 (6th Cir. 2006) (quoting Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967 (1967)).

250.    Defendants Reid, Muise, McMahon, Scammons, McNulty, and Fleury, under color of state law, facilitated identifications using unduly suggestive identification procedures, which led to the improper identification of Plaintiff as the individual who shot Ms. Seymour, shot Mr. Cooke, and robbed Mr. Stokes.  These improper procedures included:

      a.    The October 30, 1986 photo array during which Defendants Reid and Muise showed Mr. Hosten, a bystander at the After Five Shooting, a picture of Plaintiff, told him that Plaintiff had shot Ms. Seymour, inserted the picture of Plaintiff into a stack of photographs and then instructed Mr. Hosten to identify from the stack of photographs the individual who had shot Ms. Seymour.  ADA Bloom was also involved in orchestrating the photo array and negotiating a deal with Mr. Hosten whereby pending charges in an unrelated criminal matter would be dropped in

exchange for his cooperation in the investigation of Plaintiff.

b. The December 15, 1986 line-up for Messrs. Dixon, Chase and Charles Stokes following the arrest of Plaintiff, during which Defendant McMahon and ADA Bloom constructed a line-up consisting of two police officers, two Springfield jail inmates, one man who was being held at a police lock-up, and Plaintiff – where Plaintiff was the only individual whose picture these individuals had been shown in prior photo arrays and where Plaintiff was the only line-up participant whom the individuals did not know personally.

251.    Other photo-arrays conducted by the Defendants Scammons, McNulty, and Fleury were also suggestive, biased and improper.  Such suggestive, biased and improper conduct includes, but is not limited to:

a. The photo arrays conducted by Defendants Scammons, Muise, Reid, and Assad on September 17, 1986 (Kenneth Whitted), September 18, 1986 (Lavon Dixon), September 18, 1986 (Al Cooke).  Defendants failed to keep or provide records of the photographs that were shown to these witnesses.

b. The reliance of Defendants McNulty, Fleury, Scammons, and Reid on photographs provided to the SPD by Defendant Faggaini on September 23, 1986. These photos, which included photographs of Plaintiff, were gathered not based on facts garnered from the criminal investigation, but simply from Defendant Faggaini's general knowledge of the Hartford street scene.

c. The photo arrays conducted by Defendants McNulty, Fleury, Scammons, and Reid on September 23, 1986 (Al Cooke), September 24, 1986 (Lavon Dixon and Al Chase), September 24, 1986 (Charles Stokes), and October 24, 1986 (Michael

Bernard), during which Defendants used a selection of the photographs obtained by Defendant Faggaini, including a photograph of Plaintiff.  Defendants failed to keep or provide records of the photographs that were shown to the witnesses.  Consequently, it is not known whether these witnesses were shown the same photographs.

    d.   The photo arrays conducted by Defendants Scammons, Reid, and Muise on September 24, 1986 (Lavon Dixon and Al Chase); September 24, 1986 (Kenneth Whitted); September 24, 1986 (Charles Stokes); October 24, 1986 (Michael Bernard); October 30, 1986 (Michael Hosten); December 31, 1986 (Willie Darko), which included at least one color Polaroid picture of Plaintiff.  The use of the color Polaroids in the photographic arrays was unfair and unduly suggestive because, among other things, the individual Polaroids were single profile shots and did not depict Plaintiff from multiple profiles, as was typical of the other mugshot pictures used in the photographic array.  Defendant Muise falsely testified that he did not show the Polaroids to any witnesses, and acknowledged that the use of such photographs would be unduly suggestive.

252.   The Individual Defendants committed these unduly suggestive, biased and otherwise improper acts intentionally and with deliberate indifference to Plaintiff's clearly established constitutional rights.  No reasonable officer would have believed these procedures were lawful or would produce a reliable identification.

253.   As a direct and proximate result of these unduly suggestive procedures, Messrs. Cooke, Hosten, Dixon, Chase, and Charles Stokes falsely identified Plaintiff in the photo array and line-up, before the Grand Jury, and subsequently at trial, in violation of Plaintiff's

Fourteenth Amendment right to a fair trial and to be not deprived of liberty without due process of law.   Due to these Defendants' misconduct, Plaintiff suffered 27 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

## COUNT II

### 42 U.S.C. § 1983 Claim by Plaintiff for the Suppression of Exculpatory Evidence in Violation of the Fourteenth Amendment Against Defendants McMahon and Doe Defendants

254.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

255.    The Supreme Court has recognized for more than 70 years that the deliberate suppression of exculpatory evidence by state authorities in order to obtain a conviction against a criminal suspect constitutes a deprivation of rights guaranteed under the federal Constitution. Pyle v. State of Kansas, 317 U.S. 213, 216, 63 S. Ct. 177 (1942) (citing Mooney v. Holohan, 294 U.S. 103, 55 S. Ct. 340 (1935)); see also Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004) (citing Mooney and Pyle).

256.    In Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194 (1963), the Supreme Court further held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  As the court stated in Haley v. City of Boston, 657 F.3d 39, 49 (1st Cir. 2011), "[t]here is no doubt that this due process protection applies to police officers who deliberately keep the defense in the dark about important evidence."

257.    Upon information and belief, Defendant McMahon suppressed exculpatory evidence, including the Stokes Interview Report containing the September 24, 1986 account of an

interview with Mr. Charles Stokes.  In that interview, Mr. Stokes had given a description of his assailant that was vastly different to the appearance of Plaintiff at that time.  This exculpatory and suppressed police report was material to the outcome of the trial.  It was exculpatory in that it demonstrated that the victim's description of the assailant was markedly different in appearance and physical characteristics to Plaintiff, and thus the assailant could not have been Plaintiff.

258.    Sometime after the trial and conviction of Plaintiff, Detective Reid discovered this report in a locked drawer in Defendant McMahon's office at SPD headquarters.  Based on the location where the original and complete version of the September 24, 1986 police report was found, upon information and belief, Defendant McMahon is responsible for the suppression of the exculpatory evidence.

259.    Additionally, unnamed Doe Defendants suppressed exculpatory evidence in the form of the First Weaver Report, a police report by HPD officers Nicholas Russo and J. Cunningham documenting their interview with Randy Weaver, who had been questioned regarding his involvement with the events of the After Five Shooting.  Randy Weaver confirmed in this interview that he was in Springfield at the night of the After Five Shooting.  Randy Weaver also stated in this interview that Plaintiff had not accompanied him to Springfield and was not present at the After Five shooting.  This exculpatory police report was never disclosed to Plaintiff's defense counsel, but was only made known to counsel at the trial of Roger Schand, Plaintiff's brother.

260.    Additionally, unnamed Doe Defendants suppressed exculpatory evidence in the form of the Second Weaver Report, a police report by HPD Sergeant Robert Taylor documenting an anonymous informant's statement to him that Mr. Weaver was responsible for the After Five

Shooting. Upon information and belief, Sergeant Taylor forwarded this report to the SPD. However, certain unnamed Doe Defendants failed to disclose this report to Plaintiff's defense counsel.

261.    The Defendant officers performed the above-described acts under color of state law, deliberately, recklessly, and with deliberate indifference or reckless disregard of Plaintiff's constitutional rights and innocence. No reasonable officer would have believed that this conduct was lawful.

262.    As a direct and proximate result of Defendant McMahon's and the unnamed Doe Defendants' suppression of exculpatory evidence, Plaintiff suffered an unfair trial in violation of his clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law and his right to a fair trial; a wrongful conviction; almost 27 years of wrongful imprisonment; and endured all of the other physical, emotional and pecuniary damages set forth above.

## COUNT III

### 42 U.S.C. § 1983 Claim by Plaintiff for Fabrication of Evidence in Violation of the Fourteenth Amendment Against Defendant McMahon and Doe Defendants

263.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

264.    The Due Process Clause of the Constitution is violated if a defendant is deprived of liberty through a "deliberate deception" of the court and the jury. Mooney, 294 U.S. at 112; Limone, 372 F.3d at 45 ("[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.").

265.    Upon information and belief, Defendant McMahon and other unnamed officers fabricated otherwise exculpatory evidence in the Stokes Interview Report by intentionally removing the second page from the copy given to Plaintiff's defense counsel, which contained notes from an interview with Charles Stokes, whose description of the assailant did not match Plaintiff at that time.  Although the original report indicated that the complete report was two-pages in length, it is believed that Defendant McMahon, in conjunction with other unnamed individuals, doctored the police report given to Plaintiff's defense counsel to indicate that it was only one-page in length.  Thus, Plaintiff's defense counsel was unaware that the copy of the police report that they received was missing exculpatory evidence.  This exculpatory evidence was material in that it demonstrated that the victim's description of the assailant was different in appearance and physical characteristics to Plaintiff, and thus could not have been Plaintiff.  Sometime after the trial and conviction of Plaintiff, Detective Reid discovered the un-doctored and complete version of the report in a locked drawer in Defendant McMahon's office at SPD headquarters.

266.    Defendant McMahon and the Doe Defendants performed the act described above under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Plaintiff's constitutional rights and innocence.  No reasonable officer would have believed that this conduct was lawful.

267.    As a direct and proximate result of Defendant McMahon's and the Doe Defendants' fabrication of evidence, Plaintiff suffered an unfair trial in violation of his clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process or law and to a fair trial; a wrongful conviction; almost 27 years of wrongful imprisonment; and endured all of the other physical, emotional and pecuniary damages set forth above.

**COUNT IV**

**42 U.S.C. § 1983 Claim by Plaintiff for Malicious Prosecution in Violation of the Fourth Amendment Against Defendants Reid, Muise, McMahon, Scammons, McNulty, Fleury, and Assad**

268.     Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein

269.     A plaintiff alleging a Fourth Amendment malicious prosecution claim under section 1983 must demonstrate that defendants caused a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and that criminal proceedings terminated in plaintiff's favor. Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st. Cir. 2013); see also Albright v. Oliver, 510 U.S. 266, 274, 114 S. Ct. 807 (1994).

270.     The Individual Defendants, under color of state law and with malice and knowledge that probable cause did not exist to arrest Plaintiff and prosecute him for the murder of Victoria Seymour and robbery of Charles Stokes, acting individually and in concert, caused Plaintiff to be arrested, charged, and prosecuted for those crimes, thereby violating Plaintiff's clearly established right under the Fourth Amendment of the United States Constitution, to be free of unreasonable searches and seizures.

271.     Specifically, Defendants Reid, Muise, McMahon, Scammons, McNulty, Fleury, and Assad, with malice, knew or should have known that probable cause did not exist to arrest and prosecute Plaintiff because these Defendants had procured false witness identifications of Plaintiff by improperly influencing witnesses and causing these witnesses to falsely testify against Plaintiff at trial, and that these factors, as well as additional material exculpatory and impeachment evidence which Defendants did not disclose to the Grand Jury or Commonwealth, undermined the evidence presented in support of a probable cause finding against Plaintiff.

272.    The Individual Defendants performed the above-described acts with malice, under color of state law, deliberately, intentionally, or with reckless disregard of the truth and Plaintiff's rights.

273.    The Individual Defendants initiated and continued the prosecution against Plaintiff without probable cause, in violation of Plaintiff's constitutional rights.

274.    No reasonable police officer would have believed that this conduct was lawful.

275.    Plaintiff did not commit the murder of Victoria Seymour or the robbery of Charles Stokes on September 2, 1986.

276.    Despite his innocence and the absence of probable cause to prosecute him, Plaintiff was held from his arrest on October 29, 1986, until the Hampden County Superior Court granted his motion for a new trial based on newly discovered evidence on October 4, 2013.

277.    The Commonwealth ultimately terminated its prosecution of Plaintiff on October 16, 2013, when the *nolle prosequi* was filed dismissing the indictments against him.

278.    As a direct and proximate result of these Defendants' malicious acts, Plaintiff was falsely arrested in violation of his clearly established rights under the Fourth Amendment, suffered an unfair trial, a wrongful conviction, and 27 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

## COUNT V

### 42 U.S.C. § 1983 Claim by Plaintiff for Failure to Intercede Against Reid, Muise, McMahon, Scammons, McNulty, Fleury, Assad, Doe Defendants and Supervisory Doe Defendants

279.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein

280.     "Liability under section 1983 may be imposed both for action that deprives a plaintiff or a constitutional right and for *failure to act*, when there is a duty to prevent such a deprivation." Clark v. Taylor, 710 F.2d 4, 9 (1st Cir. 1983) (emphasis added).

281.     By their conduct and under color of state law, Defendants Reid, Muise, McMahon, Scammons, McNulty, Fleury, Assad, Doe Defendants, and Supervisory Doe Defendants, had opportunities to intercede on behalf of Plaintiff to prevent the violation of Plaintiff's right against the deprivation of liberty without due process of law and his malicious prosecution, but, due to their intentional conduct and/or reckless and deliberate indifference, declined and refused to do so.  These Defendants' failures to intercede violated Plaintiff's clearly established constitutional rights, including but not limited to his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

282.     Defendants Reid, Muise, McMahon, Scammons, McNulty, Fleury, and Assad, as well as the Doe Defendants and Supervisory Doe Defendants, performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Plaintiff's constitutional rights and innocence.

283.     No reasonable officer would have believed this conduct was lawful.

284.     As a direct and proximate result of these Defendants' actions, Plaintiff suffered a violation of his clearly established rights under the Fourth Amendment to be free from unreasonable search and seizure and a violation of his rights under the Fourteenth Amendment to be free from deprivation of liberty without due process of law and to a fair trial.  Plaintiff suffered an unfair trial, a wrongful conviction, and 27 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

## COUNT VI

### 42 U.S.C. § 1983 Claim by Plaintiff for Conspiracy to Violate Constitutional Rights Against Reid, Muise, McMahon, Scammons, McNulty, Fleury, Assad, Doe Defendants, and Supervisory Doe Defendants

285.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

286.    To plead a claim for conspiracy under section 1983, a plaintiff must show both that there has been an agreement, and that the agreement resulted in an actual deprivation of a constitutional right.  Landrigan v. City of Warwick, 628 F. 2d 736, 742 (1st Cir. 1980).

287.    All Individual Defendants and Doe and Supervisory Doe Defendants, acting within the scope of their employment and under color of state law, conspired, reached a mutual understanding, and acted in concert to deprive Plaintiff of his Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, deprivation of liberty without due process of law, and to receive a fair trial.

288.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including without limitation, the following:

   a.   Improperly influencing several witnesses and inducing them to misidentify Plaintiff in numerous photo-arrays, at his December 15, 1986 line-up, at the December 15, 1986 Grand Jury proceeding, and at Plaintiff's November 1987 trial.

   b.   Conducting otherwise improper photographic arrays which failed to record anything other than the witnesses' positive identifications, including the contents of the photo arrays or the instructions given to the witnesses regarding the photo array.

c.  Suppressing material exculpatory evidence to which Plaintiff was lawfully entitled and which would have led to his more timely exoneration of the false charges as described above, including, but not limited to, the Stokes Interview Report; the First Weaver Report; and the Second Weaver Report; all of which documented a possible alternative suspect for the crimes.

d.  Fabricating otherwise material exculpatory evidence to remove all exculpatory material, specifically the Stokes Interview Report from September 24, 1986 documenting an interview with Charles Stokes in which he gave a description of his assailant that was significantly different from the physical appearance of Plaintiff.

e.  Maliciously prosecuting Plaintiff by inducing witnesses to provide false identifications of Plaintiff in pre-trial proceedings and at trial and providing perjured testimony at Plaintiff's December 15, 1986 Grand Jury proceeding and November 1987 trial.

289.  No reasonable police officer would have believed that this conduct was lawful.

290.  The Individual Defendants' and Doe and Supervisory Doe Defendants' conspiracy directly and proximately caused the constitutional deprivations suffered by Plaintiff, including his false arrest, malicious prosecution, unfair trial, wrongful conviction and unlawful confinement, and all other grievous permanent damages and injuries set forth above.

## COUNT VII

### 42 U.S.C. § 1983 Claim by Plaintiff for Supervisory Liability Against Supervisory Doe Defendants

291.  Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

292.    A supervisor may be found liable under section 1983 if the "supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989). Such reckless or callous indifference is evident "when it would be manifest to any reasonable official that his conduct was very likely to violate in individual's constitutional rights." Id.

293.    A supervisor "is only liable for his or her own misconduct" in a section 1983 claim and "may not be held accountable for the misdeeds of [his or her] agents." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).

294.    The false arrest, malicious prosecution, unfair trial, wrongful conviction and prolonged confinement of Plaintiff was caused by the Supervisory Doe Defendants, supervisors of the SPD and HPD, acting in their individual capacities, who, with deliberate indifference to the rights of criminal suspects, failed adequately to train and/or supervise defendant officers, lieutenants, and detectives in proper investigative techniques, identification procedures, and the documentation and disclosure of evidence to prosecutors. In so doing, the Supervisory Doe Defendants tacitly acquiesced in, condoned and/or encouraged the Individual Defendants to engage in unconstitutional misconduct, including, without limitation, using unduly suggestive identification procedures, fabricating evidence, and suppressing exculpatory evidence.

295.    The Supervisory Doe Defendants, by deliberately and/or recklessly failing to train and supervise their subordinate officers, caused their subordinates to deprive Plaintiff of his clearly established constitutional rights, including but not limited to his right to be free from deprivation of liberty without due process of law, his right to a fair trial, and his right to be free from unreasonable searches and seizures.

296.    Moreover, the Supervisory Doe Defendants allowed their subordinates to act with impunity in an environment in which those subordinates were not supervised, disciplined, or trained, and which those subordinates knew that their violations of Plaintiff's constitutional rights would be facilitated, approved, and/or condoned by the Supervisory Doe Defendants.

297.    The actions of the Supervisory Doe Defendants were under color of state law and in violation of clearly established constitutional law, and no reasonable law enforcement officer would have believed that the Supervisory Doe Defendants' actions were lawful.

298.    As a direct and proximate result of the actions of the Supervisory Doe Defendants, Plaintiff was falsely arrested in violation of his clearly established rights under the Fourth Amendment, suffered an unfair trial, a wrongful conviction, and 27 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

## COUNT VIII

### 42 U.S.C. § 1983 *Monell* Claim by Plaintiff Against the City of Springfield

299.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

300.    Under Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S. Ct. 2018 (1978) and its progeny, a plaintiff seeking to prove municipal liability under Section 1983 must demonstrate that a municipal custom or policy caused a plaintiff's injury.  A section 1983 action based on municipal policy is viable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers."  Monell, 436 U.S at 690.  Moreover, in addition to "official policies" a plaintiff may also point to a municipality's custom or practice

that is "so well settled as to constitute a 'custom or usage' with the force of law." Id. at 691.

301.    A Monell claim based on failure to train requires a plaintiff to demonstrate that the "municipalities' failure to train its employees in a relevant respect . . . amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] came into contact.'" Connick v. Thompson, 131 S.Ct. 1350, 1359-60 (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388 109 S. Ct. 1197 (1989)).

302.    A Monell claim may also be brought on the basis of the deliberately indifferent failure to supervise, recruit, and discipline employees in such a way as to protect the constitutional rights of individuals accused of criminal activity.  Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir. 1989).

303.    The City of Springfield and the SPD, by and through final policy makers and their delegees, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, implemented poor and inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning, among other things, the avoidance of (i) unduly suggestive and constitutionally infirm identification procedures; (ii) making seizures pursuant to legal process without probable cause; (iii) suppressing exculpatory evidence that should have been disclosed; and (iv) fabricating evidence.

304.    The aforesaid policies, procedures, regulations, practices and/or customs (including failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the City of Springfield, including the SPD Chief of Police.

305.    The City of Springfield's and the SPD's deliberately indifferent failure to establish adequate policies to protect the constitutional rights of individuals suspected of crimes and to

train, supervise, and discipline the Individual Defendants adequately in these constitutional duties directly and proximately caused Plaintiff's constitutional deprivations, including his being subject to unduly suggestive identification procedures, malicious prosecution, unfair trial, wrongful conviction, and other grievous permanent injuries and damages set forth above.

306.    By virtue of the foregoing, Defendant City of Springfield and the SPD are liable as state actors for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

## COUNT IX

### 42 U.S.C. § 1983 Monell Claim by Plaintiff Against Hampden County

307.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

308.    Under Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S. Ct. 2018 (1978) and its progeny, a plaintiff seeking to prove municipal liability under Section 1983 must demonstrate that a municipal custom or policy caused plaintiff's injury.  A section 1983 action based on municipal policy is viable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers."  Monell, 436 U.S at 690.  Moreover, in addition to "official policies" a plaintiff may also point to a municipality's custom or practice that is "so well settled as to constitute a 'custom or usage' with the force of law."  Id. at 691.

309.    A Monell claim based on failure to train requires plaintiff to demonstrate that the "municipalities' failure to train its employees in a relevant respect . . . amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] came into contact.'"  Connick v. Thompson, 131 S.Ct. 1350, 1359-60 (quoting City of Canton, Ohio v. Harris, 489

U.S. 378, 388 109 S. Ct. 1197 (1989).

310.    A <u>Monell</u> claim may also be brought on the basis of the deliberately indifferent failure to supervise, recruit, and discipline employees in such a way as to protect the constitutional rights of individuals accused of criminal activity.  <u>Bordanaro</u> v. <u>McLeod</u>, 871 F.2d 1151 (1st Cir. 1989).

311.    Hampden County and the Hampden County District Attorney's Office, by and through final policy makers and their delegees, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, including Plaintiff, implemented poor and inadequate policies, procedures, regulations, practices, customs, training, and supervision, and discipline concerning the investigation and prosecution of individuals suspected of criminal activity.

312.    Hampden County and the Hampden County District Attorney's Office, by and through final policymakers and their delegees, as a result of their deliberate indifference to the constitutional rights of individuals suspected of criminal activity, including Plaintiff, failed to supervise, train, and discipline assistant district attorneys in connection with fundamental and recurring constitutional and ethical duties.

313.    These aforesaid policies, customs, or patterns and practices (including the failure to supervise, train, and discipline assistant district attorneys) led to, among other actions, the commission of multiple constitutional violations and related acts of misconduct committed by ADA Bloom and supervisors in the Hampden County District Attorney's Office in the course of the investigation of Plaintiff, and in the course of prior and subsequent investigations and prosecutions.

314.    As a direct and proximate result of Hampden County's and the Hampden County District Attorney's Office constitutionally inadequate polices, customs, and patterns or practices of conduct (including their failure to supervise, train, and discipline assistant district attorneys), prosecutors, including but not limited to ADA Bloom, committed multiple constitutional violations and related misconduct in the course of prosecuting Plaintiff, including but not limited to the following:

      a.   Orchestrating the unduly suggestive photo array on October 30, 1986, whereby witness Michael Hosten was essentially instructed to identify Plaintiff from the photo array and promised that pending charges against him in an unrelated crime would be dropped if he cooperated with Bloom and the SPD.

      b.   Orchestrating the unduly suggestive line-up on December 15, 1986 for Messrs. Dixon, Chase and Charles Stokes, in which Plaintiff was the only individual whose picture these individuals had been shown in prior photo arrays and where Plaintiff was the only line-up participant whom the individuals did not know personally.

315.    The Hampden County District Attorney's Office also maintained an unspoken policy, custom, or pattern and practice of "consideration for cooperation" – a system that rewarded criminal suspects for cooperating with prosecution authorities by providing false testimony and false identifications in prosecution cases in exchange for leniency on pending charges.

316.    This policy or understanding was confirmed and discussed in <u>Commonwealth</u> v. <u>Johnson</u>, 21 Mass. App. Ct. 28 (1985) and <u>Commonwealth</u> v. <u>Collins</u>, 386 Mass. 1 (1982).

317.    In accordance with this policy or understanding, ADA Bloom struck deals with several prosecution witnesses to compel them to testify against Plaintiff in exchange for leniency

on pending charges that these individual witnesses faced with regard to separate crimes. ADA Bloom reached such agreements with several prosecution witnesses, including but not limited to Charles Stokes, David Stokes, Michael Bernard, Michael Hosten, and Anthony Cooke.

318. Hampden County's and the Hampden County District Attorney's Office policymakers were deliberately indifferent to the known and obvious risk that their poor and inadequate policies, customs, or patterns and practices (including their failure to supervise, train, and discipline assistant district attorneys) in connection with fundamental and recurring ethical and constitutional duties would lead to the violation of the constitutional rights of criminal suspects like Plaintiff.

319. As a direct result of the policies, customs, or patterns and practices of state actors Hampden County and the Hampden County District Attorney's Office, Plaintiff's constitutional rights were violated and he was wrongly prosecuted, convicted, and imprisoned for 27 years, and endured all of the other physical, emotional and pecuniary damages set forth above.

## COUNT X

### 42 U.S.C. § 1983 Monell Claim by Plaintiff Against the City Of Hartford

320. Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

321. Under Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S. Ct. 2018 (1978) and its progeny, a plaintiff seeking to prove municipal liability under Section 1983 must demonstrate that a municipal custom or policy caused plaintiff's injury. A section 1983 action based on municipal policy is viable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." Monell, 436 U.S at 690. Moreover,

in addition to "official policies" a plaintiff may also point to a municipality's custom or practice that is "so well settled as to constitute a 'custom or usage' with the force of law." Id. at 691.

322.    A Monell claim based on failure to train requires plaintiff to demonstrate that the "municipalities' failure to train its employees in a relevant respect . . . amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] came into contact.'" Connick v. Thompson, 131 S.Ct. 1350, 1359-60 (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388 109 S. Ct. 1197 (1989).

323.    A Monell claim may also be brought on the basis of the deliberately indifferent failure to supervise, recruit, and discipline employees in such a way as to protect the constitutional rights of individuals accused of criminal activity.  Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir. 1989).

324.    The City of Hartford and the HPD, by and through final policy makers and their delegees, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, including Plaintiff, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, and supervision, and discipline concerning the investigation and prosecution of individuals suspected of criminal activity.

325.    The City of Hartford's and HPD's failure in that regard led to, among other things, the HPD officers – including but not limited to former Detective Ronald Faggaini – working with the SPD to facilitate constitutionally infirm identification procedures and otherwise conspiring with the SPD to deprive Plaintiff of his constitutional rights.

326.    The aforesaid policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto)

were implemented or tolerated by policymaking officials for the Defendant City of Hartford, including but not limited to, the Hartford Police Commissioner.

327.    The City of Hartford's and HPD's failure to train and supervise its officers and detectives, including former Detective Ronald Faggaini, adequately in these constitutional duties directly and proximately caused Plaintiff's constitutional deprivations, including his false arrest, malicious prosecution, unfair trial, wrongful conviction, and other grievous permanent injuries and damages set forth above.

328.    By virtue of the foregoing, state actors Defendant City of Hartford and the HPD are liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

## STATE LAW CLAIMS[1]

### COUNT XI

**Malicious Prosecution Claim by Plaintiff Against Reid, Muise, McMahon, Scammons, McNulty, Fleury, and Assad**

329.    Each of the foregoing Paragraphs of this Complaint is incorporated as if restated fully herein.

330.    To bring a claim for malicious prosecution under Massachusetts state law, the plaintiff must show that defendant (i) initiated a criminal prosecution against him; (ii) without probable cause; (iii) with malice; and (iv) that the prosecution ultimately terminated in the plaintiff's favor. Correllas v. Viveiros, 410 Mass. 314, 318, 572 N.E.2d 7 (1991).

331.    Defendants Reid, Muise, McMahon, Scammons, McNulty, Fleury, and Assad caused Plaintiff to be improperly subjected to judicial proceedings for which there was no legitimate

---

[1] Plaintiff notified the City of Springfield of certain state law causes of action pursuant to Mass. G.L.C. 258 § 4 on or about December 9, 2014.  A copy of said notice of claim is attached as Exhibit 1.  Six months have passed, and the City of Springfield has not responded or made any offer of settlement.

probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

332.   These Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

333.   Statements of these Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured.  In so doing, Defendants Reid, Muise, McMahon, Scammons, McNulty, Fleury, and Assad fabricated evidence and withheld exculpatory information.

334.   Proof of this malicious prosecution was confirmed in the years following Plaintiff's conviction and culminated in 2013, when Randy Weaver signed an affidavit (and testified at the evidentiary hearing on Plaintiff's motion for a new trial) stating that (i) he was present at the After Five Shooting; (ii) he knew Plaintiff; (iii) Plaintiff was not present at the After Five Shooting; and (iv) he told this information to HPD officers who interviewed him, took a picture of his van, and told him that they were going to send the pictures to the SPD.  Upon information and belief, the HPD conveyed this information to the SPD, who then failed to further investigate Mr. Weaver's statements exonerating Plaintiff.  Similar testimony exonerating Plaintiff by Tracy Fischer and Martin Sailor at the 2013 evidentiary hearing, along with Al Cooke's recantation of his trial identification of Plaintiff at the same hearing, provide further evidence of Defendants' malicious prosecution of Plaintiff.

335.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

336.    As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including pain and suffering.

## COUNT XII

### Civil Conspiracy Claim by Plaintiff Against Reid, Muise, McMahon, Scammons, McNulty, Fleury, Assad, Doe Defendants, and Supervisory Doe Defendants

337.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

338.    Civil conspiracy requires a showing that the "facts . . . manifest a common plan to commit a tortious act where the participant knew of the plan and its purpose and took affirmative steps to encourage achievement of the result." Ward v. Costello, 15 Mass. L. Rptr. 644 (Mass. 2002).

339.    As described more fully in the preceding paragraphs, Defendants Reid, Muise, McMahon, Scammons, McNulty, Fleury, and Assad, as well as the Doe Defendants and Supervisory Doe Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

340.    In furtherance of the conspiracy, these Defendants committed overt acts and were otherwise willful participants in joint activity.

341.    Proof of the misconduct described in this Count was confirmed in the years following Plaintiff's conviction and culminated in 2013, when Randy Weaver signed an affidavit (and testified at the evidentiary hearing on Plaintiff's motion for a new trial) stating that (i) he was present at the After Five Shooting; (ii) he knew Plaintiff; (iii) Plaintiff was not present at the After Five Shooting; and (iv) he told this information to HPD officers who interviewed him, took a picture of his van, and told him that they were going to send the pictures to the Springfield Police.  Upon information and belief, the HPD conveyed this information to the SPD, who then failed to further investigate Mr. Weaver's statements exonerating Plaintiff.  Similar testimony

exonerating Plaintiff by Tracy Fischer and Martin Sailor at the 2013 evidentiary hearing, along with Al Cooke's recantation of his trial identification of Plaintiff at the same hearing, provide further evidence of Defendants' misconduct.

342.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

343.    As a proximate result of these Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

**COUNT XIII**

**Negligent Investigation Claim by Plaintiff Against Reid, Muise, McMahon, Scammons, McNulty, Fleury, Assad, Doe Defendants, Supervisory Doe Defendants, and the City of Springfield**

344.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

345.    To prove negligence under Massachusetts law, plaintiff must show that (i) defendant owed him a duty of care; (ii) defendant breached that duty; (iii) plaintiff suffered damage, and (iv) defendant's breach was the proximate cause of plaintiff's damage.  Limone v. United States, 479 F. Supp. 2d 143, 230 (D. Mass. 2007) (citing Bennett v. Eagle Brook Country Store, 408 Mass. 355, 557 N.E.2d 1166 (1990)).

346.    Defendants Reid, Muise, McMahon, Scammons, McNulty, Fleury, and Assad, as well as the Doe Defendants and Supervisory Doe Defendants, owed Plaintiff a duty of care, and breached that duty by failing to investigate properly the crime for which Plaintiff was convicted.

347.    For example, these Defendants ignored evidence that pointed at other suspects, and failed to memorialize and/or disclose evidence which would have been exculpatory to Plaintiff.

348.    Proof of such negligence came to light in the years following Plaintiff's conviction and culminated in 2013, when Randy Weaver signed an affidavit (and testified at the evidentiary

hearing on Plaintiff's motion for a new trial) stating that (i) he was present at the After Five Shooting; (ii) he knew Plaintiff; (iii) Plaintiff was not present at the After Five Shooting; and (iv) he told this information to HPD officers who interviewed him, took a picture of his van, and told him that they were going to send the pictures to the SPD. Upon information and belief, the HPD conveyed this information to the SPD, who then failed to further investigate Mr. Weaver's statements exonerating Plaintiff. Similar testimony exonerating Plaintiff by Tracy Fischer and Martin Sailor at the 2013 evidentiary hearing, along with Al Cooke's recantation of his trial identification of Plaintiff at the same hearing, provide further evidence of defendants' negligent misconduct.

349.    At all times relevant to this Complaint, each of these Defendants was an employee of the City of Springfield through the SPD.

350.    Under the Massachusetts Tort Claims Act, the City of Springfield must answer for its employees' breach of this duty.

351.    As a direct and proximate result of these Defendants' breach of the duty described in the preceding paragraphs, Plaintiff was arrested, prosecuted, convicted, and imprisoned for a crime he did not commit, resulting in injuries.

352.    The misconduct described in this Count was undertaken with reckless indifference to the rights of others.

## COUNT XIV

### Negligent Training and Supervision Claim by Plaintiff Against Supervisory Doe Defendants and the City of Springfield

353.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

354.    To prove negligent supervision under Massachusetts law, plaintiff must show that (i) the persons whose actions form the basis of the claim were agents and/or employees of the

defendant employer; (ii) the agents and employees came into contact with member of the public in the course of their employer's business; (iii) that the employer failed to use reasonable care in the selection, supervision and retention of the agents and employees; and (iv) that the failure to use such reasonable care was the proximate cause of harm to the plaintiff.  Limone v. United States, 479 F. Supp. 2d 143, 233 (D. Mass. 2007) (citing Carson v. Canning, 180 Mass. 461, 62 N.E. 964 (1902); Foster v. The Loft, Inc., 26 Mass. App. Ct. 289, 526 N.E. 2d 1309 (1988)).

355.     Each of the Supervisory Doe Defendants and the City of Springfield, through the SPD, owed Plaintiff a duty of care, and breached that duty by failing to adequately supervise and train the Individual Defendants to investigate properly the crime for which Plaintiff was convicted.

356.     Proof of such negligence came to light in the years following Plaintiff's conviction and culminated in 2013, when Randy Weaver signed an affidavit (and testified at the evidentiary hearing on Plaintiff's motion for a new trial) stating that (i) he was present at the After Five Shooting; (ii) he knew Plaintiff; (iii) Plaintiff was not present at the After Five Shooting; and (iv) he told this information to HPD officers who interviewed him, took a picture of his van, and told him that they were going to send the pictures to the SPD.  Upon information and belief, the HPD conveyed this information to the SPD, who then failed to further investigate Randy Weaver's statements exonerating Plaintiff.  This failure to conduct proper investigative techniques was the result of negligent training and supervision on the part of the Supervisory Doe Defendants. Similar testimony exonerating Plaintiff by Tracy Fischer and Martin Sailor at the 2013 evidentiary hearing, along with Al Cooke's recantation of his trial identification of Plaintiff at the same hearing, provide further evidence of defendants' negligent misconduct.

357.     At all times relevant to the Complaint, each of the Supervisory Doe Defendants was an employee of the City of Springfield through the SPD.

358.     Under the Massachusetts Tort Claims Act, the City of Springfield must answer for its employees' breach of this duty.

359.     As a direct and proximate result of the Supervisory Doe Defendants' breach of the duty described in the preceding paragraphs, Plaintiff was arrested, prosecuted, convicted, and imprisoned for a crime he did not commit, resulting in injuries.

360.     The misconduct described in this Count was undertaken with reckless indifference to the rights of others.

## COUNT XV

**Intentional Infliction of Emotional Distress by Plaintiff Mark Schand and Family Plaintiffs Mia Schand, Mark Schand, Jr, Quinton Schand, and Kiele Schand Against Reid, Muise, McMahon, Scammons, McNulty, Fleury, Assad, Doe Defendants, and Supervisory Doe Defendants**

361.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

362.     To make a claim for intentional infliction of emotional distress under Massachusetts law, plaintiffs must show (i) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (ii) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (iii) the actions of the defendant were the cause of the plaintiffs' distress, and (iv) the emotional distress suffered by the plaintiffs was severe and of such a nature that no reasonable person could be expected to endure it.  Limone v. United States, 497 F. Supp. 2d 143, 226-27 (D. Mass 2007) (citing Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 681 N.E.2d 1189, 1197 (1997) (quoting Payton v. Abbott Labs, 386 Mass. 540, 437 N.E.2d 171, 180 (1982)).

363.    Family member claims for intentional infliction of emotional distress require "both (a) substantially contemporaneous knowledge of the outrageous conduct and (b) a severe emotional response."   <u>Limone</u> v. <u>United States</u>, 497 F. Supp. 2d 143, 228 (D. Mass 2007) <u>Anthony H.</u> v. <u>John G.</u>, 415 Mass. 196, 612 N.E.2d 663, 665 (1993).

364.    Defendants Reid, Muise, McMahon, Scammons, McNulty, Fleury, Assad, as well as the Doe Defendants and Supervisory Doe Defendants, engaged in a continuous pattern of extreme and outrageous conduct directed at Plaintiff and Family Plaintiffs from the time of Plaintiff's false arrest on October 29, 1986 at least until his release from prison on October 4, 2013.

365.    As a proximate result of the false arrest and initiation of prosecution of Plaintiff for the murder of Victoria Seymour and other crimes without probable cause and with malice by the Individual Defendants and Doe and Supervisory Doe Defendants, Plaintiff was convicted and imprisoned for 27 years.

366.    The acts and omissions of the Individual Defendants and Doe and Supervisory Doe Defendants in falsely arresting and initiating the prosecution of Plaintiff without probable cause and with malice were extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

367.    The Individual Defendants and Doe and Supervisory Doe Defendants knew or should have known that their false arrest and initiation of prosecution of Plaintiff for the murder of Victoria Seymour and other crimes without probable cause and with malice, and the imprisonment of Plaintiff which proximately resulted from their actions, was likely to cause Plaintiff and Family Plaintiffs severe emotional distress.

368.     The aforementioned acts and omissions of the Individual Defendants and Doe and Supervisory Doe Defendants did in fact proximately cause Plaintiff and Family Plaintiffs to suffer severe emotional distress of a nature that no reasonable person could be expected to endure as described above.

369.     The foregoing actions of the Individual Defendants and Doe and Supervisory Doe Defendants constitute the tort of intentional infliction of emotional distress under Massachusetts law.

## COUNT XVI

### Loss of Consortium Claim by Plaintiff Mark Schand and Family Plaintiff Mia Schand Against Reid, Muise, McMahon, Scammons, McNulty, Fleury, Assad, Doe Defendants, and Supervisory Doe Defendants

370.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

371.     An action for loss of consortium may be maintained under Massachusetts law where such loss is shown to arise from tortious injury to one's family member caused by a third party. Limone v. United States, 336 F. Supp. 2d 18, 49 (D. Mass. 2004) (citing Agis v. Howard Johnson Co., 371 Mass. 140, 144-45, 355 N.E.2d 315 (1976); Mouradian v. General Elec. Co., 23 Mass. App. Ct. 538, 544, 503 N.E.2d 1318 (1987).

372.     As a proximate result of the false arrest and initiation of prosecution of Plaintiff for the murder of Victoria Seymour and other crimes without probable cause and with malice by the Individual Defendants and Doe and Supervisory Doe Defendants, Plaintiff was convicted and imprisoned for 27 years until his release in 2013.

373.     In addition, the false arrest and initiation of prosecution of Plaintiff for the murder of Victoria Seymour and other crimes without probable cause and with malice by the Defendants and Does, resulting in his twenty-seven year conviction, proximately caused Plaintiff Mark

Schand and Family Plaintiff Mia Schand to suffer the loss of society, affection, and relations with each other during the time that Plaintiff was imprisoned.

374.   The Individual Defendants and Doe and Supervisory Doe Defendants knew or should have known that their false arrest and initiation of the prosecution of Plaintiff for the murder of Victoria Seymour and other crimes without probable cause and with malice and the imprisonment of Plaintiff, which proximately resulted from their actions, was likely to cause Family Plaintiff Mia Schand and Plaintiff Mark Schand to suffer the loss of the society, affection, companionship and relations with each other during the time that he was imprisoned.

375.   The foregoing actions of the Individual Defendants and Doe and Supervisory Doe Defendants constitute the tort of loss of consortium under Massachusetts law.

376.   As a result the Individual Defendants' and Doe and Supervisory Doe Defendants' commission of the tort of loss of consortium, Plaintiff Mark Schand and Family Plaintiff Mia Schand have suffered damages, including, without limitation, damages for pain and suffering.

## COUNT XVII

### Loss of Parental Consortium Claim by Family Plaintiffs Mark Schand, Jr., Quinton Schand, and Kiele Schand Against Reid, Muise, McMahon, Scammons, McNulty, Fleury, Assad, Doe Defendants, and Supervisory Doe Defendants

377.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

378.   An action for loss of consortium may be maintained under Massachusetts law where such loss is shown to arise from tortious injury to one's family member caused by a third party. Limone v. United States, 336 F. Supp. 2d 18, 49 (D. Mass. 2004) (citing Agis v. Howard Johnson Co., 371 Mass. 140, 144-45, 355 N.E.2d 315 (1976); Mouradian v. General Elec. Co., 23 Mass. App. Ct. 538, 544, 503 N.E.2d 1318 (1987).

379.    As a proximate result of the false arrest and the initiation of prosecution of Plaintiff for the murder of Victoria Seymour and other crimes without probable cause and with malice by the Individual Defendants and Doe and Supervisory Doe Defendants, Plaintiff was convicted and imprisoned for 27 years.

380.    In addition, the false arrest and the initiation of prosecution of Plaintiff for the murder of Victoria Seymour and other crimes without probable cause and with malice by the Individual Defendants and Doe and Supervisory Doe Defendants and his conviction as a result thereof proximately caused Plaintiff and Family Plaintiffs Mark Schand, Jr., Quinton Schand, and Kiele Schand to suffer the loss of society, affection, and nurturing of their father during the time that he was imprison and they were minors.

381.    Prior to the time that Plaintiff was wrongfully imprisoned for the murder of Victoria Seymour and other crimes, Plaintiff had a loving and caring relationship with his children, Mark Schand, Jr., Quinton Schand, and Kiele Schand, and his children depended on him for society, affection, and nurturing.   As such, Mark Schand, Jr., Quinton Schand, and Kiele Schand's dependency on their father was not entirely economic.

382.    The Individual Defendants and Doe and Supervisory Doe Defendants knew or should have known that their false arrest and initiation of the prosecution of Plaintiff for the murder of Victoria Seymour and other crimes without probable cause and with malice and the imprisonment of Plaintiff which proximately resulted from their action were likely to cause Family Plaintiffs Mark Schand, Jr., Quinton Schand, and Kiele Schand to suffer the loss of society, affection, and nurturing of their father during the time that their father was imprisoned and they were minors.

383.    The foregoing actions of the Individual Defendants and Doe and Supervisory Doe Defendants constitute the tort of loss of parental consortium under Massachusetts law.

384.    As a result of the Individual Defendants' and Doe and Supervisory Doe Defendants' commission of the tort of parental loss of consortium, Family Plaintiffs Mark Schand, Jr., Quinton Schand, and Kiele Schand have suffered damages, including and without limitation, damages for pain and suffering.

## COUNT XVIII

### Respondeat Superior Against the City of Springfield

385.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

386.    The theory of respondeat superior holds employers vicariously liable for the torts of employees committed in the scope of their employment.  Worcester Ins. Co. v. Fells Acres Day School, Inc., 408 Mass. 393, 404 (1990).

387.    In committing the acts alleged in the preceding paragraphs, the Individual Defendants and Doe and Supervisory Doe Defendants were members of, and agents of, the SPD acting at all relevant times within the scope of employment and under color of law.

388.    Defendant City of Springfield is liable as principal for all torts committed by its agents.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## DAMAGES DEMAND

WHEREFORE, Plaintiff and Family Plaintiffs demand judgment against the Defendants as follows:

a.   For compensatory damages in an amount to be determined at trial;

b.  For punitive damages in an amount to be determined at trial;

c.  For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

d.  For pre-judgment interest as allowed by law; and

e.  For such other and further relief as this Court may deem just and proper.

Dated:  August 20, 2015                                  Respectfully submitted,

                                         By:   /s/   *James Trainor*
                                               James Trainor (BBO # 6487879)
                                               WHITE & CASE LLP
                                               1155 Avenue of the Americas
                                               New York, NY 10036
                                               Phone: 212.819.8200
                                               Fax: 212.354.8113
                                               jtrainor@whitecase.com

OF COUNSEL:

Heather K. McDevitt
Joshua D. Weedman
Jacqueline L. Chung
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
Phone: 212.819.8200
Fax: 212.354.8113
hmcdevitt@whitecase.com
jweedman@whitecase.com
jacqueline.chung@whitecase.com