## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MARK SCHAND, et al.,

          Plaintiff,

   v.

CITY OF SPRINGFIELD, et al.,

          Defendants.

Case No. 3:15-cv-30148

The Honorable Michael A. Ponsor

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(LEAVE TO FILE 50 PAGES GRANTED ON OCTOBER 13, 2017 [DKT. 97])

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND ......................................................................................4

    A.    The After Five Shooting ....................................................................4

    B.    The SPD Investigation .......................................................................5

    C.    The Trial and Wrongful Conviction of Mark Schand.........................7

    D.    New Evidence Raised in Mr. Schand's Motions for New Trial ............8

STANDARD OF REVIEW .......................................................................................9

ARGUMENT .........................................................................................................10

I.      PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983 ARE NOT TIME-BARRED.........10

II.    THE RECORD CONFIRMS THAT DEFENDANTS UTILIZED UNDULY
       SUGGESTIVE IDENTIFICATION PROCEDURES ......................................12

    A.    Defendants Included Distinctive Polaroids of Mr. Schand in Photo Arrays .........13

    B.    Defendant McMahon Staged an Unduly Suggestive Lineup................16

    C.    The Affidavit of Michael Hosten.......................................................18

III.   DEFENDANTS WITHHELD AND FABRICATED EXCULPATORY
       EVIDENCE..............................................................................................21

    A.    The SPD Fabricated the Stokes Report to Suppress Exculpatory
         Information ........................................................................................21

    B.    The SPD Withheld the Hartford Reports from Mr. Schand's Trial Counsel.........24

    C.    Plaintiffs' Claims Are Not Barred by Collateral Estoppel....................25

IV.   DEFENDANTS ENGAGED IN MALICIOUS PROSECUTION ....................26

    A.    Defendants Seized Mr. Schand....................................................27

    B.    Mr. Schand's Seizure Was Not Supported By Probable Cause.............27

    C.    Defendants' Conduct Occurred Both Before and After Mr. Schand's
         Arrest................................................................................................29

    D.    The Proceedings Terminated in Mr. Schand's Favor ............................29

    E.    Defendants Are Not Entitled to Qualified Immunity............................29

V.    THE RECORD DEMONSTRATES DEFENDANTS' FAILURE TO
      INTERCEDE ...........................................................................................31

VI.   DEFENDANTS ENGAGED IN A CONSPIRACY TO VIOLATE MR.
      SCHAND'S CONSTITUTIONAL RIGHTS ..................................................32

VII.  THE RECORD SUPPORTS *MONELL* MUNICIPAL LIABILITY ................33

i

      A.     Plaintiffs' Expert Analysis ...................................................................35

      B.     The SPD's Own Witnesses Confirm the SPD's Failures......................37

      C.     An Audit Performed By an Outside Consultant at the Direction of the SPD Confirms That Training Was Inadequate ...............................................41

VIII.   PLAINTIFFS' STATE LAW CLAIMS ARE TIMELY ...................................................43

IX.     DEFENDANTS ENGAGED IN MALICIOUS PROSECUTION UNDER MASSACHUSETTS LAW ...........................................................................................44

X.      the RECORD SUPPORTS PLAINTIFFS' LOSS OF CONSORTIUM CLAIMS............45

XI.     DEFENDANTS ENGAGED IN A CIVIL CONSPIRACY ..............................................47

XII.    DEFENDanTS ENGAGED IN NEGLIGENT INVESTIGATION ...................................47

XIII.   SPRINGFIELD ENGAGED IN NEGILIGENT SUPERVISION AND TRAINING .......................................................................................................................48

XIV.   DEFENDANTS ENGAGED IN INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ........................................................................................49

CONCLUSION..........................................................................................................................50

AMERICAS 93592309

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Alexis v. McDonald's Rests., 67 F. 3d 341 (1st Cir. 1994)............................................................26

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)................................................................10

Annunziata v. City of New York, 2008 U.S. Dist. LEXIS 42097 (S.D.N.Y. May
    28, 2008) ........................................................................................................................20

Ayuso-Figueroa v. Rivera-Gonzalez, 456 F. Supp. 2d 309 (D.P.R. 2005)....................................12

Baggett v. Ashe, 41 F. Supp. 3d 113, 117 (D. Mass. 2014) (Ponsor, J.) ........................................9

Bazinet v. Thorpe, 190 F. Supp. 3d 229, 240 (D. Mass. 2016) ....................................................50

Beecy v. Pucciarelli, 441 N.E.2d 1035 (Mass. 1982) ...................................................................44

Blinzler v. Marriott Int'l, 81 F.3d 1148 (1st Cir. 1996)...............................................................23

Bordanaro v. McLeod, 871 F.2d 1151 (1st Cir. 1989) .................................................................34

Brady v. Maryland, 373 U.S. 83 (1963) .......................................................................................21

Burke v. Town of Walpole, 405 F.3d 66 (1st Cir. 2002)...............................................................27

Casas Office Machs. v. Mita Copystar Am., 42 F.3d 668 (1st Cir. 1994)....................................10

City of Canton v. Harris, 489 U.S. 378 (1989) ............................................................................33

Clark v. Taylor, 710 F.2d 4 (1st Cir. 1983) .................................................................................31

Commonwealth v. Cameron, 39 N.E.3d 723 (Mass. 2015).........................................................25

Correlas v. Viveiros, 572 F.E.2d 7 (Mass. 1991) .........................................................................44

Crooker v. Burns, 544 F. Supp. 2d 59 (D. Mass. 2008) ...............................................................11

Dunn v. Tennessee, 697 F.2d 121 (6th Cir. 1982)........................................................................31

Dwan v. City of Boston, 2002 U.S. Dist. LEXIS 5628 (D. Mass. Mar. 29, 2002)........................45

Echavarria v. Roach, No. 16-cv-11118, 2017 U.S. Dist. LEXIS 144589 (D. Mass.
    Sept. 7, 2017)...................................................................................................................31

Esteras v. Diaz, 266 F. Supp. 2d 270 (D.P.R. 2003) ...................................................................26

Ferguson v. Omnimedia, Inc., 469 F.2d 194 (1st Cir. 1972) ........................................................32

Foster v. California, 394 U.S. 440 (1969) ....................................................................................13

Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344 (D. Mass. 2002) ......................47

Gregory v. City of Louisville, 444 F.2d 725 (6th Cir. 2006) ........................................................12

Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552 (Mass. 2002) .........................................44

Guzman-Rivera v. Rivera-Cruz, 29 F.3d 3 (1st Cir. 1994) ...........................................................11

Haley v. City of Boston, 657 F.3d 39 (1st Cir. 2011) ...................................................................43

Hassett v. Hasselbeck, 757 F. Supp. 2d 73 (D. Mass. 2010) ..........................................................9

Heck v. Humphrey, 512 U.S. 477 (1994) .........................................................................10, 11, 43

Hernandez-Ceuvas v. Taylor, 723 F.3d 91 (1st Cir. 2013) ................................................. passim

In Ciolino v. Eastman, 128 F. Supp. 3d 366 (D. Mass. 2015) ......................................................32

Irwin v. Town of Ware, 467 N.E.2d 1292 (Mass. 1984) ...............................................................48

Jackson v. Coalter, 337 F.3d 74 (1st Cir. 2003) ...........................................................................25

Kibbe v. Springfield, 777 F.2d 801 (1st Cir. 1985) .......................................................................34

Kurker v. Hill, 689 N.E.2d 836 (Ct. App. Mass. 2998) ...............................................................47

Limone v. United States, 336 F. Supp. 2d 18 (D. Mass. 2004) ........................................44, 45, 46

Limone v. United States, 497 F. Supp. 2d 143 (D. Mass. 2007) ...............................31, 48, 49, 50

Lombard v. Salisbury Police Dep't, No. 9422937B, 1995 Mass. Super. LEXIS
    411 (Mass. Super. Ct. June 14, 1995) ...................................................................................43

Lopez v. Massachusetts, 349 F. Supp. 2d 109 (D. Mass. 2004) ...................................................23

Manuel v. City of Joliet, 137 S. Ct. 911 (2017) ...........................................................................26

Marquez v. Home Depot USA, Inc., 154 F. Supp. 2d 152 (D. Mass. 2001) ................................48

McMillian v. Johnson, 88 F.3d 1554 (11th Cir. 1996) .................................................................22

Mitchell v. City of Boston, 130 F. Supp. 2d 201 (D. Mass. 2001) ...............................................12

Mlodzinski v. Lewis, 648 F.3d 24 (1st Cir. 2011) ........................................................................30

iv

Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978)..............................................................................................................33

Moore v. Dickhaut, 842 F.3d 97 (1st Cir. 2016)...........................................................13

Morrison v. Jones, 551 F.2d 939 (4th Cir. 1977)..........................................................31

Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701 (1st Cir. 1993) ............................9

Noel v. Town of Plymouth, 895 F. Supp. 346 (D. Mass. 1995) ....................................29

Norton v. Liddel, 620 F.2d 1375 (10th Cir. 1980).......................................................31

O'Brien v. Wainwright, 738 F.2d 1139 (11th Cir. 1984) .............................................14

Oklahoma City v. Tuttle, 471 U.S. 808 (1985)..............................................................33

Osorio v. Barnes, 2015 U.S. Dist. LEXIS 143287 (C.D. Cal. May 21, 2015) .......13, 17

Passman v. Blackburn, 652 F.2d 559 (5th Cir. 1981)...................................................14

Pelletier v. Magnusson, 195 F. Supp. 2d 214 (D. Me. 2002) .......................................23

Perry v. New Hampshire, 565 U.S. 228 (2012) ............................................................17

Philbrook v. Perrigo, 637 F. Supp.2d 48 (D. Mass. 2009)...........................................32

Polay v. McMahon, 10 N.E.3d 1122 (Mass. 2014) ......................................................49

Poy v. Boutselis, 352 F.3d 479 (1st Cir. 2003).............................................................10

Riley v. Presnell, 565 N.E.2d 780.................................................................................43

Rua v. Glodis, 52 F. Supp. 3d 84, 97-98 (D. Mass. 2014).....................................34, 36

Salvas v. Walmart-Stores, Inc., 893 N.E.2d 1187 (Mass. 2008) ..................................43

Simmons v. United States, 390 U.S. 377 (1968) ...........................................................16

Solomon v. Dookhan, No. 13-10208, 2014 U.S. Dist. LEXIS 9650 (D. Mass. Jan. 7, 2014) ...............................................................................................................30

Springfield Library & Museum Ass'n v. Knoedler Archivum, Inc., 341 F. Supp. 2d 32 (D. Mass. 2004)....................................................................................44

Szymanksi v. Bos. Mut. Life Ins. Co., 778 N.E.2d 16 (Mass. App. Ct. 2002).............43

Toro v. Murphy, 2009 U.S. Dist. LEXIS 117303 (D. Mass. Dec. 17, 2009) ....... passim

v

Torres v. Superintendent of Police, 893 F.2d 404 (1st Cir. 1990)................................................31

United States v. Barone, 114 F.3d 1284 (1st Cir. 1997)..............................................................19

United States v. Benitez-Avila, 570 F.3d 364 (1st Cir. 2009).......................................................16

United States v. Castro-Caicedo, 775 F.3d 93 (1st Cir. 2014)......................................................13

United States v. de la Cruz-Paulino, 61 F.3d 986 (1st Cir. 1995) ................................................23

United States v. Monserrate-Valentin, 729 F.3d 31 (1st Cir. 2013) ............................................21

United States v. Ocasio-Ruiz, 779 F.3d 43 (1st Cir. 2015) .........................................................21

United States v. Paz-Alvarez, 799 F.3d 12 (1st Cir. 2015)..........................................................33

United States v. Pizarro-Berrios, 448 F.3d 1 (1st Cir. 2006).......................................................33

United States v. Wade, 388 U.S. 218 (1967) ...............................................................................17

Williams v. City of Boston, 771 F. Supp. 2d 190 (D. Mass. 2011)..........................................32, 45

Wynne v. Rosen, 464 N.E.2d 1348 (Mass. 1984).........................................................................12

Zeneca Ltd. v. Pharmachemie B.V., 37 F. Supp. 2d 85 (D. Mass. 1999).....................................25

## STATUTES AND RULES

42 U.S.C. § 1983........................................................................................... passim

22A C.J.S. Criminal Law § 419 ...............................................................................12

Fed. R. Civ. P. 30(b)(6)...............................................................................39, 40, 41

Fed. R. Civ. P. 56(a) ...............................................................................................4, 9

Fed. R. Evid. 804(b)(3)(A) ...........................................................................19, 20, 21

Local R. 56.1 ...............................................................................................................4

M.G.L. c. 258...........................................................................................................48

M.G.L. c. 268 § 1 ....................................................................................................20

## MISCELLANEOUS

Fourth Amendment ........................................................................................26, 27, 28

Sixth Amendment .....................................................................................................39

AMERICAS 93592309

Fourteenth Amendment ...............................................................................................29

Mass. Civil Rights Act................................................................................................43

AMERICAS 93592309

## PRELIMINARY STATEMENT

An unfathomable injustice was done to Mark Schand. Mark Schand spent 27 years in prison for a crime he did not commit. We know this because, in 2013, multiple men made two key admissions: (1) they were involved in the September 2, 1986 altercation outside of a bar in Springfield, Massachusetts that led to the shooting death of Victoria Seymour, an innocent bystander (the "After Five Shooting"), and (2) Mr. Schand was not involved in any way. On October 15, 2013, Mr. Schand's conviction was vacated, and one day later, Hampden County District Attorney Mark Mastroianni entered a *nolle prosequi*. Mr. Schand was freed from prison after nearly three decades of wrongful imprisonment.

No physical evidence connected Mr. Schand to the After Five Shooting. Instead, his conviction was obtained solely on the testimony of a handful of eyewitnesses. Now, many of those eyewitnesses have recanted their testimony and, after almost 30 depositions and the exchange of thousands of pages of documents, the evidence has revealed that Mr. Schand's wrongful conviction was procured as a direct result of faulty identification procedures and the suppression of key evidence by the Springfield Police Department (the "SPD")—failures borne from systematic and pervasive practices by the SPD. As Plaintiffs' expert concluded: "the training, policies, practices, and supervisory oversight of detectives in the [SPD] were ***egregious departures*** from generally accepted police practices at the time of the arrest and conviction of Mr. Schand. As a result of these agency failures, [SPD] employees utilized faulty photo identification procedures and tainted lineup practices during Mr. Schand's investigation, and also conducted an unreasonable follow-up investigation." <u>See</u> Plaintiffs' Counterstatement of Facts ("PSOF") ¶ 238 (emphasis added).

Defendants now seek to escape the consequences of their wrongful conduct by filing a

1

summary judgment motion rooted in a series of specious legal and factual arguments. Defendants do not dispute the facts surrounding the After Five Shooting, nor do they dispute many of the key facts surrounding the subsequent investigation.  Instead, Defendants claim there are no disputed issues of fact solely based on their own denials of wrongdoing. Defendants' denials, without anything more, are not sufficient to prevent a trial in this case.

First, Defendants argue that Plaintiffs' claims under 42 U.S.C. § 1983 are barred by a three-year statute of limitations, but Defendants ignore Heck v. Humphrey, in which the Supreme Court established that claims under § 1983 premised on a wrongful conviction do not accrue until after the plaintiff is released from prison.

Second, Defendants argue that there is no evidence to suggest that an unduly suggestive identification process was used in Mr. Schand's case.  To the contrary, the record is replete with evidence showing that the SPD used unduly suggestive identification procedures, both in photographic arrays and in an in-person lineup.  There is no basis at law to ignore the weight of this evidence and Plaintiffs' right to place it before a jury.

Third, Defendants claim that there is no evidence to prove that Defendants withheld or fabricated evidence.  Again, Defendants ignore large swaths of the record, which actually shows that (i) a doctored police report—which had been manipulated with white-out tape to conceal exculpatory evidence from Mr. Schand's attorney—was found locked in a drawer in the SPD's exclusive custody; and (ii) two other exculpatory reports that the SPD had from the Hartford Police Department (the "HPD") identifying a potential alternative suspect (who ultimately admitted to being present at the crime) were never produced to Mr. Schand's attorney.

Fourth, Defendants claim that qualified immunity bars claims for malicious prosecution. Defendants disregard the fact that "probable cause" existed for Mr. Schand's arrest only as a

AMERICAS 93592309

result of the SPD's violations of Mr. Schand's constitutional rights.

Fifth, Defendants argue that there is no evidence that any of the Defendants had a duty to intercede to stop the deprivation of Mr. Schand's rights. Again, the record is full of evidence from which a reasonable juror could conclude that each Defendant was aware of these Constitutional violations, but did nothing to stop them.

Sixth, Defendants assert that the conspiracy claim must be dismissed because there is no evidence of an affirmative agreement between the Defendants. However, case law is clear that actual evidence of agreement is not required when, as here, an agreement can reasonably be inferred from the circumstances. A jury could certainly so conclude in these circumstances.

Seventh, Defendants argue that Plaintiffs have not demonstrated a viable claim for municipal liability under Monell. This argument strains credulity. Among other things, the expert report by one of the nation's leading experts in police procedures concludes that the SPD had deficient policies, procedures, and training in place during the time when Mr. Schand was investigated and prosecuted. Further, Defendants themselves admitted in depositions to significant weaknesses in the SPD's policies, procedures, and training, a fact buttressed by the SPD's own documents.

Finally, Defendants claim that Plaintiffs' state law claims are time-barred and unsupported by any credible facts. But Plaintiffs' claims were equitably tolled until Mr. Schand's release from prison and, in any event, the last event alerting Plaintiffs to the nature of their claims did not come to light until 2013 and the statute of limitations would not affect claims for malicious prosecution and loss of consortium under any circumstances. Further, all of the extensive evidence supporting Plaintiffs' claims under § 1983 also support the parallel claims brought under state law, including those claims for malicious prosecution, loss of consortium,

3

civil conspiracy, negligent investigation, and negligent supervision.

In short, there is simply no basis under Rule 56 or the case law to allow the Defendants' bare denials to keep Plaintiffs' affirmative evidence of wrongdoing from a jury.[1]

### FACTUAL BACKGROUND[2]

On September 2, 1986, an altercation took place outside of the After Five Lounge in Springfield that left one bystander, Victoria Seymour, dead. The After Five Shooting also changed the life of one man who was not at the scene of the crime and, indeed, was not even in Springfield on the night that the crime occurred: Plaintiff Mark Schand. Mr. Schand was sentenced to life in prison for a murder that he did not commit and served almost 27 years in prison before having his conviction vacated.

#### A.    The After Five Shooting

A botched drug deal led to the After Five Shooting. Charles Stokes, David Stokes, Anthony Cooke, and Michael Hosten were outside the After Five Lounge when a group of unidentified men, believed to have been from Hartford, Connecticut, approached them and inquired about buying drugs. PSOF ¶ 1. A scuffle ensued, and Anthony Cooke was immediately shot in the shoulder. PSOF ¶ 1. Charles and David Stokes and Mr. Hosten and Mr. Cooke then turned to flee the scene while the unidentified man kept firing shots at them. PSOF ¶ 1. Charles Stokes fell while attempting to flee, and the gunman robbed him and fled. PSOF ¶ 1. During the melee, bystander Victoria Seymour, who was at the After Five Lounge with her friends Willie Darko and Michael Bernard, was shot in the back. Ms. Seymour died hours later. PSOF ¶ 1.

---

[1] Given the abundance of undisputed facts demonstrating that Defendants violated Mr. Schand's constitutional rights, as set forth herein, Plaintiffs believe they would be entitled to summary judgment in their favor. However, Plaintiffs look forward to taking their claims to trial and presenting this record to a jury.

[2] Plaintiffs file concurrently herewith a response to Defendants' Statement of Undisputed Facts and a Statement of Additional Facts, pursuant to Local Rule 56.1 ("PSOF").

AMERICAS 93592309

B.    **The SPD Investigation**

The SPD interviewed a number of eye-witnesses in connection with the After Five Shooting, including Charles Stokes, Mr. Cooke, Mr. Bernard, and Mr. Hosten.  DSOF ¶¶ 2-5; PSOF ¶¶ 2-5.  Additionally, they interviewed two teenagers, Lavon Dixon and Al Chase, who had been at the Pizza King Restaurant near the After Five Lounge on the night of the shooting, and who had had an encounter with a group of individuals from Hartford who were believed to be connected with the After Five Shooting.  DSOF ¶¶ 6-9; PSOF ¶ 6-9.  All of these individuals gave inconsistent descriptions of the shooter at the outset.  See DSOF ¶¶ 2-9; PSOF ¶¶ 2-9.  Notably, Mr. Chase identified an individual who had braided hair and who wore distinctive sunglasses known as "Cazals."   DSOF ¶ 8; PSOF ¶ 8.  Mr. Chase stated that a group of individuals accompanying this man had gotten into a blue-grey van with Connecticut license plates.  DSOF ¶ 8; PSOF ¶ 8.

The SPD showed photographic arrays to witnesses to elicit an identification of the After Five Shooting perpetrator.  The SPD obtained its first set of arrays by transporting Kenneth Whitted, a Springfield resident who was not at the scene of the After Five Shooting, but who purportedly knew about recent altercations between Springfield and Hartford men, to the Hartford Police Department ("HPD") to look at mugshots.  DSOF ¶ 16; PSOF ¶ 16.  Mr. Whitted identified six or seven photographs of Hartford men, none of whom was Mr. Schand, and the SPD used these pictures for their initial set of photo arrays.   DSOF ¶ 16; PSOF ¶ 16.  No positive identifications were made through the pictures contained in this array.  DSOF ¶ 16; PSOF ¶ 16.  The SPD then obtained a larger set of photographs from the HPD, which included pictures of Mr. Schand. DSOF ¶ 25; PSOF ¶ 25.

The SPD had in its possession mugshots of Mr. Schand, as provided by the HPD, and

color Polaroid pictures of Mr. Schand, which showed him with his hair in braids, wearing distinctive glasses known as "Cazals" and gold chains around his neck. PSOF ¶ 142. The SPD used these pictures of Mr. Schand—including the color Poloroids—in the photo arrays shown to witnesses. PSOF ¶¶ 142-49.

On September 24, 1986, Defendants Scammons and Reid interviewed Dixon, Chase, Whitted, and Charles Stokes. Dixon and Chase identified Mr. Schand's photo, but without certainty. DSOF ¶ 28; PSOF ¶ 28. Mr. Stokes indicated with 30 to 40% certainty that the photo of Mr. Schand looked similar to his assailant, as did one other individual. DSOF ¶ 30; PSOF ¶ 30. Mr. Stokes also mentioned that his assailant had "bad teeth," a descriptive feature that did not match Mr. Schand. DSOF ¶ 30; PSOF ¶¶ 30, 190. Defendants Scammons and Reid recorded all of this information into a police report, dated September 24, 1986 (the "Stokes Report").

Defendant Scammons and Detective Doty subsequently interviewed Michael Bernard, who was shown approximately 30 photographs. DSOF ¶ 41; PSOF ¶ 41. At least one of the 30 photographs shown to Mr. Bernard was the color Polaroid of Mr. Schand. PSOF ¶¶ 41, 66, 148. Mr. Bernard identified Mr. Schand during that meeting, and an arrest warrant was issued for Mr. Schand solely on the basis of Mr. Bernard's identification. DSOF ¶¶ 41-43; PSOF ¶¶ 41-43.

Mr. Schand was arrested on October 29, 1986. Following his arrest, the SPD continued to build its case against him. Defendants Reid and Muise conducted another interview of Michael Hosten, during which they showed Mr. Hosten a color Polaroid of Mr. Schand wearing Cazal glasses and large chains around his neck, and told Mr. Hosten that Mr. Schand had shot Victoria Seymour. PSOF ¶¶ 47,67, 91, 212-21. The Polaroid was then inserted back into the stack of photographs, at which time Mr. Hosten selected Mr. Schand's photo, as the officers had made it clear to Mr. Hosten which photo he was supposed to select. PSOF ¶¶ 47,67, 91, 212-21.

6

Defendant Scammons and Detective Doty also interviewed Willie Darko, who identified Mr. Schand at this meeting, but subsequently testified that there were two photographs of Plaintiff in the photo array that he was shown by the police, including a color Polaroid. PSOF ¶¶ 66, 148.

Defendant McMahon staged an in-person lineup for Messrs. Dixon, Chase, Lawrence Gadson (another eye witness to the After Five Shooting), and Charles Stokes. PSOF ¶ 50, 158. Mr. Schand was the subject of the lineup and there were five filler participants—two SPD officers, two Hampden County jail inmates, and one man who was being held in police lockup. PSOF ¶¶ 159-60. Charles Stokes knew all of the participants in the lineup except Mr. Schand; it was clear to him that the SPD wanted him to identify Mr. Schand. PSOF ¶¶ 177-181. By this point, Al Chase and Lavon Dixon had already seen Polaroids of Mr. Schand, which influenced their identification of him in the line-up. And about one month later, Mr. Cooke was shown a photo of the lineup. PSOF ¶ 169. According to Mr. Cooke, he knew everyone in the lineup but Mr. Schand and it was therefore obvious who he was supposed to pick. PSOF ¶¶ 170-72.

By the time of Mr. Schand's trial in 1987, more than six witnesses had identified him as the perpetrator of the After Five Shooting based on photo arrays and a line up orchestrated by the SPD.

### C.    The Trial and Wrongful Conviction of Mark Schand

Mr. Schand was tried for the murder of Victoria Seymour from November 9-20, 1987. DSOF ¶ 78; PSOF ¶ 78. The only evidence linking him to the shooting was eyewitness identification testimony. PSOF ¶ 175. Numerous witnesses provided alibi testimony for Mr. Schand. PSOF ¶ 208. Mr. Schand was convicted of all charges and sentenced to his natural life in prison. DSOF ¶ 88; PSOF ¶ 88.

7

### D.    New Evidence Raised in Mr. Schand's Motions for New Trial

Mr. Schand's trial and criminal defense attorneys subsequently learned in connection with the prosecution of Roger Schand, Mr. Schand's brother, that certain key exculpatory evidence had not been provided to Mr. Schand's trial counsel.  Among those was the second page of the Stokes Report, which included Charles Stokes' description of the suspect having bad teeth, and two HPD reports indicating that another individual named Randy Weaver, who was similar in appearance to Mr. Schand, owned a grey van very similar to the one seen by Dixon and Chase and had been heard bragging about the After Five Shooting (the "Hartford Reports"). PSOF ¶¶ 102, 183, 194.  Defendant Reid found a doctored copy of the Stokes Report in Defendant McMahon's office in 1991, which included white tape placed over two notations on the first page that indicated that there was a second page to the report.  PSOF ¶¶ 185-87. Consequently, Mr. Schand's attorneys filed a motion for new trial in 1992, at which Mr. Stokes testified that he was recanting his identification.  DSOF ¶ 98; PSOF ¶ 98.   That motion for new trial was ultimately denied.  DSOF ¶ 125; PSOF ¶ 125.

Over the course of the next decade, Mr. Schand continued to uncover newly discovered evidence.  In 1999, Anthony Cooke recanted his testimony and identification of Mr. Schand. PSOF ¶ 210.  Mr. Cooke reaffirmed this recantation in 2013 at the motion for new trial.  PSOF ¶¶ 228-29.   In 2006, Michael Hosten stated in an affidavit that the SPD had taken a single photo out of Mr. Schand and told him that they believed Mr. Schand killed Victoria Seymour, so it was apparent to Mr. Hosten who he was supposed to identify.  PSOF ¶¶ 212-221.  Charles Stokes first recanted his identification of Mr. Schand in 1989 and affirmed his recantation in 2010. PSOF ¶¶ 177-79.  Thus, by 2010, the majority of eyewitnesses to the After Five Shooting had recanted their identifications of Mark Schand (Charles Stokes, Cooke, and Hosten) and the

remainder of the witnesses had been shown to identify Mark Schand as a result of suggestive identification procedures (Darko, Bernard, Dixon, and Chase).  PSOF ¶¶ 144-48.

Also during this time, investigators from Centurion Ministries began to identify individuals who had been present at the After Five Shooting and who unequivocally stated that Mark Schand was not present outside the After Five Lounge on that night.  Those individuals were Tracy Fisher, Randy Weaver, and Martin Smith.  See PSOF ¶¶ 208-27.

Mr. Schand filed another motion for new trial in 2013 on the basis of this evidence. DSOF ¶ 131; PSOF ¶ 131.  Hampden County District Attorney Mark Mastroianni—who, at that time, had given Mr. Schand a polygraph examination that Mr. Schand passed as truthful—did not oppose the motion, DSOF ¶ 135; PSOF ¶ 135, and following a hearing, Mr. Schand's motion for new trial was granted, PSOF ¶ 233 and the Commonwealth issued a *nolle prosequi*.  PSOF ¶ 234.  After 26 years, 11 months, and 4 days, Mr. Schand was free.

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Hassett v. Hasselbeck, 757 F. Supp. 2d 73, 78-79 (D. Mass. 2010).  "A genuinely disputed issue concerns a material fact if the fact carries with it the potential to affect the outcome of the suit under the applicable law."  Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

On summary judgment, "the facts and all reasonable inferences that might be drawn from them are viewed in the light most favorable to the non-moving party."  Baggett v. Ashe, 41 F. Supp. 3d 113, 117 (D. Mass. 2014) (Ponsor, J.) (citing Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004).  The court reviews the parties' submissions without weighing

AMERICAS 93592309

the evidence to resolve factual disputes, make credibility determinations, or choose which inferences to draw from the facts.  <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Casas Office Machs.</u> v. <u>Mita Copystar Am.</u>, 42 F.3d 668, 684 (1st Cir. 1994).

## <u>ARGUMENT</u>

## I.    <u>PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983 ARE NOT TIME-BARRED</u>

Defendants' argument that Plaintiffs' § 1983 claims are barred by the statute of limitations is based on a fundamental misunderstanding of the law.  <u>See</u> Mot. at 12.[3]  The applicable statute of limitations for claims under § 1983 is three years from the time the claims accrued.  <u>Poy</u> v. <u>Boutselis</u>, 352 F.3d 479, 483 (1st Cir. 2003).  However, Defendants misapply the accrual date when they argue that Mr. Schand's federal claims accrued no later than the hearing date for Mr. Schand's first motion for a new trial in 1992.  Mot. at 13.[4]  This is because in <u>Heck</u> v. <u>Humphrey</u>, 512 U.S. 477, 489-90 (1994), the U.S. Supreme Court held that a "§ 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."

<u>Heck</u> involved allegations by the plaintiff that defendants "had engaged in an unlawful, unreasonable, and arbitrary investigation leading to [plaintiff's] arrest; knowingly destroyed evidence which was exculpatory in nature and could have proved [plaintiff's] innocence; and caused an illegal and unlawful voice identification procedure to be used at trial."  <u>Id.</u> at 479.  The plaintiff's claim was brought while he was still imprisoned and while his appeal was pending.  Thus, the Supreme Court was presented with the question of whether the plaintiff could bring a cognizable claim under § 1983 that called into question the lawfulness of his conviction, when

---

[3] On October 13, 2017, the Court granted Defendants' request to amend the Motion so that Defendants' statute of limitations arguments apply to all of Plaintiffs' causes of action under 42 U.S.C. § 1983.  <u>See</u> [Dkt. 99].
[4] Defendants acknowledge that "federal law [ ] determines when these constitutional claims accrue."  Mot. at 13; <u>see also</u> <u>Boutselis</u>, 352 F.3d at 483.

10

the finality of that conviction remained an open issue.  Id. at 483.

Analogizing plaintiff's § 1983 claims to malicious prosecution, which requires proof of the "termination of the prior criminal proceeding in favor of the accused,"  the Court noted that a favorable termination was necessary to avoid duplicative litigation on the issue of the conviction and to prevent a collateral attack on the conviction through civil suit.  Id.  at 484.  Accordingly, a § 1983 plaintiff bringing claims for wrongful conviction must first "prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus."  Id. at 486-87.  The Court concluded that "[j]ust as a cause of action for malicious prosecution does not accrue until the criminal proceedings have been terminated in the plaintiff's favor . . .  so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."  Id. at 489 (emphasis added).

Defendants' Motion fails to even mention Heck, let alone distinguish it.[5]  But since Heck, courts in this Circuit have repeatedly confirmed that a § 1983 challenge to a wrongful conviction does not accrue until the conviction or sentence has been invalidated.  See, e.g., Guzman-Rivera v. Rivera-Cruz, 29 F.3d 3, 5-6 (1st Cir. 1994) (citing Heck, noting that "the actual injury implicitly alleged is that [the plaintiff] was wrongfully convicted and/or wrongfully detained after the defendants were apprised of the exculpatory evidence"); Crooker v. Burns, 544 F. Supp. 2d 59, 64 (D. Mass. 2008) (Heck deferred accrual rule dictates "the statute of limitations for a claim does not begin to accrue … until a ruling on the conviction's validity has issued, thus eliminating  the  possibility  that  the  limitations  period  for  bringing  a  civil  claim  for  a

---

[5] Further, all but one of the cases relied upon by Defendants pre-date Heck, and the single case cited by Defendants that post-dates Heck, Carreras-Rosa v. Alves Cruz, does not involve a claim premised on an unlawful conviction. 127 F.3d 172 (1st Cir. 1997).  See Mot. at 12-13.

AMERICAS 93592309

constitutional violation might run out before criminal proceedings ended in a favorable disposition for the plaintiff"); Ayuso-Figueroa v. Rivera-Gonzalez, 456 F. Supp. 2d 309, 320-21 (D.P.R. 2005) (same).[6]

Here, Mr. Schand was granted a new trial on October 15, 2013, and the Commonwealth submitted its *nolle prosequi* on October 16, 2013.[7]  PSOF ¶¶ 136-37.  Plaintiffs' complaint was filed on August 20, 2015, less than two years after the favorable termination of his conviction. PSOF ¶ 236.  Thus, Plaintiffs' claims were brought well within the three-year statute of limitations.

## II.    THE RECORD CONFIRMS THAT DEFENDANTS UTILIZED UNDULY SUGGESTIVE IDENTIFICATION PROCEDURES

"Criminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law."  Gregory v. City of Louisville, 444 F.2d 725, 746 (6th Cir. 2006) (quoting Stovall v. Denno, 388 U.S. 293, 302 (1967)).  Indeed, the First Circuit has confirmed "that pre-trial identifications resulting from procedures 'so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification may offend due

---

[6] Notably, while Heck involved claims for malicious prosecution, courts have expanded the Heck doctrine to all other types of § 1983 claims premised on wrongful conviction.  See, e.g., Mitchell v. City of Boston, 130 F. Supp. 2d 201, 208-09 (D. Mass. 2001) (applying Heck to § 1983 claim for conspiracy involving accusations of false arrest and suggestive photo identifications).

[7] The granting of a new trial and entry of a *nolle prosequi* represent a favorable termination of Mr. Schand's conviction, as defined by Heck.  A motion for new trial is a "party's postjudgment request that the court vacate the judgment and order a new trial for such reasons as factually insufficient evidence, newly discovered evidence, and jury misconduct."  Black's Law Dictionary 1170 (Bryan A. Gardner ed., 10th ed. 2014).  Further, a *nolle prosequi* is defined as "[a] legal notice that lawsuit or prosecution has been abandoned."  Black's Law Dictionary 1210. Black's Law Dictionary goes on to quote 22A C.J.S. Criminal Law § 419, at 1 (1989):  "Nolle Prosequi is a formal entry on the record by the prosecuting officer by which he declares that he will not prosecute the case further, either as to some of the counts of the indictment, or as to part of a divisible count, or as to some of the persons accused, or altogether. ***It is a judicial determination in favor of the accused and against his conviction***, but it is not an acquittal, nor is it the equivalent to a pardon."  Id. (emphasis added).  See Wynne v. Rosen, 464 N.E.2d 1348, 1351 (Mass. 1984) ("[A] criminal proceeding is terminated in favor of the accused when the public prosecutor formally abandons the proceeding by way of a *nolle prosequi* or motion to dismiss, unless such abandonment is the result of an agreement of compromise with the accused or if new proceedings for the same offense have been instituted.")

AMERICAS 93592309

process.'"  Moore v. Dickhaut, 842 F.3d 97, 101 (1st Cir. 2016) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).

Undue suggestiveness arises where an identification procedure places such a special focus upon a suspect that it was all but inevitable the suspect would be identified.  Foster v. California, 394 U.S. 440, 442-44 (1969) (lineup procedures unfair where "suggestive elements in [] identification procedure made it all but inevitable that [the witness] would identify petitioner whether or not he was in fact 'the man'"); Osorio v. Barnes, 2015 U.S. Dist. LEXIS 143287, at *26-27 (C.D. Cal. May 21, 2015) ("Examples of unduly suggestive identification procedures include lineups where all in the lineup but the suspect were known to the identifying witness, the other participants in a lineup were grossly dissimilar in appearance to the suspect…the suspect is pointed out before or during a lineup, and the participants in the lineup are asked to try on an article of clothing which fits only the suspect.") (quoting United States v. Wade, 388 U.S. 218, 232-33 (1967)).

In their Motion, Defendants argue that there is no evidence to suggest that the SPD utilized any identification procedure that was unduly suggestive, see Mot. at 14-16, but the record shows otherwise.

### A.    Defendants Included Distinctive Polaroids of Mr. Schand in Photo Arrays

Use of a color Polaroid or other distinctive photograph of an accused in a photographic array that otherwise contains only mugshots can be unduly suggestive, biased, and otherwise improper.  See, e.g., United States v. Castro-Caicedo, 775 F.3d 93, 97-98 (1st Cir. 2014) ("A real concern the identification…will result from the suggestive means the government used to prompt the witness…may arise 'if the police display to the witness…the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized'")

(quoting <u>Simmons</u>, 390 U.S. at 383); <u>O'Brien</u> v. <u>Wainwright</u>, 738 F.2d 1139, 1140-41 (11th Cir. 1984) (photographic lineup was unduly suggestive where police interspersed color Polaroid of defendant among five other black-and-white mug shots, which "caused the defendant to stick out like a sore thumb"); <u>Passman</u> v. <u>Blackburn</u>, 652 F.2d 559, 570 (5th Cir. 1981) (photographic lineup unduly suggestive where color photograph of defendant was displayed with eleven other black-and-white mugshots).

Indeed, when asked whether he used Polaroids in a photo array, Defendant Muise denied doing so, admitting that to have done so "would be too suggestive.… Because they are Polaroids, they are not consistent with the other photographs."  PSOF ¶ 142. Defendants' experts agreed. PSOF ¶ 142.  Here, the record shows that the SPD repeatedly used unduly suggestive Polaroids of Mr. Schand in several photographic arrays.

<u>First</u>, it is undisputed that eyewitness Al Chase described to police an encounter with a suspicious man at the Pizza King Restaurant on the night of the After Five Shooting, not far from the After Five Lounge.  He identified the man as black male of approximately 20 years in age, with braids in his hair and wearing "sunglasses with brown frame and lenses, gold trim on each side."   PSOF ¶ 8; DSOF ¶ 8.  According to the police report, Chase also stated that the man had inquired about the gold chains around Chase's neck.  DSOF ¶8.  SPD officers pursued leads regarding this man wearing distinctive glasses under the theory that he and the other men with him were responsible for the After Five Shooting.[8]

<u>Second</u>, it is undisputed that the SPD was in possession of Polaroids of Mr. Schand in which Mr. Schand was wearing distinctive Cazal glasses and a gold chain.  PSOF ¶¶  23, 143. The record is also clear that the *only* photographs the SPD had of Mr. Schand wearing these

---

[8] Notably, no other witness interviewed by the police within the first two days after the After Five Shooting identified the assailant as wearing distinctive sunglasses and only two witnesses, Chase and Lawrence Gadson, identified the assailant as wearing braids.  DSOF ¶ 2-12; PSOF ¶¶ 2-12.

14

distinctive glasses were Polaroids that they obtained from the HPD.  PSOF ¶ 143.

Third, at least five witnesses have confirmed that they were shown pictures of Mr. Schand in which he was wearing the distinctive glasses.  PSOF ¶¶ 144-49.  For example, both Al Chase and Lavon Dixon testified at Mr. Schand's criminal trial that the SPD showed them a photo array which contained a photo of Mr. Schand wearing the distinctive glasses.  PSOF ¶ 145.  Indeed, Al Chase testified that he saw the photo of Mr. Schand in the distinctive glasses before making his lineup identification in December of 1986, and then made an in-court identification of Mr. Schand at trial.  PSOF ¶ 146.  Similarly, Lavon Dixon testified that the first time he viewed a photo array he picked out the photo of Mr. Schand wearing the distinctive glasses.  PSOF ¶ 147.

Further, two other witnesses, Michael Bernard and Willie Darko, also made in-court identifications of Mr. Schand at the motion to suppress hearing or at Mr. Schand's criminal trial after confirming that the Polaroid of Mr. Schand wearing the distinctive glasses was included in the photo arrays shown to them by the SPD.  PSOF ¶ 148.  And the record also indicates that Michael Hosten viewed a photograph of Mr. Schand wearing the distinctive glasses, which again, the SPD only had in color Polaroid form.  PSOF ¶ 149.

In short, the record demonstrates that the SPD repeatedly used an unduly suggestive photo array because: (i) certain witnesses stated the perpetrator was wearing distinctive glasses; (ii) the only pictures the SPD had of Mr. Schand wearing distinctive glasses were Polaroids, (iii) numerous witnesses confirmed they viewed pictures of Mr. Schand in photo arrays wearing the distinctive glasses, and (iv) therefore, these witnesses viewed the color Polaroids.   Such facts are, at a minimum, material issues of disputed fact regarding the photo array process employed by the SPD during their investigation that must brought to trial.

Defendants' effort to rebut this evidence by relying only on their own testimony in which the police individual officers deny that they used a suggestive array thirty years ago, see Mot. at 14, not only is conclusory, but inherently creates a disputed issue of fact because there is ample disputed evidence to the contrary.

### B.     Defendant McMahon Staged an Unduly Suggestive Lineup

Lineups must also consist of individuals who look similar to the accused.  See United States v. Benitez-Avila, 570 F.3d 364, 367, 372 (1st Cir. 2009) (finding a lineup reasonable only because the participants all had short, dark hair similarly styled to the defendant with facial hair drawn on them to match the defendant's, and all participants were of a similar body type and skin tone).  Here, a reasonable juror could easily conclude that the lineup Defendant McMahon staged on December 15, 1986 was unduly suggestive for three reasons.

First, a cursory review of the lineup shows that it emphasized Mr. Schand in several distinct ways.  Mr. Schand was noticeably shorter and younger than the rest of the lineup participants.  See PSOF ¶ 161.  For instance, two of the lineup participants were seasoned police officers, whereas Mr. Schand was only 22 years old at the time.  See PSOF ¶ 161.

Second, two witnesses to the lineup—Al Chase and Lavon Dixon—selected Mr. Schand *after* they had already been tainted by an unduly suggestive photo array containing Mr. Schand's distinctive Polaroids.  See PSOF ¶ 164.  Thus, Mr. Schand was the only person in the lineup that either Chase or Dixon had seen before in the photo array.  PSOF ¶ 164.  After testifying about both the photo array and the lineup, Chase and Dixon identified Mr. Schand in court.  PSOF ¶ 164. This fact alone constitutes undue suggestiveness.  Simmons, 390 U.S. at 383-84 (finding that there is "substantial likelihood of irreparable misidentification" when an eyewitness is shown photos of same suspect in multiple identification procedures because "the witness

16

thereafter [was] apt to retain in his memory the image of the photograph rather than the person actually seen, reducing the trustworthiness of the subsequent lineup or courtroom identification.").

Third, two other witnesses to the lineup—Charles Stokes and Anthony Cooke— testified that they knew every participant in the lineup *except* Mr. Schand.  Charles Stokes executed an affidavit in 1989 confirming that he "knew everyone in [the lineup] except Mark Schand who [he] recognized from the photos."  PSOF ¶¶ 165-66.  Mr. Stokes provided the same sworn testimony in Mr. Schand's 1992 Motion for a New Trial.  PSOF ¶ 167.  Mr. Stokes reaffirmed a third time that he indeed knew everyone except Mr. Schand in lineup during an interview with Centurion Ministries in 2010. PSOF ¶ 168.[9]  Anthony Cooke viewed a photograph of the lineup that took place on December 15, 1986, and he also testified in court that he identified Mr. Schand.  PSOF ¶¶ 169-71.  However, since the original trial, Mr. Cooke has consistently maintained that he only identified Mr. Schand because he was the only person in the lineup that Mr. Cooke did not know.  PSOF ¶¶ 172-73.  Knowing all of the "fillers" in a lineup is a paradigmatic example of an unduly suggestive lineup.  United States v. Wade, 388 U.S. 218, 232-33 (1967); see also Perry v. New Hampshire, 565 U.S. 228, 242-43 (2012); Osorio, 2015 U.S. Dist. LEXIS 143287, at *27; Thomas R. Leedham, Leedham's Notes:  On the Defense of Personal Misidentification (1984), 63 ("It is further essential that the witness not know other participants in the line-up as that would automatically reduce the number of the proposed line-up.").  Indeed, several Defendants admitted that a lineup would be unduly suggestive if the witness personally knew one or more of the line participants from a different context. PSOF ¶ 174.

---

[9] And although Mr. Stokes did not testify in 1987 regarding his lineup identification, the Commonwealth elicited this testimony from Defendant McMahon and thus used this identification as part of its case-in-chief.  See PSOF ¶ 166.

AMERICAS 93592309

C.    **The Affidavit of Michael Hosten**

Perhaps the most damning piece of evidence of the SPD's use of an unduly suggestive identification process comes from an affidavit supplied by Michael Hosten in 2006 (the "Hosten Affidavit") regarding a photographic array that he was shown just after Mr. Schand's arrest. PSOF ¶ 213.   A police report documenting the interview with Mr. Hosten confirms that Defendants Muise and Reid were the police officers who presented him with the photographic array.   PSOF ¶ 214.   Mr. Hosten was a participant in the botched drug deal that led to the After Five Shooting, and he testified at trial that Mr. Schand was one of the armed assailants.   See PSOF ¶ 221.   However, none of this was true.

In his affidavit, Mr. Hosten recounted that:

> two plain clothes Springfield police officers brought me into a small room in the Hall of Justice in Springfield.   My attorney was not present. The police told me that they had found the guy who shot Vickie Seymour. They told me he was from Hartford.   After describing what a bad person he was, they threw a single mug shot down on the table and told me that this was a picture of the Vickie's killer. He was a black male wearing sunglasses and thick chains.   There was a side view and a front view.

PSOF ¶ 215.   There can be no doubt that this was one of the Polaroid photos of Mr. Schand.   Mr. Hosten admitted that "I did not recognize this person. I had never seen him before. I was sure he was not the person who had robbed Heavy Stokes on September 2, 1986."   PSOF ¶ 216. However, this did not stop Mr. Hosten from identifying Mr. Schand based on the suggestion of the SPD:

> The police then picked up the photo, put it in a stack of other photos and handed me the stack of photos.   They asked me to pick out the guy who I had seen standing over Heavy Stokes outside the After Five on September 2, 1986.  I went through the photos and came to the photo they had shown me earlier. I looked at it for a few seconds, looked at the cops and indicated that this was the person I had seen*. **I identified this photo as the person I had seen because it was obvious that this was the person they wanted me to pick out since they had just shown me his photo and told me he was the shooter.**   I got the impression that if I

18

picked him, the police would help me in some way.

PSOF ¶ 217 (emphasis added). And the SPD did, in fact, help Mr. Hosten as a result of his wrongful identification of Mr. Schand. As Mr. Hosten recounted, "I lied because I had a bunch of pending criminal cases and the police had promised that they would make them disappear if I identified Mark Schand as the guy who attacked Heavy." PSOF ¶ 218. Mr. Hosten's identification of Mr. Schand was elicited at the criminal trial and used to make an in-court identification. PSOF ¶¶ 218, 221. Following the trial, Mr. Hosten's pending criminal cases were "nolle prossed." PSOF ¶ 91.

In arguing that the Hosten Affidavit is inadmissible hearsay because Mr. Hosten is deceased and his testimony does not qualify as an exception to hearsay under the "prior testimony" exception of Federal Rule of Evidence ("FRE") 804(b)(1), see Mot. at 14-15, Defendants ignore that the Hosten Affidavit qualifies as a statement against interest under FRE 804(b)(3). FRE 804(b)(3) provides that a statement that would otherwise be hearsay is nonetheless admissible if, at the time it was made, the statement is self-inculpatory; that is, it is "so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A). A statement is self-inculpatory if it is "sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." United States v. Barone, 114 F.3d 1284, 1295 (1st Cir. 1997). Here, Mr. Hosten's affidavit contains numerous statements against interest.

First, Mr. Hosten admits to perjury: "[a]t the suppression hearing and again at trial, I identified Mark Schand as the person I had seen standing over Heavy Stokes with a gun. This

19

was not true.  I lied because I had a bunch of pending criminal cases and the police had promised that they would make them disappear if I identified Mark Schand as the guy who attacked Heavy."  PSOF ¶ 218.  Accordingly, given the risk of a perjury charge that Mr. Hosten faced, the Hosten Affidavit constitutes a declaration against interest under Fed. R. Evidence 804(b)(3).[10]  See, e.g., Annunziata v. City of New York, 2008 U.S. Dist. LEXIS 42097, at *38-39 (S.D.N.Y. May 28, 2008) (eyewitness' handwritten recantation of prior identification exposed witness to perjury and thus qualified as exception to hearsay under Rule 804(b)(3)).

Second, Mr. Hosten admits to a conspiracy aimed at framing Mr. Schand for murder.  In his own words: "I was being held at the York Street Jail with Heavy Stokes, David Stokes and Anthony Cooke. We had a meeting to discuss our concern that the District Attorney's Office was getting ready to send us to prison for a long time.  At that point, we all agreed that we should try to help the police identify Vickie's killer in exchange for the dismissal of our open criminal cases."  PSOF ¶ 219.  Mr. Hosten notes that he falsely identified Mr. Schand as the killer, and that he updated his co-conspirators as to his conduct when he went back to jail.  PSOF ¶ 220 ("I told Heavy Stokes and Lawrence Gadson what had happened. I described the photo the police wanted me to pick out as a light skinned black guy wearing big chains.  I also told them that the police had promised to make all of my cases disappear if I cooperated.").  Thus, the Hosten Affidavit constitutes a co-conspirator statement against interest.  First Circuit law confirms that Rule 804(b)(3) encompasses hearsay statements that "demonstrate 'an insider's knowledge' as to

---

[10] Mr. Hosten's brazen admission to perjury is not alleviated by any statute of limitations.  The law is unsettled as to what the statute of limitations for perjury in a murder case is, if there is even one at all.  Indeed, in his deposition in this matter, Judge Mark Mastroianni, who served as the prosecuting attorney during Mr. Schand's 2013 motion for a new trial, acknowledged this ambiguity around the statute of limitations for perjury in a murder trial.  See PSOF ¶235.  Judge Mastroianni expressly granted releases in 2013 to those witnesses who agreed to recant their 1986 testimony, a step that would have been unnecessary had these witnesses not faced potential liability for perjury.  PSOF ¶ 235.  And, in any event, the statute of limitations for perjury would not have lapsed when Mr. Hosten made his affidavit, as the basis for his perjury could not have been discovered before Mr. Hosten admitted to it.  See M.G.L. c. 268 § 1.

the activities of the conspiracy . . . [and a] reasonable person in [the declarant's] shoes would not have made [the] statement" because "it gives the impression that [the declarant] was directly involved in the conspiracy." United States v. Monserrate-Valentin, 729 F.3d 31, 55 (1st Cir. 2013)); see also United States v. Ocasio-Ruiz, 779 F.3d 43 (1st Cir. 2015) (statements by mother of deceased coconspirator regarding her son's confession to her that he alone had killed victim are admissible under Rule 804(b)(3)).

## III.    **DEFENDANTS WITHHELD AND FABRICATED EXCULPATORY EVIDENCE**

To succeed on a § 1983 action for the withholding of exculpatory evidence, a plaintiff must prove: (1) that exculpatory evidence was withheld, (2) that the withholding was intentional or reckless, and (3) that the evidence was material.  Toro v. Murphy, 2009 U.S. Dist. LEXIS 117303 (D. Mass. Dec. 17, 2009) (Saris, J.); accord Brady v. Maryland, 373 U.S. 83, 87 (1963). Mark Schand's defense was jeopardized because the SPD deliberately concealed exculpatory evidence from defense counsel.  First, the record shows that the SPD deliberately tampered with the Stokes Report in which Charles Stokes identified the assailant as having "bad teeth." Second, the SPD also deliberately withheld reports produced by the Hartford Reports that indicated that Randy Weaver may have been involved in the After Five Shooting.

### A.    **The SPD Fabricated the Stokes Report to Suppress Exculpatory Information**

First, it is undisputed that the Stokes Report was altered. The unaltered version of the Stokes Report, which was discovered after Mr. Schand's trial, is a two-page document that includes a description of a police interview with Charles Stokes on the second page, in which he identified the assailant has having "bad teeth."  PSOF ¶ 184.  Mr. Schand's trial attorney, Roy Anderson, did not receive a full copy of the Stokes Report, but instead received an altered copy which concealed the existence of the second page, which included the referenced to "bad teeth."

21

PSOF ¶¶ 182-84.  Although the original Stokes Report contained page designations "Page 1 of 2" and "continued on page 2" on the first page, the altered version of this report had white-out tape over these designations, thus concealing to defense counsel the existence of a second page. PSOF ¶ 187.

Second, the record contains substantial proof that the withholding of the Stokes Report was intentional.  Notably, "[i]ntent or recklessness can be inferred in lieu of direct evidence of either."  Toro, 2009 U.S. Dist. LEXIS 117303, at *9 (citing Educadores Puertorriqueños en Acción v. Hernandez, 367 F.3d 61, 65 (1st Cir. 2004) (holding that state official's improper motive could be reasonably inferred from non-conclusory facts)); see also McMillian v. Johnson, 88 F.3d 1554, 1561 (11th Cir. 1996) (holding that officer's intent to withhold exculpatory evidence can be "infer[red] from the circumstances").  Here, the Stokes Report was found in 1991, locked in a cabinet in Defendant McMahon's office and under his custody and control. PSOF ¶ 185.  Defendant McMahon was the supervising officer during the investigation into the After Five Shooting.  PSOF ¶ 186.  Detective Reid testified in his deposition that he was "surprised" upon finding the original version of the Stokes Report with white out tape concealing the page designations following an inquiry from the press about the document.  PSOF ¶ 189. The SPD ultimately turned over the report to the Attorney General's office for a tampering investigation.  PSOF ¶ 188.

Defendants argue that they are entitled to summary judgment because there is "no basis in the record to indicate who altered the [Stokes Report]."  See Mot. at 17.  This is a hotly disputed issue of fact.  Based on the totality of circumstances and the evidence presented, a jury could certainly infer that the SPD in general, and Defendant McMahon in particular, were responsible for destroying or altering this piece of evidence ***that was in their sole possession*** and

was exculpatory to the defense.  See Blinzler v. Marriott Int'l, 81 F.3d 1148, 1158-59 (1st Cir. 1996) ("When a document relevant to an issue in a case is destroyed, the trier of fact sometimes may infer that the party who obliterated it did so out of a realization that the contents were unfavorable.").  Circumstantial evidence can support this adverse inference.  See United States v. de la Cruz-Paulino, 61 F.3d 986, 999 n.9 (1st Cir. 1995) ("[C]ourts in general have recognized that circumstantial evidence may, in given settings, have equal if not greater weight than direct evidence." (quoting United States v. Sutton, 801 F.2d 1346, 1358 (D.C. Cir. 1986)).  Ultimately, any explanation by a defendant concerning missing documents "is an issue of credibility that can be left for trial."  Pelletier v. Magnusson, 195 F. Supp. 2d 214, 236 (D. Me. 2002).

Finally, the Stokes Report was material, because it pointed to an alternative perpetrator. In the Stokes Report, Mr. Stokes described his assailant as approximately 30 years old with "bad teeth."  PSOF ¶ 184.  This description does not fit Mr. Schand, who was 21 years old at the time of the After Five Shooting and did not have bad teeth (to the contrary, Mr. Schand had a very distinctive gold front tooth).[11]  However, one key figure in the After Five Shooting *did* have bad teeth: Tracy Fisher.  PSOF ¶ 191. At the time of the After Five Shooting, Mr. Fisher was 28 years old and had suffered serious damage to his front teeth when he was previously shot by a police officer.  PSOF ¶ 192.  Thus, Mr. Fisher was a match for description of the alleged perpetrator in the withheld Stokes Report.

In order for "alternative perpetrator" evidence to meet the materiality standard for § 1983 claims, there must be "some plausible nexus linking the other suspect to the crime."  Toro, 2009 U.S. Dist. LEXIS 117303 at *12; see also Lopez v. Massachusetts, 349 F. Supp. 2d 109, 121 (D.

---

[11] Indeed, Mark Schand's defense counsel, Roy Anderson, testified that the unaltered Stokes Report with the reference to "bad teeth" would have been material to his defense as "it certainly would have been an area that I would have pursued in cross examination of the identification because it simply would not be how Mark Schand would be described by anyone that saw him."  PSOF ¶ 190.

23

Mass. 2004) (evidence that alternative suspect was seen near scene of crime and was acquainted with several key parties was material). The nexus linking Mr. Fisher to the After Five Shooting is not just plausible, it is beyond dispute. Mr. Fisher was found after years of searching by Mr. Schand's investigatory team, serving a 50-year prison sentence for a murder he committed one year after the After Five Shooting. In 2013, as part of Mr. Schand's motion for a new trial, Mr. Fisher admitted, under oath, that he was a participant in the After Five Shooting (though he denied killing Ms. Seymour). He also confirmed that Mr. Schand was not present at the scene of the crime. PSOF ¶ 227. Thus, the Stokes Report not only pointed to an alternative perpetrator, but one who (i) committed murder one year after the After Five Shooting; and (ii) admitted under oath in 2013 that he was involved in the After Five Shooting, and that Mr. Schand was not.

### B.      The SPD Withheld the Hartford Reports from Mr. Schand's Trial Counsel

The Hartford Reports also contained exculpatory evidence as they pointed to an alternative perpetrator: Randy Weaver. The First Hartford Report noted that the HPD had arrested Randy Weaver in a van that matched the description of the van observed at the scene of the After Five Shooting. PSOF ¶ 195. The HPD also noted that Mr. Weaver had similar hair and glasses to Mr. Schand. PSOF ¶ 196. The Second Hartford Report informed the SPD that the HPD had received an anonymous tip that Mr. Weaver was responsible for the After Five Shooting. PSOF ¶ 197.

The record also shows that the Hartford Reports were withheld from Mr. Schand's trial counsel. Roy Anderson again confirmed that these reports were not given to him during the trial, and that he was not informed of their existence until they were produced several years later during the trial of Mr. Schand's brother, Roger Schand, in connection with the After Five Shooting. PSOF ¶ 194. It is reasonable for a jury to infer that the SPD intentionally withheld

24

these documents, given that all documents relating to the After Five Shooting investigation were in the <u>sole possession</u> of the SPD, and located in a <u>locked</u> cabinet in Defendant McMahon's office.  <u>See</u> <u>Toro</u>, 2009 U.S. Dist. LEXIS 117303, at *9-10.

Finally, the evidence pointing to Randy Weaver as the assailant in the After Five Shooting was material.  Mr. Weaver testified at the 2013 motion for a new trial and admitted that he had been present at the scene of the After Five Shooting.  PSOF ¶ 227.  And, like Mr. Fisher, Mr. Weaver testified that Mr. Schand was not at the scene.  PSOF ¶¶ 222, 227.  He also confirmed that he owned a van in 1986 that matched the description of the van that had been seen at the crime.  PSOF ¶ 231.  At the time of the After Five Shooting, Mr. Weaver also had a similar appearance—including hairstyle—to Mr. Schand.  PSOF ¶ 232.  Thus, the nexus to Mr. Weaver is undeniable.

## C.    <u>Plaintiffs' Claims Are Not Barred by Collateral Estoppel</u>

Defendants argue that Plaintiffs are collaterally estopped from pursuing claims relating to this exculpatory evidence because such claims were the subject of prior proceedings.  Mot. at 16-22.  But in the First Circuit, it is "hornbook law that '[a] vacated judgment has no preclusive force either as a matter of collateral or direct estoppel or as a matter of the law of the case." <u>Jackson</u> v. <u>Coalter</u>, 337 F.3d 74, 85 (1st Cir. 2003); <u>Zeneca Ltd.</u> v. <u>Pharmachemie B.V.</u>, 37 F. Supp. 2d 85, 92 (D. Mass. 1999) (same).  As the First Circuit held in <u>Jackson</u>, a vacatur of a previous conviction means "there now is no final determination of the facts," so that "collateral estoppel [could] not apply."  <u>Jackson</u>, 337 F.3d at 85 (quoting <u>Jackson</u> v. <u>Commonwealth</u>, 717 N.E.2d 1001, 1004 (Mass. 1999)).  And, as noted above <u>supra</u> n.7, the granting of a motion for a new trial serves to vacate the underlying judgment.  <u>See</u>, <u>e.g.</u>, <u>Commonwealth</u> v. <u>Cameron</u>, 39 N.E.3d 723, 731 (Mass. 2015) (vacating and setting aside judgments of conviction and

25

remanding for new trial).[12]  Thus, because Mr. Schand's judgments of conviction were vacated, he is not estopped from challenging any of the conduct that was the subject of his prior proceedings.[13]

## IV.   DEFENDANTS ENGAGED IN MALICIOUS PROSECUTION

To establish a claim for malicious prosecution under § 1983, a plaintiff must show that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor."  Hernandez-Ceuvas v. Taylor, 723 F.3d 91, 100-101 (1st Cir. 2013).  A plaintiff need only establish that the seizure was "objectively unreasonable;" the plaintiff need not prove the defendant acted with malice.  Id. at 99.  "Probable cause exists if 'the facts and circumstances within [a police officer's] knowledge and of which [the officer] had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution' to believe that a crime has been or is being committed."  Alexis v. McDonald's Rests., 67 F. 3d 341, 351 (1st Cir. 1994).

Notably, a plaintiff's Fourth Amendment rights apply to both pre- and post-arrest conduct.  Manuel v. City of Joliet, 137 S. Ct. 911, 920 (2017); Hernandez-Cuevas, 723 F.3d at 99.  Accordingly, the individual Defendants may be held liable under § 1983 if the officers were "responsible for [plaintiff's] continued, unreasonable pretrial detention[.]"  Hernandez-Cuevas, 723 F.3d at 100 (holding officers may be liable for unlawful detention when they have "lied to or misled the persecutors" or (2) failed to disclose exculpatory evidence"); see also Esteras v. Diaz, 266 F. Supp. 2d 270, 280 (D.P.R. 2003) (holding that post arraignment detention also places "definitive restrictions on [plaintiff's] liberty," and therefore constitutes seizure subject to Fourth

---

[12] As noted above, a *nolle prosequi* also amounts to the same as vacating the conviction.  See supra note 7.
[13] In any event, Plaintiffs would not be collaterally estopped from bringing these claims, as Messrs. Weaver's and Fisher's testimony at the 2013 motion for new trial provides new evidence on which the exculpatory evidence's materiality would need to be evaluated.

26

Amendment protections).

### A.    Defendants Seized Mr. Schand

It is beyond dispute that Mr. Schand's arrest and subsequent detention constituted a seizure under the Fourth Amendment. "Where an individual is arrested pursuant to a judicial warrant…he becomes held pursuant to a legal process at the moment of arrest." Huevas-Cuevas, 723 F.3d at 100, n.9.

### B.    Mr. Schand's Seizure Was Not Supported By Probable Cause

Defendants' seizure of Mr. Schand was also not supported by probable cause. In order for a magistrate's finding of probable cause to satisfy the Fourth Amendment, it "must not have relied upon evidence an officer submitted in bad faith." Hernandez-Ceuvas, 723 F.3d at 101. Further, in order for the officer to be held liable for such a submission, the statements made in the warrant application must amount to "deliberate falsehood or . . . reckless disregard for the truth," and those deliberate falsehoods "were necessary to the magistrate's probable cause determination." Id. at 102; see also Burke v. Town of Walpole, 405 F.3d 66, 81-82 (1st Cir. 2002) ("In the case of allegedly material omissions, 'recklessness may be inferred where the omitted information was critical to the probable cause determination.'" (internal citation omitted).

Here, the only evidence used by the SPD to support probable cause and obtain the warrant, Michael Bernard's identification, was predicated on a suggestive photo array. See supra at Section II.A; PSOF ¶ 43. Mr. Bernard's identification was made after he was shown an array of photos that included an unduly suggestive Polaroid of Mr. Schand. See supra at Section II.A; PSOF ¶ 148. This tainted identification was gathered by Defendant Scammons, who later was involved in applying for the warrant.

27

In Hernandez, the First Circuit concluded that an officer's knowing use of a tainted identification as evidence to support a warrant constituted such a "reckless disregard for truth" in the application and therefore invalidated the warrant and left plaintiff's arrest as one unsupported by probable cause. Hernandez-Cuevas, 723 F.3d at 104. Just as in Hernandez, the SPD knowingly used a tainted identification to support its warrant application, and the magistrate relied only upon that tainted identification to issue the warrant. Therefore, Defendants improperly obtained a warrant and arrested Mr. Schand without probable cause in violation of the Fourth Amendment.

Defendants also had additional reason to believe that the identification was unreliable and insufficient as evidence of probable cause because Mr. Bernard made contradictory statements regarding the shooter. In his interview immediately after the shooting, Mr. Bernard stated that he had never seen the man who was the shooter. PSOF ¶¶ 5, 43. However, in the interview in which he identified Mr. Schand, he noted that the photo he picked was of a man "he had seen in Hartford a couple time prior to the shooting." PSOF ¶ 43. These contradictory statements further undermine the reliability of Mr. Bernard's identification, and thus Defendants should have known it was not sufficient to form probable cause.

The record also reveals Defendants had knowledge of alternative suspects they failed to investigate, and withheld this information from Mr. Schand and the Commonwealth. See PSOF ¶¶ 182-98, 206. Defendants also ignored contradictory identifications, such as those made stating that the shooter wore a mask. PSOF ¶ 207. A reasonable juror could conclude that all of these facts establish that Defendants lacked probable cause to make the arrest of Mr. Schand, and engaged in faulty procedures in attempt to procure evidence to support probable case. See PSOF ¶¶ 182-98, 206.

## C.     Defendants' Conduct Occurred Both Before and After Mr. Schand's Arrest

Defendants contend that there is no evidence that all of the Defendants personally engaged in conduct violating Mr. Schand's rights. Mot. at 27-31.  But, Mr. Schand's right to be free from an unlawful seizure extended beyond his initial detainment and therefore Defendants could be held liable for conduct which took place after the arrest.  Hernandez-Ceuvas, 723 F.3d at 100.  As shown above, the record also contains numerous facts that establish that each individual Defendant engaged in conduct both before and after Mr. Schand's arrest that violated Mr. Schand's Fourth and Fourteenth Amendment rights.  See supra Sections II, III, IV.B.

## D.     The Proceedings Terminated in Mr. Schand's Favor

Finally, as noted above, the proceedings terminated in Mr. Schand's favor when District Attorney Mastoianni entered a *nolle prosequi*.  Noel v. Town of Plymouth, 895 F. Supp. 346, 355 (D. Mass. 1995).  That *nolle prosequi* was not issued on the grounds of a procedural or technical defect, but because of the "examination of newly discovered evidence" resulting from the motion for a new trial.  PSOF ¶ 234.  Therefore, the record establishes Mr. Schand received a termination in his favor.  Noel, 895 F. Supp. at 355.

Defendants contend that a conviction conclusively establishes probable cause.  However, that conviction has been vacated and has no precedential effect.  See supra at Section III.C. Further, as the First Circuit has noted, malicious prosecution under § 1983 "stands on its own" and is not tied to procedures of the common law.  Under First Circuit precedent, a plaintiff need only show that he received a favorable termination, which has been satisfied here.  Hernandez-Ceuvas, 723 F.3d at 101.

## E.     Defendants Are Not Entitled to Qualified Immunity

Defendants argue they are entitled to qualified immunity on the claim for malicious

prosecution.  Mot. at 23-24.  The doctrine of qualified immunity protects police officers from §

1983 liability only when their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.  Mlodzinski v. Lewis, 648

F.3d 24, 28 (1st Cir. 2011).  The First Circuit has established a two prong analysis to determine

whether a defendant is entitled to qualified immunity: "(1) whether the facts alleged or shown by

the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was

clearly established at the time of the defendant's alleged violation."  Id. at 32. The essential

question is "whether the state of the law at the time would have given a reasonably competent

officer clear notice that what he was doing was unconstitutional." Id. 33.

Defendants have not provided any basis to suggest they are entitled to qualified

immunity.  Defendants claim is that because probable cause existed to arrest Mr. Schand, they

had qualified immunity.  This argument fails, however, because Defendants lacked probable

cause to arrest Mr. Schand in the first place, as shown above.

In any event, Defendants are not entitled to qualified immunity for their deliberate actions

to prosecute Mr. Schand based on fabricated and unreliable evidence, which clearly violated Mr.

Schand's rights that were existing at the time of his arrest, and which no reasonable officer

would have believed to be lawful.  See, e.g., Solomon v. Dookhan, No. 13-10208, 2014 U.S.

Dist. LEXIS 9650, at *32-33 (D. Mass. Jan. 7, 2014); Toro, 2009 WL 5064575, at *7;

Hernandez-Ceuvas, 723 F.3d at 98 ("There has long been a sense among the courts that the

Constitution provides some protection of individuals who are targeted for unreasonable, baseless

prosecutions, and who, as a result, a detained without probable cause during the pretrial

period.").  Indeed, as the First Circuit noted in 1990, "many courts, including this court, have

recognized that a plaintiff may have a cause of action for malicious prosecution under Section

1983." Torres v. Superintendent of Police, 893 F.2d 404 (1st Cir. 1990) (citing cases back to 1975); see also Dunn v. Tennessee, 697 F.2d 121, 125-26 (6th Cir. 1982) (finding malicious prosecution claim under Section 1983 as violation of Fourth Amendment rights); Morrison v. Jones, 551 F.2d 939, 940 (4th Cir. 1977) (same); Norton v. Liddel, 620 F.2d 1375, 1379 (10th Cir. 1980) (same).[14]

## V.    THE RECORD DEMONSTRATES DEFENDANTS' FAILURE TO INTERCEDE

Both supervisory and nonsupervisory officers may be held liable in § 1983 actions "for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace." Clark v. Taylor, 710 F.2d 4, 11 (1st Cir. 1983) (quoting Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972)). Defendants claim they are entitled to summary judgment because they see "no indication" in the record that they had a duty to prevent constitutional harm to Mr. Schand. Mot. at 32. This argument represents a fundamental misreading of the law and the record.

It has long been established that a law enforcement officer has a duty to intercede on behalf of a citizen whose constitutional rights are being violated. See Clark, 710 F.2d at 9. Further, law enforcement officers have the constitutional duty to correct false testimony by a government witness. See Limone v. United States, 497 F. Supp. 2d 143, 218-219 (D. Mass. 2007) ("The constitutional duty to intervene to correct false testimony by a government witness is not limited to the prosecutor in a given case."). As discussed exhaustively above, there is ample evidence showing that Defendants' conducted unduly suggestive identification procedures and then withheld and fabricated evidence, which constituted a violation of Mr. Schand's constitutional rights. None of the Defendants interceded to stop such constitutional violations.

---

[14] But see Echavarria v. Roach, No. 16-cv-11118, 2017 U.S. Dist. LEXIS 144589, *22-23 (D. Mass. Sept. 7, 2017) (dismissing malicious prosecution claim, but noting "the right not to be framed by law enforcement agents was clearly established" at the time of the investigation of the case, and that "to the extent that any defendant implicitly argues that qualified immunity shields him from a claim that Defendants fabricated false evidence and used it to convict plaintiff, Plaintiff may proceed with such a claim").

## VI.    DEFENDANTS ENGAGED IN A CONSPIRACY TO VIOLATE MR. SCHAND'S CONSTITUTIONAL RIGHTS

Defendants next claim "there is not a scintilla of evidence to support any finding of an agreement to commit harm" between the Defendants.    Mot. at 33.    As an initial matter, conspiracy claims are typically not ripe for adjudication on summary judgment.    Indeed, the First Circuit has cautioned that "[c]onspiracy is often beyond the reach of summary judgment because a conspiratorial agreement is rarely out in the open, and proof of conscious complicity may depend upon the careful marshalling of circumstantial evidence and the opportunity to cross-examine hostile witnesses."    Ferguson v. Omnimedia, Inc., 469 F.2d 194, 198 (1st Cir. 1972). This is because "[a] reasonable juror may be able to infer the existence of a conspiracy…and, moreover, is better positioned than the Court is at this stage of litigation to undertake such a fact-sensitive analysis."    Philbrook v. Perrigo, 637 F. Supp.2d 48, 57 (D. Mass. 2009) (declining to enter summary judgment on the claim of conspiracy for lack of agreement).    Moreover, "the agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof:    more often than not such an agreement must be inferred from all the circumstances."    Williams v. City of Boston, 771 F. Supp. 2d 190, 205 (D. Mass. 2011) (quoting Earle v. Benoit, 850 F.2d 836, 843 (1st Cir. 1988)).

In any event, a conspiratorial agreement may be inferred where there is evidence of concerted action and knowledge on the part of the coconspirators of a common plan.    In Ciolino v. Eastman, for example, the district court declined to enter summary judgment on plaintiff's claim that defendant officers fabricated evidence in an attempt to justify plaintiff's arrest and substantiate charges brought against him.    128 F. Supp. 3d 366, 377 (D. Mass. 2015).    The court found that testimony of the officer receiving the false information was sufficient evidence for a jury to infer that defendants conspired to provide false information with the intent to maliciously

32

prosecute the plaintiff.  Here, a reasonable juror can infer the existence of a conspiracy on behalf of the individual Defendants, who constituted the almost the entirety of the SPD homicide bureau, where the record shows that Defendants singled out Mr. Schand as a suspect, orchestrated unduly suggestive photographic arrays focused on him, used an unduly suggestive line up to induce identifications of Mr. Schand, and then withheld exculpatory evidence that would have indicated that he was not the suspect.[15]

## VII.    THE RECORD SUPPORTS *MONELL* MUNICIPAL LIABILITY

Under Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), and its progeny, a plaintiff seeking to prove municipal liability under § 1983 must show that a municipal custom or policy caused the plaintiff's injury.  An absence of a policy or custom, or a deficient policy or custom, in recruitment, training, supervision, or discipline of police officers, is also proof of municipal liabilty when it evidences a deliberate indifference to constitutional rights of individuals accused of criminal activity.  City of Canton v. Harris, 489 U.S. 378, 388 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."); Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).

There are two requirements that must be satisfied in order to establish municipal liability under Monell.  First, a custom or practice "must be attributable to a municipality," meaning that "it must be so well settled and widespread that the policymaking officials of the municipality can

---

[15] Moreover, Defendants' argument that summary judgment should be granted in favor of Defendant Assad because he was not part of the events that led to the wrongful conviction of Mr. Schand, is incorrect.  Liability for conspiracy continues even after a conspirator becomes inactive in the conspiracy.  United States v. Paz-Alvarez, 799 F.3d 12, 26 (1st Cir. 2015) ("[A]n 'inactive co-conspirator is presumed to be a continuing member of an ongoing conspiracy' unless he withdraws." (quoting United States v.  Ngige, 780 F.3d 497, 503 (1st Cir. 2015))).  In order to withdraw from a conspiracy, a conspirator must "act affirmatively either to defeat or disavow the purposes of the conspiracy."  United States v. Pizarro-Berrios, 448 F.3d 1, 10 (1st Cir. 2006).

AMERICAS 93592309

be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989). Second, the custom or practice "must have been the cause of and the moving force behind the deprivation of constitutional rights." Bordanaro, 871 F.2d at 1156-58. To satisfy this prong, a plaintiff must show "an affirmative link" between the policy of inadequate training and the harmful police practices that produced the constitutional violation. Kibbe v. Springfield, 777 F.2d 801, 804 (1st Cir. 1985). An affirmative link can be established by showing that a municipality failed to implement a training program that would effectively protect individuals against constitutional violations. See id. In order to show liability under a failure-to-train theory, a plaintiff "must establish that the particular officers who committed the violation had been deprived of adequate training, and that this specific failure in training was at least a partial cause of the ultimate injury." Rua v. Glodis, 52 F. Supp. 3d 84, 97-98 (D. Mass. 2014).

Here, the record contains extensive proof of municipal liability. First, Mr. Lou Reiter, a renowned expert in police practices and procedures, opined that the SPD's practices, policies, procedures, and training at the time of Mark Schand's arrest and conviction "were egregious departures from generally accepted police practices at the time of the arrest and conviction of Mr. Schand." PSOF ¶ 238. Defendants did not even bother to depose Mr. Reiter, and his expert report alone creates a triable issue of fact on all Monell issues. Second, the record contains extensive testimony from each of the Defendant officers which indicates that they did not receive training on issues such as eyewitness identifications, handling exculpatory evidence, proper recordkeeping, and interviewing alibi witnesses. Third, Defendants' own documents underscore the deficiencies in Defendants' policies and procedures.

34

A.    **Plaintiffs' Expert Analysis**

Plaintiffs' expert has opined at length as to the SPD's training and policies, concluding that they were far below the generally accepted standards at the time of Mr. Schand's arrest in 1986.  Indeed, after reviewing the voluminous record, Mr. Reiter concluded that:

> the training, policies, practices and supervisory oversight of detectives in the Springfield Police Department were egregious departures from generally accepted police practices at the time of the arrest and conviction of Mr. Schand.  As a result of these agency failures, Springfield Police Department employees utilized faulty photo identification procedures and tainted lineup practices during Mr. Schand's investigation, and also conducted an unreasonable follow-up investigation.  The Springfield Police Department also generally exercised a lack of supervisory oversight of the Springfield Police Department detectives' work product, leading to the focus of the investigation on Mr. Schand to the exclusion of other suspects.

PSOF ¶ 238.

Mr. Reiter analyzed the SPD's specific policies and practices in the mid-1980s.  For example, with respect to photo arrays, Mr. Reiter concluded that "[t]he failure to implement adequate policies on photo arrays and the failure to train and supervise police officers with regard to photo arrays led to instances where Springfield police officers egregiously misused this investigative technique" and that this was caused by a "conscious choice" from the SPD "not to provide the direction the direction and training necessary to avoid serious failures in its identification procedures to its personnel, specifically those involved in the Schand murder investigation."  PSOF ¶ 240.

With respect to lineups, Mr. Reiter opined that the SPD "did not provide written directives, training or supervisory oversight over identification procedures known to commonly produce accurate witness identifications."  PSOF ¶ 241.  Mr. Reiter also found that there was also a "complete failure to train off[ic]ers to investigate a potential exonerating alibi, and actual

35

failure by the Springfield Police Department to investigate Mr. Schand's exonerating alibi, was a departure from generally accepted police practices at the time of Mr. Schand's arrest and conviction." PSOF ¶ 242. According to Mr. Reiter, all of this established that the SPD "had insufficient training, policies, practices and procedures to account for exculpatory evidence and to ensure that all exculpatory materials were properly turned over to defendants." PSOF ¶ 243. Mr. Reiter more broadly concluded that the SPD "was grossly negligent with respect to [these] generally accepted police practices." PSOF ¶ 244. Mr. Reiter also found that the SPD "failed to provide specific direction for reasonable, consistent performance with written policy and training of its investigators in the common procedures of conducting photographic arrays and lineups, and handling exculpatory materials." Id. The policies and procedures of a police department must not remain static, but must continue to be reevaluated and revised to accommodate new changes in the law. PSOF ¶ 245. The policy manual used by the SPD leading up to and at the time of Mr. Schand's arrest was deficient, as it was not "up-to-date with current developments in the law enforcement industry" and did not contain any written directives or procedural guidelines "in the areas of eyewitness photo arrays, lineups, or exculpatory materials and the duty to disclose exculpatory materials." PSOF ¶ 246.

Defendants' attempts to discredit Mr. Reiter's report (even though they did not depose him) are without merit and should be disregarded.

First, although Defendants claim that there was no duty for the SPD to "mimic the language" of policy manuals, Mot. at 38, Mr. Reiter does not claim any such duty. Instead, as noted in the report, the policies and manuals of other departments serve as evidence that, at the time of Mr. Schand's arrest and conviction, there were generally accepted police practices in place around the country to protect the constitutional rights of an accused, and the SPD's own

36

procedures were "egregious" departures from these generally accepted practices.  See, e.g., PSOF ¶ 238.

Second, Defendants argue that individual Defendants confirmed they followed proper procedures, but this is a hotly disputed fact.  Mot. at 36-39.   Indeed, as described more fully below, there is a wealth of testimony from the individual Defendants that they in fact did ***not*** receive adequate training, leading to photo arrays and lineups that were unduly suggestive.  See discussion infra Part VII.B.

Finally, Defendants argue that Mr. Reiter has not "articulated a nexus" between any lack of written policy in the SPD and the harm sustained by Mr. Schand.  This is not Mr. Reiter's role, but it is also simply wrong.  Mr. Reiter expressly notes that as a result of the SPD failures to implement adequate policies, SPD officers utilized unduly suggestive photo array and lineup procedures during Mr. Schand's investigation and conducted a faulty investigation that focused unreasonably on Mr. Schand to the exclusion of other suspects.  PSOF ¶ 238.

B.    **The SPD's Own Witnesses Confirm the SPD's Failures**

The individual Defendants all testified that they did not recall receiving any training from the SPD on how to compile or conduct photo arrays.  See PSOF ¶ 71. Defendant Leonard Scammons testified that the only training he had received with respect to photo arrays dealt with the number of photos that needed to be in array.  Id.

The Municipal Police Training Committee ("MPTC"),[16] which is responsible for developing the curriculum for new recruit training programs in Massachusetts, provided instructions on how to conduct photo arrays within the context of constitutional law protections, but there is no evidence that the MPTC actually had any role in what was taught to new recruits

---

[16] This organization was also known as the Criminal Justice Training Council, its former name before becoming the MPTC.  For purposes of clarity, the organization will be referred to as the MPTC throughout.

37

in Springfield.  See PSOF ¶ 70.  To the contrary, the SPD's witnesses designated to testify about training uniformly testified that how to prepare or conduct photo arrays was _**not**_ discussed as part of new recruit training.  See, e.g., PSOF ¶ 71.  The techniques of conducting a photo array also were not discussed in in-service training.  See, e.g., id.  Sergeant Donald Sicard, who was in charge of the SPD's training programs during the time period when the individual Defendants were trained, testified that with respect to new recruit training on photo arrays, "they talked about it very briefly but they basically just explained what a photo array was.  They didn't go into detail on how to set one up and do it, because those were for detective officers."  Id.

Despite the fact that the SPD had a written manual of policies and procedures that was given to new SPD recruits, see id., there was no written policy in that manual discussing how to conduct photo arrays that did not violate an individual's constitutional rights.  See id.  There were also no general orders issued by the Chief of Police regarding the process for conducting photo arrays, id., and no amendments were ever made to the rules and regulations to include policies regarding photo arrays.  See id.  Defendants Muise and Reid testified to receiving the policies and procedures manual, but admitted that there was nothing in the manual regarding techniques for conducting proper photo arrays.  Id.  Defendants Assad and Scammons did not recall ever receiving a written policies and procedures manual, contrary to testimony that every new officer was supposed to receive that written manual, and Defendant McMahon did not recall whether the manual discussed proper techniques for photo arrays.  See id.  Accordingly, a reasonable juror could conclude that the SPD failed to provide adequate training to its officers, and that the SPD failed to have any written policy or procedure as to how to prepare a photo array that did not violate the constitutional rights of an accused.  This resulted in the unduly suggestive and constitutionally infirm identification procedure discussed supra at Part I.

With respect to lineups, the SPD also failed to provide any training on how to properly conduct lineups so that a suspect's constitutional rights were not violated.  See id.  It is also clear that there was no in-service training with respect to lineups.  See id.  As with photo arrays, Sergeant Donald Sicard testified that although lineups would be discussed during in-service training on the Sixth Amendment, lineups "would not have been a major topic for the recruit class."  Id.  Specifically, when asked how much time was spent on instructing recruits on lineups and showups, Sergeant Sicard testified that he "wouldn't spend that much time with a recruit officer.    I would explain what a lineup was, a show-up, a photographic identification, fingerprints, voice prints, et cetera."  Id.

Further, the SPD's policies and procedures manual did not contain any written rules and regulations addressing procedures for conducting lineups.  See id.  There were also no amendments made to the rules and regulations relating to conducting lineups.  See id.  Lieutenant Thomas Kennedy, who was designated as the City of Springfield's Rule 30(b)(6) representative to testify as to on-the-job and any other training, testified that there were no rules and regulations regarding policies on how to conduct a lineup.  Id.  There also were no general orders pertaining to lineups issued around Mr. Schand's arrest.  Id.

New recruits in the SPD also did not receive training on how to handle exculpatory evidence.  See id.  Lieutenant Thomas Kennedy and Sergeant Donald Sicard, the City's two Rule 30(b)(6) deponents designated to testify about training at the SPD, both admitted that there was no formal training on exculpatory evidence.  See id.  When asked whether SPD officers were "aware of Constitutional law cases regarding exculpatory evidence in the 1980s," Lieutenant Kennedy replied, "[s]ome may have been, and some maybe not."  Id.  There also was a lack of in-service training on exculpatory evidence.  See id.

39

Again, as with eyewitness identification procedures, there was no policy regarding handling exculpatory evidence in the rules and regulations distributed to each officer, nor were there any general orders promulgated related to exculpatory evidence or amendments to the rules and regulations to include policies on exculpatory evidence.  See id.  The SPD also did not provide training on how to thoroughly investigate and interview alibi witnesses.  Id.  There were no written policies or guidelines about investigating a suspect's alibi or interviewing alibi witnesses.  Id.

Finally, although there were policies and procedures about how records should be kept, PSOF ¶ 71, the SPD did not adhere to those policies.  Case files in the Detective Bureau were kept in the Bureau in a locked file cabinet, but the files could also be maintained in the Captain's office which was locked and only accessible to the Captain.  See id.  Commissioner Fitchet described the record keeping system as "more informal," where the Captain of the Detective Bureau had the large case folder to which the investigators had access. Id.

Taken together, there is ample evidence showing that the SPD's training of its officers and its policies and procedures were inadequate and left open the likelihood that constitutional violations would occur.

Defendants claim that the lack of formal training or policies on the foregoing is immaterial, as the individual Defendants and other members of the SPD received "on-the-job" training with respect to eyewitness identification procedures, handling exculpatory evidence, investigating alibi witnesses, and keeping and maintaining records.  But Defendants have developed no evidence of officers in the SPD receiving specialized on-the-job training that would have equipped them to conduct their investigation in a manner that did not violate Mr. Schand's constitutional rights, and Defendants' own expert acknowledged that on-the-job

40

training, by itself, is an insufficient safeguard.  PSOF ¶ 246.  Thus, in the case of the SPD, there

was no formal or on-the-job training that officers had that would have satisfied the standard

under <u>Monell</u>.  None of the individual Defendants could articulate any structured training that

they received, nor could any of the Rule 30(b)(6) deponents.  At a minimum, the officers'

testimony creates a disputed issue of fact about whether they received any training at all on the

issues of photo arrays, lineups, exculpatory evidence, recordkeeping, and interviewing alibi

witnesses.

### C.  <u>An Audit Performed By an Outside Consultant at the Direction of the SPD Confirms That Training Was Inadequate</u>

In the early 1990s, the City of Springfield engaged Wasserman Associates, a police

consulting firm, to conduct an audit of the SPD.  PSOF ¶ 198.  Wasserman Associates then

authored a report detailing its findings in April 1993 entitled "Policing Springfield:  Building

Capacity Developing Excellence."   PSOF ¶ 199 (hereinafter "the Wasserman Report").

Wasserman Associates interviewed elected officials, police department officials like the Chief of

Police and Deputies, and members of the community with the goal of making recommendations

to the City of Springfield and the SPD about issues to address in the department.  PSOF ¶ 200.

In the preliminary statement to the Wasserman Report, the authors identified "the most

important of these problems" with policing in Springfield.  The first of those problems was that:

> **The Department lacks sufficient resources to accomplish its mission.**
> The department does not have the resources it requires to perform its tasks
> in an efficient and productive manner:  Cruisers are in poor shape; <u>the
> records system which was once the envy of police departments across the
> Commonwealth threatens to collapse under the weight of its cumbersome
> paperwork; super officers do not receive the training and guidance
> required for policing a diverse community in the 1990s.  Police officers all
> spoke of a desire for more meaningful in-service training and education</u>.

PSOF ¶ 201.

According to Deputy Chief Fitchet, the Springfield Police Department was "woefully underfunded" at the time when the Wasserman Report was drafted.  PSOF ¶ 203.  This state of disarray was corroborated by former Chief of Police Thomas Fitzgerald, who stated that in the years before the Wasserman Report was drafted "[t]he City's finances were a disaster and there was layoffs across the board, so we really didn't have the financial resources to do much of anything."  PSOF ¶ 203 (emphasis added).  Commissioner Fitchet acknowledged that this issue of lack of funding was a "gradual progression" that resulted from funding issues dating back to the 1970s.  PSOF ¶ 203.

The Wasserman Report also highlighted training issues in the SPD.  Describing the "Perceptions of Employees," the Wasserman Report observed that members of the SPD "want to receive the training and resources they need to do their job" but felt in certain cases that they were "being denied the opportunity to participate in training" or otherwise had complaints about "access to training."  PSOF ¶ 204 (emphasis added).  Following the publication of the Wasserman Report, Deputy Chief Fitchet testified that the "chiefs tried to make training available as best they could within their budget, for as many officers as they could.  And that the Wasserman report might have had an effect on that, to try to give more training to more officers to spend more energy in trying to make training available for officers."  PSOF ¶ 205.

Based on this extensive record, there is ample evidence from which a jury could decide that Mr. Schand's constitutional rights were violated as a direct result of the City of Springfield's failure to adequately train its police officers.  The SPD did not provide any formal training to officers on the issues of eyewitness identification techniques, on handling and disclosing exculpatory evidence, on proper recordkeeping, or investigating alibis.  Nor did the SPD have any formal, standardized written policies and procedures about eyewitness identification,

AMERICAS 93592309

exculpatory evidence, recordkeeping, or investigation of alibis.  Those deficiencies resulted in a culture of inexperience and inconsistency within the SPD, despite the fact that there was clearly-established legal guidance on all of these issues around this time.

## VIII.  PLAINTIFFS' STATE LAW CLAIMS ARE TIMELY

As discussed supra, the Supreme Court held in Heck that, in order to recover damages for any "harm caused by actions whose unlawfulness would render a conviction or sentence invalid," the plaintiff must only prove that the conviction has been invalidated.  512 U.S. at 486-87.  The First Circuit has expressly acknowledged the possibility that the time period for filing suit under Massachusetts state law for wrongful convictions may also be tolled until the conviction is overturned.  See Haley v. City of Boston, 657 F.3d 39, 54-55 (1st Cir. 2011); see also Lombard v. Salisbury Police Dep't, No. 9422937B, 1995 Mass. Super. LEXIS 411, at *6-7 (Mass. Super. Ct. June 14, 1995) (concluding that the Massachusetts Civil Rights Act adopts limitation similar to that established in Heck).

All of Plaintiffs' state law claims are based on Mr. Schand's wrongful conviction, and the events that put Plaintiffs on notice of their claims was the favorable termination of Mr. Schand's conviction upon the issuance of the *nolle prosequi* in 2013 based on the evidence that was presented at the motion for new trial, including the witness recantations and the disclosure of the full nature of the SPD's conduct.[17]  Further, until the vacating of his judgment by Judge Kinder in 2013, Mr. Schand would have been collaterally estopped from bringing a suit relating to

---

[17] Summary judgment is not proper on the grounds of statute limitations when the time of accrual is at issue.  The question of when the plaintiff knew or should have known of its cause of action is one of fact that should be decided by the trier of fact, not at summary judgment.  Szymanksi v. Bos. Mut. Life Ins. Co., 778 N.E.2d 16, 20 (Mass. App. Ct. 2002) (citing Taygeta Corp. v. Varian Assocs., 763 N.E.2d 1053 (Mass. 2002)).  The same applies for issues of equitable tolling and equitable estoppel.  See Riley v. Presnell, 565 N.E.2d 780 ("[A]ny disputed issues relative to the statute of limitations ought to be decided by the jury."); Salvas v. Walmart-Stores, Inc., 893 N.E.2d 1187, 375 (Mass. 2008) (reversing summary judgment on statute of limitations where plaintiffs have shown disputed issue of material fact on whether equitable tolling applies).

AMERICAS 93592309

certain facts underlying his state law claims; those claims were not ripe until collateral estoppel was extinguished in 2013. Courts in this district have found that the statute of limitations on state law claims should be tolled when plaintiff may have been aware of wrongdoing but did not have definitive knowledge of it sufficient to put the plaintiff on notice. See Limone v. United States, 336 F. Supp. 2d 18, 47-48 (D. Mass. 2004) (stating that plaintiff "may have believed that [an individual] committed perjury, and even suspected…that the FBI had a hand in it. But he could not have known – the facts as alleged are so shocking – that the FBI was enabling, encouraging, and covering up the perjury.").[18]

## IX.    DEFENDANTS ENGAGED IN MALICIOUS PROSECUTION UNDER MASSACHUSETTS LAW

"To make out a claim for malicious prosecution, a plaintiff must prove:  (1) the institution of criminal process against the plaintiff with malice; and (2) without probable cause; and (3) the termination of the criminal proceeding in favor of the plaintiff." Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552, 561 (Mass. 2002). Malice may be inferred from a lack of probable cause. Beecy v. Pucciarelli, 441 N.E.2d 1035, 1039 (Mass. 1982). Such an inference is proper because in some cases "the lack of probable cause may be so obvious that the logical inference is that the prosecution resulted not from an error, but from malice." Id. Favorable termination of criminal proceedings is necessary to prove a claim of malicious prosecution, thus the statute of limitations on such a claim cannot run until favorable termination has occurred. See Limone, 336 F. Supp. 2d at 30 ("[W]hile most intentional torts . . . 'arise' and 'accrue' at the same time, a

---

[18] At a minimum, the statute of limitations for Mr. Schand's state law claims should equitably tolled as Mr. Schand could not have viably brought his claims premised on wrongful conviction until a favorable termination of his lawsuit.  See e.g., Correlas v. Viveiros, 572 F.E.2d 7 (Mass. 1991) (requiring that the prosecution ultimately terminated in plaintiff's favor to bring a claim for malicious prosecution).  Further, Defendants, who were responsible for Mr. Schand's incarceration—and therefore his inability to bring state law claims premised on a wrongful conviction—should be equitably estopped from invoking any limitations defense.  See Springfield Library & Museum Ass'n v. Knoedler Archivum, Inc., 341 F. Supp. 2d 32, 41 (D. Mass. 2004) (equitable estoppel bars defendant from benefitting from its own wrongdoing)

malicious prosecution claim requires an additional later act to occur, namely that the plaintiff's conviction be terminated in his favor.").

Here, Defendants again argue they have shown probable cause "because there is nothing in the record to refute or call into question the eye witness identification." Mot. at 41. But as explained in great detail above, Defendants initiated the action against Mr. Schand knowing they did not have probable cause, and continued to investigate and target Mr. Schand without probable cause through the use of suggestive identification procedures, by withholding exculpatory evidence, and by failing to investigate alternative suspects, thus permitting an inference of malice. See supra at Section VI. All of these facts, taken together or separately, fatally undermine a finding of probable cause. See Williams v. City of Boston, 771 F. Supp. 2d 190, 206 (D. Mass. 2011) (allowing state-law malicious prosecution claim where plaintiff alleged "that his conviction was obtained by the defendants' false testimony and as a result of a conspiracy between the defendants to deprive him of his constitutional rights").[19]

## X.    THE RECORD SUPPORTS PLAINTIFFS' LOSS OF CONSORTIUM CLAIMS

An action for loss of consortium may be maintained where such loss is shown to arise from tortious injury to one's family member caused by a third party. Limone, 336 F. Supp. 2d at 49 (citing Agis v. Howard Johnson Co., 371 Mass. 140, 145-46 (1976); Mouradian v. General Elec. Co., 23 Mass. App. Ct. 538, 544 (1987)). "In Massachusetts, a claim for loss of consortium on behalf of the wife (or children) of an injured party can only be maintained when the injured party has a valid tort claim." Dwan v. City of Boston, 2002 U.S. Dist. LEXIS 5628, at *26-27 (D. Mass. Mar. 29, 2002) (citing Mouradian v. General Elec. Co., 23 Mass. App. Ct. at 544). Mr. Schand has numerous valid state-law tort claims, including malicious prosecution, thus

---

[19] Defendants argue "it is not clear the plaintiff can prove the criminal proceedings" terminated in favor of Mr. Schand. Mot. at 41. As repeatedly shown above, this is wrong as a matter of law. See supra at n.7.

allowing Plaintiffs Mia, Quinton, Kiele, and Mark Schand Jr. to maintain claims for loss of consortium. See discussion supra VIII-IX; see discussion infra XI-XV.

Defendants argue that, because Mark and Mia Schand were not married at the time when Mr. Schand was arrested, there is no right to spousal consortium. But, the underlying injuries giving rise to Mrs. Schand's consortium claim did not accrue until 2013, after Mark and Mia had been married for over 20 years. See supra at I, IX. To take just one example, the malicious prosecution violation was ongoing at the time of the 1992 Motion for New Trial, at which time Mark and Mia Schand were married. See Limone, 336 F. Supp. 2d at 37-38.

The expert report authored by Dr. Antoinette Kavanaugh describes in painful detail the basis for Mia Schand's loss of consortium claim. PSOF ¶ 140. As set forth therein, Mia was pregnant when Mr. Schand was arrested, and was forced to endure labor without her spouse and could not bring her son to see Mark until a month after her giving birth. Id. Mia Schand "was able to identify ways in which her life had been impacted by her husband's incarceration," including that she wanted to have more children but could not, that she was without financial and emotional support of her husband, that being a single parent made it harder to be involved in her son's life, that she could have maybe opened her own business one day with the added financial support of her husband, and that she did not have a proper wedding. Id.

Plaintiffs Mark Jr., Quinton, and Kiele Schand all also have a viable loss of parental consortium claim. As with spousal consortium above, Mr. Schand has numerous valid state law claims, including but not limited to malicious prosecution, and consequently his three sons have viable claims for loss of parental consortium. And, as Dr. Kavanaugh discussed in her report, all three of Mark Schand's son spoke of the profound effects that not having their father with them had on them as they grew up. Id.

46

## XI.    DEFENDANTS ENGAGED IN A CIVIL CONSPIRACY

Defendants claim that a clam for conspiracy cannot stand because Plaintiffs cannot prove coercion.  Mot. at 41-42.  But Massachusetts has two kinds of civil conspiracy, and coercion is only required "if there is no independent basis for imposing tort liability." Kurker v. Hill, 689 N.E.2d 836, 839 (Ct. App. Mass. 2998) (noting "the absence of facts supporting the element of coercion is not fatal to the plaintiff's claim").  Here, the record supports a claim for the second form of conspiracy based on the "concerted action theory."  Id. (citing Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994)); see also Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 362-63 (D. Mass. 2002).  Under this theory, Plaintiff must show "facts which manifest a common plan to commit a tortious act where the participant knew of the plan and its purpose and took affirmative steps to encourage achievement of the result." Kurker, 689 N.E.2d at 837.

As shown above, Defendants engaged in a common plan the purpose of which was to deprive Mr. Schand of his constitutional rights and prosecute him for a crime he did not commit. See supra at Section VI. Defendants argue that there is no evidence in the record to establish any agreement or meeting of the minds between defendants, or an unlawful purpose.  But as shown above, there is ample evidence to conclude that Defendants, acting together as members of a small, tight-knit department, engaged in conduct which caused numerous constitutional rights violations against Mr. Schand.  See supra at Section VI.

## XII.    DEFENDANTS ENGAGED IN NEGLIGENT INVESTIGATION

In order to succeed on a claim of negligence under Massachusetts law, plaintiff must show "(1) that defendant owed them a duty of care; (2) that defendant breached that duty; (3) that plaintiffs suffered damages; and (4) that defendant's breach was the proximate cause of

plaintiff's damage." Limone v. United States, 497 F. Supp. 2d 143, 229 (D. Mass. 2007) (citing

Bennet v. Eagle Brook Country Store, 557 N.E.2d 1166 (Mass. 1990)).

Police officers owe a duty of care to investigate that is within the scope of their duties.

See Limone, 497 F. Supp. 2d at 230 (quoting Commonwealth v. Levesque, 766 N.E.2d 50, 56-57

(Mass. 2002).  The record contains numerous facts that establish that officers breached that duty

by failing to properly investigate the After Five Shooting because Defendants used suggestive

photo arrays and lineups, failing to investigate alternative suspects, failing to investigate Mr.

Schand's alibi, and failing to memorialize and disclose evidence, including exculpatory

evidence.  See supra at Sections VI-VII.  As shown above, this breach of duty proximately

caused the damage Mark Schand experienced, in the form of twenty-seven years of incarceration

for a crime he did not commit.[20]

## XIII.  SPRINGFIELD ENGAGED IN NEGLIGENT SUPERVISION AND TRAINING

To prove negligent supervision under Massachusetts law, plaintiff must show that: (1) the

persons whose actions form the basis of the claim were agents and/or employees of the defendant

employer; (2) the agents and employees came into contact with member of the public in the

course of their employer's business; (3) the employer failed to use reasonable care in the

selection, supervision, and retention of the agents and employees; and (4) that the failure to use

such reasonable care was the proximate cause of harm to the plaintiff.  Limone, 497 F. Supp. 2d

at 233 (citing Carson v. Canning, 62 N.E. 964 (1902); Foster v. The Loft, Inc., 526 N.E.2d 1309

---

[20] Defendants also argue on this point that the individual defendant officers – Reid, Muise, Assad, Scammons, and McMahon – are immune from suit under M.G.L. c. 258 and thus are entitled to summary judgment for negligent investigation.  (Def. Mot. at 42-43).  It is improper to grant the individual Defendants summary judgment on this ground, as the question of whether their actions constituted negligence remains a triable issue of fact.  See Marquez v. Home Depot USA, Inc., 154 F. Supp. 2d 152, 156 (D. Mass. 2001) (denying motion for summary judgment and stating that "[a]lthough the existence of a duty is a question of law, usually the question of negligence is one of fact for the jury." (citing and quoting O'Sullivan v. Shaw, 431 726 N.E.2d 951, 954 (Mass. 2000); Irwin v. Town of Ware, 467 N.E.2d 1292, 1305 (Mass. 1984).

(1988))).  While supervisors are to be granted some discretion in carrying out their roles as supervisors, "[f]ailure to act after notice of illegal action does not represent a choice based on plausible policy considerations" but rather constitutes "complete abandonment of the supervisory role."  Id. at 232-33 (quoting Tonelli v. United States, 60 F.3d 492, 496 (8th Cir. 1995)).

Defendants argue that they are entitled to summary judgment because "the record supports a finding that the training afforded SPD officers at the time of the acts complained of was fully adequate, and especially with regard to use of photo arrays, line up procedures, duties with regard to exculpatory evidence, and investigatory techniques."  As shown in above, however, there is ample evidence that the SPD engaged in negligent supervision and training, and had no written policies or procedures to guide officers on how to conduct investigations without violating individuals' constitutional rights.  See supra at VII.B.  As described above, negligent training and lack of supervision caused numerous constitutional rights violations and the wrongful conviction of Mr. Schand for a crime he did not commit.  See supra at Section VII.B.

## XIV.  **DEFENDANTS ENGAGED IN INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

To make a claim for intentional infliction of emotional distress, plaintiff must show "(1) that [defendants] intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe."  Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014).

Defendants argue there is no evidence in the record to show that that any of the named defendants had the requisite intent to cause emotional distress.  However, as shown above, there is ample evidence to support a finding that Defendants engaged in a concerted plan to prosecute

49

Mr. Schand for a crime they knew he did not commit—resulting in a conviction with a life sentence.  Contrary to Defendants' argument, there is ample evidence to show that Defendants coerced witnesses to identify the assailant as Mr. Schand and withheld exculpatory to the contrary.  See supra at Sections VI-VII.  This conduct, taken separately or with all actions conducted by Defendants to intentionally violate Mr. Schand's rights as shown above, is sufficient to show Defendants engaged in extreme and outrageous conduct which they should have known, and did in fact cause, Mr. Schand and his family to suffer.  See Bazinet v. Thorpe, 190 F. Supp. 3d 229, 240 (D. Mass. 2016) (finding that "fabricating evidence in an effort to obtain criminal charges against an innocent citizen" sufficient to show IIED claim); Limone, 497 F. Supp. 2d at  227 (holding that there was a valid IIED claim and nothing that "[f]raming innocent men for a capital crime, prolonging their suffering for decades while they made futile attempt after attempt to win their freedom, thwarted at every turn – these acts are beyond all bounds of decency.  Perverting the system of justice [the defendant officers] had sworn to uphold – that has no place in a civilized community.").  Moreover, as evidenced in the discussion of Plaintiffs' loss of consortium claims, there is ample support in the record to show that Plaintiffs' suffered severe emotional distress.  See supra Part X; PSOF ¶ 140.

## CONCLUSION

For the reasons set forth above, summary judgment is inappropriate, and Plaintiffs respectfully request that the Court deny the Motion and grant any other relief the Court deems just and proper.

Dated:  November 17, 2017                       Respectfully submitted,

By:  /s/   Joshua D. Weedman

James Trainor (BBO # 6487879)
Heather K. McDevitt (pro hac vice)

AMERICAS 93592309

Joshua D. Weedman (*pro hac vice*)
Jacqueline L. Chung (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Phone:  212.819.8200
Fax:  212.354.8113
jtrainor@whitecase.com
hmcdevitt@whitecase.com
jweedman@whitecase.com
jacqueline.chung@whitecase.com

*Counsel for Plaintiffs*

AMERICAS 93592309

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment was sent to the following counsel on November 17, 2017 via ECF:

Lisa C. deSousa
Edward M. Pikula, BBO # 399770
John T. Liebel, BBO #299660
Law Department, City of Springfield
36 Court Street
Suite 210
Springfield, MA 01103
Phone: 413-787-6085
Email: ldesousa@springfieldcityhall.com; attyemp@aol.com; jliebel@springfieldcityhall.com
*Counsel for Defendants City of Springfield, Joseph Assad, and Raymond P. Muise*

Austin M. Joyce, Esq. BBO #255040
Reardon, Joyce & Akerson, P.C.
4 Lancaster Terrace
Worcester MA 01609
Phone: (508) 754 7285
Email: ajoyce@rja-law.com
*Counsel for Defendant Elmer McMahon*

Kathleen E. Sheehan, BBO #456910
Keyes & Donnellan
293 Bridge Street, Suite 600
Springfield, MA 01103
Phone: (413) 781-6540
Email: ksheehan@keyesanddonnellan.com
*Counsel for Defendant Michael Reid*

Kevin B. Coyle, BBO # 103540
1299 Page Boulevard
Springfield, MA 01104
Phone: (413) 787-1524
Email: attycoyle@aol.com
*Counsel for Defendant Leonard Scammons*

*/s/ Joshua D. Weedman*
Joshua D. Weedman

52