# Exhibit 46

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MARK SCHAND, et al.,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**CITY OF SPRINGFIELD, et al.,**<br><br>**Defendants.** | **C.A. No. 3:15-cv-30148-MAP** |

# **EXPERT REPORT OF LOU REITER**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................1

II. CASE BACKGROUND ..................................................................................3

III. DOCUMENTS AND INFORMATION CONSIDERED.............................................4

IV. METHODOLOGY .........................................................................................6

V. SUMMARY OF OPINION ................................................................................8

VI. GENERALLY ACCEPTED POLICE PRACTICES ..............................................8

A. Generally Accepted Police Practices for Photographic Identifications ..........................9
B. Generally Accepted Police Practices for Lineups.......................................................14
C. Generally Accepted Police Practices for Disclosure of Exculpatory Evidence............18
D. Generally Accepted Police Practices for Police Oversight.........................................19
E. Generally Accepted Police Practices for Investigations ..............................................20

VII. THE SPRINGFIELD POLICE DEPARTMENT FAILED TO FOLLOW GENERALLY ACCEPTED POLICE PRACTICES ..................................................21

A. The Springfield Police Department's Policies and Procedures Manual Is Deficient ...22
B. The Springfield Police Department Had Inadequate and Inconsistent Policies, Procedures, and Training for Photographic Identifications ........................................26
C. The Springfield Police Department Used Inadequate and Inconsistent Policies, Procedures and Training for Lineups.............................................................................29
D. The Springfield Police Department Utilized Inadequate and Inconsistent Policies, Procedures and Training for Disclosure of Exculpatory Evidence..............................31
E. The Springfield Police Department Utilized Inadequate and Inconsistent Policies, Procedures, and Training on Detective Follow-up on Alibi Evidence .........................34

## I. INTRODUCTION

1. My name is Lou Reiter. I have been actively involved in police practices and law enforcement since 1961. I was an active police officer for 20 years. Since my retirement as a police officer in 1981, I have been involved in police and law enforcement practices as a private police consultant.

2. Since 1983, I have been providing law enforcement consultations in police training and management. I provide law enforcement training in the following areas:

- Policy and procedure development.
- Investigative procedures and supervision.
- Investigation of critical incidents – officer-involved shootings, use of force, and pursuits.
- Managing the Internal Affairs function.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit issues.
- Jail intake procedures.
- Personnel practices.
- Supervisory techniques.
- Crowd control procedures.
- Liability management.
- Management effectiveness.

I also consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization. Six of those have been as a consultant to the Special Litigation Section, Civil Rights Division, of the U.S. Department of Justice. My primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.

- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.

3. Since 1983, I have been retained in over 1100 police-related cases. In about two-thirds of those cases I was retained by the plaintiff and, in about one-third, by the defendant. Assistance provided includes case analysis and development and expert witness testimony. I have been qualified in state and federal courts, including the District of Columbia and Puerto Rico, to provide trial testimony in many areas including:

- Field procedures including tactics, arrest techniques and pursuits.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures.
- Jail intake procedures.
- Police management and personnel practices.
- Investigation of citizen complaints and discipline.
- Police policy and procedures development.
- Police training.

4. I am a former Deputy Chief of Police of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over twenty years until I retired in 1981. During that period of time I served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer. I was involved in police training, investigating allegations of police misconduct, and I served as Chairman of the Use of Force Review Board, as a member of the Unusual Occurrence Command Post Cadre, and as a researcher and author of the chapters on internal discipline, training, and management/employee relations for the Police Task Force Report of the National Advisory Commission on Criminal Justice Standards and Goals. In 1993 I published the manual "Law Enforcement Administrative Investigations", the Second Edition in 1998, and the current Third Edition in 2006. I have supervised detectives while with the Los Angeles Police Department. Since my retirement, I

have audited police agencies in their investigative practices. I have conducted similar audits for the U.S. Department of Justice, Civil Rights Division. At least once each month for the past 20 years I have conducted training programs for police agency investigators and interacted with these in-service police personnel. This breadth of experience has provided me with the specialized knowledge, historical experience, and training to determine what are reasonable and generally accepted practices for police investigators.

5. My experience, training, and background are more fully described in my resume, which is attached as Exhibit A. A complete list of my testimony during the past four years is also attached as Exhibit B

## II. CASE BACKGROUND

6. I have been retained to evaluate the arrest and conviction of Plaintiff Mark Schand ("Mr. Schand") stemming from the homicide of Victoria Seymour outside the After Five Lounge in Springfield, Massachusetts on September 2, 1986.

7. I understand that Mr. Schand was arrested by officers of the Springfield Police Department in Hartford, Connecticut on October 29, 1986, and ultimately convicted and sentenced to life without the possibility of parole following a jury trial which took place in 1987.

8. In the years since Mr. Schand's conviction in 1987, I understand that evidence has come to light that proves that Mr. Schand was not actually guilty of the crime for which he was convicted. This evidence led to a hearing in 2013 on Mr. Schand's request for a new trial, at which a number of eyewitnesses recanted prior statements they had made to the police. Mr. Schand was subsequently exonerated and released from prison in 2013.

9. Mr. Schand and his family filed the present lawsuit in 2015, alleging that the Springfield Police Department violated their rights under the U.S. Constitution and various state laws. Among other things, Mr. Schand and his family allege that the Springfield Police Department utilized unduly suggestive identification procedures, failed to disclose exculpatory evidence, failed to interview alibi witnesses, and failed to maintain accurate investigatory records.

## III. DOCUMENTS AND INFORMATION CONSIDERED

10. I have reviewed the following materials regarding this case:

- The complaint in *Mark Schand et al. v. City of Springfield et al.*, Case No. 3:15-CV-30148 (MAP)
- Notice of Deposition for Defendant City of Springfield 30(b)(6) designee
- Police Reports
  - Investigative Summary Regarding Interview of Al Chase signed by Det. Assad and Det. Reid, September 3, 1986
  - Investigative Summary Regarding Interview of Anthony Cooke, signed by R. Cheetham and E. Dean, September 3, 1986
  - Summary of Investigative Interviews, signed by Det. Reid and Det. Scammons, September 16, 1986
  - Activity Report, signed by Det. Scammons and Det. Reid, September 24, 1986 (unaltered version)
  - Activity Report, signed by Det. Scammons and Det. Reid, September 24, 1986 (altered version)
  - Lieutenant Elmer McMahon's notes on the December 15, 1986 Lineup
  - Summary of Anthony Cooke's Viewing of Photo of December 15, 1986 Lineup, signed by Det. Scammons and Det. Doty, January 16, 1987
  - Report from the Hartford Police Department Regarding John Randall Weaver, signed by Sgt. Robert Taylor
  - Report from the Hartford Police Department Regarding John Randall Weaver, signed by Officers Russo and Cunningham, October 15, 1986
- Answers to Interrogatories
  - Defendant Joseph Assad's Answers to Plaintiffs' First and Second Sets of Interrogatories
  - Defendant Elmer McMahon's Answers to Plaintiffs' First and Second Sets of Interrogatories

  - Defendant Raymond Muise's Answers to Plaintiffs' First and Second Sets of Interrogatories
  - Defendant Michael Reid's Answers to Plaintiffs' First and Second Sets of Interrogatories
  - Defendant Leonard Scammons's Answers to Plaintiffs' First and Second Sets of Interrogatories
  - Defendant City of Springfield's Answers to Plaintiffs' First and Second Sets of Interrogatories

- Request for Admissions
  - Defendant City of Springfield's Responses to Plaintiffs' Request for Admissions

- July 15,1987 Motion to Suppress Transcript

- November 9, 1987 Trial Transcript

- August 9, 2013 Testimony of Anthony Cooke during the 2013 Motion for New Trial

- Certain additional Springfield Police Department documents
  - 1981 Rules and Regulations
  - 1993 Consulting Audit Report
  - 2005 Consulting Audit Report
  - 2007 Consulting Audit Report

- Certain witness statements
  - Affidavit of Michael Hosten, June 24, 2006
  - Affidavit of Charles Stokes, July 7, 1989
  - Summary of Interview with Charles Stokes, taken by Centurion Ministries Investigator Richard Hepburn, March 10, 2010
  - Investigation Report of Interview with Anthony Cooke, February 9, 1999
  - Statement of Kenneth Whitted, 2010
  - Affidavit of Martin Smith, January 28, 2013
  - Summary of Interview with Tracy Fisher, May 24, 1990

- Depositions
  - Deposition of Defendant Raymond Muise, dated October 21, 2016
  - Deposition of Defendant Elmer McMahon, dated October 28, 2016
  - Deposition of Defendant Michael Reid, dated October 20, 2016
  - Deposition of Defendant Joseph Assad, dated November 29, 2016
  - Deposition of Defendant Leonard Scammons, dated November 28, 2016
  - Deposition of Assistant District Attorney Alyson Yorlano, dated November 14, 2016
  - Deposition of Thomas F. Fitzgerald (Defendant City of Springfield, 30(b)(6)), dated February 16, 2017

  - Deposition of Thomas Kennedy (Defendant City of Springfield, 30(b)(6)), dated May 19, 2017
  - Deposition of Daniel R. Zivkovich (Municipal Police Training Committee, 30(b)(6)), dated May 1, 2017
  - Deposition of former Police Commissioner Edward Keating, dated May 23, 2017
  - Deposition of Donald Sicard (Defendant City of Springfield, 30(b)(6)), dated June 7, 2017
  - Deposition of Brian Mulvagh, dated January 5, 2017
  - Deposition of C. Lee Bennett, dated May 19, 2017
  - Deposition of William J. Fitchet, dated April 13, 2017
  - Deposition of Plaintiff Mia Schand, dated February 3, 2017

- Additional Materials
  - MASSACHUSETTS LAW ENFORCEMENT HANDBOOK, Attorney General Robert H. Quinn, Committee on Law Enforcement and Administration of Justice, 1972
  - Newton MA. Police Department, General Order 85-24 Eyewitness identification, Lineup, Photographic Arrays, June 16, 1985
  - <u>Rhode Island Law Enforcement Officers Official Manual, Third Edition</u>, August 1985, Department of Attorney General. These guidelines are exactly the same as reflected in the <u>Rhode Island Law Enforcement Officers Official Manual</u>, Attorney General Israel, 1974
  - <u>Introduction to Criminal Evidence and Court Procedure</u>, Hanley, Schmidt and Robbins, McCutchan Publishing, 1987
  - Newton MA. Police Department, General Order 85-24 Eyewitness identification, Lineup, Photographic Arrays, June 16, 1985
  - <u>Criminal Procedure for the Criminal Justice Professional</u>, Third Edition, John N. Ferdico (member of Maine and Massachusetts Bars) 1985
  - <u>Criminal Law and Procedure: text and cases</u>, Second Edition, Felkenes, 1985
  - Criminal Investigation, Weston and Wells, 1988
  - Criminal Investigation, International Association of Chiefs of Police, 1989
  - Practical Homicide Investigation, Second Edition, Geberth, 1993
  - Report on Police, National Advisory Commission on Criminal Standards and Goals, U.S Department of Justice, 1973
  - <u>Police Supervision</u>, International Association of Chiefs of Police, 1985
  - <u>Police</u>, National Advisory Commission on Criminal Justice Standards and Goals, U.S. Department of Justice, 1973

## IV. <u>METHODOLOGY</u>

11. The opinions expressed in this report are based upon the totality of my specialized knowledge in the field of police practices. This expertise is derived from my personal police

experience, knowledge, and training, and has been developed during my 56 years of involvement in law enforcement as both a practitioner and later on as a trainer, auditor and litigation consultant. This experience has provided me with extensive personal and specialized training, as well as with experience and knowledge of police operations and generally accepted police practices. The body of knowledge that I have reviewed over the years coupled with my personal and professional experiences, my continued auditing of police agencies, my constant training of police supervisors, managers and executives, and my continuous interaction with other police professionals, organizations and training personnel, all form the foundation for the opinions I am rendering in this matter.

12. My examination of the factors involved in this particular case embodies the basic fundamentals which I employ in my professional examination of police agencies during my audits and when working as a consultant with the U.S. Department of Justice. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

13. The terminology I use in this report is not meant to invade the purview of the court or the final jury determination. I use these terms in my training of police supervisors, managers and command officers when instructing on administrative investigations and civil liability. These are products of my continuous review of case law that should guide a reasonable police agency in supervising its employees. These terms have become common terms within law enforcement supervision, management and risk management; just as the terms of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

## V. SUMMARY OF OPINION

14. Based upon my review of the materials in this matter and my specialized knowledge, skills, experience and training in police practices, I have concluded that the training, policies, practices, and supervisory oversight of detectives in the Springfield Police Department were egregious departures from generally accepted police practices at the time of the arrest and conviction of Mr. Schand. As a result of these agency failures, Springfield Police Department employees utilized faulty photo identification procedures and tainted lineup practices during Mr. Schand's investigation, and also conducted an unreasonable follow-up investigation. The Springfield Police Department also generally exercised a lack of supervisory oversight of the Springfield Police Department detectives' work product, leading to the focus of the investigation on Mr. Schand to the exclusion of other suspects.

## VI. GENERALLY ACCEPTED POLICE PRACTICES

15. Major crimes, particularly homicides, were regular incidents that police departments during the 1980s should have expected to encounter and investigate. In fact, the depositions of Springfield Police Department officers in this case indicated that the Springfield Police Department investigated about fifteen homicides each year.

16. There were common and generally accepted police investigative practices during that period that any police department, but specifically one the size and with the criminal exposure of the Springfield Police Department, should have been aware of, promulgated written procedures for, trained for, and exercised supervision of, to ensure that investigative conduct met those generally accepted practices.

17. Indeed, there is a large body of knowledge and literature concerning the practices and standards that modern, reasonably managed and administered police agencies across the

U.S. should follow and apply to their operations. These generally accepted practices have developed over time to encourage and assist police agencies to deliver professional, reasonable, effective, and legal police services to communities.

18. Many of these generally accepted practices have been developed from law enforcement's critical analysis of field incidents and examinations of reported incidents relating to police liability, operational deficiencies and employee misconduct. These generally accepted practices have been a response to reported cases of police misconduct and liability, and have been driven by a desire of law enforcement to create a system that ensures that police conduct remains within acceptable legal and Constitutional bounds. I am familiar with this body of knowledge through my continuous training, audits, and assistance to law enforcement agencies.

19. Law enforcement has recognized and generally accepted that there is an ongoing requirement for reasonable and legal police response to field incidents, including the investigation of serious crimes such as homicides, and for constant improvement necessary to ensure that those responses are consistent with the protections of the United States Constitution.

## A. Generally Accepted Police Practices for Photographic Identifications

20. There is extensive, publicly-available documentation from the 1970s and 1980s that demonstrates that the procedures for photo arrays, lineups, and other identification procedures were well settled by the time that Mr. Schand was arrested in 1986.

21. For example, a Massachusetts police handbook from 1972 (the "Massachusetts Law Enforcement Handbook")[1] provides the following guidance on photographic arrays:

> When you suspect that a person may have committed a certain crime and you wish to show his picture to eyewitnesses, place it in a group (a sampling) of at least eight similar photographs of persons of the same sex, race, and approximate age and

[1] MASSACHUSETTS LAW ENFORCEMENT HANDBOOK, Attorney General Robert H. Quinn, Committee on Law Enforcement and Administration of Justice, 1972.

> appearance. They may be front-and-side-view photographs of the traditional "mug shot" style and have numbers on them, but it is better to use other types of photographs, if they are available. If the photograph of your suspect is of the "mug shot" variety, however, be certain that at least half (preferably all) of the other photographs in the sampling are also. Similarly, if the suspect's photograph is in color or is large, include several other color or large photographs in the sampling. Make a note of the photographs in each group or sampling that you show to an eyewitness…Take note of anything he says. If he identifies one of the photographs as that of the perpetrator, keep all of them together so that they can be brought to the trial…

22. Similarly, the Introduction to Criminal Evidence and Court Procedure, published in 1987, provides that:

> If, however, a particular person or persons are under suspicion, the following procedure should be utilized:
>
> (i) All photographs of the suspects should be removed from the books or files in which they are kept.
>
> (ii) The suspects' photographs should be mixed with pictures of persons with similar features. It is not absolutely necessary that these individuals have been arrested for the crime under investigation, but, if at all possible, they should be.
>
> (iii) "Mug shots" should not be mixed with other photographs unless there is not alternative.
>
> (iv) The date of arrest and other ID data that might appear in a mug shot should be covered up. This will minimize the chance that the witness will pick out a recent arrestee when the witness knows that a suspect has been picked up.
>
> (v) If a particular person is suspected of the offense, and he is in jail or facing charges, the prosecutor should be consulted. He may want to notify the suspect's attorney of the scheduled viewing.
>
> (vi) After an identification is made, the officer in charge should record the IE numbers of each photograph shown the witness, if the photographs are displayed separately." 182.

23. An order from the Newton, Massachusetts Police Department in 1985 provided that, when conducting photo arrays, "[t]he suspect's photograph should be placed in a group of

at least ten other similar type photographs of persons...If possible, retain all photographs displayed to a witness in the exact group from which the identification was made for subsequent court presentation in order to prove the fairness of the procedure and to enhance the reliability of an in-court identification."[2]

24. A manual written by the Rhode Island Law Enforcement Officers Official Manual (the "Rhode Island Law Enforcement Manual"), published by the Rhode Island Attorney General, was introduced in 1974 and provided extensive, explicit descriptions of how to preserve evidence and conduct photo arrays. For example, the Rhode Island Law Enforcement Manual provided that:

> There are three basic types of pre-trial identification procedures used by law enforcement agencies: the show-up, the line-up and identification by photographs. Each case of a challenged pre-trial identification will be considered by the courts on its own facts, and evidence from the identification will be excluded only if the procedure was so suggestive that it could have influenced the witness's choice.
>
> NOTE: Whether or not a positive ID is made, all photographs and/or records of identification procedures must be kept and stored until after trial.

25. The Rhode Island Law Enforcement Manual continued:

> When an officer questions witnesses or suspects, he is required to record all the details of the interview including the names, addresses, and descriptions of the witnesses or suspects as well as their observations of the crime. He should be careful to note any mention by them of articles which might have been touched or moved at the scene...

26. Finally, the Rhode Island Law Enforcement Manual provided a very detailed description of how to make identifications with the use of photographs:

---

[2] Newton MA. Police Department, General Order 85-24 Eyewitness identification, Lineup, Photographic Arrays, June 16, 1985.

Another acceptable method of police investigation is the showing of photographs and mug shots to witnesses to aid in identifying or eliminating suspects. Again, impartiality must be the rule during photograph identification procedures, and the following guidelines should be followed:

> (1) If possible, at least five photographs of different subjects should be shown to the witness, and the photographs should depict the persons in a similar way. For example, if the photograph of the suspect is a front and side view (mug shot), then most of the photos should also be front and side views.
>
> (2) The suspects in the photographs should be of the same sex and race and of the same approximate age and appearance.
>
> (3) No photograph of a suspect should re-occur during a viewing session, and no suspect should be emphasized in any way.
>
> (4) Witnesses should not be allowed to view the photographs together.
>
> (5) The police officer and the witness may view the photographs alone. The suspect DOES NOT have a right to have a lawyer present.
>
> (6) If there are several witnesses, some of them should be shown photographs to obtain an initial identification. The rest of the witnesses should then view the suspect in a line-up situation to corroborate the initial identification.
>
> (7) Police officers should make a record of the photographs shown to each witness and the order of arrangement in which there were shown.
>
> (8) If the police have no particular suspect in mind, a witness may come to the police station to view the files of photographs in the hope of identifying a possible suspect. Again, in this situation the police should be careful not to influence the witness by calling attention to a particular photograph. Notes should be made of any identification.[3]

[3] Rhode Island Law Enforcement Officers Official Manual, Third Edition, August 1985, Department of Attorney General. These guidelines are exactly the same as reflected in the Rhode Island Law Enforcement Officers Official Manual, Attorney General Israel, 1974.

27. Similarly, the prominent textbook Criminal Law and Procedure, by George T. Felkenes, indicates the importance of keeping records of photo arrays that have been shown to witnesses:

> Police Use of Photographs. The Rogue's Gallery is an old and accepted police practice. It is often used because (1) a lineup may be impractical, (2) there are no suspects and the police want witnesses to view persons with criminal records for similar crimes, and (3) the police may not want to alert a possible suspect that he is under investigation at that time. If a photograph is used, then it should be current. Remember that it only shows how a person appeared at the time the photograph was taken. Generally followed procedures in police departments are that:...4. If identification is made, all photographs viewed by the witness are collected and recorded. If in a book, the officer must note the page the witness viewed and be prepared to bring the book to court. 190-191.[4]

28. These materials confirm that, by at least 1985, there was a general consensus that proper photographic arrays procedures should consist of: (1) ensuring the array contains between 5-10 photographs; (2) ensuring that the suspect's photo does not re-occur in the photos shown to witnesses; (3) ensuring that the photos in the array are of individuals of similar race, gender, age, and other physical characteristics; (4) ensuring that, if mug shots are used, that at least some of the other photos in the array are also mug shots; (5) ensuring that officers conducting the array do not engage in behavior that suggests to witnesses who they should be selecting from the array; (6) ensuring that accurate records are made of a witness's selection at a photo array and that the composition of the photo array is recorded and preserved for trial.

---

[5] Introduction to Criminal Evidence and Court Procedure, Hanley, Schmidt and Robbins, McCutchan Publishing, 1987.

**B. <u>Generally Accepted Police Practices for Lineups</u>**

29. There were also well-established protocols for conducting in-person lineups during the mid-1980s. Indeed, the requirement that eyewitness identification procedures such as in-person lineups, photo arrays, and show-ups must not be unnecessarily suggestive was well-settled by the U.S. Supreme Court by the mid-1980s. *See, e.g., Manson v. Brathwaite*, 432 U.S. 98 (1977); *Stovall v. Denno*, 388 U.S. 293 (1967); *United States v. Wade*, 388 U.S. 218 (1867).

30. For example, the Massachusetts Law Enforcement Handbook provides detailed instructions on the proper method for conducting lineups:

> When you wish to conduct an in-person identification, you should consult with your district attorney or legal advisor. If you are unable to do so, and the suspect has been arrested, use the following procedures:
>
> Advise the suspect that you wish to conduct a lineup. Tell him that he has the right to have a lawyer present and that, if he cannot afford a lawyer, the court will provide one without expense. If he wishes to have a lawyer present, you must permit him to call one or take him to court so that a lawyer may be appointed. You are advised to contact your legal advisor or district attorney before proceeding. It the suspect waives his right to a lawyer, you may proceed with the lineup.
>
> Select five or six people of the same sex, race, and general appearance as the suspect. Be certain the suspect is not markedly taller or shorter than the rest of the group. Have the people in the lineup wear the same type of clothing as the suspect, if possible. Take a color photograph of the lineup, if possible…
>
> Do not use any other procedure for in-person identifications without consulting your legal advisor or district attorney. The recent case of *Kirby v Illinois*, 92 S. Ct. 1877 (1972), does not permit the use of a procedure different from this…The *Kirby* case puts an even greater burden on you to make certain that no suspect is displayed except in a properly composed lineup…" 47-50.

31. The Introduction to Criminal Evidence and Court Procedure, published in 1987, also provided that:

> It must be assumed, however, that certain rudimentary records are kept of the proceedings (lineups).[5] They include the following:
>
> (i) a frontal and profile color photograph of each participant and the entire group assembled;
> (ii) the name, address, race, age, height, weight, and clothing worn by each participant;
> (iii) the names of all witnesses and police officers present;
> (iv) the time and place of the lineup;
> (v) information on whether the participants were required to wear specified clothing or masks, assume certain postures or walk, repeat directed words or phases, and so forth;
> (vi) a tape recording, should the lineup contain verbal identification procedures.
>
> In addition, a very thorough written report should be made immediately following the lineup. Questions asked of each witness and their response should be transcribed or recorded. Officers must use great care not to suggest the identification of any particular participant. Each witness should be interviewed separately and told not to discuss possible identifications with each other." 176.

32. The Newton, Massachusetts 1985 Order provided:

> In the case of U.S. v. Wade, the Supreme Court discussed at length the danger inherent in eyewitness identification and concluded, The influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor - - perhaps for more errors than all factors combined. The police must, therefore, be most careful to ensure that their eyewitness identification procedures are not conducted in a suggestive manner and they do not lead to a likelihood of misidentification.
>
> This order specifically delineates the procedures for lineups. ...at least six persons of the same general description and appearance as the suspect. 9. During a lineup, a suspect may be directed to wear

[5] Introduction to Criminal Evidence and Court Procedure, Hanley, Schmidt and Robbins, McCutchan Publishing, 1987.

> certain clothing...All lineup participants will be asked to perform these same actions. d. make a written notation of any identification made, including any spontaneous exclamation or reaction by a witness, and incorporate all of this information in the official department report.[6]

33. The Rhode Island Law Enforcement Manual also provided an entire chapter on pre-trial identification procedures, noting, inter alia:

> A line-up is an identification procedure by which an eyewitness to a crime views a group of similar individuals to determine whether he can identify the person who committed the crime. The line-up is the preferred method of making suspect identifications.
>
> …
>
> The admissibility of a line-up identification in court depends on the overall fairness of the proceeding. Police officers should follow certain rules to insure impartiality of a line-up identification:
>
> (1) There should be at least five participants in the line-up.
>
> (2) All persons in the line-up should be the same race and sex, and similar in height, weight and age.
>
> (3) All persons in the line-up may be asked to perform certain body movements, gestures and verbal statements. However, no individual may be singled out to perform any movement alone, and no participant should be asked to repeat an action unless the witness requests it.
>
> (4) Suspects may be compelled to put on clothing used in a crime. However, each person in the line-up should put on the clothing in return.
>
> (5) A photograph of the line-up should be taken and a copy given to the suspect's lawyer. This is extremely important for use at trial.
>
> (6) The names of all persons in the line-up should be taken, as well as the names of everyone else present at the line-up including police officers and lawyers.

---

[6] Newton MA. Police Department, General Order 85-24 Eyewitness identification, Lineup, Photographic Arrays, June 16, 1985.

> (7) Witnesses at the line-up should not see a photograph of the suspect prior to the line-up.
>
> (8) When more than one witness is to view the same line-up, the witnesses should not be permitted to converse with one another beforehand. Each witness should view the line-up alone, out of the presence of the other witnesses.
>
> (9) The officer in charge of the line-up should in no way indicate which of the persons in the line-up is the suspect in the case, nor should they do anything which might draw special attention to the suspect.
>
> (10) The officer in charge should make complete notes of what is said by the witnesses during the line-up.

34. Additional contemporaneous materials from the 1980s also provide evidence of the generally accepted police practices at the time.

35. For example, John Federico's Criminal Procedure for the Criminal Justice Professional, Chapter 14 Pre-trial Identification Procedures, provided, in relevant part:[7]

> Checklist for lineup identifications...1. No lineup identification should be conducted by a law enforcement officer without discussion the legal advisability of it with the prosecuting attorney...6. The names of all persons participating in the lineup and the names of the officers conducting the lineup should be recorded and preserved...During the lineup...After the lineup...1. Should make complete notes of everything that takes place at the lineup and then make an official report...
>
> Therefore, law enforcement officers should only use on-the-scene showups when the suspect can be shown to the witness minutes after the crime has occurred. 352.
>
> Photographic identifications...7. The officer in charge should keep careful notes of all remarks of witnesses while viewing photos, and of all identifications and mistakes in identification...12. Photographic identification should not

[7] Criminal Procedure for the Criminal Justice Professional, Third Edition, John N. Ferdico (member of Maine and Massachusetts Bars) 1985.

> be used once a suspect's identity is known and the suspect is in police custody[.] 356.

36. Again, these materials confirm that, by at least 1985, there was a general consensus that lineups: (1) should contain at least 5-6 individuals; (2) should consist of individuals who are of similar age, race, gender, height, and weight; (3) should be free from suggestive comments or actions by officers conducting the lineup which would indicate to the witnesses who they should be selecting; (4) should be recorded accurately both in terms of who is in the lineup and the selection that a witness makes. Moreover a suspect must be advised of his right to have counsel present, and officers should make sure that witnesses have not seen a particular lineup participant's photograph prior to the lineup.

### C. <u>Generally Accepted Police Practices for Disclosure of Exculpatory Evidence</u>

37. I understand from my review of the materials in this litigation that there are specific issues of failure to disclose relevant, exculpatory documents of the investigation to Mr. Schand's defense counsel.

38. I have specific law enforcement experience in the issues of the duty to disclose and the elements of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). I have written on this topic and its implications for law enforcement agencies and personnel. Each month I have a section in my Internal Affairs training seminars during which I discuss those cases and resulting litigation and its implications on routine police practices, including investigations. I have also presented a webinar to police practitioners on this topic; these are web-based seminars delivered to widely differing groups from law enforcement agencies across the nation.

39. The duty to disclose potentially exculpatory evidence is a well-established and well-known requirement in law enforcement. The U.S. Supreme Court, in 1963 with *Brady* and

then in 1972 with *Giglio*, set the parameters for the duty of the State, including the police, to disclose all potential exculpatory evidence and provide it to the prosecutor for disclosure to the defense. These cases and their progeny have solidified this requirement. These cases continue to state that the responsibility rests with the police as well as the prosecutor. These cases also continue to state that it does not matter whether the failure to disclose is intentional or not. The law recognizes that large agencies, such as the U.S. Attorney's Office in the *Giglio* case, may face certain challenges, but the cases recognize that these challenges must be overcome by the agency. These cases also continue to state that there is no "ambiguity" with respect to the responsibilities of the State, including police agencies and officers, in this duty to disclose.

## D. Generally Accepted Police Practices for Police Oversight

40. I also understand that this lawsuit involves allegations regarding the failure of the Springfield Police Department to ensure supervisory oversight of this homicide investigation.

41. A sample of this generally accepted practice of appropriate oversight from the relevant period of time is from the study of policing by the U.S. Department of Justice from 1973:[8]

> Quality control procedures should be applied to criminal investigation operations to insure that each reported crime receives the investigation that it warrants. Procedures include constant review of reported crimes, preliminary investigation reports, and follow-up reports…The review or reports should determine the comprehensiveness of the investigation, and the report should aid in coordinating investigative activities, particularly in developing pattern analysis and method of operation…Performance may be audited best by having a supervisor interview victims, witnesses, and arrestees to gain knowledge about the thoroughness of the investigation. Although some investigators and their supervisors dislike this technique, it has proven valuable to some industries, especially utility companies, in discovering quality of work and customer satisfaction…Each case file should include records of all

[8] Report on Police, National Advisory Commission on Criminal Standards and Goals, U.S Department of Justice, 1973.

> related police, prosecutorial, prejudicial, and judicial activities. The records selected for this file should clearly document all major action on the case from first police involvement to final judicial disposition. The file should constitute a firm foundation on which the case could be reopened, if necessary, and on which police agency recommendations on diversion, bail setting, sentencing, probation, and parole could be based… 235-236.

### E. Generally Accepted Police Practices for Investigations

42. A number of contemporaneous materials from the 1980s also provide evidence of the generally accepted police practices for investigations at the time.

43. Other available resources confirmed the complexity and exactness required in police investigations. For example, from Weston and Wells' Criminal Investigation:

> Criminal investigation is a lawful search for people and things useful in reconstructing the circumstances of an illegal act or omission and the mental state accompanying it. It is a probing from the known to the unknown, backward in time, and its goal is to determine truth as far as it can be discovered in any post-factum inquiry. Successful investigations are based on fidelity, accuracy, and sincerity in lawfully searching for the facts of an event under investigation and on an equal faithfulness, exactness, and probity in reporting the results of an investigation. Investigators are persons who stick to the truth and are absolutely clear about the time and place of an event and the measurable aspects of evidence. The work throughout their investigation fully recognizing that even a minor contradiction or error may destroy confidence in their investigation.[9] 1.

44. Additionally, the International Association of Chiefs of Police published its own Criminal Investigation manual in 1989, which contained this comment:

> Upon receipt of the preliminary investigation report, the investigator should carefully analyze the detail and quality of information supplied. Once the analysis has been made and a decision reached that the case should be investigated further, the investigator should develop an investigative plan. After the approaches, strategies, and work format have been outlined, the plan should be discussed with the investigator's supervisor and agreement reached as to the decision to continue, the

[9] Criminal Investigation, Weston and Wells, 1988.

> appropriateness of the plan, and the first review date to further decide on continuation.[10] 55.

45. Finally, Geberth's Practical Homicide Investigation, published in 1993, stressed the essential nature of recordkeeping and coordination among different officers in a police department:

> Two basic principles of homicide investigation are documentation and preservation. In order to ensure that these principles are accomplished, there must be an established management policy that gives direction to the investigative unit. Management is necessary to assure that the preliminary investigation and initial actions taken at the scene, as well as the total investigative effort, have been properly documented, and that any evidence recovered has been properly handled and preserved. The effective and professional investigation of homicide is the responsibility of the entire police organization and not just the individual investigator assigned to the case. Hence, there is a need for an efficient coordination of activities and procedures critical to the processing of the case. Some of these activities are the collection of evidence, procedural tactics, duties of patrol officers at the scene, preparation of official forms and required reports, overtime allowance, case-officer responsibility, confidential informant funds, allocation of police department equipment, supervisor's duties, and notifications. The activities must be properly managed in order to bring the entire organization into play to effect the successful conclusion of the case. [11] 540.

## VII. <u>THE SPRINGFIELD POLICE DEPARTMENT FAILED TO FOLLOW GENERALLY ACCEPTED POLICE PRACTICES</u>

46. During the time of the investigation, arrest, and conviction of Mr. Schand, the Springfield Police Department was grossly negligent with respect to the generally accepted police practices discussed above. The Springfield Police Department also failed to provide specific direction for reasonable, consistent performance with written policy and training of its

[10] Criminal Investigation, International Association of Chiefs of Police, 1989.
[11] Practical Homicide Investigation, Second Edition, Geberth, 1993.

investigators in the common procedures of conducting photographic arrays and lineups, and handling exculpatory materials.

47. Reasonable police departments engage in the development of policy and procedure to provide guidance to field officers. This is not a static exercise, but one that is ongoing. It must reflect the changes in policing, tasks encountered, and new developments in equipment and operations.

48. In a more general sense, there are many accepted law enforcement sources that delineate the necessity for a police agency to continuously assess its written policies to ensure reasonable and responsive policing: "Every police chief executive immediately should establish written policies in those areas of operations in which guidance is needed to direct agency employees toward the attainment of agency goals and objectives"; "Policies should be clear and positive so it can be understood by everyone in the organization. Policies are tools for directing employees toward uniform goals and objectives." National Advisory Commission on Criminal Justice Standards and Goals, U.S. Department of Justice, at 53-54 (1973). Moreover, "[t]here is nothing sacred in a policy; it exists only to achieve an objective. When it fails in practice, it is either revised or succeeded by a new policy. For this reason, alert police agencies keep major policies under constant review, the process often starting with a supervisor's report." Police Supervision, International Association of Chiefs of Police, at 145 (1985).

## A. The Springfield Police Department's Policies and Procedures Manual Is Deficient

49. The Springfield Police Department promulgated its Rules and Regulations Manual in 1981 (the "Manual"), which was amended in 1983.[12] Even at the time the Manual was adopted, the manual was already deficient and not up-to-date with current developments in

[12] The Springfield Police Department Rules and Regulations Manual is attached hereto as Exhibit C.

the law enforcement industry. The task of investigative procedures was listed in the Manual in Rule 8, Detective Bureau, on page 9, and Rule 12, General Rules of the Detective, Crime Prevention, Youth Aid and Traffic Bureaus, on pages 15 and 16. There was absolutely no discussion of investigative techniques and the policies and procedures that govern them included in those sections; they were only organizational in structure.

50. There is no evidence that the Manual was ever updated or further refined in subsequent years to account for ongoing developments in the area of law enforcement. In 2005, the City of Springfield paid for "A Management Study of the Springfield Police Department," undertaken by Buracker and Associates ("Buracker Report"). One of the study's findings was that "[t]he current written directives system is dated, substandard and very fragmented… The current "Rules and Regulations" manual was promulgated by the Board of Police Commissioners in 1981. Since that time, there have been some amendments."[13]

51. One of the City of Springfield's 30(b)(6) designees, Thomas Kennedy, admitted that the Manual lacked written procedures for witness identification procedures, lineups, use of photo arrays, or exculpatory evidence. *See* Deposition of Thomas Kennedy, dated May 19, 2017 ("Kennedy Dep. Tr."), at 43. He further acknowledged that there were no general orders or revisions to the Manual that would address these common detective procedures, including the issues of exculpatory evidence and how detectives should maintain their police investigative files and records. Kennedy Dep. Tr. at 45-46.

52. In recent history, Springfield has consistently been the third largest city in Massachusetts. There have been a plethora of sources for a police agency to access to assist in the development of reasonable written policies and procedures. I am familiar with the model

[13] The Buracker Report is attached hereto as Exhibit D.

policies in Massachusetts, commonly known as the MPI manual. Originally that was a designation for the Municipal Police Institute, which was eventually taken over by the Massachusetts Police Chiefs Association. I know there were editions available in 1981 and 1985, and the manual has been continually updated and available since then. I understand that the Springfield Police Department had access to these materials. *See* Deposition of Donald Sicard, dated June 7, 2017 ("Sicard Dep. Tr."), at 122-125. The International Association of Chiefs of Police have issued Training Keys since the 1960s and continued that resource with its Model Policy Institute. I also understand that the Springfield Police Department also had access to materials from the International Association of Chiefs of police. *See* Sicard Dep. Tr. at 69-72. In 1983, the National Commission for Accreditation of Law Enforcement Agencies was initially established, along with its requirements for a broad range of necessary police procedures, including written manual provisions and investigative procedures.

53. There was a consensus from the depositions of all Springfield Police Department officers I have reviewed that there were no written directives, procedural guides, or specific training for detectives in the areas of eyewitness photo arrays, lineups, or exculpatory materials and the duty to disclose exculpatory materials. Even the person initially selected as the "person most knowledgeable" about the training of Springfield police officers, retired Chief of Police Fitzgerald, agreed with this assessment. He had been a member of the Police Department from 1966 to 1990. *See* Deposition of Thomas Fitzgerald, dated February 16, 2017 ("Fitzgerald Dep. Tr."), at 28, 48. He testified that there were no policies or procedures for eyewitness photo procedures, Fitzgerald Dep. Tr. at 125, lineups, Fitzgerald Dep. Tr. at 126, or exculpatory evidence, Fitzgerald Dep. Tr. at 127. He also testified that there was no training provided in these common investigative tasks. Fitzgerald Dep. Tr. at 130. He stated, "Now, what

constitutes something being suggestive, I suppose, would be somewhat individual." Fitzgerald Dep. Tr. 128. The deposition testimony of the detectives involved in Mr. Schand's investigation uniformly stated that it was left up to the discretion of the individual detective on what procedure and analysis to use during an investigation.

54. This complete absence of training and written guidance in the areas of eyewitness photo arrays, lineups, or exculpatory materials and the duty to disclose exculpatory materials was an egregious departure from the generally accepted police practices at that time, as described above.

**B. <u>The Springfield Police Department Had Inadequate and Inconsistent Policies, Procedures, and Training for Photographic Identifications</u>**

55. Springfield's lack of investigative oversight can be seen from the varying responses given during depositions by the Springfield Police Detectives on their understanding of the use of photo arrays. These are the types of investigative performances that should be controlled and uniform when an agency has a reasonable and effective supervisory protocol.

56. For example, Detective Michael Reid stated that he had no recollection of the names of the photos shown to witness Al Chase and that it was not standard practice to have a list of photographs, or to record which photos were used during a photographic array. *See* Deposition of Michael Reid, dated October 20, 2016 ("Reid Dep. Tr."), at 100, 109. Detective Raymond Muise stated that he did not recall if he recorded the eight photos he used during his interviews, and that, while it was common practice to copy the array used, he did not know whether he did that for the Schand investigation. *See* Deposition of Raymond Muise, dated October 21, 2016 ("Muise Dep. Tr."), at 90. Detective Leonard Scammons said that a minimum of six photos were used. *See* Deposition of Leonard Scammons, dated November 28, 2016 ("Scammons Dep. Tr."), at 34.

57. Similarly, while all the detectives denied ever using a Polaroid photograph as part of a photographic array, as it was not their practice, retired Springfield Police Department Chief Fitzgerald testified, "We on occasion would use Polaroids." Fitzgerald Dep. Tr. at 133. I also understand that certain witnesses have testified that they recall seeing Polaroids as part of the photographic arrays that they were shown in connection with the Schand investigation, which is another practice generally understood to be unduly suggestive, particularly when Polaroids are mixed in with other non-Polaroid photographs. *See* Testimony of Al Chase and Lavon Dixon, 1987 Trial, dated November 9, 1987, at 249:1-20, 276:1-277:1; Testimony of

William Darko and Michael Bernard, Motion to Suppress, dated July 15, 1987, at 41-43, 188.

58. These common failures can be illustrated in the activity report submitted by Detectives Scammons and Reid dated September 24, 1986, where the officers only identified the photos selected by the witness and made no mention of the total number or identifications of the other individuals in the array.

59. Detectives Scammons and Assad, in their answers to Plaintiffs' First Set of Interrogatories, acknowledged that the Springfield Police Department was in possession of three Polaroid photos of Mr. Schand, but stated that they were not used.

60. Thomas Kennedy also testified that it was common for detectives to use photo arrays during this period of time. Kennedy Dep. Tr. at 46. While he used eight photos, he stated, "I don't know what the minimum number was. I personally have never seen less than six photographs" used. Kennedy Dep. Tr. at 49. He further confirmed that there was no written procedure or "formal communication" as to how to conduct photo arrays. Kennedy Dep. Tr. at 50. "Some officers used eight, some may have used ten. Some may have used more." Kennedy Dep. Tr. at 51. He acknowledged there may have been some times where photos other than mug shots were used and some might have been in color, but this was "rare." Kennedy Dep. Tr. at 52. He acknowledged that there was no written documentation or training prohibiting the use of Polaroids. Kennedy Dep. Tr. at 52-53. He did not recall any training during which the use of photo arrays was discussed. Kennedy Dep. Tr. at 55. There also was no requirement to identify all "fillers" used during a photo array. Kennedy Dep. Tr. at 57.

61. Donald Sicard, who was the City of Springfield's 30(b)(6) witness for topics related to new recruit and in-service training, testified that in the 1970s and 1980s trainings on photo arrays consisted of explaining what a photo array was but not the mechanics of a photo

array, such as how to construct one. *See* Sicard Dep. Tr. at 65, 82. He also acknowledged that there was no in-service training on photo arrays. Sicard Dep. Tr. at 40. He testified that all instructors had access to reference materials from the International Association of Chiefs of Police, Massachusetts Criminal Justice Training Council and the Massachusetts Police Institute. Sicard Dep. Tr. at 70, 73. He further stated that there was no in-service training in the 1970s and he began this form of training in 1985. Sicard Dep. Tr. at 127.

62. The failure to implement adequate policies on photo arrays and the failure to train and supervise police officers with regard to photo arrays led to instances where Springfield police officers egregiously misused this investigative technique.

63. For example, Michael Hosten swore under oath in his June 2006 affidavit that the Springfield Police Department officers Muise and Reid "threw a single mug shot down on the table and told (him) that this was a picture of Vickie's killer…(he) did not recognize this person…never seen him before…(he) was sure he was not the person…." *See* Affidavit of Michael Hosten, June 24, 2006, at 4.[14] Mr. Hosten said this photo was put in the stack of other photos and he was asked to pick out the one, and he picked out the one he had been shown. *Id.* Mr. Hosten also said that he knew the real shooter, Randy Weaver, but he testified that he instead identified Mr. Schand in order to get several criminal cases against him dismissed with only "time served." *Id.* at 6-7.

64. In law enforcement, it is widely acknowledged that witness identification is fraught with problems, even when it involves trained police personnel who might be witnesses to a police incident or crime. Generally accepted police practices and case law are very clear that when an agency knows that its personnel will commonly face an issue, and this issue will

[14] Attached hereto as Exhibit E.

require the officers to make significant choices from available options, and when that decision can cause a Constitutional harm, the agency must provide reasonable direction and training.

65. Even without crediting the testimony of Mr. Hosten and other witnesses who have testified as to the serious flaws in the Springfield Police Department's photographic identification procedures, it is apparent from all the testimony of the Springfield Police Department personnel and the documentation provided that the Springfield Police Department made a conscious choice not to provide the direction and training necessary to avoid serious failures in its identification procedures to its personnel, specifically those involved in the Schand murder investigation.

### C. The Springfield Police Department Used Inadequate and Inconsistent Policies, Procedures and Training for Lineups

66. A similar divergence of testimony came on the subject of lineup practices for witness identification. Detective Reid denied that there were any police personnel used in the lineup in this case, Reid Dep. Tr. at 203, and that the decision on who should serve as a filler was left to the discretion of the officer, Reid Dep. Tr. at 204. He further stated it was not required to have a supervisor approve the use of a lineup, and he could not recall whether the District Attorney was ever consulted. Reid Dep. Tr. at 203-205. Detective Assad stated that it was his opinion that "at least 4 to 5" individuals would be used in a lineup, and a photo would be taken of the lineup and included in the case file. *See* Deposition of Joseph Assad, dated November 29, 2016, at 84, 87. Lt. McMahon stated a minimum of 6 individuals had to be in a lineup, *see* Deposition of Elmer McMahon, dated October 28, 2016, at 141, as did Detective Scammons, Scammons Dep. Tr. at 30.

67. Lt. McMahon, however, stated in his Answers to Interrogatories that for the lineup used on December 15, 1986, for witnesses Dixon and Chase there were six persons used

in the lineup. This included two black Springfield police officers, one black male from the lockup, two black males from the York Street Jail, and Mr. Schand.

68. Thomas Kennedy, 30(b)(6) witness, testified that the Springfield Police Department did not train or provide any written procedure to officers regarding lineups and, while he had never used one, he would not have known what procedure to use if he had done one. Kennedy Dep. Tr. at 61. He stated that there were no directives or training on lineups. Kennedy Dep. Tr. at 62. Donald Sicard testified similarly with respect to lack of training on police lineups. Sicard Dep. Tr. at 82.

69. All of this testimony is refuted by the recantations of the principal eyewitnesses.[15] If these accounts are believed, they paint a decidedly different investigative practice than even the varying accounts of the investigators deposed in this case.

70. For example, Mr. Charles Stokes stated in July 1989 that Springfield Police Department officers showed him three photos of Mr. Schand, and only one photo each of the other individuals in the array. Mr. Stokes also participated in an in-person lineup, at which he personally knew all persons in the lineup other than Mr. Schand. *See* Affidavit of Charles Stokes, July 7, 1989, ¶ 4 (attached hereto as Exhibit F).

71. Further, Mr. Anthony Cooke testified in a 2013 hearing on Mr. Schand's motion for new trial that he never went to an actual lineup, but was shown a photograph of the lineup. *See* Testimony of Anthony Cooke, 2013 Motion for New Trial, dated August 12, 2013 ("2013 MNT Tr."), at 22-23.[16] He testified that there were six persons in the photograph and he knew five of them (two police officers, a friend of his named Johnson, and two persons he knew from the York Street Jail). As with Mr. Stokes' viewing of the lineup, Mr. Schand was the only

[15] I am aware that there are divergent versions of the events of this fatal shooting and the resulting investigation. For purpose of this report, I am not making any credibility determinations.

[16] Mr. Cooke's testimony from the 2013 Motion for New Trial Hearing is attached at Exhibit G.

person he did not know. Cooke, 2013 MNT Tr. at 24. Mr. Cooke further stated that he had lied when he identified Mr. Schand as the person who shot the victim in order to gain favorable treatment on some pending charges against him. Cooke, 2013 MNT Tr. at 32.

72. Additionally, Al Chase and Lavon Dixon, who were also asked to view the lineup, had previously seen pictures of Mr. Schand in photo arrays that that Springfield police department had presented to them. *See* Activity Report, dated September 24, 1986 ("September 24, 1986 Activity Report"), at 1.[17]

73. It is obvious that whatever testimony is accepted, the Springfield Police Department did not provide written directives, training or supervisory oversight over identification procedures known to commonly produce accurate witness identifications.

## D. <u>The Springfield Police Department Utilized Inadequate and Inconsistent Policies, Procedures and Training for Disclosure of Exculpatory Evidence</u>

74. As noted above in paragraphs 38 and 39 of this report, the requirement for the police to turn over all materials that might be exculpatory is well settled, and there is certainly no ambiguity in this area. The duty to disclose this material is a requirement of all police personnel involved in the process.

75. In the Schand investigation, the duty to disclose exculpatory evidence was complicated by inadequate training, supervisory oversight, failures of record management systems used, and the practice of individual investigators keeping personal written notes separate from the official police file used and presented to the prosecutor.

76. Indeed, there was a total lack of any reasonable detective oversight in the Schand investigation as evidenced by the investigators' "activity reports." These types of reports are common in police investigations, but they more often are referred to as supplemental reports

[17] The September 24, 1986 Activity Report is attached as Exhibit H. I understand that, while this document does not identify Mark Schand by name, I have been informed that picture #20618 was a photo of Mr. Schand.

and contain reference to the case management file number and are signed by the approving detective supervisor. All one has to do is look at the reports submitted by members of the Hartford Police Department regarding their locating of the "blue van" and the information relative to suspect Weaver. These are referenced by a case number and approved by a signature of a supervisor. By contrast, the testimony of the Springfield detectives deposed in this case indicate that each one simply adds his "activity report" to the master case file in a "closet" in the office of Elmer McMahon, who was the detective supervisor.

77. Even by the time that the Buracker Report was completed, this failure to conduct reasonable supervisory oversight was not rectified. That study stated that the Police Department "had no formalized case management systems for criminal investigations." Page 23. This type of investigative oversight system was referenced in the 1973 Report on the Police authored by U.S. Department of Justice identified in paragraph 41 of this expert report.

78. There are egregious failures regarding the discovery and treatment of exculpatory evidence in this case. Detective Muise testified that all documents and notes were included in the case file and given to the District Attorney. Muise Dep. Tr. at 42. Detective Scammons stated that he kept his notes in a personal book. Scammons Dep. Tr. at 17.

79. Even Thomas Kennedy, one of the City of Springfield's 30(b)(6) representatives, stated, "most detectives do, including myself, keep a notebook of investigations." Kennedy Dep. Tr. at 45. He acknowledged that the Springfield Police Department had no written directives or training regarding exculpatory evidence, Kennedy Dep. Tr. at 64, but it was unwritten policy that the investigator turns over information to the prosecutor, Kennedy Dep. Tr. at 65. He further testified that there are no requirements to log in information regarding the investigation being conducted that has been received from other police departments. Kennedy

Dep. Tr. at 72. Again, Donald Sicard, another 30(b)(6) witness, testified similarly on the lack of training with respect to handling exculpatory evidence. Sicard Dep. Tr. at 40.

80. It is my understanding that there is a document at issue in this case – the September 24, 1986 Activity Report signed by Detectives Scammons and Reid – which Mr. Schand's attorney did not receive in its entirety prior to Mr. Schand's trial in 1987. This report is a two-page document outlining their meetings with four witnesses (Dixon, Bush, Whitted, and Stokes), during which they showed them photo arrays, and their responses. The second page of this document related to the detectives' contact with Stokes and noted that he was only 30-40% sure of his identification, but also told the detectives that the suspect had "bad teeth." I understand that there are allegations in this case that this report was apparently submitted to Mr. Schand's attorney with only the first page. I also understand that this assertion is bolstered by testimony of certain Springfield Police Department officers, who confirmed that they found a copy of this activity report several years later, locked in a file cabinet of Springfield Police Department Captain Elmer McMahon, and that the report had some form of white tape over the "page 1 of 2" and "continued on page 2." *See* Reid Dep. Tr. at 154.

81. I also understand that there are two police reports drafted by officers in the Hartford Police Department that indicated that the Hartford Police Department had located a van that matched the unique description of the van seen at the After Five Lounge on the night of the murder, and that this van belonged to a Mr. Randy Weaver. I understand that these two reports which identified an alternative suspect – a suspect who later confirmed he was present at the After Five Lounge on the night of the murder – were not produced to Mr. Schand's

attorneys during his trial, but were later disclosed in subsequent legal proceedings after Mr. Schand's conviction.[18]

82. Without making any credibility determinations about whether these documents were or were not turned over to Mr. Schand's attorney prior to trial, it is my opinion that the Springfield Police Department had insufficient training, policies, practices and procedures to account for exculpatory evidence and to ensure that all exculpatory materials were properly turned over to defendants.

### E. The Springfield Police Department Utilized Inadequate and Inconsistent Policies, Procedures, and Training on Detective Follow-up on Alibi Evidence

83. In paragraphs 42-45 of this expert report I have highlighted the complexity of this detective/investigative task specifically when dealing with a major crime such as a homicide. The detective assigned to a case is usually the only one who has access to the information and leads of the investigation. He must remain impartial and be open to new avenues of the investigation that might not fit into his/her initial or preconceived belief of how the crime was committed. It is easy to put blinders on when the detective believes he has sufficient evidence on a particular subject; when this occurs, injustice can result. The detective is required to follow up on alibis the suspect might be using in order to rule out the alibi or to confirm it and build the case with this new information that might drastically alter the direction of the investigation.

84. In the Schand investigation, there were indications that Mr. Schand had an alibi that could have eliminated him as a suspect. From all documentation and testimony, that information was never considered and followed up on by the detectives. Indeed, I understand that Mr. Schand's wife, Mia Schand, has testified spent virtually the entire day with Mr. Schand

[18] Those two Hartford Police Department reports are attached as Exhibits I and J.

on the day of the murder, which would have made his participation in the murder at the After Five Lounge impossible. *See* Deposition of Mia Schand, dated February 3, 3017 ("Mia Schand Dep. Tr."), at 85-109. Mrs. Schand confirmed that the Springfield Police Department never even interviewed her to obtain her version of events. *See* Mia Schand Dep. Tr. at 228.

85. Thomas Kennedy testified that it was the "discretion of the officer or detective, supervisor in charge" whether or not to investigate an alibi and that there was no written policy, training, or directive by the Springfield Police Department on this issue. Kennedy Dep. Tr. at 77. Thomas Fitzgerald also testified that there was no written policy regarding the investigation of alibis and that officers did not receive training on investigating alibis. Fitzgerald Dep. Tr. at 178-79.

86. This complete failure to train offers to investigate a potential exonerating alibi, and actual failure by the Springfield Police Department to investigate Mr. Schand's exonerating alibi, was a departure from generally accepted police practices at the time of Mr. Schand's arrest and conviction.

***

87. Should any subsequent information be produced and materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

88. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, they will be made available for review, if requested, prior to their use.

89. My fees for this professional service is a flat Case Development Fee of $9500 and a fee of $2500 for a deposition in the Atlanta area or $2500 per day plus expenses for

services away from the Atlanta area including depositions and trial appearances.

June 26, 2017
Jasper, GA

Lou Reiter

# EXHIBIT A

# LOU REITER...RESUME

**LOU REITER & ASSOCIATES**...87 Chula Drive, Jasper, GA 30143
706.268.1824...404.242.9069(cell)...loureiter@gmail.com

## POLICE CONSULTING EXPERIENCE

Lou Reiter has been the principal consultant with Lou Reiter & Associates since its inception in 1983. In that capacity he has been providing professional consulting to law enforcement agencies in three primary areas: (1) training, (2) agency audits and (3) litigation services.

### TRAINING

Lou Reiter typically conducts 20-30 training seminars and programs each year involving approximately 1000 persons. These presentations range in time from 3 hours to five (5) days with the majority being a two (2) day seminar. Normally attended by police supervisors, managers, command personnel and litigation/risk management elements, these seminars involve police practitioners from federal, state, county and municipal law enforcement agencies.

For the past 20 years, Lou has been the national Internal Affairs procedures trainer for Public Agency Training Council, Indianapolis, IN. He is co-director of the company's Legal and Liability Risk Management Institute. Lou is the Director of the National Certification for IA/OPS Investigator/Supervisor providing national certification for IA/OPS public safety practitioners throughout the country.

The most common areas of presentation and instruction are:

- Managing the Internal Affairs function, police discipline and the citizen complaint process.
- Investigation of critical incidents - officer involved shootings, use of force, and pursuits/emergency responses.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit/emergency response issues.
- Investigative procedures and supervision.
- Personnel practices.
- Supervisory techniques.
- Liability management.
- Policy and procedure development.
- Jail intake procedures.
- Management effectiveness.

These training programs have been presented in the following states for police training academies, private training groups, public agencies, governmental entities and academic facilities:

| | | | |
|---|---|---|---|
| California | Ohio | Washington | New Jersey |
| Florida | Indiana | Hawaii | Connecticut |
| Georgia | Wisconsin | Vermont | District of Columbia |
| New York | United Kingdom | North Carolina | New Mexico |
| Texas | Minnesota | Illinois | Michigan |
| South Carolina | Missouri | Oklahoma | North Dakota |
| Massachusetts | Arizona | Louisiana | Arkansas |
| Rhode Island | Nevada | Mississippi | Alabama |
| Pennsylvania | Utah | Kentucky | U.S. Virgin Islands |
| Virginia | Colorado | Tennessee | Mexico City (Policia Federal) |
| Maryland | Oregon | Alaska | |

**LAW ENFORCEMENT AGENCY AUDITS**

These types of agency audits take on many different forms. Some are designed to identify the strengths and weaknesses of the agency, make recommendations and present specific timetables for implementation. Others are specifically designed to evaluate the agency's liability potential, make recommendations and suggest implementation strategies. Some involve budgetary concerns and consideration of consolidation of police jurisdictions. Occasionally the purpose is to conduct an administrative investigation using external investigators due to sensitive or political potential conflicts of interest. Some are accreditation and re-accreditation on-site assessments for the Commission on Accreditation for Law Enforcement Agencies, Inc.

These audits are conducted either as a one-person unit or as a member of a larger team of police professionals, although not more than six (6) total. Most of these are through contracts with the affected governmental body. Some are through a litigation or risk management unit.

In 2001, Lou Reiter was appointed as the Federal Court Monitor for the consent decree in *Colln, et al., v. County of Ventura, et al.,* CV 97-8352, 98-3051 and 98-6092 LGB (Cwx), United States District Court, Central District of California.

Since 1996, Lou Reiter has acted as a consultant for the Special Litigation Section, Civil Rights Division, U.S. Department of Justice, in six (6) pattern and practices investigations concerning the cities of New York, New Orleans, Pittsburgh, Buffalo, Columbus, OH., and Charleston, WV. He has also worked with the cities of Cincinnati and Schenectady which were being investigated by this governmental agency.

Lou is Co-Director and Director of Audits for the Legal and Liability Risk Management Institute of the Public Agency Training Council, Indianapolis, IN. As an independent consultant with this firm he conducts agency audits and policy development/implementation for agencies represented by insurance pools in 10 states.

Lou Reiter since 1983 has audited law enforcement agencies as small as three (3) persons to as large as 39,000 personnel. They have represented municipal, county and state entities. Normally, he conducts 3-5 of these audits each year. During these forms of audits, he rides with line officers and first level

supervisors for nearly 100 or more hours for interviews and direct observation of field implementation.

The primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.
- Training and training documentation
- Use of police resources
- Support functions including communications, records and detention and holding facilities.

These types of agency audits have been conducted in the following states:

| | | | |
|---|---|---|---|
| Florida | North Carolina | West Virginia | Washington |
| Georgia | South Carolina | Arkansas | New Jersey |
| Arizona | Virginia | Louisiana | Kentucky |
| Colorado | New Mexico | Tennessee | Connecticut |
| Ohio | California | Texas | Vermont |
| Delaware | Illinois | New York | New Hampshire |
| Pennsylvania | Wisconsin | Rhode Island | |

**LITIGATION SERVICES**

Lou Reiter, since 1983, has been involved in over 1100 law enforcement civil litigation cases and a few criminal matters. He has acted both as a consultant and testimonial expert witness. These have been in Federal and local courts. He has worked with plaintiff attorneys approximately 60 percent of the time and the remainder with defense units. He has also been employed in this area by insurance entities, risk management pools, local prosecutorial offices and the United States Department of Justice.

While there has been a wide range of specific law enforcement practices and procedures which have been involved in these cases, some of the more common issues addressed in case development and subsequent testimony have been:

- Field procedures including tactics, arrest techniques and pursuits/emergency response driving.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures, including warrant applications, informant control and use, and search warrant processes.
- Jail intake procedures.
- Police management.
- Personnel practices, including hiring, retention, remediation, background investigations, use of

professional counseling services and promotion/assignment.

- Investigation of citizen complaints.
- Employee discipline.
- Police policy and procedures development.
- Police training.

These litigation services have been in the following states and jurisdictions:

| | | | |
|---|---|---|---|
| Florida | Oregon | South Carolina | Connecticut |
| Georgia | New Mexico | North Carolina | Maine |
| Alabama | Montana | Virginia | New Hampshire |
| Mississippi | Wyoming | New Mexico | Puerto Rico |
| Louisiana | Colorado | Arizona | Rhode Island |
| California | Kansas | Alaska | Washington |
| Texas | Oklahoma | Hawaii | Wisconsin |
| Missouri | Texas | Maryland | Massachusetts |
| Illinois | Kentucky | Pennsylvania | Idaho |
| Indiana | Tennessee | New York | West Virginia |
| Michigan | Minnesota | New Jersey | Nevada |
| Iowa | Ohio | Delaware | |

## PRIOR ACTIVE POLICE EXPERIENCE

Lou Reiter was a sworn member of the Los Angeles Police Department for 20 years between 1961-1981. He began as a police officer and retired as a Deputy Chief of Police. During that tenure he served in over 20 assignments. Some of those assignments included:

**Promotion schedule.**

- 1980 Deputy Chief of Police
- 1976 Commander
- 1974 Captain
- 1970 Lieutenant
- 1966 Sergeant
- 1961 Police Officer

**Personnel and Training Bureau, Commanding Officer.** As a Deputy Chief directed the operations of three (3) divisions and two (2) major sections, involving over 300 employees.

- Responsible for all training, personnel management, recruitment and selection, employee-management relations and behavioral science services
- Responsible for the successful implementation of the 1980 Consent Decree requiring increased hiring of females and minorities
- Chairman of the Use of Force Review Board which adjudicated all officer-involved firearm discharges, serious injuries resulting from police action and in-custody deaths
- Caused the initiation of a unique peer counseling program for employees and a transfer system for “burned out” employees from high activity areas and assignments.

**Operations West Bureau Commanding Officer.** Directed all police operations (patrol, traffic,

investigations and vice/street narcotics) in the Western quadrant of the City with four (4) geographic stations and one (1) traffic division involving over 1400 employees.

**Planning and Fiscal Bureau Commanding Officer.** Directed the operations of five (5) divisions, involving over 400 employees.

- Responsible for the $310 million Police budget preparation and management
- Automated systems
- Planning and research
- Communications
- Guided the development of the Emergency Command Control Communications System, a multi-faceted computer based system financed by a $40 million tax override
- Provided on-going liaison with the City Council and directed efforts to develop local and state legislation

**Uniformed Coordinator for Operations Central and Valley Bureaus.** Each Bureau consisted of five (5) geographic stations, a traffic division, gang enforcement unit, and over 1600 employees. In addition to the overall coordination of patrol and uniformed operations, monitored and approved personnel complaint investigations, adjudications and discipline during this four (4) year assignment.

- Coordinated the successful police efforts in the San Fernando Valley during the 1978 school desegregation
- Directed the City-wide 500 person police reserve officer program
- Department liaison to community alcoholism programs
- Participant in the Physical Altercation and Tactics Committee
- Regular member of the Fleet Safety Review Board and Shooting Review Panel.

**Central Area Commanding Officer.** For two (2) years commanded over 250 uniformed officers and detectives in the Los Angeles Central City (downtown) area.

**Team policing.** Selected to make preliminary preparations and then command a unique team policing experiment in Foothill Division in July, 1973 (this was similar to the current Community Oriented Policing concept). This consisted of a command of 57 employees including detectives and traffic officers to maintain 24-hour police service for this area. Crime went down in this area while it rose in adjacent areas.

**Traffic assignments.** Served as a uniformed traffic accident investigator throughout the City. Investigated 1200-1500 traffic accidents and arrested nearly 400 drunk drivers. Provided specialized enforcement and accident investigation on the City's freeway systems in specially equipped pursuit vehicles.

**Patrol assignments.** Was a uniformed patrol officer in three (3) geographic stations. Functioned as a plainclothes member of an anti-crime unit. As a sergeant was a field supervisor and later, as a lieutenant, was a uniformed watch commander.

**Employee misconduct administration.** Investigated cases alleging employee misconduct both as a field supervisor and member of Internal Affairs Division. As the Department Advocate, presented the agency case against employees during internal administrative hearings (Boards of Rights). Later, as a Lieutenant, acted as a defense representative for accused employees during these same hearings. Adjudicated investigations of police misconduct and served as a member of Boards of Rights on many

occasions.

**Other personnel related activities.** Participant in the Physical Altercation and Tactics Committee, Fleet Safety Review Board and Shooting Review Board. In 1981, chaired the Police Productivity Workshop which presented recommendations for massive changes in operations to respond to budgetary restrictions imposed by the passage of Proposition 13.

**Training commands and assignments.** Commanded (1980-1981) the Personnel and Training Bureau which included the Police Academy and video training production unit. Implemented programs (1980-81) to assist in the achievement of court consent decree hiring of females/minorities and their successful performance during the training aspect of their employment. Was the Assistant Commanding Officer of the Police Academy. Was the Officer-in-charge of the Human Relations Training Unit which covered such topics as community and cultural diversity, officer-partner relations, inter-personal communications, and handling the emotionally disturbed and mentally ill.

**Staff researcher and author for the 1973 *Police Task Force Report* of the National Advisory Commission on Criminal Justice Standards and Goals.** The report assisted agencies nationwide to update their operations and develop plans for future growth and strategies. The three (3) specific chapters researched authored by Lou Reiter were "Internal Discipline, Training and Management-Employee Relations."

**Managing Unusual Occurrences.** Member of the Department Field Command Post Cadre since its inception following the 1965 Watts Riots. Developed procedures for police operations during such incidents principally as a member of the Operations Section and later incident command functions. Participated in numerous actual unusual occurrence control operations as well as training exercises responding to natural and man-made incidents.

**Volunteer police.** Managed the LAPD 500 person Reserve Officer Corps. Developed revised training programs and an in-service training element. Created a unique expert advisory group within this volunteer corps specializing on the expertise of lawyers, doctors, statisticians, educators and other specialists. Implemented a 54 person Reserve Chaplain program. Lobbied for and supported State laws mandating strengthened training and selection requirements for volunteer elements of police agencies.

**Community Relations and Crime Prevention.** Community Relations lieutenant and Assistant Commanding Officer of Hollywood Division, directing the community mobilization and crime prevention efforts. Was the Officer in Charge of the Public Service and Crime Prevention Section, Public Affairs Division.

**New Careers and Concentrated Employment Program.** In 1967, initiated, implemented and administered this U.S. Department of Labor funded program which employed, trained and assigned disadvantaged, underemployed persons to police community relations and crime prevention programs. Ninety (90) percent were ex-convicts or former narcotics users.

**Planning and Research.** Researched and authored policy and procedure changes for the Department and incorporated them into the Department Manual.

## ADDITIONAL INSTRUCTIONAL EXPERIENCE

During the years since 1971, Lou Reiter has been involved in continuous and varied aspects of training

both within and outside the law enforcement field. Some of those not covered in the preceding sections are:

- Faculty member for national level police management and specialized programs for organizations such as the Public Agency Training Council (Indianapolis), Americans for Effective Law Enforcement (Chicago), Institute for Police Technology and Management (Jacksonville, FL.), Police Foundation Executive Institute, Commission on Accreditation for Law Enforcement Agencies, National League of Cities, Law Enforcement Assistance Administration, academic institutions, local police academies, state police organizations and risk management/insurance pool groups.
- Senior Consultant, Institute for Liability Management.
- Faculty member, Criminal Justice Management Program, Florida Center for Public Management, Florida State University.
- Certified Instructor, Law Enforcement Supervision/Management, Florida Department of Law Enforcement.
- Lifetime Vocational Training Certificate, Law Enforcement, California.
- Developed and presented "Frontline Supervision," a police supervision program.

Elected to the Santa Clarita Community College Board of Trustees in 1975 and reelected in 1979. Served as Board President and acted on many local and State committees on education.

Past member:

- Police Science Advisory Boards for Junior Colleges of Rio Hondo, El Segundo and Harbor City in the Los Angeles area.
- Faculty member for graduate and undergraduate level courses at various universities and colleges.
- Principal faculty member for the Management Development Program for the City of Los Angeles.
- Trainer for Florida American Cancer Society's Volunteer Leadership Development Program.
- California State University, Northridge, Advisory Committee on Teacher Education.
- Advisory Committee on Clinical Rehabilitative Services Credential, Department of Communicative Disorders.

## LAW ENFORCEMENT PROFESSIONAL ACTIVITIES

Since 1973, Lou Reiter has been involved in law enforcement professional activities and programs. Many of these were during his tenure with the LAPD. Others have been as a concerned public member and police consultant. Some of those include:

- Assessor, Commission on Accreditation for Law Enforcement Agencies, Inc., (1985- ), and has been assigned to both on-site audits for accreditation and re-accreditation. Re-certified as an assessor in 1999 at Montreal Conference and in 2002 at Cleveland.
- American Society for Law Enforcement Trainers, member.
- National Internal Affairs Investigator's Association, member and conference presenter.
- National Center for Women and Policing, member.
- Public Safety Committee, Big Canoe, GA.
- Founding Member, Tallahassee Committee of Ninety-Nine and former member of Board of Directors (1982-1988) and Secretary (1984-1987). This organization was formed in 1981 and

provided support to local law enforcement agencies for greater professionalization, underwriting local police training programs, purchasing police equipment and ensuring benefits to families of police officers.

- Presenter and participant, 1982 and 1983 Florida Governor's Challenge Conference on Crime.
- Chair, Public Safety Committee, 21st Century Council, City of Tallahassee (1990-1993). This citizen group was organized to create an annual assessment guide to evaluate the effectiveness of our community's public safety performance.
- Past member, California Peace Officers Association
- Chairman (1979-81) Standards and Ethics Committee.
  - Initiated and moderated the First Joint Symposium on Professional Issues.
  - Developed and received State approval and distribution of the *Code of Professional Conduct and Responsibilities for Peace Officers.*
  - Member, Law and Legislation Committee.
  - Member, Small Agency Committee.
  - Member, Reserve Officers Committee.
  - Recipient of the 1981 'Professionalism Award' from the California Peace Officers Association.
- Member or past member:
  - Florida Sheriffs' Association, Lifetime Member.
  - Florida Council on Crime and Delinquency.
  - American Society for Training and Development, local and National.
  - Public Safety Committee, League of California Cities.
  - Los Angeles County Peace Officers Association.
  - Southern California Police Community Relations Officers Association.

## PUBLICATIONS

Lou Reiter has published many law enforcement articles. With the exception of his Internal Affairs manual mentioned below, most of his current publications are integral parts of training he provides and are tailored to the specific subject matter and audience of the presentation. The below represent most of his published works:

- *Law Enforcement Administrative Investigations, a manual/guide.* This comprehensive 120 page manual was first published by Lou Reiter & Associates in 1993. The 2nd edition was published in 1998 and is an expanded version with several guest author chapters and contains over 300 pages in a 'nuts and bolts' method of presentation for practitioners. The Third Edition was published in November, 2006, by the Public Agency Training Council.
- *Broken Badges: Cases from Police Internal Affairs Files*, a fiction novel, Lou Reiter, Deeds Publishing, November 2013
- "FIVE ISSUES THAT MIGHT PROTECT YOUR AGENCY FROM A 'FERGUSON'," LLRMI/PATC Legal Update, December 2014
- "What's the best way for cops to report and monitor 'stop, question and frisk' citizen encounters?" LLRMI/PATC Newsletter, September, 2014
- "Conducting Covert Investigations, Integrity Tests, and Financial Investigations on Law Enforcement Employees – Part 1 and 2," Rothlein/Reiter, LLRMI publication, March/May, 2014
- "Off Duty Officers Arrested for DUI/OWI: An Employment Decision," LLRMI/PATC Newsletter, January, 2014
- "Chemical Testing of NYPD Officers Involved in Shooting Incidents: *Lynch v. City of New York*," LLRMI/PATC Newsletter, December, 2013

- “The cop who’s a sexual predator,” co-authored with Steve Rothlein, LLRMI/PATC newsletter, October, 2012
- “US Supreme Court: Private actor hired by governmental entity for Internal Affairs investigation gets treated as government official for purposes of Qualified Immunity: *Filarsky v. Delia 2012,*” The Local Government Liability Beat, Local Government Risk Management Services, Inc., GA, June, 2012
- “REESTABLISHING SCHEDULED INSPECTIONS/AUDITS OF POLICE HIGH RISK, HIGH LIABILITY TASKS,” LLRMI/PATC newsletter, April, 2012
- “The Search for Witnesses in Law Enforcement Administrative Investigations,” LLRMI/PATC newsletter, April, 2012
- “The Need for an IA/OPS Audit,” LLRMI/PATC newsletter, March, 2012
- “Employees Posting Material or Comments that Adversely Affect Agency – Legal Question Answer,” LLRMI/PATC newsletter, March, 2012
- “*Brady/Giglio* implications for law enforcement,” Webinar, LLRMI/PATC, Feb. 2012
- “The truth about *Garrity*,” Webinar, LLRMI/PATC, Feb. 2012
- “Occupy and Beyond: Practical steps for reasonable police crowd control,” LLRMI/PATC newsletter, December, 2011
- “The Social Network and public safety employees: the good; the bad; and the ugly,” LLRMI/PATC newsletter, March, 2011
- “Narcotic/Special Enforcement Unit Control and Audit,” Lou Reiter, Stephen Campbell and Steve Rothlein, LLRMI/PATC newsletter, August, 2010
- “From the United States Supreme Court Search of Officer’s Text Messages from Department Issued Pager was Reasonable,” Lou Reiter/Jack Ryan *City of Ontario v. Quon,* 560 U.S.___ Slip op. 08-1332 (2010), LLRMI/PATC newsletter, July, 2010
- “Nepotism and Fraternization in Public Safety Agencies,” LLRMI/PATC newsletter, July, 2010
- *“Brady:* The Next Step for Law Enforcement Agencies,” LLRMI/PATC newsletter, January, 2010
- “*Garrity* and the Civilian Review Board,” LLRMI/PATC newsletter, August, 2009
- “Must you tape and transcribe interviews in administrative investigations?” LLRMI/PATC newsletter, August, 2009
- “The Economy and Unexpected Employee Problems,” LLRMI/PATC newsletter, June, 2009
- “Are Your Internal Affairs Reports Confidential?” LLRMI/PATC newsletter, December, 2007
- “Domestic Misconduct Involving Public Safety Employees,” LLRMI/PATC newsletter, 3 Parts, June, 2007
- “Sexual Misconduct by Public Safety Officers is a Job for Use, Not the Courts,” LLRMI/PATC newsletter, August, 2007
- “Conduct Unbecoming: Sex, videotapes, the Internet and police misconduct,” Public Agency Training Council Information, April, 2007
- “Procedural Time Limits in Administrative Investigations - Absolutes,” The Local Government Liability Beat, Georgia Risk Management, March, 2007
- “Sex, Videotapes, the Internet, and Police Misconduct,” Law Enforcement Executive Forum, Illinois Law Enforcement Training and Standards Board of Executive Institute, Western Illinois University, 2007
- “Are You Providing Reasonable Training and Policy Direction on the Handling of the Mentally Ill and Emotionally Disturbed Persons,” LLRMI/PATC newsletter, September, 2006
- “Preparing a Defense in Law Enforcement Litigation: A Formula for Law Enforcement,” LLRMI/PATC newsletter, August, 2006
- “Conduct Unbecoming: Still a Viable Discipline Charge,” LLRMI/PATC newsletter, June, 2006
- “Common Questions About Law Enforcement Administrative Investigations,” LLRMI/PATC newsletter, March, 2007

- “Administrative Insight: A Key to Defending Your Decisions for Administrative Investigations,” Law Enforcement Risk Management Legal Update, Summer, 2006, LLRMI/PATC
- “Preparing a Defense in Law Enforcement Litigation: A Formula for Law Enforcement,” Public Agency Training Council Information, August, 2006
- “The Search for Witnesses in Law Enforcement Administrative Investigations,” LLRMI/PATC newsletter, September, 2005
- “Rhode Islands Law Enforcement Officers Bill of Rights Needs a Fresh Look,” Providence Journal OpEd article, July, 2005
- “The Need for an IA/OPS Audit,” LLRMI/PATC newsletter, March, 2005
- “Creating Reasonable and Defensible Discipline,” Commission on Accreditation for Law Enforcement Agencies, Inc., Newsletter, November, 1996.
- “Timesharing With Your Subordinates,” Florida Police Chief, April, 1984.
- “Police Agencies Need Shooting Policy,” Tallahassee Democrat, September 27, 1982.
- “Truth About Miami Is Down in the Streets,” Tallahassee Democrat, December 27, 1982.
- “Police Recruitment in the 80's - Crisis or Opportunity?” Western City, May, 1981.
- “Civil Detoxification in Los Angeles,” Police Chief, August, 1981
- “Professional Police,” California Peace Officer, 1980.
- “The Elected Public Official Views Police Professionalism,” California Peace Officer, 1980.
- “A Footbeat Officer’s View of Police Work,” Journal of California Law Enforcement, October, 1979.
- “A Day With Sergeant Maynard Jones,” Police Chief, April, 1979.
- “Field Sergeants’ Administrative Time Utilization,” Journal of California Law Enforcement, unknown date.
- “Make Your Meetings Successful,” Journal of California Law Enforcement, April, 1979.
- “Ways To Get That Paper Out Now, Faster and Better,” Journal of California Law Enforcement, October, 1978.
- “Internal Discipline,” “Training,” and “ Management-Employee Relations,” Police Task Force Report, National Advisory Commission on Criminal Justice Standards and Goals, United States Department of Justice, U.S. Printing Office, 1973.

## Webinar presentations

- Beyond Occupy: Reasonable demonstration control methods 2012
- *Brady/Giglio* and its implications for law enforcement 2012
- *Garrity* and compelled statements of public employees 2012
- Sexual misconduct: 3 essential control and defense elements 2013
- How to audit your IA/OPS operations 2013
- Making defensible employee discipline 2013
- Discipline matrix vs. individualized employee discipline 2013
- Social media use by public safety employees 2013
- Administrative interviews of public safety employees 2013
- Domestic misconduct involving public safety employees 2013
- *Brady/Giglio* update 2014
- Compelled statements: the plain truth 2014
- Legal Update: Internal Affairs and Officer Misconduct 2014

## URBAN ECONOMIC DEVELOPMENT AND COMMUNITY ACTION GROUPS

During his residence in both Southern California and Florida, Lou Reiter has been active in various programs designed to improve and enhance community and economic development. Some of those activities have included:

- Tallahassee Area Chamber of Commerce and committees on County and City Governments.
- Local committee for district member voting in Leon County.
- Forward Tallahassee.
- Board of Directors, Skid Row Development Corporation. A non-profit organization formed to stimulate redevelopment of the skid row area in Los Angeles, attract funding sources, funnel monies to redevelopment projects and oversee the general plan for this designated area. During the first year originated over $6 million of projects impacting business stimulation and residential housing.
- Board of Governors, Alcohol Detoxification and Rehabilitation Center. In 1976 conducted an extensive management study of this program. The results were implemented and produced an increased intake of public inebriates and reduction in walkout rates.
- Central Business District Redevelopment Project, Skid Row Task Force.
- Greater Van Nuys Chamber of Commerce and member of the Business Improvement Committee and Vitalize Van Nuys, Inc. (a specific economic action project).

## COMMUNITY ACTIVITIES

Community activities have been a personal commitment for Lou Reiter. Many of these were in connection with his duties as a police practitioner. Others were from his personal orientation to the communities in which he has lived. Some of those not previously mentioned have included:

- American Cancer Society
  - Board of Directors and Executive Board, Florida Division.
  - State Crusade Committee, Vice Chair.
  - Chairperson, State Direct Mail and Marketing Subcommittee.
  - President (1986-87) and Board of Directors, Leon County Unit.
  - Trainer, State Volunteer Leadership Development Program.
  - Crusade Chairperson (1982-84) Leon County Unit which increased donations 60% to a record high of $111,000 annually.
- President, Consolidation NOW, a citizens' group advocating the consolidation of governments of Leon County and the City of Tallahassee.
- President (1985) and member Board of Directors (1983-88), Tallahassee Junior Museum. During the year as President the museum received accreditation from the American Association of Museums.
- Chairperson, Airshow '86, Tallahassee's first major airshow. Co-chair, Airshow '87.
- Hope House Board Member, Jasper, GA., a temporary home for children involved in family crisis
- Rotary International
  - Jasper, GA, Rotary (2008- )
  - Providence Rotary (2004-2008)

- Smithfield, RI, Rotary (2002-2004)
- Tallahassee Capital Rotary (1981-1999)
- Paul Harris Fellow (1976)
- Service Above Self/Member of the Year recipient (1986-7)
- Presenter at district and zone conferences
- Past member, Newhall, CA., Rotary
- Creator of the Newhall Rotary Community Service Fund
- Memberships, current and previous:
  - Forward Tallahassee, Public Safety Committee
  - Florida Economics Club
  - Tallahassee Tiger Bay Club
  - WFSU-TV committees
  - Partners in Excellence, a school/business support program
  - 1987 Leon County School District “Citizens For Better Schools” Bond Steering Committee
  - Florida State University Artists Series, benefactor
  - Public Inebriate Task Force, Alcoholism Council of Greater Los Angeles
  - Canyon County, CA., Formation Committee
  - Vice President and Board of Directors, Santa Clarita Valley Boys and Girls Club
  - Board of Directors, Tallahassee Informed Parents
  - Boy Scout Troop 23 Committee
  - Swannee Area Scout Council Fund-raising Committee
  - Board of Directors, LeMoyne Art Foundation
  - Member and Director, United Way of Leon County

## FORMAL EDUCATION

University of Southern California - Graduate of the Managerial Policy Institute (1980) and graduate study in the Master of Public Administration program.

Pepperdine University - Bachelor of Science in Public Management/Criminal Justice Program .

University of California at Los Angeles - undergraduate study in Political Science.

## PERSONAL

Born March 31, 1939, in Minneapolis, Minnesota.

Resident of Georgia since 2008,Rhode Island since 1999 and Tallahassee, Florida, between 1981-1999. Lou Reiter lived in the Los Angeles area for nearly 30 years.

Lou’s wife is Marilyn McFadden who is an attorney and was a certified Florida police officer. She currently specializes as a consultant in law enforcement and prosecution issues of Domestic Violence and is considered one of the leading experts in police employee-related domestic misconduct. They have six (6) grown children one of whom was a police officer with the City of Tallahassee.

# EXHIBIT B

## LOU REITER TESTIMONY

**March, 2012**

Camille Cordova/Jim Riley (P), Atlanta, *Archuleta v. City of Alberquerque*, D

**August, 2012**

Camille Cordova/Jim Riley (P), Atlanta, *Archuleta v. City of Alberquerque*, T

**October, 2012**

Terry Ekl (P), Chicago, IL., *Obryeka v. City of Chicago,* 07 C 2372, T

**November, 2012**

Alex Karpinski (D), Washington DC, *Youngbey v. DC,* 09-cv-0596(JSG), D

**January, 2013**

Walter Ketchum (D), Orlando, FL., *Jones v. Jackson,* 6:11-cv-1681-Orl-19KES, T

**April, 2013**

Jonathan Moore (P), New York City, *Floyd, et al., v. NYPD,* T

**October, 2013**

Candace Gorman (P), Chicago, *Fields v. City of Chicago,* 10 C 1168, D
Jeff Bouma, Phoenix (P), *Foust v. City of Page AZ,* 3:12-cv-08115-DGC, D

**December, 2013**

Scott Street/Dan Miller (P), Los Angeles, *Mulligan v. City of Los Angeles,* D

**March, 2014**

Candace Gorman (P), Chicago, *Fields v. City of Chicago,* 10 C 1168, T

**April, 2014**

Candace Gorman (P), Chicago, *Fields v. City of Chicago,* 10 C 1168, T

**September, 2014**

John Burris/Ben Neisenbaum (P), Oakland, *Espinoza v. San Francisco Police,* C 06 04686 JSW, T

**December, 2014**

Jeff Bouma, Phoenix (P), *Foust v. City of Page AZ,* 3:12-cv-08115-DGC, T

**May, 2015**

Jeff Bouma, Phoenix (P), *Foust v. City of Page AZ,* 3:12-cv-08115-DGC, T

**June, 2015**

Roshna Keen, Chicago (P), *Lemons v. City of Milwaukee, et al,* 13cv331, D

**July, 2015**

Kerslyn Featherstone, District of Columbia (D), *Westfahl v. District of Columbia,* 1:11-cv-2210 (RLW), T

**December, 2015**

Jeff Taren/Christopher Smith, Chicago (P), *Spalding/Echeverria v. Chicago Police Department,* 12CV8777, D

**May, 2016**

Benjeman Nichols, Chicago (P), *Cazares, et al., v. Frugoli, et al.,* 13-cv-05626, D

**December, 2016**

James Scherer, Littleton CO (P), *Cox v. Wilson,* 15-cv-0128-WJM-NYW, T

**February, 2017**

Anthony Romanucci, Chicago (P), *LaPorta v. City of Chicago, et al.,* 14-cv-9665, D

Brian Nichols, Albuquerque (D), *Green v. City of Farmington NM,* 1:16-CV-0029-WRL-KK, D