# Exhibit 58



# Policing Springfield

## Building Capacity
## Developing Excellence

April 1993

**Wasserman Associates Inc.**
675 Massachusetts Avenue
Cambridge, Massachusetts 02139

# Table of Contents

**Executive Summary** 1

**Introduction** 7
Acknowledgements 7
What the Work Sought to Do 8
How the Work Was Done 8
Who Did the Work 9

**Community Perceptions About Police Services** 10
Perceptions of Crime and Fear 12
Community Views About the Police Department 13
Community Perceptions of Policing Needs 17

**Police Department Organization and Operation** 20
The Demand for Police Service 20
Deployment and Allocation 22
Supervision 25
Civilianization 18
Detective Bureau 29
Crime Prevention Bureau 30
Narcotics Unit 31
Arson Unit 33
Youth Aid Bureau 33
Student Support Unit 33
Traffic Bureau 34
Internal Investigations Unit 35
Information Management 37
Records Bureau 37
Radio Room 38
Booking, Prisoner Control and Matrons 38
The Administrative Services Bureau 39

**The Environment of Policing** 39

**The Role of the Police Commission** 41

**The Perceptions of Employees** 42

**Findings and Recommendations** 44
The Strategy for Action 48

## Executive Summary

The review of the Springfield Police Department has sought to identify the changes necessary to support a transformation into the community policing philosophy. From an extensive series of interviews with community residents and business people, government officials, and police officers, the consultants found that there is general agreement that community policing is a viable objective for policing Springfield. However, these interviews also identified a number of issues that needed to be resolved prior to the Department being able to adopt the basic community policing principles.

Community policing is a philosophy of policing focusing on developing police-citizen partnerships to address the problems of crime, disorder and citizen fear. It re-focuses the police organization from a reactive stance into a proactive stance, and moves the operational mode from response to 911 calls for service as the highest priority to problem-solving in the neighborhoods of the city. The key problems addressed by the community policing philosophy are crime and disorder.

The elements of the community policing philosophy that are applicable to Springfield, reflecting the current national model for this type of policing, are the following:

- Policing based upon a set of values setting forth standards applied to policing activities;
- A commitment to problem-solving rather than simply responding to each call for service as an isolated incident;
- A move away from dependence on 911 as the primary means for generating police work demands;
- A focus on the city's neighborhoods as the basic level of police service delivery;

- Decentralization of policing to the neighborhood level and a move away from specialization in the department to generalized police service delivery at the neighborhood level;

- Involvement of neighborhood residents in developing problem-solving strategies; and a commitment to the forming of problem-solving partnerships between neighborhood residents, police officers and other government agency officials;

- Increased accountability of the police to neighborhood residents and of police officers to each other as well as the community; and

- Empowerment of police officers at the lowest level of the organization to problem-solve.

The embodiment of these community policing elements requires substantial organizational transformation for any police agency. Springfield is no different. The Springfield Police Department has a rich history of community service, and has grown during a period when priorities for policing were far different from those today. Thus, the transformation to community policing must reflect the many strengths of the community and the Department, using those characteristics as the basis for building a responsive, neighborhood-focused policing structure. The key characteristics of Springfield and its Police Department that will impact its transition to community policing are the following:

- **Springfield is a city of neighborhoods, mostly identifiable groupings of residents and businesses serving a defined population group.** The existence of these neighborhoods is one of the greatest assets of the city, and provides an important base upon which a community policing philosophy can be built.

- **The Springfield Police Department has, over the years, attempted to respond to changes in the social fabric of the city.** It has sought to adopt modern technologies to support professional law enforcement, it has tried to provide meaningful training to police personnel, and it has experimented with a variety of community programs in an effort to establish a positive police-community relationship.

- **The Springfield community, from all segments of the city, is desirous of seeing crime, violence and fear reduced.** While there is no general agreement on the best strategy to achieve this end, there is agreement that the Police Department, government and the community need to develop a working partnership supportive of crime reduction and maintenance of order in the neighborhoods.

- **The patrol force of the police department provides a great deal of service.** The department responds to an ever increasing number of calls for service. The police handled over 161,000 calls for service in 1992. Most were routine and order maintenance calls.

- **The Springfield Police Department has many officers who care deeply about the Springfield community.** They want nothing more than seeing the Department's effectiveness enhanced as it attempts to meet the recent challenges found in our nation's cities.

These strengths provide a strong base upon which the community policing philosophy can be built. But there are also substantial problems in Springfield; problems that must be addressed if the transformation to community policing is to be successful. The most important of these problems are the following:

- **The Department lacks sufficient resources to accomplish its mission.** The department does not have the resources it requires to perform its tasks in an efficient and productive manner: Cruisers are in poor shape; the records system which was once the envy of police departments across the Commonwealth threatens to collapse under the weight of its cumbersome paperwork; superior officers do not receive the training and guidance required for policing a diverse community in the 1990s. Police officers all spoke of desire for more meaningful in-service training and education.

- **There is an Isolation between the police and the community.** The community has little confidence in the police ability to provide professional and competent services. Many feel that the department serves its own interests without regard to the priorities and concerns of the neighborhoods.

- **The Department has lost its sense of mission.** The department has fallen into a reactive mode of addressing the issues of crime and violence that it is forced to address. The men and women of the department feel a terrible burden to react to the levels of crime and disorder. It does so without a clearly articulated vision of how policing in Springfield can address important public concerns about crime, disorder and fear.

- **The department does not always focus on neighborhood priorities.** While many members of the department are available to respond to community concerns there are not enough ties to the neighborhoods to determine community priorities. Many in Springfield spoke of their desire for walking police officers in their neighborhood. However, when pressed what citizens really seemed to want is a sense of connection to their police department. They want someone who knows their neighborhood and who is concerned about their problems to be available. They want community policing.

- **There is somewhat of a policing leadership void.** Because of the complex historical relationship between previous police commissions and the department, clear and consistent leadership has not been displayed. The commission has spent far too much time involved in the day to day management of the department and not nearly enough on broad policy questions of role, mission and the values that govern the department. In this context the Chief has been filling a ministerial role. He has not been given a mandate and allowed to run with it.

- **There is a widely held perception that advancement within the department is based upon being in with the right crowd.** Consistently officers spoke of feeling that their hopes for advancement were futile because they just did not fit in with the "powers that be". Assignments to the detective bureau or other plain clothes assignments are not based upon any clearly articulated criteria.

These problems must be addressed prior to adoption of the community policing philosophy, since they are generally debilitating to efforts in the Police Department to modernize its operations responsive to current neighborhood

priorities and concerns. There is substantial agreement within the community and within the Police Department that the transformation to the community policing philosophy can succeed, providing these important issues are addressed.

The initial steps for the Department and the community to take are relatively modest. They focus on correcting several important infrastructure problems in the Department, and focusing energy on bringing together citizens and police officers in a few important design and developmental activities that will give the city experience in collaborative problem-solving, a key element of community policing. The key actions are the following:

- Bringing together community, police officers and government officials to constructively engage in developing plans for community policing;
- Changing the relationship of the Police Commission and the Police Department to strengthen the management and oversight of policing activities; and
- Correcting some of the technical deficiencies in the Police Department to provide the support and resources needed by the city's police officers in meeting the challenges of policing an urban environment.
- Create a Task Force of citizens, police officers, business leaders and city officials to develop a statement of mission and values for the Springfield Police Department, setting forth the standards to be applied to policing the Springfield community.
- Select a single neighborhood policing beat (or assignment area) to experiment with a small group of police officers - covering all hours of the day - developing "beat profiles" of the community, identifying policing priorities with a group of neighborhood residents, and impacting those problems with police and community action.
- Form a Technical Advisory Committee to the Police Commission and Chief of Police consisting of members from other Massachusetts Police Departments experienced as police administrators.

- Introduce a Home Rule Petition to remove the position of Chief of Police from Civil Service.
- Support an independent audit yearly of the internal affairs function to provide credibility to the process in the eyes of the Department and the community.
- Civilianize selected functions in the Police Department, including telephone answering, clerical or mechanical roles.
- Design and implement a system for carefully screening 911 calls for service, diverting to appropriate resources those not requiring a police response.
- Redesign police beats to ensure they reflect the natural boundaries of Springfield's neighborhoods.
- Appoint a citizen/professional panel to review the issue of police officer incentive pay and make recommendations for action in dealing with this issue.
- Formalize and strengthen the Department's employee stress programs.
- Strengthen the Department's stress and officer counseling capabilities so Springfield Police Officers have access to the best possible assistance in dealing with the unique pressures of policing the urban environment.

## Introduction

This Summary Report sets forth the review of the Springfield Police Department toward implementation of the community policing philosophy. It reviews the operations of the Department in terms of the elements of community policing, and considers perceptions existing in the community, within government and the Department in terms of how they can impact the transformation of the Department from a reactive, centralized policing agency into a decentralized, community-oriented agency responsive to the needs of Springfield's many neighborhoods.

**Acknowledgments.** Wasserman Associates, Inc. is grateful to the many people of Springfield who willingly gave of their time and wisdom to discuss their views and opinions about the quality of policing in Springfield. Everyone we spoke with seemed genuinely concerned about improving their police department. While people's perceptions of the problem may vary, they are united in their desire for change. From the Police Commission to the command staff to the rank and file officer, to the man or woman on streets of Springfield, there is agreement that policing in this city can be improved.

It was particularly impressive that people were willing to state their concerns in an open and forthright manner. Members of the Springfield Police Department, the Office of the Mayor, the Police Commission, the Springfield City Council and residents of the city were very forthcoming about what they perceived needed to be done to reach excellence in the way police services are delivered in Springfield. We suspect that there is far more agreement between the many people who provided us with constructive suggestions than public perception may indicate. It is clear that many people - from residents to police officers - believe Springfield is uniquely positioned to move quickly into community policing if several important changes can be made. We thank all the parties for their suggestions and observations. Yet, the content and recommendations in this report is solely that of Wasserman Associates Inc.

**What the Work Sought to Do.** Wasserman Associates was contracted with to review the status of operations and systems within the Springfield Police Department in light of a desire to adopt basic principles of community policing. A group of citizens from nearly every neighborhood in the city and organized as the Springfield Citizens for Effective Community Policing advocated for a review of the department. The Mayor, the City Council, the Police Commission and the Police Chief all endorsed the project. It is clear that the people of Springfield care deeply about the quality of policing in their city. Citizens from all walks of life expressed support and concern for the police department and how it operates. Moreover, the willingness of the police department to undergo the examination that we have done is rare and commendable.

This spirit of openness and willingness to consider change bodes well for the future of policing in Springfield. At all levels of the police department we have been afforded splendid cooperation and assistance. The many good men and women of the Springfield Police Department strive to be compassionate and professional police officers.

Wasserman Associates conducted a review of the systems within the police department. We have examined the relationship between the Police Commission and the department; the structure of the various bureaus within the department; and the relationships between the police department and the various neighborhoods of Springfield. We sought to identify those community policing components applicable to this city and identify what organizational systems needed to be addressed in a transition to community policing. Lastly we sought to develop a strategic action plan setting forth the required organizational changes necessary to prepare the department for change.

**How the work was done.** Members of Wasserman Associates interviewed citizens from all sections of the city to understand their views about crime, fear and policing in Springfield and within their own neighborhood. We asked people to express their sense of priorities for police services. We interviewed numerous members of the police department at every level of the agency to identify issues of concern to employees. Wasserman Associates Inc. staff members observed numerous police operations to gain an understanding of how the department works. Data about internal police operations was collected and reviewed. Members of the Police Commission and a variety of public officials were interviewed to ascertain their sense of priorities and to discuss strategies for change. The leadership of the various collective bargaining units were also interviewed to determine their views of the issues facing the department. Staff

members of Wasserman Associates Inc. met on a regular basis to share information and discuss the components of the work in Springfield.

A summary of the findings of this assessment was presented to the Mayor, Police Commission and City Council in mid-March. That review generated substantial public and private discussion about the state of policing in the city and the strategy proposed to transform the Department into an agency committed to the community policing philosophy. This Summary Report reflects many of the issues raised in those discussions as well as the findings of the assessment undertaken late in 1982 and early in 1983.

**Who did the work.** The Springfield work was conducted by Wasserman Associates Staff and consulting associates over the past six months. Numerous site visits in Springfield combined with data analysis and planning sessions were conducted by the following people:

- Patrick Ryan,
  Project Coordinator
- Brent Larabee (Chief of Police, Framingham),
  Police Operations/Management Consultant
- Andrew Michaelson,
  Resource Allocation Associate
- Russell H. Boxley, Phd.
  Community Analysis Consultant
- Sara Ranney,
  Community Analysis Associate

Robert Wasserman, Wasserman Associates Inc. President led, the policy discussions about future strategies and guided the project.

## Community Perceptions about Police Service

The people of Springfield want their police force to be consistently professional effective, compassionate, and accountable for keeping order including minor ordinance violations and the most critical emergency situations. Many individual Springfield officers are recognized for their commitment and abilities, especially in emergencies. The main issues expressed by community members in interviews were reliability of service: whether officers would respond to the average call for service, and what their conduct and effectiveness would be. Many Springfield residents who previously sympathized with the police have been discouraged by the behaviors of particular officers recently. There is a growing fear that the Springfield police department as a whole is less concerned with serving the community and guaranteeing public safety and more committed to forwarding personal interests.

All across the United States cities are discovering that community involvement is the crucial element in solving urban problems. People in Springfield see police officers as potentially useful problem-solvers to partner with in facing crime in their communities. Souring that potential now is the fear that officers do not take their responsibilities seriously and choose what laws to enforce and what situations to investigate. Particularly damaging in more than one Springfield community is the conversation that police overlook smaller violations in the interest of apprehending larger offenders ("let the little fish go in order to catch the bigger fish"). Residents see this approach as a shirking of responsibility on the part of the police, and an abandonment of police concern for their neighborhoods.

People want to see and hear from more officers who move through their communities. They want the same officers to return and interact with residents and become familiar to and with the community. They want officers to look like the people in the area. They want officers to be a part of the neighborhood, to take an interest in the neighborhood's people and issues. People want safe neighborhoods. Springfield currently faces many significant challenges, from unemployment and drug abuse to violent crime. Many community leaders want or are willing to work with the police on these and other problems, seeing the vitality of the city and its citizens at stake. All people interviewed want a consistent level of basic services including enforcement of ordinances (expressions of community standards) and provision of emergency services. Most would like a new relationship between police and community members as well. Springfield has

many community leaders willing to cooperate with the police on problems facing Springfield's neighborhoods; that the problems are serious; and that such a cooperation, to be successful, necessitates a vigorous integration of professionalism, compassion, and accountability into the daily workings and the overall mission of the Springfield Police Department.

The job of the Springfield Police Department is recognized as difficult, challenging, and essential. Community members recognize that risks are inherent in the work, and that officers are willing to take these risks. Acknowledging the difficulty of the job, some community members ask what outlets individual officers have to deal with job-related stress and ask whether officers have difficulty finding ways to vent stress, especially after particularly violent or otherwise unsettling events. Many residents question whether officers choose not to upset family members unfamiliar with policing issues and turn to other officers for support, as a result alienating themselves from people in their non-police communities.

There are people in Springfield who expressed support and admiration for the work of the SPD's Narcotics Unit. Individuals involved with Springfield Action Commission's drug outreach work, in particular, commend the Captain for his "sensitivity" and praised the department for having "integrity," and for understanding the psychology of the people they work with; everyone interviewed credits the Captain for influencing this high standard. People involved with SPAC's C.R.A.C.K. (Community Response to Community Killers) anti-drug program recount the initial reticence of the police to work with them: "citizens advocating against drugs and violence are putting themselves in potential danger by directly confronting people involved in criminal activities, and the police naturally wanted to avoid that." Currently, organizations such as SPAC are utilized as resources by the police working on drug-related issues. Reviews of the anonymous Narcotics hotline are positive, and D.A.R.E. is regarded as an excellent program throughout the city. One woman described D.A.R.E. officers she encountered as perfectly suited for the job, both personable and professional enough to impress the kids with their message. Children she knew who were allowed into cruisers were especially impressed, and recognized police officers afterwards as people and not just uniforms.

People like that police officers have attended public meetings addressing drugs, crime, and protection of the elderly. In one neighborhood, an initial crime prevention meeting was attended by a reported 110 residents and a police officer who fielded questions; later in that same community, a detective worked

successfully with the residents to track and arrest a serial break-in criminal. Many individuals in other communities complimented the work of the department's crime prevention officer.

There are numerous examples in Springfield of satisfaction with police service. One woman described how police responded to her complaint of an illegal vendor, and shut down the operation. Another woman said police investigated her call about a man looking into cars parked outside a neighborhood church during Sunday services; no arrest was made but no crime was committed, either. A neighborhood council president told of a call she made to the police when her garage was broken into. She did not identify herself as a council president because she "was calling as a private citizen," and she complimented the prompt service she received from responding officers.

Residents interviewed gave a consistently positive review of police response to major emergencies, and described particular instances of officers' professionalism and compassion. Unquestionably, these interactions color their general perception of the police, even when annoyances with non enforcement of codes are at issue. One woman in an outlying community called 911 when her husband was suffering a heart attack and said that police could not have given better attention to the dying man. When another woman's son was seriously injured by a hit and run driver, the police successfully apprehended the driver, contacted the mother after identifying her son as the victim and gave the son excellent care. A man involved in a recent automobile accident said that the attending officers were extremely professional and sympathetic with him even though, he says, he obviously had caused the accident through inattention.

**Perceptions of Crime and Fear.** Many people interviewed for this report expressed fear about crime and safety within the city as a important concern. Most associated fear with particular places and times and said that they alter their behavior because of that worry. A majority stated that they are more troubled about violence and safety in the street than they were a year ago. This was true for residents in the urban center, and in the outlying communities.

Some individuals are afraid of people believed to be involved in drug dealing or other criminal activities, and many are afraid of people under the influence of drugs. Others have heard of driveby shootings and conflicts between turf gangs and fear being inadvertently caught in crossfire. Some people are afraid of housebreaks in their areas, especially into the homes of elderly residents. In the New North, people worry about the groups of up to 30 or 40 kids loitering and sometimes even controlling which drug dealers can occupy positions on Main Street. Some individuals base the blame for their fear on television

programs depicting violent and thoughtless acts for juveniles to emulate and an increased number of handguns in the hands of kids who do not how to use them.

Notorious incidents of crime often tend to color community perceptions about crime. Individuals detail daytime housebreaks, youths circulating between neighborhoods, and driveby purchases of drugs by local and non-local people. In more than one neighborhood, loitering or clientele overflow at popular malls, bars, or restaurants have led to vandalism, illegal drinking, and disputes between establishment owners and loiterers, or between loiterers.

**Community Views about the Police Department**

**Non-Response to Calls for Service.** One frequent complaint of community residents in Springfield is that the police do not always respond to calls. A South End woman tells of a summertime incident in which she and others were harassed by boys on bicycles. Despite calls to 911 no officers ever responded to their call and the women were very frightened. In other communities, people who call to report suspicious activities, specifically regarding public drinking or illegal drug activity, often receive no police response, and don't expect it.

In one scenario, a man called the police to report that he had been assaulted by a known assailant and waited for a long time for officers to arrive; when they arrived, one officer reminded him that in his call he said that the assault was no longer in progress, and explained that shifts were changing when his call came in. Another man noticed his neighbor's Cadillac being broken into by three youths and told his neighbor; he and his neighbor called 911 and requested assistance two or three times in the course of the next hour before a squad car arrived on the scene.

**Non enforcement of Minor Laws and Ordinances.** "When the police do not honor lesser laws, no one does" is a refrain heard throughout Springfield's neighborhoods. When police back-up cannot be assured, individuals committed to solving their community's problems have an even greater challenge in trying to enroll others in the possibilities and risks of change. Police accountability diminishes in the eyes of neighborhood residents when officers do not do anything about large, disruptive parties. Individuals say that other ordinance violations go un-enforced, or are selectively enforced by officers (examples include illegal parking, fixing cars of the street, stray dogs). Many times, calls for ordinance enforcement communicated through the city's official complaint centers are not acted on. People are frustrated with the lack of ticketing by Springfield

police officers for traffic law violations, and by ongoing unsafe traffic patterns such as the conflicts between morning commuters and children waiting for school buses on the same busy thoroughfares.

**Arrests Not Made/Non enforcement of Law.** The police, according to some individuals, do not make arrests on problems obvious to everyone else, claiming that they cannot see problems. Community perception is that police often "let the little fish go in order to land the big fish." Individuals express frustration with this situation, especially in cases regarding drugs. "The little fish," one man says, continuing the metaphor, "are what ruins the neighborhood." Frequently, nothing is done about loitering, dealing, or groups of kids roaming the streets; officers drive by without investigating. A man who said that his house had been broken into two times said that the first time, officers came and made no investigation, and the second time, officers chased the thief but reportedly were outrun by him. Another man who reported kids' suspicious activities in his neighborhood later had his walkway lights broken and torn up, a number of times. He came to see this as retaliation for his call and called the police again for help with the situation. The officer who answered told him that if he was afraid, he should just stay inside.

**Unprofessional Activity/Conduct.** People in Springfield want to see the police officers as examples for the community. The appearance of some Springfield officers is seen by some as sloppy and unprofessional. The manner in which 911 lines are answered at times and the way officers listen to individual's calls for assistance often leave people feeling as though they are imposing on the police. Officers' apparent failure to distinguish between lawbreakers and victims of crime concern many people; they see this in insensitive treatment of victims at the scene of a crime. The behavior of rookie officers is occasionally cited as problematic. In one incident, a rookie officer doing security duty in a store accused a well-known black community leader and two visiting out-of-town friends he served with in the military, "all respectable men," of shoplifting. While the rookie called for assistance, the man, who has worked on drug-related and other issues in the Mason Square areas for years, told him "I'm your best friend and you don't even know it." All of these things detract from officers' effectiveness in their neighborhoods because questions about police professionalism arise.

**Officers Relationships with Individuals and Communities.** One man says about the police: "We have our characters," he said, "and we have our outstanding citizens. The police have no idea who to seek out or to trust without getting to recognize what role any given individual might play in the community."

People in all Springfield communities where most of the population is minority want to see "police who look more like the community." People say that officers' interactions with them exhibit that they do not understand the diversity of the various cultures in the city. Not enough police are minority, or speak languages other than English. One woman's opinion is that an officer's trepidation going into a situation he or she cannot fully comprehend can be a greater problem than the incident itself; knowing a language helps the police to police.

**Cooperation with Neighborhood Councils.** People are grateful that police officers have attended public meetings addressing drugs, crime, and protection of the elderly. In one neighborhood, an initial crime prevention meeting was attended by a reported 110 residents and a police officer who fielded questions; later in that same community, a detective worked successfully with the residents to track and arrest a serial break-in criminal. Many individuals in other communities complimented the work of the department's crime prevention officer.

**Completed Calls for Service.** There are numerous examples in Springfield of satisfaction with police service. One woman described how police responded to her complaint of an illegal vendor, and shut down the operation. Another woman said police investigated her call about a man looking into cars parked outside a neighborhood church during Sunday services; no arrest was made but no crime was committed, either. A neighborhood council president told of a call she made to the police when her garage was broken into. She did not identify herself as a council president because she "was calling as a private citizen," and she complimented the prompt service she received from responding officers.

People in Springfield know that the Springfield Police do not have an expansive budget or the contract they want with the city. Many residents perceive the symptoms of a manpower shortage and outdated equipment. These symptoms in turn justify, for some people, low police morale, the prioritizing of calls, slow response times (and in some cases no response at all), and few officers out of their cars or with time enough to stop and talk to people. Many people previously sympathetic to the department's problems are now angry and frustrated with the conduct of officers involved in various recent protests. The acts of these officers mar the department's image throughout the city. Citizens now ask whether the commitment of all officers truly lies in maintaining public safety, and some people see the police as failing to offer solutions to problems.

**Frustrations of the Job.** "Most officers would be halfway decent people if they didn't have the frustrations of the job." In communities at the city periphery,

businesses and restaurants often back up against woods. Loiterers, often kids carrying police scanners, slip away into these woods, away from police. In the inner city Mason Square area, a drug dealer tells of putting baggies of drugs in his mouth, to swallow if he is confronted by a nearby officer; if the officer grabs the dealer by the neck to keep him from swallowing the drugs and people are watching, the dealer can claim assault by the officer and challenge the arrest procedure.

Often, the police are seen as hard-working, and frustrated, necessary agents in the community. A concern expressed several times was that police, seeing the seamier side so often, come to expect it. Some community members see officers as frustrated with spending all their time "fighting fires."

The job of the Springfield Police Department is recognized as difficult, challenging, and essential. Community members recognize that risks are inherent in the work, and that officers are willing to take these risks in a responsibility to the public. Acknowledging the difficulty of the job, some community members ask what outlets individual officers have to deal with job-related stress and ask whether officers have difficulty finding ways to vent stress, especially after particularly violent or otherwise unsettling events. Many residents question whether officers choose not to upset intimates unfamiliar with policing issues and turn to other officers for support, as a result alienating themselves from people in their non-police communities.

**Court System.** The District Court of Springfield is backlogged with cases. Often, people who have been arrested are out within hours. A recent example of this is the were prostitutes picked up in the South End and then released to return to their spots the same day. Occasionally, individuals are arrested a second time before their first court date comes up. These situations frustrate community members, some of whom see this situation as being justifiable cause for police resignation around making arrests.

## Community Perceptions of Policing Needs

**Individual Officers.** People want the professionalism and compassion at times in evidence in the conduct of many officers to be reliable and consistent. They want Springfield officers to be more professional in appearance. Springfield residents want officers to be personable with citizenry, that is, to be patient with people and to welcome, not express annoyance with calls for assistance. People want officers to acknowledge that while a call for service may be routine for them, an emergency is a major interruption in the lives of most callers. They want walking patrols, and they want the officers patrolling to be sensitive to the dynamics of the neighborhood they are in. Others want police to approach their work from the position that officers and citizens are on the same side. Some would like to see officers participate more in community events like baseball games, perhaps sponsoring teams as they once did. Some think that much would be accomplished, especially with youth, by officers talking about the profession they have committed themselves to. People want officers to see themselves as role models with an effect which can either positive or negative. People say that many officers need to distinguish more clearly between criminal and victim in their interactions with victims of crime, and be more aware of available social services

**Police-Community Relationships.** Community members want the police to make community relations a priority. They want minorities to be hired so that the police force looks more like the community it is serving. Residents want police to be trained in the diversity of the various populations of the city, feeling that such training would help the police to police in seeing that some parts of the city, issues and even the culture have changed. Police should make more effort to support community organizing, and to change the perception that the police are the adversaries of the community. Residents would like to see police establish closer personal relationships with local businesses, perhaps even participate in local business associations. By developing rapport with shop-owners, officers could enhance crime prevention and information-gathering channels because shop-owners are invested in their properties and businesses, spending up to twelve hours each day in their communities, are familiar with them. Residents reiterate that police support is the key issue, saying that no neighborhood will get involved without knowing they have the support of the police. One man says, "people call 911 so the officers come around. People don't call 911 when the officers are around. We need officers around."

**Partnership.** What is more important than the implementation of any one idea from the community is that the police recognize members of Springfield's

neighborhoods as resources for their work. Springfield residents want to see the police establish a vehicle for police-community communication. One proposal describes the formation of a liaison committee between neighborhood associations and the police department with regular meetings every two months in which two or three policing issues would be addressed.

Community members would like to see officers trained in prevention and crisis intervention work, and to deal better with victims of crimes. Some would like to see more officers trained as Emergency Medical Technicians. Other individuals want to see community relations projects reinstated, with officers directing sessions on self-defense and home security; others feel the police should provide written guidelines to citizens on what exactly they should do in a given emergency or violent situation (for example, call 911 or call some other bureau).

Many people in a range of Springfield's communities want to see more D.A.R.E. and other programs in which officers can feel like they are making a difference on an individual level. Some residents think that all officers should go through a D.A.R.E. training. One individual thinks that Springfield should look into a program in which at-risk kids are shown the inside of a jail, mock-booked and handcuffed, for a sense of what a jail term might feel like. Another likes a program which has young kids ride regularly with police in relatively safe areas, able to support their "partners" on the radio but prohibited from leaving the cruiser.

People of the Springfield community want the Springfield Police Department to reestablish a consistent standard of professionalism and accountability. They want the police to responded to calls in a timely fashion. Residents want the police to take on problem-solving with them, and to make arrests when criminal activity is occurring. They want police to enforce traffic laws, and parking and other ordinances. They want changes, too, in particular services, such as the answering of the 911 lines. Community members want to see officers take a conscientious interest in the people of the neighborhoods they patrol, and treat all citizens with dignity and respect, as a matter of policy.

Assistance to victims might involve informing them what they can do to prevent recurrent or new crimes against themselves, or by being familiar with available social services and referring victims to one or another program. Residents support the idea of officers learning continually about issues (both real and potential) confronting the city so that they better understand the incidents and individuals they respond to. Pertinent issues include, but certainly are not limited to, AIDS, drugs, the occult and gangs (people say that gangs are not yet in

Springfield at the powerful, organized level they are in other cities). All want 911 phones answered more politely, and all calls responded to, even if not immediately. Some people want psychological testing for police candidates; others want the minimum age of rookies raised.

People in Springfield want police really talking to people on their rounds. Some say that when police, even staying in cruisers, slowed down to talk to people in their yards years ago, that was a good thing for police-community relations. Residents want the same officers returning day after day so that a rapport with the community is developed. Many people want more minorities on the force, so that officers "look like the community" they are patrolling. Some feel that having more officers speak languages other than English is essential to ensure the rights of all citizens, to enhance police-community relationships and to improve policing effectiveness.

# Organizational Chart
## Springfield Police Department



## Police Department Organization and Operations

The Springfield Police Department is commanded by the Chief of Police, who reports on all policy and disciplinary matters to the Board of Police Commissioners. Assisting the chief are an administrative lieutenant and two deputy chiefs. The department has nine captains, each of whom commands a particular bureau, with the exception of the three captains in the Patrol Bureau, each of whom commands a squad.

The backbone of the Springfield Police Department is the Uniform Bureau which is organized into three squads to provide round the clock service to the community. While most of the department's officers are assigned to the patrol function they are not always assigned to their highest and best use. The department provides a number of services that adversely impact its street strength.

**The Demand for Police Service.** For the Springfield Police Department to become community-based, it must concentrate its police resources in patrol, and direct its patrol resources to the times and locations where they are most needed.

In calendar year 1992, the Springfield Police received 183,628 dispatch able calls for service, of which 161,201, or 88%, were judged to be "police calls," as distinguished from routine administrative matters. These 161,201 police calls can be categorized into three categories: dangerous; order maintenance; and routine.

**Dangerous** jobs include

| | |
|---|---|
| Assault with Weapon | Serious Assault |
| Assist Officer | Domestic Disturbance |
| Man With Gun | Robbery |
| Shots Fired | Breaking & Entering |
| Hold-Up Alarm. | |

There were 14,963 dangerous jobs is 1992, comprising 9% of the total police call workload. Of these, domestic crimes made up over two-thirds (67%), breaking and entering accounted for 19%, and the remaining 14% were divided among the other seven offenses.

**Order-maintenance** jobs include

- Simple Assault
- Drug Complaints
- Unnecessary Noise
- Destruction of Property
- Animal Complaints
- Street Gangs
- Pocketbook Snatch
- Disturbance.

There were 24,508 order-maintenance jobs in 1992, comprising 15% of the total police call workload. Of these, Disturbance and noise complaints comprised 60%, drug and street gang complaints comprised 31%, and the remaining 9% was split among the remaining four offenses.

**Routine** jobs include

- Accident with Injury
- Alarm
- Out on Arrest
- Bomb Threat
- Fire
- Larceny
- Police Pursuit
- Report on Assault
- Report on Larceny
- Stolen Motor Vehicle
- Towed Car
- Transport
- Warrant
- Property Damage Accident
- Assist Ambulance
- Routine Assistance
- Disabled Motor Vehicle
- Hazardous Material
- Missing Person
- Miscellaneous Report
- Report on Breaking & Entering
- Report on Vandalism
- Suspicious Person
- Traffic Enforcement
- Motor Vehicle Stop
- Unknown.

There were 121,730 routine jobs in 1992, comprising 76% of the total police call workload. These results are condensed in the following table.

**Police Calls for Service. 1992.**

| Category | % of Total Number | Primary Contributors |
|---|---|---|
| Dangerous | 9% 14,963 | Domestic Disturbances (67%)<br>Breaking & Entering (19%) |
| Order Maintenance | 15% 24,508 | Disturbance & Noise (60%)<br>Drug & Gang (31%) |
| Routine | 76% 121,730 | Accident<br>Suspicious Persons |
| **TOTAL** | **100% 161,201** | |

Calls for service are unequally divided among months, reaching their peak in the spring and summer (March to September), and unequally divided among time of day, falling mostly on "B" Squad.

Dispatched Calls for Service by Patrol Squad, 1992.

| Hours | Squad | % of Calls | N of Calls |
|---|---|---|---|
| | | | |
| 0000-0800 | A | 27 | 29,614 |
| | | | |
| 0800-1600 | B | 30 | 43,988 |
| | | | |
| 1600-2400 | C | 43 | 62,565 |
| | | | |
| | **TOTAL** | **100** | **146,167** |

In the spring and summer months (March to September) calls remain at high volume until between 0300 and 0400; in winter months calls remain at high volume until between 0200 and 0300.

**Deployment and Allocation.** The current deployment system in Springfield could be better matched to the pattern of calls for service and to the needs of the city's neighborhood. For instance, our review of the call for service data indicate that half-again as many calls occur on the evening shift as occur at any other time -- yet during the period of our review *fewer*[1] officers work the evening shift than work any other shift.

In addition, analysis of the Patrol Division indicates that 24.9% of patrol officer-hours is consumed in tasks that could be performed by civilian employees and managers. Each civilian hired for one of these tasks will release a full-time police officer to street duty.

On a typical night, patrol resources and demand are allocated as follows.

| | "A" (midnights) | "B" (days) | "C" (evenings) |
|---|---|---|---|
| % of total officers on duty, by shift | 34% | 34% | 31% |
| % of total calls for service, by shift | 27% | 30% | 43% |

Not only are the least number of officers available when the demand is greatest, but the increased seriousness of calls for service during evening hours requires the department to use an additional number of 2-officer cruisers, reducing the total number of units even further. The result of this allocation system is that on a typical day, the following number of patrol officers and police units are on the street.

[1]Recently the Chief of Police has made transfers to address the inequity. Police deployment strategies need to be sufficiently flexible to rapidly respond to changing circumstances.

| | "A" (midnights) | "B" (days) | "C" (evenings) |
|---|---|---|---|
| Total Patrol Personnel | 41 | 40 | 37 |
| Total Patrol Units (Squad Cars) | 20 | 24 | 21 |
| Total Patrol Supervisors on the Street | 4 | 3 | 3 |

These generalized assignments, coupled with interior administrative assignments, comprise virtually all uniformed patrol personnel. There are only two major specialized assignments within Patrol:

- The Neighborhood Drug Reduction Unit, a team of two officers and a lieutenant, assigned a few days a month to high-visibility uniformed drug enforcement; and

- Foot patrol, a team of either 7 or 9 officers and one sergeant working a partial shift (either 1300-1900 or 2000-2400) six days a week (Monday through Saturday) in high-visibility neighborhood policing.

Both of these assignments are filled on overtime only. Neither group is dispatched calls for service; the walking officers do not even appear on the daily detail sheets and are not logged into the computer aided dispatch system.

Some obvious features of the allocation model include:

- **A service focus.** The department's generalization in Patrol is admirable and impressive. It is easily adaptable to community policing, because Patrol, to some degree unlike plainclothes functions, is not weighed down by overlapping or isolated specialized units.

- **Lack of supervision.** One supervisor is in Booking and another in Radio every night, leaving 10.7 officers for every supervisor on the street.

- **Use of sworn personnel in civilian jobs.** Every day, 3 officers are working in the garage, another 15 are answering calls for service or dispatching cars, 11 are working in booking, and 2 more are processing paperwork for the court. On the basis of the department's 61% on-duty rate, this is the equivalent of **51 full-time officers** performing civilian and administrative tasks, not

counting the one officer in the front lobby 24 hours a day, which costs an additional 5 full-time officers.

- **Ambiguous role for lieutenants.** Lieutenants are used interchangeably with sergeants and with shift commanders, depending on need, but they do not appear to have a role of their own. On evening shifts, there are typically more lieutenants than sergeants.

Allocation of personnel is extremely even across shifts, as shown above, despite the tremendous workload differential. This inequity is magnified by the department's decision to run more two-officer cars during the highest-incident hours, producing a significantly **smaller** number of response units during the hours of greatest demand. As a result, there is a very great differential in the amount of work done by officers on the different shifts, as shown in the table below.

| | "A" (midnights) | "B" (days) | "C" (evenings) |
|---|---|---|---|
| Calls for Service / day | 108.5 | 120.5 | 171.4 |
| Patrol Units / day | 20 | 24 | 21 |
| CFS / Unit / day | 5.43 | 5.02 | 8.16 |

Patrol allocation could be altered to greatly improve service *with no increase in personnel.* At present 172 of the 229 officers (not counting supervisors) in Patrol are assigned to actual patrol services, with the remainder performing administrative or clerical functions. If these 172 officers were allocated as follows, the number of officers on duty at any given time would be in proportion to workload.

Recommended assignments, by shift:

| | "A" (midnights) | "B" (days) | "C" (evenings) |
|---|---|---|---|
| Total Patrol Officers | 46 | 52 | 74 |
| % of total officers, by shift | 27% | 30% | 43% |
| % of daily calls for service, by shift | 27% | 30% | 43% |

The Patrol Division has an on-duty rate of 61.1%; that is, on any given day about 40% of the division is on a day off, out sick, in training, or otherwise unavailable. On the basis of this percentage and the recommended shift assignments, the following total number of officers would be on the street during each shift of a typical day.

| | "A" | "B" | "C" |
|---|---|---|---|
| Patrol Officers On Duty | 28 | 32 | 45 |
| % of total daily officers | 27% | 30% | 43% |
| % of daily calls for service | 27% | 30% | 43% |

In addition to the patrol officers currently on the street, up to 57 officers in Patrol serve in functions that could be civilianized. As these 57 officers' functions are civilianized, the officers should be assigned to squads in similar proportion to demand. For instance, if all 57 were civilianized, 16 should work midnights; 17 should work days; and 24 should work evenings.

Finally, this report makes several recommendations for reorganization of existing staff, including the recommendation that 10 patrol officers be transferred from Traffic to Patrol. If this reorganization were to occur, those ten officers should again should be assigned in proportion to call-for-service demand; that is, 3 on midnights, 3 on days, and 4 on evenings.

If these reorganizations were completed in their entirety, and if the department allocates personnel according to demand using the formula above, the number of personnel working the busiest shift on any typical day will increase **97%** from 37 to 73, *with no increase in personnel and no decrease in service elsewhere.*

**Supervision.** One of the primary tenets of modern community policing is the recognition that police officers in the field exercise tremendous discretion. For the department to feel comfortable with the discretion its officers now exercise and will continue to exercise in the future, and for that discretion to be tailored to the specific needs of the community, intensive, community-based, uniformed leadership is required. Our analysis suggests that the department should reorganize to increase the supervisory ranks in Patrol, where they are needed most:

- Transfer 2 captains, 3 lieutenants, and 3 sergeants from the various plainclothes units to patrol.

At this time, the span of control in Patrol is almost double that of the plainclothes units. This amounts to essentially an added perquisite for supervisory personnel -- the chance to come out of uniform or off the street -- and it perpetuates the belief that the Department exercises favoritism before meeting critical staffing needs. The opposite should be true: promotion should be a time

for experienced, talented officers to *return* to uniformed duty and reacclimate themselves to the community's needs and desires.

More important, the Patrol Division simply does not have enough supervisors to ensure that the Department's new mandate -- or old mandate -- gets translated into reality through day-to-day work. This crisis outweighs the needs of detectives, who have a more easily monitored role.

Through these recommended reorganizations, the Patrol supervisory ranks would be increased to:

- 34 sergeants
- 9 lieutenants
- 6 captains

This will provide the department with unprecedented opportunities for community policing and organizational integrity.

The roles of these three ranks should be clearly distinguished. Sergeants, as field-based leaders, should be primarily in the community service business. To achieve this mission, sergeants should be realigned along the lines of Springfield's **neighborhoods.** Obviously 18 neighborhoods is to many for each to receive its own supervisor, 24 hours a day. Instead, the 18 neighborhoods should be divided by volume and violence of service calls into three categories, as follows.

- 5 Busiest Neighborhoods, each to receive 3 permanent sergeants, one on each shift

- 6 Full-Service Neighborhoods, each to receive 2 permanent sergeants, on whichever two shifts are busiest.

- 7 Moderate Neighborhoods, each to receive one permanent sergeant.

Each sergeant should work his or her own neighborhood **only,** and they should divide the patrol officers of the department amongst them, forming neighborhood teams to share information and develop community policing strategies across squads. All uniformed personnel working the neighborhood will report to the neighborhood sergeant, who will be the community's primary liaison to the department at the service level. (At the policy level, the community's liaison is the Board of Police Commissioners.)

This empowered role for sergeants also gives long-overdue definition to the role of lieutenant. In order to keep sergeants in their neighborhoods full-time, lieutenants will supervise all neighborhoods uncovered by a sergeant at any given time. At any given time, a lieutenant should be covering eight of the eighteen neighborhoods, *or the same amount as a shift lieutenant today.*

Through their distance both from the community and from any particular pool of officers, lieutenants will be well positioned to serve as field integrity officers, monitoring officers and sergeants for potential integrity violations, corruption, or dereliction. There have been concerns raised that greater community accountability poses unknown risks of corruption; the role of the lieutenant will control against this and allow the department to demonstrate to itself and to the public that community policing has enhanced rather than impeded officer integrity.

Finally, with 6 captains, there should never be a shortage for patrol shift commander. When there are two captains, one should be on the street in a marked cruiser.

**Civilianization**

The easiest and least costly way to increase Patrol resources is transfers from other, non-patrol divisions within the department.

The second easiest way, and one which should be used in conjunction with transfers, is to civilianize those functions within Patrol that do not require a sworn officer, primarily the Radio, Records, and Booking rooms. Although the department will face initial costs in new hires, there are great advantages to putting sworn officers in sworn functions civilian employees in civilian functions.

- Civilianization is an investment in service. It returns police officers to the street and orients all personnel toward community policing.

- Civilians can be hired with the precise degree of experience and expertise necessary. In some instances, particularly clerical assignments, police officers are over-qualified. In other instances, particularly computer tasks, budget management, and the like, police officers may lack the particular skills and experience to perform at a high level.

- Civilians' salaries are often lower.

- Police officers require a large investment in law enforcement training and equipment not required for civilians.

- Civilian employees are a significant cost saving because they work the 5-2 workweek instead of the 4-2. The 4-2 week is the equivalent of giving every sworn employee **three and a half extra weeks of vacation** a year.

There are several assumptions most departments make about civilian employees. Most departments assume:

- that civilians are skilled only for clerical assignment
- that civilians cannot supervise other civilians
- that civilians are less capable and creative than sworn personnel

These assumptions tend to be self-fulfilling, as they often dictate both hiring and placement policies. In fact, civilian employees, like police officers, are

available with a great range of skills and, also like police officers, tend to live up (or down) to the degree of expectation and responsibility given them. Also, like all employees, civilians need training and **career development** in their own fields.

It is recommended that the department hire civilians in service delivery and mid-managerial capacities for all positions in the Radio, Record, and Booking Rooms, and that the chief civilian in these rooms at any given time report to the sworn patrol shift commander, who will be a captain.

One good way to promote civilianization, particularly in clerical and public service functions, is the expansion of the Cadet program, which grooms young Springfield women and men to become police officers.

**Detective Bureau.** The Detective Bureau is commanded by a Captain under a Deputy Chief. Its responsibilities include investigation and clearance of major crimes (homicide, robbery; assault; larceny; embezzlement, including check fraud; B+E including safes; counterfeiting; forgery; kidnapping; and all auto theft).

As one might expect, the largest number of Detective Bureau cases are non-violent offenses, primarily breaking and entering, and motor vehicle theft. The Bureau is organized into four functional units reflecting the disparity in crime types: the Robbery-Homicide-Assault Squad, the Burglary Squad, the Larceny Squad, and the Auto Theft Squad. Together they investigated 25,809 incidents, clearing 1,361 (or 5.3%) of them and making 4,024 arrests and complaints.

| Type of Incident | | N | % of Total Incidents | Arrests |
|---|---|---|---|---|
| | | | | |
| B+E/Attempts | | 3,963 | 15% | 528 |
| Motor Vehicle Theft | | 3,726 | 14% | 702 |
| Unarmed Assault | | 3,495 | 14% | 831 |
| Malicious Damage to M.V. | | 2,082 | 8% | 0 |
| Larceny | | 2,294 | 9% | 772 |
| Misc. Robbery/Assault | | 1,895 | 7% | |
| Larceny from Motor Vehicle | | 1,827 | 7% | 238 |
| Armed Assault | | 1,775 | 7% | 761 |
| Larceny Registration Plates | | 1,411 | 5% | |
| Malicious Damage to Prop | | 1,380 | 5% | 0 |
| Larceny M.V. Parts/Accessories | | 936 | 4% | |
| Unarmed Robbery | | 435 | 2% | 96 |
| Armed Robbery | | 388 | 2% | 78 |
| Misc. Larceny | | 93 | 0% | |
| Misc. Motor Vehicle | | 67 | 0% | |
| Suicide & Attempted | | 29 | 0% | |
| Homicide | | 13 | 0% | 18 |
| | | | | |
| TOTAL | | 25,809 | 100% | 4,024 |

Of these 25,809 incidents, 2,611 (10.1%) were crimes of violence (homicide, robberies, armed assaults). By comparison, about 9% of jobs taken by patrol officers were prone to violence. This percentage indicates that detectives work about the same ratio of violent to non-violent cases as do patrol officers, although -- as in patrol -- the Bureau probably concentrates more time and effort on the violent ones.

In addition, the Robbery-Homicide-Assault Squad investigated another 3,495 unarmed assaults and 1,895 miscellaneous crimes. The Burglary Squad took about half as many total cases, investigating 3,351 residential break-ins and attempted break-ins, plus another 612 similar crimes in businesses. The Larceny Squad investigated 3,767 cases of larceny and malicious damage, and the Auto Theft Squad, accounting for 39% of the Bureau's caseload, investigated 10,049 motor-vehicle-related crimes.

**Crime Prevention Bureau.** The Crime Prevention Bureau is commanded by a Captain under the Chief of Police. Its responsibilities are primarily vice enforcement, including all commercialized vice and racketeering, including gaming and gambling; lotteries; liquor and narcotic regulation; prostitution; sex deviations; pornography; sexual assaults; checking public events for vice violations; and issuing licenses for potential locations of vice (such as bowling

alleys, pool rooms). Other responsibilities include investigating missing adults, and cooperation with federal and state enforcement agencies.

The Crime Prevention Bureau handled some 10,210 incidents in calendar year 1992,[2] but the vast majority of these (85.4%) were receipts and service of restraining orders, the 2,249 of which were served an average of 2.9 times each. The remaining 1,487 incidents broke down as follows.

% of Total

| Type of Incident | | N | % of Total Incidents | Arrests |
|---|---|---|---|---|
| | | | | |
| Miscellaneous | | 409 | 28% | 22 |
| Rape & Sexual Assault | | 301 | 20% | 115 |
| Child Abuse | | 276 | 19% | |
| Missing Persons | | 259 | 17% | |
| Obscene Phone Calls | | 147 | 10% | 1 |
| Liquor/Permit/License | | 45 | 3% | 88 |
| Custodial Interference | | 38 | 3% | 3 |
| Elderly Abuse | | 12 | 1% | |
| Prostitution | | | | 757 |
| Gaming Offenses | | | | 10 |
| Restraining Order Viol. | | | | 374 |
| **TOTAL** | | **1487** | **100%** | **1370** |

Clearly the primary administrative question for the Crime Prevention Bureau is the service of restraining orders. With the supervisory reorganization recommended herein, it would be valuable to transfer much of the responsibility for the service of these orders to community police officers, who could simply hand them over from shift to shift until properly disposed of.

**Narcotics Unit**. The Narcotics Unit is a proactive investigation and enforcement unit specializing in narcotics crimes and raids of businesses and dwellings involved in the selling of narcotics or illegal gang activity. It is commanded by a Captain reporting to the Chief of Police through a Deputy Chief. The narcotics unit is responsible for all street level enforcement of drug violations in the city. This unit also maintains relationships with all the other agencies engaged in drug enforcement. The important work of this unit needs to be coordinated with the day to day activity of patrol officers engaged in moving suspected drug dealers from various street corners. The department needs to

[2]The data from the Crime Prevention Bureau, unlike other department bureaus, includes only the first eleven months of 1992.

find ways to address the community's concerns about street dealing as disruptive of neighborhood tranquillity.

These three sub-organizations -- the Detective Bureau, Crime Prevention, and Narcotics -- clearly overlap operationally. This overlap impedes communication and tends to wastes supervisory resources. There is a need to provide enhanced information sharing and cooperation. The duplication of function among these three bureaus costs the department an unnecessarily large number of supervisors. And, the marginally functional organization of plainclothes personnel not only impedes communication among detectives, it also prevents any reorganization of detectives along area lines, thus ensuring that the geographically based way uniformed personnel conceptualize problems and the crime-type-based way detectives conceptualize problems will always be inconsistent. Finally, the existing division separates similar crime types from one another, preventing problem-solving, neighborhood crime reduction, and -- most important -- the identification of patterns of criminality. It is out of touch with the most basic modern understanding of recidivism, problem-oriented policing, and decentralized investigating. These bureaus could be combined at no cost, freeing up personnel and improving the quality of investigations. The only cutbacks will be in the individual "fiefdoms" the leaders of such specialized detective units tend to create for themselves.

Efficient organizational structure and enhanced supervisions are two characteristics of all high-functioning community police agencies. However, most agencies, while ascribing in theory to the benefits of these two organizational attributes, tend to amalgamate their various units haphazardly, rather than functionally, and do not have the time to reassess the value of the existing structure. This is the case in Springfield.

In Springfield, for instance, the Patrol Division has far too little supervision -- to the point where sergeants and lieutenants are forced to perform each other's roles -- whereas virtually every other division has a very, very narrow span of control. Sergeants, lieutenants, and captains may be the department's most valuable asset in the transition to community policing. Sergeants, regardless of their division, are field supervisors and as such have two roles: to work with officers (or detectives), often on a geographic basis; to lead by example; and to provide the primary community liaison at the service delivery level. Lieutenants are primary field administrators, providing integrity and accountability for mid-managers and shift-based service delivery personnel. Captains are shift supervisors, managing all uniform or plainclothes operations throughout the

department and providing the last word on administrative command questions in the absence of the chief or deputy chief.

**Arson Unit.** The Arson Unit investigates all arsons and bomb complaints. Current staffing is one sergeant; two officers, one of whom is a bomb expert; and four firefighters, commanded by a fire lieutenant.

**Youth Aid Bureau.** The Youth Aid Bureau is commanded by officer of rank, currently a lieutenant, under a Deputy Chief. Its investigative responsibilities include delinquency prevention; investigation of missing and runaway juveniles; recovery and restoration of stolen bicycles and mopeds; investigation of all crimes committed by people age 16 and under, including all crimes committed by children in schools and all cases of child abuse committed by other children (the Detective Bureau investigates parental abuse of children); and investigation of referrals from the state Department of Social Services

It also has significant liaison responsibilities, including cooperation with juvenile court and schools; and cooperation with the Detective Bureau, Crime Prevention Bureau, and Traffic Bureau on their juvenile cases.

Its current staffing is one lieutenant, one sergeant, and six officers, one of whom is the court officer.

**Student Support Unit.** The Student Support Unit patrols the hallways of high schools and middle schools and refers investigations to Youth Aid Bureau. Student Support officers work in plainclothes, 0700-1500, for the duration of the school year. Their salaries are reimbursed to the department by the Schools Department. When the school year ends, the officers are returned to their previous squads. Its current staffing is one sergeant and eight officers.

The anomaly of having two overlapping plainclothes units in this service field costs the department in its level of supervision and communication. We recommend that the department:

- Assign the Student Support Unit to the Youth Aid Bureau, but retain its proactive patrol function.

Student Support Officers are currently underutilized in their problem-solving capacity. By organizing them with Youth Aid detectives, they can serve as the Bureau's "eyes and ears" to identify and recommend solutions to

problems. This could be a great asset to the Youth Aid Bureau, which could be one of very few juvenile crime bureaus to have full-time police agents in the field.

**Traffic Bureau**. The Traffic Bureau is commanded by a Captain under a Deputy Chief and includes both patrol officers and meter maids. Their responsibilities include accident investigations, traffic law enforcement, and parking violation enforcement.

Their mission is to prevent congestion, expedite traffic, safeguard pedestrians, prevent accidents, deter speeding and reckless driving, exemplify courtesy "but [as the department's Rules and Regulations order] any unnecessary conversation with the citizens is forbidden."

According to the Rules and Regulations, the primary tactic is high visibility enforcement; speed traps and concealed motorcycles are prohibited. As a result of Proposition 2.5, the motorcycles for which the unit was intended were scrapped in 1988. The unit now confines itself to accident investigation, routine traffic enforcement (stop lights), and radar, the latter clearly contrary to the spirit if not the letter of the Rules and Regulations.

The Traffic Bureau is unusually large for a city of Springfield's size. It is extremely popular in the community essentially because it is the department's major high-visibility pro-active operation. This popularity has served to justify the use of 20 full-time traffic police officers in the field; such a rationale is essentially manipulative of the public's thirst for greater police visibility. In fact, if properly utilized, 10 extra police officers and their supervisors can significantly increase the visibility of the *patrol* division, assuaging the public to the same degree and providing full-service policing, not just traffic enforcement. Additionally, the existence of any specialized unit like traffic, often results in the rest of the department feeling as though it has no responsibility for enforcement in that area of specialization. Traffic enforcement is a useful law enforcement tool that in our view should be a department wide obligation.

- Operate the Traffic Unit on "B" Squad only, and divide them equally among foot posts and squad cars. Transfer 8 to 10 officers to patrol.

While traffic enforcement is important to Springfield, and cannot be taken lightly, we believe far more important is the need to adequately staff the community policing beats throughout the city. The existence of a large traffic unit draws so many resources from patrol that adequate staffing is difficult. There is

no reason that police officers assigned to community policing beats cannot assume responsibility for traffic enforcement in their neighborhoods. The Department need only have a small strategic traffic enforcement unit that does traffic analysis, and possibly some strategic enforcement in light of the analysis undertaken. But the primary responsibility for traffic under community policing needs to be the beat officer.

**Internal Investigation Unit.** The Internal Investigating Unit is commanded by a Deputy Chief on a 6-month rotation, under the Chief of Police. Its investigative responsibilities include cases of police officer mis- or malfeasance reported by any law enforcement official; Department Rule 32 (citizen complaints); and Department Rule 29, Section 35 (which prohibits officers from recommending particular private services, such as bail bondsmen, contractors, and so forth to victims, arrestees, and the public at large). Current staffing of the IIU is one lieutenant and two sergeants.

The Deputy Chief sends to the Chief a report of all investigations with recommended finding; recommendations for amendments to the Rules And Regulations; and recommendations for general orders.

The structure of Rule 32 determines the overall functioning of the unit. In a commendable effort to be thorough and responsive to community concerns, Springfield's citizen complaint process has become unwieldy, unworkable, and undifferentiated. Because virtually all complaints move all the way up the chain of command, up to and including the Police Commission, the process is inevitably cumbersome.

Unlike similar regulations in most other police departments, Springfield's complaint procedure makes no distinctions between mis-, mal-, and non-feasance; the same process applies, for instance, to allegations of sleeping on duty, rudeness, and police brutality. In principle, this is a progressive and positive innovation, rooted in a complex understanding of the nature of police professionalism. It expects officers to display and unify a professional work ethic, demeanor, and self-control. The virtues of this unified disciplinary system, however, have great operational cost, mostly in the form of excessive attention to minor complaints.

It would be preferable to dispose of minor citizen complaints (such as rudeness) and minor dereliction charges (such as sleeping on duty) at a much lower level. Not only would this greatly expedite the IIU process -- allowing greater attention to be paid to more serious allegations --, it would also allow

discipline for minor events to be carried out with dispatch and surety, the two essential elements of deterrence.

At present the Internal Investigating Unit, on behalf of the Chief, is the bottom rung in the upwards paper train of citizen complaints. Its role is to prepare the Chief to present the facts to the Police Commission. We recommend a new role for the Unit and for the complaint process as a whole. The process should be rewritten to allow the Unit, on behalf of the Chief, to route complaints to the **most appropriate investigating unit,** based on objective complaint-based criteria.

The most appropriate investigative body should be at the **lowest capable level of the department**. For instance, citizen complaints which can be resolved by sergeants in the field should be so resolved. Complaints which require action by shift commanders (or captains) should be resolved at that level. IIU should track and route cases to make sure they go to the right place, and to make sure that repeat offenders are bumped up to a higher level.

All cases, with their resolution and the name of the particular investigating unit, should be routed back to the citizens initiating the complaints, so that they can appeal to the Board for a ruling at a tertiary level.

We recommend the following criteria for complaints against patrol officers and detectives.

| Type of Complaint | Initial Investigating Unit | 2nd Investigating Unit (Repeat Offenders) | 3rd Investigating Unit (Citizen Appeals) |
|---|---|---|---|
| Dereliction | Field Supervisor (sergeant) | Shift Supervisor (captain) | Chief of Police |
| Rudeness | Field Supervisor | Shift Supervisor | Chief of Police |
| Recommendation of Service | IIU | Police Commission | Police Commission |
| Gratuity | IIU | Police Commission | Police Commission |
| Civil Rights (racial or sexual harassment) | IIU | Chief of Police | Police Commission |
| Excessive Force (hands and handcuffs) | Shift Supervisor | Chief of Police | Police Commission |
| Excessive Force (use of police weapon) | IIU | Police Commission | Police Commission |
| Lethal Force | Police Commission | Police Commission | Police Commission |

The Police Commission should undertake to have an audit done of the existing IIU files to assure the thoroughness and integrity of the process. A community's faith in its police requires that citizens and police officers believe that complaints of police misconduct will be dealt with in a fair and impartial fashion. Additionally, the IIU should consider the implementation of a computer based early warning system to track officer complaints and allows the department to intervene in circumstances where warranted. These tracking systems monitor the type and frequency of complaints against officers and can be an important tool for both police officers and supervisors in guarding against abuse of force claims.

**Information Management.** Police Departments like many other organizations are required to collect, process, analysis, preserve and act upon an ever increasing volume of information about every aspect of its operation. The department has a relatively sophisticated computer aided dispatching system that is capable of generating a wealth of information about calls for service. The **Records Bureau** is designed exclusively for paper-based records, and the unit is run on the principle that "all records ... shall be considered irreplaceable." Responsibilities include physical security of record room ; providing records to officers requesting them before trial testimony; logging, numbering, and filing of warrants; and preparing a monthly statistical report to the Chief and other commanding officers, on request. The Records Bureau via police radio also provides information to police in the street about warrants, criminal records and stolen property. It is critical that this information by accurate, timely, and secure.

The department needs to revamp its records system by investing in the latest technology for information collection imaging and storage. The use of mobile data terminals can provide up to the minute information to the police officer on the street. However, the information is only as good as what goes into the system.

The department should move toward an agency wide case management system so that information about suspects, arrests and warrants can be shared across all bureaus with security and accuracy. Such a system should be part of a Department wide management information system for report writing, information sharing and electronic data transfer (i.e. photo arrays MOs etc.) Additionally, the information such a system can provide will be critical to neighborhood policing as the department becomes more decentralized.

**Radio Room and CAD.** The Radio Room is where all calls for service to the Springfield Police Department are received. It is the point where many people have their first contact with the police department. It is a critical function and must be staffed by knowledgeable, well trained people. Officers are assigned to the radio room by their squad commanders and often do not receive proper training in the systems and procedures of that critical function. In our view this is an area where the use of well trained civilians can free police officers to work on the street. Assignments to the radio room should never be used as a punishment assignment. In fact as the department moves toward neighborhood policing the function of the radio room in screening calls and establishing service priorities demand a high level of skill.

**Booking, Prisoner Control, Matrons.** The department's Booking Room and lock up area currently require a great deal of patrol resources. A sergeant is always assigned to the Booking area to process prisoners and supervise the lock up. This is not the highest use of a supervisor's time. However, the department feels is rightfully concerned about prisoner's safety and control. It is our recommendation that the department make use of non sworn personnel to manage and operate the Booking Room. These employees would be responsible for prisoner control and safety. Indeed the department may wish to explore with the Sheriff's office the establishment of a regional lock up run by Sheriff's Department personnel. Currently matrons are under the command of the official in charge of the police station. Their responsibilities include managing the female lockup, children in detention, and lost children brought to the police station. Under the current staffing matrons are not always available and far too often female officers are pulled from patrol assignments to guard female prisoners.

**Administrative Services Bureau.** The administrative service division of the Springfield Police Department is an amalgamation of many of the support services required to run any organization. Under the direction of a Captain the division handles all licenses and permits, personnel and payroll, fleet maintenance and repair, property, supply and evidence, the extra jobs detail and building management and budget. Also included under this division are the highly regarded and well worthwhile Drug Abuse Resistance Education program , the Student Support Unit and a Research and Development Unit. Many of the functions of this division lend themselves to the use of highly skilled civilian personnel. For example a skilled human resources professional is required to manage the myriad personnel issues that bedevil this and many other police departments. The entire area of the M.G.L. c.111F, status for police officers injured in the line of duty needs to be revamped and closely managed. The department's fiscal management systems would also benefit from the talents of a professional budget analyst.

## The Environment of Policing

Over the past twenty years most urban police departments, including the SPD, have focused on improving their response to 911 calls for service. The notion of rapid response to incidents was the operational compass for police everywhere. In this process the demand for calls for service continued to increase as the police were called upon to handle an ever increasing workload. Many calls for service have little to do with serious crime but involve quality of life and order maintenance issues within our communities. Nonetheless, we expect the police to respond in a timely fashion to settle the domestic dispute between a feuding couple; to quiet the restless teenagers hanging on the corner; to mediate the dispute amongst neighbors; and catch the drug dealer, the robber, the mugger or other criminal. In fact over the past five years the demand for calls for service have increased in total numbers while the calls involving response to serious crime have remained relatively constant. Add to this the serious disruption that drug abuse have brought to urban communities and it is plain that policing is in a crisis.

The Springfield Police Department has been at the center of controversy for some time. The lay offs of several years ago, the contentious collective bargaining process, the change in the composition of the police commission and the changes within the city of Springfield have called into question the role of the police department. Citizens expectations about the police have changed, the police are frustrated by the system and increasingly as municipal budgets shrink,

police chiefs are being asked to do more with less. The challenges facing policing today are myriad. Citizens often feel disconnected from their police department. Police often feel no connection with the community as the move from call to call. In Springfield the link between the citizen and the police department is the Police Commission. It represents civilian control of the awesome power of law enforcement and provides a forum for the police and community to articulate the shared values that should guide the role and mission of the police. It is our view that the articulation of the values that guide policing are critical. Moreover, the Springfield Police Commission and the Police Department would be well advised to consider *reaffirming* the values that guide its actions. These might well include:

- A commitment to adhere to the highest ethical standards, with police employees avoiding even appearance of impropriety or conflict of interest; never using the police position for personal gain.
- A commitment to the rule of law and to protect the rights of all individuals, never violating the law even in the pursuit of police objectives.
- A commitment to the protection of life as the highest priority; recognizing that the protection of life.
- A commitment to treat all persons with respect and dignity, regardless of their circumstances.
- A commitment to be responsive to neighborhood and community priorities in Springfield; to permit citizens to work with police in setting policing priorities and developing new policing strategies.
- Recognition of the accountability of police employees not only to the law and their profession but to members of the community, as well.
- A commitment to treating employees with respect, to care about employee job satisfaction, and to support employee professional growth and development.

## The Role of the Police Commission

The Police Commission of the City of Springfield is the appointing authority for the police department. It is charged with overseeing the functions of the police department and providing civilian oversight and control of the police. This is a good and desirable function in our view. However, over time the role of the Commission has become confused and resulted in a system that has emasculated the day to day decision making authority of the Chief of Police and his command staff. Historically, the commission has been involved in many operational decisions without fully considering the professional policing implications of their actions. The commission has promoted officers without seeking the advise and consent of the department's command staff. Commissioners often influenced appointments to plain clothes assignments on the basis of politics and not always on merit. The Commission has become involved in all discipline within the department from the most minor to the most egregious infraction. The Commission has been involved in day to day personnel matters involving officers injured on duty and similar matters of personnel policy. Additionally, the commission has been involved in operational matters in a way that is not the best use of a citizens panel.

The Commission's role is to be the community's voice in the setting of departmental policy issues. They represent civilian control of the police. They should not replace the chief as the chief executive officer of the department who is responsible for the day to day operations of the agency. The commission should be like a board of directors setting policy and providing linkage between citizen's concerns and the police administration. The commission has a role in monitoring discipline within the department. Discipline should occur within the agency and the commission should only hear the most serious cases. discipline should be resolved at the lowest possible level within the agency. The commission is responsible for acting as the appeal avenue for citizens and police officers who are aggrieved by discipline decisions within the department.

The highest and most useful role for the commission is to empower the police chief to act in furtherance of the role and mission of the police department as articulated by the citizens of Springfield acting through its Police Commission. The Chief's role must be strengthened to assume responsibility for many of the managerial tasks now deemed to be under the aegis of the commission. No longer should the commission be involved in lengthy hearings around injured on duty officers status or minor complaints about police officer conduct. These matters can and must be resolved by the day to day managers of the department.

**Commission vs. Chief's Roles**

| Commission | Chief of Police |
|---|---|
| Makes Policy | Carries out Policy |
| Considers Appeals from Investigative complaint decisions | Conducts internal investigations and recommends discipline |
| Makes Promotional Decisions | Evaluates performance and recommends promotional decisions |
| Sets resources levels | Assigns resources to meet needs |
| Sets performance measures | Manages the day to day operations of the department to meet those measures |

## The Perceptions of Employees

**The men and woman of the Springfield Police Department Care About Their Department.** Many officers of all ranks gave freely of their time and talents to help us with this report. Officers came in on their day off to speak with members of our team about their concerns. They want to do a good job they want to have better relations with the community. They want to assist in problem solving. They want to receive the training and resources they need to do their job and they want to be paid a fair wage for doing it.

**There is a Perception of Assignments Based On Politics**. It is widely believed that assignments to the detective bureau or other plain clothes assignments are based upon influence rather than merit. Many people we spoke to within the police department expressed a great sense of frustration with the generally held belief that getting ahead within the department was a function of being in with the right crowd. This perception is pervasive and affects every aspect of the departmental operations. The use of certain assignments as punishment posts; regularly being assigned to the radio room; being on the so call tramp list; or being denied the opportunity to participate in training are all examples of areas where officers felt that assignments are based upon real or perceived influence rather than merit. The 5.5% pay differential for officers assigned to plain clothes assignments is an example of the destructive fall out from this system. A Plain clothes assignment is viewed as highly desirable yet the department does not have an articulated standard that governs the awarding of such an assignment. Without a clearly explained method of assignment the perception of favoritism lingers.

**There is a Perception of an Absence of Fundamental Fairness.** It is widely believed that members of the department are not treated fairly in matters of discipline, promotion or recognition for effort. Throughout the department we heard from employees that there is not a consistently applied standard of fairness in many areas. Access to training, the treatment of women officers, and a perception of inconsistent discipline contribute to this view. The remedy to this perception, we believe, lies in the adoption of departmental values that guide and inform police department policies.

**There is a Perception of Insufficient Support from the Community**. It is widely believed that the community does not understand the blight of the police and is unwilling to commit resources to dealing with the department's needs. Some of Springfield's police officers are angry about this perception. They feel it shows itself in the inability of the city and their union to resolve the collective bargaining and compensation issues that bedevil them. They feel it in what they see as constant criticism of the department and its members. They feel it in growing sense of disrespect that officers encounter in citizen encounters. Many of Springfield's police officers feel unappreciated by the very people they view themselves as serving.

**No Clear Mission.** It is widely believed that the department does not have a clearly articulated mission which directs the operations of the agency. Most police officers feel they are called upon to provide an incredible range of services to the community. They feel pressure to solve serious crime and also to perform a wide array of services that are more mundane and order maintenance focused. In our view police suffer from many generally held misconceptions about their role. These misconceptions flow the heroic view of the police as macho crime fighters who never make mistakes. This unrealistic view combines with the pressures police feel from their organizations to produce a great deal of stress.

## Findings and Recommendations

In many ways, policing in Springfield is in crisis. The general lack of job satisfaction among police employees has greatly impacted department productivity. The internal conflicts between members of the Department, sometimes overflowing into the public arena, has created an organizational climate disruptive to effective policing. The escalating demands for police service has strained Department resources, as officers try to respond to a multitude of complex neighborhood problems and issues. Yet, a large majority of members of the Springfield Police Department desire to see improvements in the Department and are generally supportive of the basic tenets of community policing. Officers wonder, however, what it will take to generate citizen support for their activities.

Many segments of the community are dissatisfied with the quality of police service. They perceive the police as being unresponsive and ineffective in dealing with complex neighborhood problems. They have little communication with the Department except for encounters with police officers at field situations. Yet, many Springfield residents desire to see the Department improve and are supportive of many of the needs expressed by members of the Department.

There are those who claim that the Department is populated with individuals who are uncaring, unprofessional and ineffective in their policing duties. This is simply not the case. The average Springfield police officer is deeply concerned about the quality of life in Springfield and the continued expansion of problems such as drug abuse, neighborhood violence and disorder, poverty, homelessness, and the myriad of other social problems that afflict America's cities, including Springfield. They make valiant efforts daily to deal with these problems without much public acclaim. Only when a situation gets out of control or a mistake is made in dealing with a difficult situation does the public seem to notice. This reinforces the sense that public expectations and policing realities are somehow "out of sync."

In fact, there is far more in common between citizen's perceived needs and those expressed by members of the Department than appears in the public dialogue. We have little doubt that if collaborative problem solving can be put in place -- if police officers and community members can engage in constructive dialogue and planning for high-impact policing -- they will find a common ground upon which a new philosophy of policing for Springfield can be built. That philosophy is community policing, the development of a partnership between police officers and residents of Springfield's neighborhoods to deal with citizen fear, crime and disorder.

To move toward community policing -- the objective of this analysis -- the Springfield community must recognize the complexity of the problems facing the Department and the need for substantial reformation of how policing is organized and carried out in the city. For Springfield, community policing will mean the following:

- Highly-motivated police employees committed to providing sensitive, responsive police service to all residents of the community;
- "Beat cops" assigned to every neighborhood in Springfield; many on foot, some in vehicles, on scooters or bicycles;
- Formation of problem-solving partnerships in every neighborhood, bringing police officers, residents, business people and other government leaders to the table in a joint discussion of strategies to deal with important neighborhood problems;
- Clearly-defined police accountability to the community for their actions; clear accountability of the community for sharing responsibility for crime control, disorder reduction and fear reduction;
- A personnel management system which rewards officers for their professional competence rather than who they know;
- State of the art equipment supporting police officers in the field;
- High levels of skill among police officers in conflict intervention, interpersonal interaction with residents, and problem solving; all achieved through participation in state of the art training programs;
- A 911 call response system that carefully screens calls for service, providing immediate response to emergencies and the response of a police officer knowledgeable about the neighborhood to all other calls, unless the call is diverted to an agency with a better capability than police to provide the needed service.

The many strengths of the Springfield Police Department and the unique nature of Springfield's neighborhoods make it quite feasible to achieve a policing system reflecting these characteristics. But to achieve this end, substantial changes will have to be put in place.

It will be necessary for the City to commit itself to correcting some of the important resource needs of the Department, providing needed equipment and resources necessary to fill gaps that negatively impact the Department's ability to operate. Important labor issues will have to be resolved, quickly, so the focus of attention can move to putting in place the systems necessary for the transition to community policing to proceed. We are submitting a separate memorandum to the Police Commission concerning staffing needs of the Department; we do not believe that the resource shortage should be viewed as an impediment to implementation of the community policing recommendations of this report. The basic reforms needed do not require additional personnel resources, except for civilianization.

The role of the Police Commission and Chief of Police must also be resolved quickly. The Chief of Police must become the chief executive of the Department, with all the powers and responsibilities that entails. The Chief must be accountable to the Police Commission, which must focus its attention on policy making, long-range planning and performance evaluation. It is the Police Commission's responsibility to not only set the standards for policing Springfield but to be advocates for the Department in receiving the resources it must have to be successful.

Members of the Department must understand that, as police officers, they must abide by a code of conduct that meets the highest standards of ethical and professional behavior. For those few officers who refuse to adhere to these standards, the Chief of Police and Police Commission must move to discipline them or, if they continue their behavior, to separate them from the force.

For the City administration and political structure, the attention must focus on ensuring that the Department has the resources needed to be successful. The Chief of Police must be supported as chief executive of the Department, the Commission supported as the policy-making body and personnel decisions relegated to these individuals, without political interference. Professional policing in Springfield must reflect a police force responsive to neighborhood residents, accountable to the Police Commission and the community, and based on professional standards of performance. The administration and legislative

branches of government play an important role in setting overall priorities, providing the needed funding and facilitating the police interaction with neighborhood residents and business people.

## The Strategy for Action.

The objective of the strategy for moving toward community policing must rest on three basic elements:

- Bringing together community, police officers and government officials to constructively engage in developing plans for community policing;
- Changing the relationship of the Police Commission and the Police Department to strengthen the management and oversight of policing activities; and
- Correcting some of the technical deficiencies in the Police Department to provide the support and resources needed by the city's police officers in meeting the challenges of policing an urban environment.

**Bringing together community, police officers and government officials** to constructively engage in developing plans for community policing should result in participants recognizing that each have common goals for the betterment of the city and elimination of the threat of crime and disorder. There has been far too little collaborative effort between the various sectors of the Springfield community. A constructive, problem-solving, planning effort can pay rich dividends not only for the community but for the participants, as well. Since collaborative problem-solving is the basis of effective community policing, the experience of the work will lay a solid foundation for expansion of the problem-solving concept into all aspects of policing in Springfield.

We suggest two major collaborative efforts be undertaken over the next six months as a means for achieving these objectives. They are the following:

- Create a Task Force of citizens, police officers, business leaders and city officials to develop a statement of mission and values for the Springfield Police Department, setting forth the standards to be applied to policing the Springfield community.

While there have been values articulated for the Springfield Police Department, those values need to be reshaped to reflect the commitments of community policing as well as the standards expected to be applied to policing the Springfield community. Every successful high-performing organization in

America has a well-articulated set of operating values and the Springfield Police Department must, also, if it is to be successful in focusing the creative energy of its employees on meaningful problem-solving.

The development of a new value statement and mission statement to position the Department in its role as crime control and order maintenance facilitator for the Springfield community is an important first step in laying the foundation for community policing. Since police officers have enormous discretion in what they do, they need guidance in using that discretion to ensure they reflect the accepted community expectations. Values provide such guidance.

Meeting together in a "retreat" setting, a group of residents, police officers, business people and government officials will find that they share far more of a common view as to how the community needs to be policed than many observers give them credit for. The experience of such a retreat, held out of the public view, but well reported afterwards, provides an opportunity to create a joint product that will serve as an example for future collaboration between police, community and government. It is an important first step to take.

- Select a single neighborhood policing beat (or assignment area) to experiment with a small group of police officers - covering all hours of the day - developing "beat profiles" of the community, identifying policing priorities with a group of neighborhood residents, and impacting those problems with police and community action.

The Department and the community need a good example of how the community policing philosophy can impact the quality of life in a Springfield neighborhood. The Department has numerous officers who are committed to trying the community policing problem-solving process and the community is desirous of seeing the process in place. A test site will provide both the Department and the community with experience with the positive outcomes of the process, as well as a testing ground upon which broader expansion of the community policing philosophy can be based.

To initiate the test, we suggest that the Department seek volunteers, provide them with training in problem-assessment and profiling methodologies, have them visit a few police agencies where the process is well in place (such as New Haven, Richmond, Newport News or New York City's 72nd Precinct), debrief the experience in the other agency, and provide them with technical assistance in

developing the community contacts necessary for the initiation of the profile process. To validate the activities undertaken, we suggest formation of an Evaluation Panel appointed by the Police Commission, including members of the community, the police union, police administration and the City Council.

**Changing the relationship of the Police Commission and the Police Department** to strengthen the management and oversight of policing activities is an important step to correcting the currently confused roles of police chief vis-a-vis Police Commission. Earlier in this report, we have suggested a role "division" between Commission and Chief. We propose that this "division" of roles be formulated through policy issued by the Commission. Specifically, we suggest the following steps be taken by the Commission toward that end:

Develop a policy statement setting forth the role of the Commission and the role of the Chief of Police

Revise the job description of the Chief of POlice setting forth the new responsibilities and accountabilities

Review Commission tasks to identify those current agenda items not consistent with the new role; re-assign those tasks

These actions will provide the basis for changing the role to that described above.

- Form a Technical Advisory Committee to the Police Commission and Chief of Police consisting of members from other Massachusetts Police Departments experienced as police administrators.

The Department and Commission have generally been insulated from knowledge of policing reforms and innovations that are being undertaken within the profession throughout the country. The Commission, and Chief of Police, ought to take advantage of the perspectives of professional police administrators in nearby communities who would be willing to offer advice and counsel as the department moves toward the community policing philosophy and deals with some difficult internal administrative and management issues.

Chiefs of Police such as Dennis Mannix, Natick Massachusetts Chief, Brent Larabee, Framingham Chief (who assisted in this work), William Bratton, Superintendent in Chief in Boston, Thomas O'Loughlin, Chief of Police in

Wellesley and Chairman of the Massachusetts Chiefs Association, Lieutenant Colonel Edward Cronin of the Massachusetts State Police and numerous other executives have had extensive experience with the types of issues that will fall to the Commission and the Chief to resolve. Meeting once a month, or so, such an Advisory Committee would serve to provide objective counsel as the process progresses. We believe these officers would be willing to serve without remuneration for an initial period of time, since they are interested in seeing the police profession in Massachusetts advance.

When the Chelsea, Massachusetts, Police Department began its reorganization under state-receivership, such a panel was formed with very beneficial results to the Police Department and the receiver. We suggest Springfield use such a panel to ensure it has an independent perspective on these important issues.

- Introduce a Home Rule Petition to remove the position of Chief of Police from Civil Service.

We recommend that the city move to remove the position of Chief of Police from Civil Service so that future Chiefs can be recruited from a wide variety of locations and can be held accountable for their performance as chief. There are two separate issues involved with civil service. First, is whether future chiefs of police ought to be recruited from a broad base, including inside and outside members of the department. Second, is whether a contract between the police chief and the Board of Police Commissioners is a better means for ensuring quality performance of a chief than civil service protection. Experience shows strongly that outside recruitment provides a community with a far better range of options than restriction to inside selection. And civil service has been shown to make it very difficult to remove a chief who has been unable to achieve the objectives for which he or she was employed.

Springfield is fortunate to currently have a Chief of Police who cares deeply about the Department and the community. It is important that in the future, Springfield have the best possible Chief of Police, drawn from the widest population possible. That individual may reside inside the department, but the City ought to ensure that it looks far and wide for the individual who best fits the needs of the community. Over the next five years, as the city hopefully moves toward community policing, the level of experience required to lead the department forward will dramatically increase. While the current chief can make substantial progress toward this end by implementing the recommendations

described later in this report, it is important that the city look to the future when the chief's experience and dedication will not be available.

As noted above, the next Chief may well currently be inside the department. But if the city is dedicated to finding the best Chief, the search must compare not only those inside but those outside the department. The cynicism existing among a large part of the community will make it very difficult for the public to have confidence in the future chief if they have not been able to compare candidates from inside and outside. Likewise, the public will not believe the appointing authority has truly been committed to selection of the most capable candidate unless all qualified applicants are encouraged to apply. This will require, at the least, if the process is kept under civil service, that the city request an open competitive examination. If civil service testing is used, the examination ought to consist of a professional panel, at the least, to do the selection.

We believe the city would be well served by taking the process out of civil service, so the process can be modernized by relying on sophisticated selection techniques not easily utilized within the civil service process. Either an assessment center or series of interviews with a local selection panel including chiefs of police from other jurisdictions, or both, should be used. And the new Chief should be a contract employee of the Commission, with a term of office from 3 to 5 years. This would permit the performance of the chief to be judged after a substantial period of time, and continuance in office assessed by the Commission based on evaluation of the success the chief has had.

Many, many communities in the United States now use such a selection process for Chief of Police. Indeed, in larger communities, it is getting less and less common for the chief to have civil service protection, with the contract replacing that protection in a manner that makes performance the key criteria in continuance in the position after the initial term of office. The last major city to abandon total civil service protection for Chief was Los Angeles following the community concerns raised over the insular nature of that police agency.

- Support an independent audit yearly of the internal affairs function to provide credibility to the process in the eyes of the Department and the community.

There is a sense of distrust within the Springfield community about the quality of the internal investigations process that is not matched by the actual quality of the process. Both police officers and citizens perceive the process as being slow, sometimes inaccurate, and burdensome. An independent audit of the

process, as recently undertaken by the Raleigh, North Carolina Police Department, can serve to point up any weaknesses in the process that might exist and reassure the community and department that the Commission is committed to a thorough and fair internal investigations process.

**Correcting some of the technical deficiencies in the Police Department** to provide the support and resources needed by the city's police officers in meeting the challenges of policing an urban environment is the third area in which action is needed. These actions will lay the technical foundation for the transformation to community policing. The key areas of action are the following:

- Civilianize selected functions in the Police Department, including telephone answering, clerical or mechanical roles.

There are too many instances in which police officers have been related to inside positions not requiring police training and skills. This has removed valuable resources from neighborhood assignments, placing even greater burdens on the remaining officers who are trying hard to meet the service demands of the neighborhoods.

Many positions in the Springfield Police Department need to be civilianized. And once civilianized, these positions must always be filled, so if an employee leaves the job, the position must immediately be filled. Unless these positions have priority for filling, police officers will be drawn from field assignments

- Design and implement a system for carefully screening 911 calls for service, diverting to appropriate resources those not requiring a police response.

Few activities are as consuming as the Department's response to citizen calls for service. The level of calls far outstrips the Department's current ability to respond, resulting in police officer frustration and citizen dissatisfaction. Not every citizen request for service requires the dispatch of a police officer, since many calls are appropriately the purview of other agencies that have better capability to service citizen needs. But the Department must have a sophisticated means for classifying such calls, citizens must be advised of the action they can expect and the Department must create an expanded capability to take reports over the telephone, avoiding the necessity to send a police officer to the scene of minor incidents that happened some time ago.

The objective of these changes is simple: create a situation where the neighborhood police officer is the person responding to most calls in the neighborhood. That neighborhood police officer is the individual with the most extensive knowledge of the neighborhood and its problems, priorities and resources. Unless 911 calls are carefully managed, that neighborhood officer will be drawn all over the city responding to calls in other neighborhoods, as is now the practice. To ensure that the neighborhood officer is the one responding, careful management of the 911 function is required. The system called Differential Police Response, developed by researchers for the National Institute of Justice, is the basic model that needs to be adopted in Springfield.

Unless the 911 call system is changed as detailed above, community policing in Springfield cannot be a reality. Since community policing requires that officers be assigned to a neighborhood area and have time to meet with residents, solve problems and build partnerships, control of 911 work demands that consume time in an unproductive manner must be addressed at an early stage of the transformation process.

- Redesign police beats to ensure they reflect the natural boundaries of Springfield's neighborhoods.

The policing assignment areas must reflect the natural neighborhood makeup of the Springfield community. Since a key element of community policing is the establishment of partnerships between police officer and neighborhood residents and business people, it is imperative that the beat structure of the Department match the neighborhood areas of the city, so officers will find their work areas coterminous with community organization areas, other agency service areas, and boundaries neighborhood residents relate to their living area.

The beat redesign process seeks to create a set of beats that are always filled by a select group of police officers over the three work shifts. By remaining assigned to that area for a substantial period of time, officers get to understand the area's problems, resident's priorities, available resources, and people who continually violate the law and cause fear among residents.

When such areas are identified, detectives can also be assigned responsibility for investigating cases for a neighborhood, becoming knowledgeable about crime patterns, offender patterns and identities, and police officer capabilities and knowledge's about the area. The "beat" becomes the basis of service under the community policing concept, for both patrol officers and

for a substantial number of detectives. That requires the redesign of the beats at an early stage of the community policing transition process.

- Appoint a citizen/professional panel to review the issue of police officer incentive pay and make recommendations for action in dealing with this issue.

There has been substantial controversy about whether members of the Springfield Police Department ought to receive incentive pay under the Quinn bill.[3] Police officers feel strongly that they should receive this benefit while the city is reluctant to burden itself with the additional costs which the bill would incur.

Incentive pay for police officers can be an important means for rewarding police officers for developing special skills or competencies. When the Quinn bill was first enacted, few police officers a had college education; the bill's objective was to encourage police education. Today, many new police officers have a college education when they join the force and many senior officers have attended a variety of college programs and earned degrees. The issue revolved, therefore, around whether a college education today is worth an increase in pay of 20 or 30% year after year. Many government and police managers are concluding that the Quinn bill does not reward police officers for the right skills and knowledges. It is becoming increasingly common for police agencies to require a college degree for promotion, if such is not required at entry level into the department. When those changes occur, the payment of educational incentives become duplicative and unnecessary.

There is no question that a police officer is well served if he or she receives a college education, not only in criminal justice but in the social sciences or other liberal arts. An education brings to the officer exposure to a variety of life issues and can enrich an individual's sensitivities to the dynamic of human life. Yet, it is a mistake to have an educational incentive the only incentive offered to officers, since other skills and knowledges can be as important as the level of

---

[3]The Quinn Bill provides that, for cities adopting it, police officers receive a pay supplement for earning degrees in an approved subject, such as criminal justice. If the bill is adopted, the state pays 1/2 of the costs of the educational benefit, although the city must front the money the first year, until state reimbursement is received.

The police contract already calls for an educational incentive of 6% for a bachelor's degree and 8% for a master's degree.

education one has achieved. Thus, it is becoming common for cities to offer career development and "pay for performance" schemes that reward police officers not only for educational level achieved but also for special skills developed and maintained (such as Spanish language skill), special training received (such as crisis intervention or CPR), performance evaluation (when performance is shown to be above the average) and other factors. These initiatives are far more useful than sole reliance on an educational incentive, which often has little direct linkage to policing responsibilities or tasks.

Incentives are important. They need to be built into the salary structure of the agency and need to reflect a broad range of competencies, many of which must be re-certified every few years. The skills required of police officers, especially under community policing, are such that every means possible must be used to encourage and support individual officers developing these skills. The Quinn Bill educational incentive is attractive because the state pays a portion of the cost, but as a true incentive for excellence in performance, it falls far short of the type of system that is needed.

The resolution of the compensation and incentive issues are so important that we strongly urge that a panel of citizens, business leaders, and law enforcement professionals panel be impaneled to examine the issue of incentive pay, career development and other aspects of the Police Department personnel system that impacts officer rewards. Springfield police officers must be rewarded for excellence in policing and the only way to do so is to independently develop a proposal for doing so after reviewing all the options. A citizen panel appears to us to be the best way of addressing the issue. It is an issue that requires resolution prior to establishing the type of accountability required under community policing.

- Strengthen the Department's stress and officer counseling capabilities so Springfield Police Officers have access to the best possible assistance in dealing with the unique pressures of policing the urban environment.

The pressures faced by Springfield Police Officers places great demands on them, and it has the potential to be severely disruptive of their health and lives. More than most occupations, police officers have been shown to react to the poverty, deprivation, conflict and disorder they must face in their daily tasks. The transformation to community policing seeks to place officers in positive relationships with neighborhood residents. But that transition will be difficult if

officers do not have access to highly qualified counseling and stress-reduction capabilities.

The Department currently has such a capability but it needs to be expanded so that officers have routine access to assistance during times of stress, without negative impact on their careers. Broadening the current capability, maybe by forming an Advisory Panel of Counseling Professionals to work with the Department in scoping out an enhanced capability. It is important that provision of this assistance be maintained separate from the internal disciplinary system.