UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


MARK SCHAND, MIA SCHAND,      )
MARK SCHAND JR., QUINTON SCHAND,)
and KIELE SCHAND,           )
                          )
    Plaintiffs,        )
                          )
       v.            )  C.A. No. 15-cv-30148-MAP
                          )
CITY OF SPRINGFIELD,       )
ELMER MCMAHON, LEONARD SCAMMONS,)
RAYMOND P. MUISE, MICHAEL REID, )
and JOSEPH ASSAD,          )
                          )
    Defendants.        )


MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO
STRIKE
(Dkt. Nos. 86, 92, and 119)

May 6, 2019


PONSOR, U.S.D.J.

## I.  INTRODUCTION

Plaintiff Mark Schand ("Plaintiff" or "Schand") and his
family members seek damages from the City of Springfield
and five city police officers, based on Schand's
imprisonment for nearly twenty-seven years for a 1986

murder he alleges he did not commit.[1]  Defendants do not concede Plaintiff's innocence and, even assuming it, deny that they were guilty of any negligence or misconduct in connection with Plaintiff's conviction and imprisonment. Two motions for summary judgment are now before the court, one filed individually by Defendant police officer Elmer McMahon, Dkt. 86, and a second filed on behalf of all remaining Defendants, Dkt. 92.  Defendants also move to strike the affidavit of Michael Hosten, a witness to the murder who is now dead.  Dkt. 119.  For the reasons set forth below, the court will allow the summary judgment motions, in part, and will deny the motion to strike, without prejudice to its reconsideration by the trial judge to whom this case will now be transferred.

---

[1] Plaintiffs' complaint names as Defendants the City of Springfield, Hampden County, City of Hartford, and former Springfield Police Detectives Elmer McMahon, Leonard Scammons, Raymond P. Muise, Michael Reid, Joseph Assad, James Fleury, and Paul McNulty, as well as a number of John and Jane Does. Dkt. 1.  Plaintiffs voluntarily dismissed Defendant Hampden County, Dkt. 41, and the court dismissed the counts against Defendant City of Hartford as well as any Jane or John Doe supervisory employees of the City of Hartford, Dkt. 49.  Plaintiffs also voluntarily dismissed Defendants James Fleury and Paul McNulty. Dkt. 60. Additionally, Plaintiffs dismissed voluntarily all the Jane and John Does 1 through 20. Dkt. 81.

## II.  FACTUAL BACKGROUND

The facts, for purposes of the motions for summary
judgment, must of course be viewed in the light most
favorable to Plaintiffs as required by Fed. R. Civ. P. 56.
The complexity of the record has made the task of applying
this standard difficult.  The parties' submissions include:
statements made to detectives immediately following the
murder (including sometimes multiple, conflicting
statements by the same witness, in some cases later
recanted); testimony presented at the July 1987 motion to
suppress hearing prior to the original trial; testimony
presented at the November 1987 trial itself; evidence
presented in connection with an unsuccessful motion for new
trial filed in 1991 (heard and denied by the state court
trial judge in 1992, and unsuccessfully appealed to the
Massachusetts Supreme Judicial Court in 1995); evidence
presented in support of the successful motion for new trial
in 2013; and deposition testimony and affidavits generated
during discovery in connection with this civil litigation.
Although counsel have worked hard to present the record
with reasonable coherence, the court's task has been

complicated by assertions of undisputed fact made by both sides with sometimes elusive support in the record.

An additional handicap has been the submission by Defendants of successive statements of undisputed fact. Defendants' first rendition appeared as Dkt. 93; it was followed by Plaintiffs' counterstatement, Dkt. 106, which was keyed to the paragraphs of Defendants' first statement. Two months later, Defendants submitted a letter, Dkt. 115, indicating they would be submitting an updated statement, to correct certain typographical errors contained in their original version. At the same time, Defendants submitted a (so to speak) counter-counterstatement of facts, Dkt. 116, which was a photocopy of Plaintiffs' counterstatement, with bolded commentary offering Defendants' disagreements. On this same day, Defendants submitted another statement of undisputed facts, Dkt. 118, which appears, except for some alterations in exhibits, to be virtually identical to their original statement of undisputed facts, Dkt. 93.

To keep the discussion coherent, the court will refer below to Dkt. 93 as "Defs' SOF," except where some other version is expressly cited. This is the document that Plaintiffs' counterstatement ("Pls' SOF"), Dkt. 106, refers

to, and this approach offers the cleanest avenue to a comprehensible overview of the parties' positions.[2]

Apart from the challenge of sorting out the factual record, the court's task has been complicated by the extremely aggressive pleading by Plaintiffs' counsel. As will be seen the complaint embraces a number of causes of action (among others, the claims against the City of Hartford, which have been dismissed) with marginal or non-existent legal or factual support.

A.   The Murder of Victoria Seymour

On the night of September 2, 1986, at approximately 11:20 pm, Charles "Heavy" Stokes, his brother David Stokes, Anthony Cooke, and Michael Hosten were loitering outside a bar in Springfield, Massachusetts, called the After Five Lounge. Strangers, who police later concluded were probably from Hartford, approached the four men to discuss purchasing illegal drugs. A scuffle broke out; shots were fired, and a bullet struck Cooke in the shoulder. Charles

---

[2]  To keep the discussion straight, the court will use the term "Defendants" when referring to Defendants except McMahon and to "Defendant McMahon" when referring to McMahon. McMahon, as noted, has filed his own motion for summary judgment, and the issues related to him are in some respects distinct.

and David Stokes, Hosten, and Cooke began to flee, and
their assailant pursued, continuing to fire at them.  When
Charles Stokes stumbled, the gunman stood over him pointing
a gun in his face while Stokes begged for his life.  He
then robbed Stokes of a bag containing drugs and some
amount of money.  The gunman and his friends then fled in
one or two vehicles.  Victoria Seymour, who had no
connection with the botched drug deal, was standing near
the front of the After Five Lounge.  A single bullet fired
by the same gunman who wounded Cooke and robbed Charles
Stokes struck Ms. Seymour in the back, and she died later
at a local hospital.  Two friends of Ms. Seymour's, Willie
Darko and Michael Bernard, observed the incident from
somewhere nearby, either from an upstairs balcony or on the
street, depending on which version of their testimony is
accepted.

B.  The Investigation

Shortly following the shooting, Defendant Detective
Leonard Scammons ("Scammons"} of the Springfield Police
Department ("SPD") began interviewing the Springfield men
involved in the incident, as well as the victim's friend
Michael Bernard.  Descriptions of the shooter varied.

Charles Stokes identified him as a black male wearing blue jeans and a white shirt.  Cooke described him as a black male with a dark complexion, five feet nine inches tall, with a slender to medium build.  On the day following the shooting, September 3, 1986, two other Springfield officers who are not defendants interviewed Cooke a second time at the hospital.  In this interview, Cooke described the shooter as five feet eleven inches tall, twenty-one to twenty-three years old, or perhaps "an old looking 19-year-old" wearing a white warm-up jacket, blue jeans and white leather sneakers, and having an Afro which was "sort of full on top."  Defs' SOF, Dkt. 93, Ex. 2 (Declaration of Detective Robert Cheetham at 4, report of interview with Anthony Cooke).

That same day, September 3, Defendant Scammons and a non-defendant Springfield police detective interviewed Michael Hosten, who described the assailant as a clean-shaven black male with medium skin who appeared to be around 30 years old, wearing a brown or beige jacket.

The first interview of Victoria Seymour's friend Michael Bernard also occurred the day after the shooting, September 3.  Defendants' Statement of Facts, Dkt. 93,

regarding this interview is perplexing.  It offers a
supposed description by Bernard of the shooter, citing in
support of this description the Complaint, Dkt. 1 at ¶42,
as well as Dkt. 93, Ex. 4A, which Defendants' Statement of
Facts identifies as a "9/3/86 Signed Bernard Statement."
Defs' SOF at ¶5, Dkt. 93.

        Contrary to Defendants' assertion, ¶42 of the Complaint
simply says that Bernard "did not provide a physical
description of the assailant."  Dkt. 1 at ¶42.  Moreover,
the document attached as Exhibit 4A to Defendants' first
Statement of Facts, Dkt. 93, is not (as Plaintiffs'
Statement of Facts at ¶5, Dkt. 106, points out) Bernard's
9/3/86 statement.  Rather, it is an undated statement
obviously taken from Bernard at some later point in time.
Indeed, in Exhibit 4A to Dkt. 93, Bernard explicitly says
that the statement is "in addition to a statement that [he]
gave on September 3, 1986."  Bernard's 9/3/86 statement
actually appears in the record as Exhibit 3 to Dkt. 105,
offered in support of Plaintiffs' opposition to Defendants'
motion for summary judgment.  To complicate matters
further, Defendants have substituted a new Exhibit 4A,
Bernard's actual statement of September 3, 1986, for the

later undated statement originally appearing as Exhibit 4A
as part of Dkt. 93, in their subsequent corrected Statement
of Facts, Dkt. 116.  In Dkt. 116, the original Exhibit 4A
appended to Dkt. 93 has vanished.

At any rate, it appears undisputed that in his
statement of September 3, 1986, Bernard described seeing
the shooter discharge a handgun at Charles Stokes three or
four times, and, when Stokes fell, lean over and take a
plastic bag from him, then run away.  Bernard described the
assailant as five feet seven inches tall, 160 pounds,
twenty-five years old with dark skin.  Bernard said in this
statement that he had never seen the shooter before.  Dkt.
105, Ex. 3 at 2.  In the later undated statement,
originally offered as Exhibit 4A of Defendants' Statement
of Facts, Dkt. 93, Bernard stated, inconsistently, that
prior to the shooting he had seen the shooter a couple
times in Hartford.

It is perhaps helpful here to take a step away from the
chronology to note the contents of the undated, but later,
Bernard statement that originally appeared in Defendants'
Statement of Facts, Dkt. 93, as Exhibit 4A.  First, the
evidence suggests that this statement was given some time

after September 23, 1986.  In this statement, Bernard described how at some point he was shown approximately thirty pictures of black males by Defendant Scammons and another Springfield Detective, Milton Doty.  The record is clear that Springfield detectives first received these thirty photographs from a Hartford detective on September 23.  Bernard did not describe any of the pictures shown to him at this time as a Polaroid.  In fact, Bernard selected as the shooter picture number 20618, indisputably a mugshot of Schand taken by the Hartford police.  This mugshot depicted Schand without any glasses and not wearing chains, and Bernard's statement did not describe Schand as wearing either glasses or chains in the photo he saw.  He asserted at this time that he was "100% sure" of his identification of Plaintiff as the shooter.  Another police activity report dated October 24, 1986, describes a further interview with Bernard in which he confirmed the certainty of his identification of Schand.  Dkt. 116, Ex. 4L at 33.

It is undisputed that Bernard has never recanted his identification of Schand as the shooter.  However, in his later testimony during the course of the suppression hearing in July 1987, prior to Schand's trial, Bernard

testified that he saw pictures of Schand "with chains."
Dkt. 105, Ex. 10 at 188.  This suggests Bernard may at some
point have seen a Polaroid picture of Schand that showed
him wearing gold chains, a critical point in the discussion
below.  His testimony offers no details about how the
pictures "with chains" were shown to him, who showed them
to him, or the context in which he saw them.

Returning to the chronology and the date of September
3, 1986, on this day, Defendant Detectives Michael Reid
("Reid") and Joseph Assad ("Assad") interviewed two
teenaged boys, Lavon Dixon ("Dixon") and Al Chase
(sometimes known as Jermaine Bush, but hereafter "Chase"),
who had been eating at a pizza parlor called Pizza King
half a mile from the After Five Lounge at around 11 pm on
September 2, approximately twenty minutes before the
shooting.  A summary report of the interview prepared by
Reid and Assad appears in the record as Defendants'
Statement of Facts, Dkt. 93, Exhibit 3B.  According to the
report, Chase stated that while he and Dixon were at the
Pizza King, a group of men from Hartford approached them.
One of the men began asking Chase about some gold chains he
was wearing, and Chase became concerned that he might be

robbed. Chase described this person ("Subject 1") as a black male, twenty years old, five feet seven inches tall, with black hair in braids, a brown and white short-sleeved shirt, blue pants, and blue sneakers, wearing sunglasses with brown frames and gold trim. Chase described another man in the group ("Subject 2") as twenty-six years old, five feet eleven inches tall, with light skin, wearing a beige fisherman's hat and a beige shirt. A third man ("Subject 3"), according to Chase, was very dark, wearing a yellow shirt and four gold chains. A fourth man was wearing a red shirt, and a fifth had on red sneakers. Chase told Assad and Reid that he recognized Subjects 1 and 3 from having previously seen them.

At the bottom of Reid's and Assad's September 3, 1986 report describing the Chase interview is a handwritten note: "one with bad/decaying teeth." Dkt. 93, Exhibit 3B at 6 (the word "bad" was inserted above the word "decaying"). Plaintiffs' Statement of Facts cites this notation as evidence that Chase "identified the perpetrator as 'one with bad/decaying teeth.'" Pls' SOF at ¶8, Dkt. 106. The record, however -- at least as reflected in this document -- does not support this assertion for two

reasons.  First, Chase was not at the scene of the shooting
and therefore was not in a position to identify any
"perpetrator."  Second, it is impossible to tell from this
interview summary which of the several subjects Chase
described encountering at the Pizza King had the
"bad/decaying teeth" that the handwritten comment refers
to.

According to the summary report, Chase told the
officers that four of the men who approached him were
driving a "grayish custom van" with a Connecticut license
plate.  Two other men in the group were driving a second
vehicle, a dark-colored car.  Defs' SOF, Dkt. 93, Ex. 3B.

More than twenty-five years following the shooting, in
January 2013, an individual named Randy Weaver submitted an
affidavit in support of Schand's ultimately successful
motion for new trial, indicating that he had come from
Hartford on the night of the shooting, September 2, 1986.
He had been in a pizza restaurant near the After Five
Lounge that evening, looking for a man who had stolen a
gold chain and medallion from him at a "Run DMC" concert in
Springfield on August 30, 1986.  He was with a group of
other men from Hartford, including a man named Tracy

Fisher, who had broken teeth (apparently resulting from an earlier gunshot wound), and another man named Ty Johnson. At the time, Weaver wore his hair in braids, wore gold chains, and drove a van. Dkt. 105, Ex. 59 at ¶6. Later, Weaver was in the area of the After Five Lounge when he heard shots. He denied participating in any shooting, but he described Johnson and Fisher reporting to him later that they had exchanged gunshots with some "Springfield guys" after a tussle over drugs. Id. at ¶13. Weaver stated that sometime after Schand was arrested, he told unidentified Hartford police officers that he had been in Springfield in the area of the shooting and that "Mark Schand wasn't there." Id. at ¶14. Without describing how he could be sure, he said that he "knew that Mark Schand was not in Springfield the night of September 2, 1986." Id. at ¶15. The record contains no explicit evidence that the Hartford police passed Weaver's comments on to the Springfield investigating officers. Plaintiffs contend, nevertheless, that Defendants were negligent in not adequately pursuing an investigation into whether either Weaver (with the chains and braids) or Fisher (with the broken teeth) may have been the shooter, and not Plaintiff.

Returning to September 3, 1986, on that day Defendant Detective Elmer McMahon interviewed a man named Richard Ramsey, who lived near the After Five Lounge.  Ramsey stated that he had just arrived home when he heard the gunshots.  When he got outside, he saw three men run into a blue van, and two others run into a blue or black car. Both vehicles sped away.  Defs' SOF, Dkt. 93 at ¶10.  No further interview was conducted of Ramsey.

Plaintiffs' Statement of Facts identifies other statements taken by detectives on September 3 from persons in the area of the shooting on the evening before.  These provide conflicting descriptions of what occurred.  One purported witness, Water Teal, described the shooter as wearing a ski mask, chasing the victim, shooting her multiple times, and pulling money out of her bra.  Dkt. 105, Ex. 5.  Another witness, Shirley Pleasant, described the group from Connecticut as driving a black Lincoln or red Mazda.  Id., Ex. 6.  Yet another witness, Walter White, described the gunman as between twenty-seven and thirty-five years old, between five feet eight inches and six feet tall, average build, weighing about 170 lbs.  According to White, the shooter had short cropped hair and it looked

like he had a "receding hairline." Id., Ex. 7. Finally,

Lawrence Gadson, another witness, described the gunman as a

black male, dark skinned, about 5'5", who looked like he

was wearing "corn braids." Id., Ex. 8.

The investigation of the Seymour murder pursued the

possibility that the killer had come from the Hartford

area. Kenneth Whitted, a confidential informant detained

in Springfield at that time, was not a witness to the

shooting, but he told the detectives that he could

generally identify men from Hartford who had been involved

in recent altercations in Springfield. On September 17,

1986, Defendant Detectives Scammons and Assad drove Whitted

from Springfield to the Hartford Police Department, where

he was shown a collection of mugshots. Whitted identified

six or seven photos of men who, according to him, had

visited Springfield over the summer. Defendants contend

that the record is undisputed that Schand's photo was not

among those shown to Whitted, but their citation for this

assertion is the complaint, Dkt. 1 at ¶¶63-69, which says

just the opposite. Paragraph 67 of the complaint states

that two pictures of Schand were shown to Whitted; ¶69 says

that Whitted did not pick either photo as depicting a

person who had been in any recent altercations in Springfield.  Plaintiffs, for their part, contend that three pictures of Schand were among the photos shown to Whitted at that time.  Pls' SOF at ¶16, Dkt. 106 (citing "Plaintiffs' Ex. 10," purportedly a motion to suppress transcript at 127-128).  A review of Exhibit 10 (at least in the version appearing on the electronic docket) reveals no reference to Whitted testimony, or to pages 127-128 of the transcript.  The dispute, while puzzling, is not material to any of the substantive issues to be resolved in this opinion.  In other words, the question whether Schand's photo appeared in the selection of men from Hartford who, according to Whitted, may (or may not) have been involved in prior beefs in Springfield does not bear significantly any issue now before the court.

It is undisputed that shortly after the day of his trip to Hartford with Whitted, September 13, 1986, Defendant Detective Joseph Assad left the Homicide Bureau and thereafter had no involvement in the investigation of the Seymour murder.  Pls' SOF at ¶19, Dkt. 106.

On September 18, Defendants Scammons and Reid showed a photo array to Dixon and Chase of the men from Hartford who

had been selected by Whitted the day before. Chase "liked" the picture of a man with cornrows as possibly being among the men who confronted him at the Pizza King on the night of the shooting, and Dixon "liked" two men in the array named Pruitt and Syms. Reid and Scammons did not make a record of the photos they showed Dixon and Chase. It appears undisputed, however, that even if a picture of Schand was included in the group of photos previously selected by Whitted, Schand's photo was not among those Chase and Dixon "liked."

That same day, September 18, Cooke was also shown the same photo array. He did not make an identification. The parties dispute whether Reid and Scammons adequately recorded which photos were shown to Cooke. For purposes of Defendants' motions, the court will accept Plaintiffs' contention that they failed to do this.

On September 19, 1986, Scammons and Reid interviewed Tanya Polon, whose home was across from the After Five Lounge. She stated that after the shooting, she had seen a four-door white Datsun traveling down the street with four black men in it. The Datsun was followed by a silver or light blue van with a white stripe running down the side, a

window on the top, bubble on the side, and a ladder on the back.  Polon noted that neither vehicle had its lights on.  Then, a black male, about 28 years old, dark complexion, about five feet seven inches tall with a large three-inch Afro appeared, ran down the street, and jumped into the Datsun.  The driver put the lights on and drove away.  Defs' SOF at ¶22, Dkt. 93.  Polon told the officers that her neighbor Lee Hutchins could identify the van.  No evidence in the record indicates whether any Springfield detective attempted to contact or interview Hutchins.  Shown a photo array, Polon made no identification.

At some point in early or mid-September of 1986 -- the record does not indicate when exactly, but the parties seem to agree on this general timeframe -- an unidentified officer of the Hartford police stopped Plaintiff for a motorcycle infraction and directed him to the Hartford police station.  At the station, three Polaroid photographs of Plaintiff were taken by this officer, or perhaps by some other unidentified Hartford officer.  In those photos, Plaintiff was wearing what were then popularly called "gazelle" or "cazal" oversized sunglasses, thick chains on his neck, and his hair in cornrows.  Two of the photographs

depicted Plaintiff full-face, and one showed him facing right.  Dkt. 105, Ex. 15.  Plaintiff does not appear to contend that the motorcycle stop and the resulting photographing were pretextual, i.e., tactics intended to obtain a picture of Schand for purposes of the Seymour murder investigation.

Here, the discussion must break from straight chronology to address a central disagreement between the parties: the question whether a material dispute of fact exists on the record as to if and when these Polaroid photos of Plaintiff came into the possession of any of the Defendants and were shown to witnesses.  Defendants cite the deposition testimony of Defendant Raymond Muise as support for their contention that Defendants only received the Polaroid photos of Plaintiff from the Hartford police on October 29, 1986, the day Plaintiff was arrested, and that the Polaroids were never shown as part of any photo array to any witnesses prior to, or even after, that date. Defs' SOF, Dkt. 93, Ex. 9 (Muise Dep. at 71-73) & Ex. 5 (Muise trial testimony at 740-742).  Indeed, Muise testified at his deposition that in his opinion using the

Polaroids "would be too suggestive." Id., Ex. 9 at 77;
Dkt. 105, Ex. 31 at 77.

Plaintiffs strenuously argue that the record contains
evidence that Defendants somehow possessed the Polaroids of
Plaintiff prior to October 29, 1986, and that they included
them in photo arrays shown to potential witnesses. Some of
these witnesses ultimately identified Plaintiff as the gun-
wielding assailant outside the After Five Lounge and
testified to this effect at Plaintiff's trial. Plaintiffs
point to the testimony of Michael Bernard at the motion to
suppress hearing. As noted above, according to the
transcript, Bernard stated that, at some unspecified date
prior to October 29, 1986, he was shown a picture of
Plaintiff "with chains." Dkt. 105, Ex. 10 at 188. The
Hartford mugshots do not show Plaintiff wearing chains; the
Polaroids do. This can be easily seen by comparing Dkt.
105, Ex. 15, with Dkt. 93, Ex. 43. Moreover, Bernard
identified "Exhibit 2A" at the suppression hearing, which
Plaintiffs contend is one of the Polaroids, as a picture he
was shown at some time prior to October 29. Dkt. 105, Ex.
10 at 188. However -- again, as already noted -- Bernard

never offers any details about the circumstances under which he saw any picture of Plaintiff "with chains."

Plaintiffs also point to the testimony of the two teenagers, Al Chase and Lavon Dixon, who encountered the men from Hartford at the Pizza King prior to the shooting. Chase testified at Plaintiff's trial that, at some point, officers came to his school and showed him a photograph of Plaintiff wearing "gazelles" and with his hair in braids. Since the mugshots do not depict Schand wearing gazelle-type sunglasses, it is a reasonable inference that Chase viewed at least one of the three Polaroids taken in Hartford. Dkt. 105, Ex. 13 at 249. However, the context of the testimony does not suggest the date of this incident, except that it appears to have taken place when police questioned Chase at his school. The other teenager, Dixon, offered similar testimony at the 1987 trial about being shown, also at school, a photo of Plaintiff with "gazelles." Id. at 275-277.

While the record is murky, and certainly disputed, it cannot be said at this stage that Plaintiffs lack evidence that could justify a reasonable jury in concluding that, by some unidentified process, Springfield police officers came

into possession of the Polaroid photos of Schand from the Hartford police and showed them to potential witnesses prior to Schand's arrest on October 29, 1986. No record evidence describes how they did this.

Plaintiffs seem to argue that displaying one of the Hartford Polaroids to a witness during the murder investigation would have been, per se, improperly suggestive and a violation of Schand's constitutional rights. But, as will be seen, the use of a Polaroid would not necessarily have been, in itself, improperly suggestive. Any conclusions about the suggestiveness of this tactic would depend on the circumstances. Defendants, of course, have no light to throw on this issue, since they deny ever showing the Polaroids to any witnesses.

The only specific evidence in the record explicitly supporting a finding that a Polaroid photo of Schand was used suggestively came from Michael Hosten, a witness at the scene who testified for the Commonwealth at the 1987 trial and identified Schand as the shooter. In June of 2006, almost twenty years after Schand's conviction, Hosten signed an affidavit repudiating his trial testimony and

describing police misconduct, including improper pressure by officers to implicate Schand and blatantly suggestive misuse of the Polaroid.  Dkt. 105, Ex. 24.  Hosten died shortly after signing the affidavit, and Defendants' motion to strike will be addressed below.

The discussion now returns to the straightforward chronology.  On September 23, 1986, Defendant Scammons and Detective Doty traveled to Hartford to speak with Detective Ronald Faggiani regarding Hartford men known to frequent Springfield.[3]  Faggiani provided them with a selection of roughly thirty police mugshots that included pictures of Plaintiff, three of his brothers, Terry Schand, Antonio Schand, and Roger Schand, and one of Randy Weaver.  Apart from this, no record was kept of the thirty or so photos received.

Later that day, September 23, Detectives McNulty and Fleury re-interviewed Cooke, showing him the thirty mugshots that had been provided earlier that day by the Hartford police.  Cooke picked out two photos as possibly being one of the men from the After Five shooting:

_____

[3] Detective Faggiani is now deceased.  His name is spelled variously by the parties.  The court has adopted what seems to be the most likely version.

Plaintiff and Antonio Schand, his brother.  Cooke stated
that he was 60-70% sure about Plaintiff's brother Antonio
and that Plaintiff may have been present at the shooting,
but he was not as sure about Plaintiff as Antonio.  Defs'
SOF at ¶27, Dkt. 93.  Cooke did not recall any of the men
from that night having cornrows.  No record was kept of the
photos shown to Cooke on this date.

On September 24, 1986, Defendants Scammons and Reid
interviewed Dixon, Chase, Whitted, and Charles Stokes,
showing them the photos received from Hartford.  Chase
identified Plaintiff with 90% certainty as one of the men
he encountered at the Pizza King shortly before the
shooting and another man, Anthony Atkins, with 50%
certainty.  Dixon identified Plaintiff with 50% certainty
and Atkins with 30-40% certainty.  Defs' SOF at ¶28, Dkt.
93.  Whitted picked out Plaintiff from the photo array as a
man he had seen in Springfield on several occasions.
Charles Stokes selected the photo of Plaintiff and another
man named Tracy Truman as looking similar to the man who
attacked him, but only with 30-40% confidence.  At this
time, Stokes described his attacker as a black male, about
thirty years old, five feet seven inches tall, 155 pounds,

wearing a beige mechanics uniform. He also said his attacker "appeared to have bad teeth." Defs' SOF, Dkt. 93, Ex. 4J at 2. Plaintiff has a visible front gold tooth, but a jury could find that he does not have what could reasonably be described as "bad teeth."

Defendants Scammons and Reid memorialized these four interviews (Chase, Dixon, Whitted, and Charles Stokes) in a police activity report dated September 24, 1986 ("the Scammons Report"). Defs' SOF, Ex. 4J. Stokes's account of his assailant appearing to have bad teeth was contained on the second page of the report.

At this point, the discussion will diverge again from the chronology to address another crucial issue, the Scammons Report and what happened to its second page. Viewing the evidence in the light most favorable to Plaintiff here, a jury could conclude that Schand's attorney, Roy Anderson, was given only the first page of the Scammons Report as part of the Commonwealth's document disclosure prior to Plaintiff's trial. He never received the second page with the arguably exculpatory comment by Stokes that his assailant had "bad teeth." A doctored copy of the Scammons Report was discovered in 1991 in a locked

cabinet in what was then Defendant McMahon's office.  On this copy, references on the first page of the report indicating that it was "Page 1 of 2" and that the report was "continued on page 2" had been covered in white-out, so that if a copy were made of the first page, the existence of the second page would be concealed.  Plaintiffs contend that because Defendant McMahon supervised the investigation and the altered report was found in his office, a jury could reasonably conclude that McMahon was responsible both for the alterations and for deliberately withholding exculpatory evidence.

On October 15, 1986, Randy Weaver was arrested in Hartford on unconnected charges.  As noted above, at that time Weaver drove a blue and grey van which matched the description of the vehicle at the shooting, styled his hair in cornrows, and wore the "gazelle" style of sunglasses Plaintiff was wearing in the Polaroid photos.  Some evidence suggests this information (the "Hartford material") was shared by Hartford law enforcement agents with the Springfield police, although Defendants dispute this.  A jury could find that this Hartford material was never shared with Schand's defense attorney, who might have

used it at the criminal trial as evidence that Weaver, not Schand, was the gunman at the After Five Lounge shooting.

As noted above, sometime after September 23, 1986, Springfield detectives Doty and Scammons took a statement from Michael Bernard while Bernard was being held in the Springfield District Court lockup. They showed Bernard the thirty mugshots received from Hartford detective Faggiani, and Bernard selected the picture of Plaintiff, stating that he was "100% sure that this was the guy who had the gun." Defs' SOF, Dkt. 93, Ex. 4A. He then signed and dated the picture, confirming that it bore the number 20618, which was a mug shot, not a Polaroid, of Plaintiff. Dkt. 116, Ex. 52 at 2. According to Bernard's statement, when Scammons and Doty asked Bernard a second time how sure he was of his identification, he stated "I am 100% sure." Dkt. 93, Ex. 4A. Another, shorter report submitted by detectives Doty and Scammons, dated October 24, 1986, describes an interview with Michael Bernard and again notes how Bernard "positively identified a photo of Mark Schand as a picture of the person who had a gun in his hand the night the Seymour homicide." Defs' SOF, Dkt. 93, Ex. 4L. It is not clear whether Exhibit L is a shorter description

of the contact that produced the statement by Bernard included in Exhibit 4A, or if it is describing some additional, independent contact. At any rate, on October 29, 1986, based on the positive identification of Schand by Michael Bernard, the Hampden County District Attorney's office obtained a warrant for the arrest of Mark Schand for the murder of Victoria Seymour. As noted above, the evidence, though disputed, is sufficient to permit a jury to conclude that Bernard was shown one of the Polaroids of Schand on or about this time.

On October 29, 1986, pursuant to the warrant issued that day, Plaintiff was arrested and questioned by the SPD. He stated that he only wore the "gazelle" glasses the day the Hartford police took the Polaroid, that he had not been in Springfield on September 2, 1986 (and had, in fact, only visited Springfield once in his life, on another occasion), and that he had never driven a van.

The SPD continued its investigation after Schand's arrest. On October 30, 1986, Reid and Muise interviewed Hosten again and showed him an array of eight photographs. Hosten selected photo 20618, the mugshot of Plaintiff, and stated that he was positive that he was the shooter. Defs'

SOF, Dkt. 93, Exs. 16D & 16E.  Hosten eventually testified

for the Commonwealth at Plaintiff's trial, a key witness

positively identifying Plaintiff as the shooter on

September 2, 1986.

According to a statement obtained from Hosten by an

investigator employed by Plaintiffs in June 2006, twenty

years after Schand's trial, Hosten's identification was a

deliberate lie, made to curry favor with Defendants and the

Springfield District Attorney's office.  Hosten said in

this statement that at the October 30, 1986 meeting, Reid

and Muise first showed him a color Polaroid of Plaintiff

and told him that Schand had been arrested for the murder

of Seymour.  The affidavit made clear that Hosten's mind

was not tainted by any suggestive display of the Polaroid.

He said in the 2006 statement that (although he never

revealed it to the officers) as soon as he saw the

Polaroid, he was immediately "sure he was not the person

who had robbed Heavy Stokes on September 2, 1986."  Dkt.

105, Ex. 24 at ¶26 (emphasis in original).  After showing

him the Polaroid on its own, the officers, according to

Hosten's statement, then inserted the Polaroid into the

photo array of mug shots, and Hosten picked out Plaintiff

as the shooter. He did not do this because he in fact recognized Schand as the gunman, or because the Polaroid had somehow misled him into actually thinking Schand was the shooter, but simply because "it was obvious that this was the person they wanted me to pick out." Id. at ¶29. The officers then told Hosten that "if [he] cooperated, they would take care of [him] and make all [his] cases disappear." Dkt. 105, Ex. 24 at ¶31. Hosten died shortly after giving this statement, and Defendants never had an opportunity to question him about it. The statement's admissibility is a very close question, which will be addressed below in connection with Defendants' motion to strike.

On November 12, 1986, Whitted signed a statement identifying Schand's photo as someone he had seen in Springfield on several occasions. Defs' SOF at ¶48, Dkt. 93, Ex. 4M. No record was kept of precisely which photos were shown Whitted.

On December 4, another witness to the shooting, Lawrence Gadson, selected a photo of Schand as possibly being the individual who wielded the gun on September 2, 1986. He stated, however, that he would prefer to see

Schand in person before making a firm decision.  Defs' SOF, at ¶49, Exhibit 3F.

On December 15, 1986, Defendant McMahon organized a lineup for Dixon, Chase, Charles Stokes, and Gadson. Plaintiff took part in the lineup with five filler participants: two SPD officers, two Hampden County jail inmates, and one man from the police lockup.  Counsel for Schand was present at the lineup and voiced no protest about its composition.  Defendants complied with defense counsel's request that the members of the lineup wear hats. In separate examinations of the lineup, Dixon and Chase identified Plaintiff as the person they saw at the Pizza King immediately prior to the shooting.  Stokes identified Plaintiff with 55% certainty.  Gadson did not make an identification.  Defs' SOF at ¶¶50-52, Dkt. 93.

Resolution of the question whether, viewing the record in the light most favorable to Plaintiffs, a jury could reasonably conclude that the composition of the lineup was unduly suggestive presents a challenge.  A photograph of the lineup appears as Exhibit 27 to Dkt. 105.  It reveals that Plaintiff is probably somewhat shorter and somewhat younger than most of the other members of the lineup, and

he has no facial hair, unlike four of the six participants. It is unsurprising that defense counsel voiced no protest about the composition of the lineup, since Exhibit 27 reveals no egregious manipulation.

One problem emphasized by Plaintiffs (accepting their view of the facts) is that Defendants' previous display of the Polaroids of Plaintiff to Dixon and Chase corrupted their perceptions and resulted in their mistaken identification of Plaintiff at the lineup.  The improper use of the Polaroids, Plaintiffs contend, primed the two teenagers to pick out Plaintiff in the lineup as one of the men they saw at the Pizza King.  Regarding the narrow question of the suggestive composition of the lineup, however, this argument offers little assistance to Plaintiffs.  A jury would not need to find the lineup suggestive in itself in order to conclude that the prior manipulation of Dixon and Chase with the Polaroids vitiated any identifications they made of Plaintiff at the lineup.

Another problem with the lineup, Plaintiffs say, is that Charles Stokes later stated that he knew all the members of the lineup except Schand and therefore was drawn to identify him, though with only 55% certainty.  But the

record contains no evidence that Stokes ever told Defendants that he was familiar with the other members of the lineup, so this problem can hardly be laid at their feet.

Stokes's testimony has other problems. A few months after the lineup, he informed Defendants that he was, in fact, positive that Schand was the person who pointed a gun at him and robbed him, not 55% sure as he had previously stated. Dkt. 105, Ex. 37. He later testified to this effect at Plaintiff's trial as a key identification witness for the Commonwealth. Six years following that, during the hearing at Schand's initial motion for a new trial in 1992, Stokes entirely repudiated his earlier identifications and claimed that Schand was not present at the shooting.

On December 31, 1986, Defendant Scammons interviewed William Darko, the friend of Victoria Seymour who, along with Bernard, was present with her at the After Five Lounge on the night of the shooting. Scammons showed Darko an array of what Darko described as nine "color" photos. Defs' SOF, Dkt. 93, Ex. 4N at 2. Darko's statement indicated that he selected a mugshot of Plaintiff with "the number 20618 on it." Id. at 3. Darko stated that he was

sure that this picture depicted "the guy who had the gun" and signed the back.  Plaintiffs contend that this identification was tainted because the reference to "color" photos means that a Polaroid or Polaroids must have been improperly inserted into the array.  The mugshots, including number 20618, were black-and-white.  Darko also testified at the July 1987 suppression hearing prior to Schand's trial that he was shown "Exhibit 2B," one of the Polaroid photos, at this interview.  Dkt. 105, Ex. 10 at 41-42.

On April 10, 1987, Defendant Scammons took a statement from Anthony Cooke in which he stated that on April 2, he recognized Plaintiff while the two of them were being held in a local jail.  Cooke said he noticed Plaintiff's gold tooth and was certain he was the same man who had been present at the After Five shooting, standing over Charles Stokes with a gun.  Defs' SOF, Dkt. 93, Ex. 4Q.

In the lead-up to the trial, prosecutors delivered discovery to Schand's defense counsel, Roy Anderson.  No one kept records of exactly what documents were produced or when, but Anderson has stated that he never received the second page of the Scammons Report and that, if he had, he

would have used it during his cross-examination of witnesses at Plaintiff's trial.  In addition, Anderson never received the "Hartford material" file that would have revealed the identities of other individuals, such as Weaver, who may have been involved in the Seymour murder. A jury could find that Defendants possessed this file, because they produced it as part of discovery in a later trial of Plaintiff's brother, Roger Schand.  Pls' SOF at ¶194, Dkt. 106.

The parties' submissions offer a plethora of additional details concerning the events leading up to Schand's trial, including a number of investigative pathways -- some pursued, some abandoned -- that have not been described here.  The summary above, regrettably lengthy, presents the factual outline of the case relevant to the pending motions.

C.  <u>SPD Training</u>

The parties have presented sharply different perspectives on the nature of the training received by SPD officers during the years leading up to the Seymour murder. Defendants point to record evidence (sometimes difficult to pin down in their citations) of some structured training,

through the Municipal Police Training Committee and other resources, on handling exculpatory evidence and identification procedures.  The depositions and other evidence in this area suggest that a significant amount of the training, though not all, was informal and on the job. Plaintiffs highlight the absence of written policies and procedures, and they point out portions of Defendants' depositions that suggest training in critical areas was at best informal and at worst scanty or non-existent.  See Defs' SOF at ¶¶70-74, Dkt. 93, and the responsive paragraphs in Pls' SOF, Dkt. 106.  It is clear that some training, whether formal, on the job, or through an annual in-service process -- and whether supported by written policies or developed through unwritten practices or the discretion of the officers -- was provided regarding identification procedures and handling of exculpatory evidence.

Plaintiffs' expert report, authored by Lou Reiter, a former law enforcement officer and expert on police practices, stated that "the training, policies, practices, and supervisory oversight of detectives in the Springfield Police Department were egregious departures from generally

accepted police practices at the time of the arrest and conviction of Mr. Schand." Pls' SOF, Dkt. 105, Ex. 46 at ¶14. Reiter noted, for example, that the Springfield police manual lacked written policies concerning photo arrays and lineups and the handling of exculpatory evidence. By comparison, model police manuals such as the Rhode Island Law Enforcement Manual and an order issued from the Newton, Massachusetts Police Department, contained detailed policies governing identification procedures and the handling of exculpatory evidence. Id. at ¶¶20-28.

Two points deserve note in connection with the factual context of the training issue.

First, if the sole issue regarding municipal liability were whether Defendant Springfield's police training, policies, and practices were substandard as of 1986, Reiter's report would be sufficient to generate a dispute and put that issue in play. However, as the First Circuit recently noted, expert testimony to this effect is not enough. A plaintiff seeking to demonstrate municipal liability must show not only that the city's training regimen fell short, but also that the city "knew or had reason to believe that such a regimen had unconstitutional

effects." Gray v. Cummings, 917 F.3d 1, 14 (1st Cir. 2019).  This may be done by offering evidence of "past violations sufficient to put the [city] on notice of such effects."  Id.  No evidence of any such past violations exists in the record.

Second, Reiter's report offers a helpful perspective on the use of mixed photo arrays as of 1986.  A key inference to be drawn from his report is that the use of photo arrays involving, for example, mug shots mixed with other photos did not necessarily render an identification tainted, so long as the mixed array was not presented in a suggestive manner. His report approvingly quotes the Massachusetts Law Enforcement Handbook, which states that the preferable practice is to use photos other than mugshots "if they are available."  Dkt. 105, Ex. 46 at ¶21.  The Handbook advises that "if the suspect's photograph is in color or is large, include several other color or large photographs in the sampling."  Id.  A later authority suggests that "'[m]ug shots' should not be mixed with other photographs unless there is not [an] alternative."  Id. at ¶22 (emphasis supplied).  Reiter's report supports the approach described in the 1985 Rhode Island Law Enforcement Manual, which

states that "if possible, at least five photographs of different subjects" should be used depicting the persons in a similar way.  Id. at ¶26.  If the photograph of the subject is a mug shot with a front and side view, "then most of the photos should also be front and side views." Id. (emphasis supplied).  The report's summary of the requirements for a valid photo array by "at least 1985" includes the proviso that "if mug shots are used, that at least some of the other photos in the array are also mug shots."  Id. at ¶28.  The report never suggests that different types of photographs, such as Polaroids, could never be used as part of a proper identification process, but only that the use of Polaroids as part of a photographic array is a "practice generally understood to be unduly suggestive, particularly when Polaroids are mixed in with other non-Polaroid photographs."  Id. at ¶57 (emphasis supplied).

     The factual summary of the Seymour murder investigation – viewed in the light most favorable to Plaintiff -- would, as noted already, permit a jury to conclude that at least one Polaroid was used in some manner during police interviews with potential witnesses.  The testimony of

Darko and Bernard at the suppression hearing prior to
Schand's trial could be interpreted by a jury as suggesting
that they were shown at least one Polaroid during their
contacts with police, along with other photos.  The
evidence of suggestiveness, beyond the mere use of a
Polaroid, is inferential.  Only the 2006 Hosten affidavit,
if it is admissible, explicitly describes an instance of a
clear misuse of a Polaroid by police.

### D.  The Trial and Pre-Trial Motions

From July 14 to July 17, 1987, Massachusetts Superior
Court Judge Lawrence B. Urbano presided at a suppression
hearing, preparatory to Plaintiff's trial.[4]  Among other
issues, the hearing presented the question whether Schand's
identification was tainted by unduly suggestive tactics
used by police officers, including the use of a Polaroid or
Polaroids in the photo arrays.  Witnesses included Chase,
Charles Stokes, Cooke, Darko, Dixon, David Stokes, Hosten,
and Bernard, along with Defendants Scammons, Muise, and
Reid.  At the suppression hearing Darko, as noted,
testified that police showed him a Polaroid of Schand along

---

[4] Defendants' Statement of Facts identifies the presiding
judge incorrectly as "Mastroianni."  Dkt. 93 at ¶67.

with nine other photographs. Dkt. 105, Ex. 10 at 41-42.
Bernard, also as noted, testified that he saw a picture of
Schand "with chains," identified as Exhibit 2A, which was
one of the Polaroids. Id. at 188. Hosten's testimony at
the suppression hearing also suggested that one of the two
photos he selected identifying Schand as the shooter showed
his "whole body" with "gold rope, thick gold rope" --
meaning gold chains -- which indicated that it was one of
the Polaroids. Id. at 158. Although the record does not
appear to contain any written findings or conclusions, it
appears evident that Judge Urbano denied the motion to
suppress.

Plaintiff's trial proceeded from November 9 to November
20, 1987, before Superior Court Judge John F. Murphy, Jr.
The juveniles Dixon and Chase testified to seeing Plaintiff
at the Pizza King shortly before the shooting. Charles
Stokes identified Plaintiff as the man with the gun who
robbed him; Cooke identified Plaintiff as the man who shot
him and robbed Charles Stokes; David Stokes identified
Plaintiff also as his brother's robber, the man with the
gun; Hosten and Bernard also positively identified
Plaintiff as the shooter. Defs' SOF at ¶78, Dkt. 93.

Plaintiff does not dispute the substance of the testimony of these witnesses, but he does point out that three of them, Cooke, Stokes, and Hosten, eventually recanted their testimony.  Dixon, Chase, Darko, and Bernard have never recanted their testimony, but all offered testimony or other evidence suggesting that they viewed Polaroids during the identification process.

Plaintiff presented an alibi defense that he was never in Springfield on September 2, 1986, the date of the murder, but was in Hartford.  He had a dental procedure in the morning, spent the day at his sister's apartment, and picked up his girlfriend (now wife), Plaintiff Mia Schand, from her job at a beauty salon at around eleven thirty p.m. Plaintiff arrived home around twelve thirty a.m. on September 3.  In addition to Mia Schand, witnesses for Plaintiff were Thomas Accierno, Plaintiff's dentist; Pearl Andrado, Mia Schand's manager at the salon; Janice Parker, a bartender where Plaintiff and Mia Schand stopped that evening; and Lorrie Williams-Bey, Mia Schand's sister.  Id. at ¶80.

On November 20, 1987, the jury found Plaintiff guilty of the murder of Ms. Seymour, and Judge Murphy sentenced him to life in prison.

### E. State Motion for a New Trial in 1991 and Federal Habeas Petition Pursuant to 28 U.S.C. § 2254

On July 7, 1989, Charles Stokes recanted his identification of Plaintiff in a handwritten affidavit. Defs' SOF, Dkt. 93, Ex. 27. Based partly on this newly discovered evidence, as well as claims of prosecutorial misconduct and ineffective assistance of counsel, on September 12, 1991, Plaintiff (represented by new counsel) filed a motion for a new trial. In his allegations of prosecutorial misconduct, Plaintiff argued that the Commonwealth had withheld exculpatory evidence, namely the second page of the doctored Scammons Report. Plaintiff also argued that the Commonwealth had withheld evidence obtained from the Hartford police, the "Hartford material," tending to show that Weaver, rather than Plaintiff, was the assailant during the After Five Lounge murder and robbery. Plaintiff pointed to two Hartford reports describing Weaver, who was similar in appearance to Plaintiff, who owned a grey van like the one seen by witnesses on September 2, 1986, and who had reportedly been heard

bragging about the After Five Lounge shooting.  Plaintiff also argued that the Commonwealth had failed to turn over impeachment evidence in the form of promises made to witnesses Charles Stokes, Michael Bernard, and David Stokes in exchange for their testimony.  Defs' SOF, Dkt. 93 at 20, Ex. 12.

In September 16, 1992, Judge Murphy, Plaintiff's trial judge, issued a 27-page memorandum with detailed findings of fact and conclusions of law, denying the motion for new trial.  In his memorandum, Judge Murphy addressed claims relating to the Scammons Report and the Hartford material. He found with regard to all of these allegedly withheld documents that they either contained no exculpatory information or that their contents were already known to Plaintiff's defense counsel through other means.  Regarding the Scammons Report, he ruled that Stokes' testimony before the Grand Jury in December 1986 contained substantially the same information as that found on the possibly concealed page 2 of the Scammons Report.  Defs' SOF, Dkt. 93, Ex. 13 at 673-674.  Judge Murphy rejected claims that impeachment evidence regarding promises, rewards, and inducements had been withheld, and he concluded that Charles Stokes'

recantation was a complete fabrication designed to discredit the Assistant District Attorney who prosecuted Schand and whom Stokes had a grudge against. Defs' SOF, Dkt. 93, Ex. 12 at 19-20. On July 18, 1995, Justice John Greaney of the Massachusetts Supreme Judicial Court issued a comprehensive opinion affirming Judge Murphy's rulings in every particular. Defs' SOF, Dkt. 93, Ex. 31, <u>Commonwealth v. Schand</u>, 420 Mass. 783 (1995).

The opinions of Judge Murphy and Justice Greaney discuss the Scammons Report and the Hartford material at length, concluding that defense counsel was aware of the substance of this evidence and, in any event, suffered no prejudice by not receiving it. The 1991 motion for new trial, however, does not appear to have raised the issue of the Polaroids, the lineup, or the improperly suggestive identification procedures generally. No mention is made of these issues in either opinion.

On May 24, 1996, Plaintiff filed a petition for writ of habeas corpus in the United States District Court for the District of Massachusetts, offering essentially the same arguments contained in his motion for new trial. On May 7, 1997, in a 22-page opinion, U.S. District Judge Frank H.

Freedman denied the petition.  Schand v. Dubois, Civ. Action 96-30088-FHF (D. Mass. May 7, 1997).  Plaintiff's motion for a certificate of appealability was denied by Judge Freedman on June 23, 1997; the Court of Appeals affirmed this ruling on December 15, 1997.  Again, in these federal collateral proceedings, the issues of the Scammons Report and the allegedly withheld Hartford material were thoroughly explored, but no mention was made of the Polaroid photos, the lineup, or any supposedly improper identification procedures.

### F.    Motion for New Trial in 2013

On May 6, 2013, Plaintiff filed a second motion for new trial, based on further recantations and newly discovered evidence.  At this time, Anthony Cooke stated that his identification of Plaintiff as the shooter had been false. While no Defendant pressured him to identify Schand, he was advised by unspecified "people," not police officers, who told him, "This will help you," so he testified falsely that Plaintiff was the man who shot him.  Dkt. 116, Ex. 50 at 66-67.  In 2006, Michael Hosten stated in the affidavit already described that police showed him a Polaroid of Plaintiff, and he felt it was obvious, first, that they

47

wanted him to identify Plaintiff as Seymour's murderer, and, second, that doing so would result in favorable treatment for him. Based on this, he said, he falsely identified Schand. In addition to the new evidence from Cooke and Hosten, Charles Stokes continued to assert his 1989 recantation.

A key additional factor was that investigators from Centurion Ministries, a resource center assisting wrongfully convicted prisoners, located three individuals who said they had been present at the After Five Lounge shooting and who now came forward for the first time to state that Plaintiff was not present that night. Those individuals were Tracy Fisher, Randy Weaver, and Martin Smith. Defs' SOF at ¶132, Dkt. 93.

At the hearing on the motion for new trial, Fisher, Weaver, and Smith testified that they knew Plaintiff in September 1986, that they were present at the After Five shooting, and that Plaintiff was not there. Pls' SOF at ¶227, Dkt. 106. Mr. Cooke also testified, contrary to what he said at the 1987 trial, that he did not know who shot him, and that he never saw Schand in the area of the After

Five Lounge on September 2, 1986.  Defs' SOF, Dkt. 93, Ex. 50 at 37.

On October 4, 2013, the Hampden County District Attorney filed a brief indicating that the Commonwealth would not oppose the motion for new trial.  Defs' SOF at ¶135, Dkt. 93.  Based on this, on October 15, 2013, Massachusetts Superior Court Judge C. Jeffrey Kinder issued an amended order allowing Plaintiff's motion for a new trial.  Judge Kinder stated in his order that the new testimony from Fisher, Weaver, and Smith coupled with the recantation of Cooke carried "a measure of strength in support of [Schand's] position, such that justice may not have been done."  Defs' SOF, Dkt. 93, Ex. 36.  Judge Kinder further noted that the Commonwealth "did not agree with the defendant's claims of actual innocence and prosecutorial misconduct" and that these were issues which the judge "did not and need not decide."  Id.  On October 16, 2013, the Commonwealth issued a nolle prosequi, stating that "[t]he time elapsed since the date of offense, availability of witnesses and the continued examination of newly discovered evidence do not allow for the continued prosecution of the case at this time."  Defs' SOF, Dkt. 93, Ex. 37.

G.  <u>Current Complaint</u>

On August 20, 2015, Plaintiffs Mark Schand, his wife
Mia Schand, and their sons Mark, Jr., Quinton, and Kiele
filed a complaint in eighteen counts, bringing federal and
state claims arising from Plaintiff Mark Schand's
conviction for the Seymour murder.  The remaining defendants
are the City of Springfield and former Springfield police
officers Elmer McMahon, Leonard Scammons, Raymond P. Muise,
Michael Reid, and Joseph Assad.  The summary of defendants
now omits McNulty, Fleury, Hampden County, Hartford and the
Hartford supervisors, since none of these defendants
currently remain in the case.  Dkts. 41 & 49.  In addition,
the "Doe" defendants are omitted since, as noted earlier,
Plaintiffs have dropped them.  This adjustment reduces the
cohort of Defendants in some of the remaining counts and
eliminates Count VII (against "Supervisory Doe
Defendants"), Count IX (against Hampden County), and Count
X (against the City of Hartford).  Accordingly, the
remaining counts are:

- Count I, brought by Plaintiff Mark Schand against
  Defendants Reid, Muise, McMahon, and Scammons (but not
  Assad), asserting a claim under 42 U.S.C. § 1983 for
  unduly suggestive, biased, and otherwise improper

identification procedures in violation of the Fourteenth Amendment;

- Count II, brought by Plaintiff Mark Schand against Defendant McMahon, asserting a claim under § 1983 for suppression of exculpatory evidence in violation of the Fourteenth Amendment;

- Count III, brought by Plaintiff Mark Schand against Defendant McMahon, asserting a claim under § 1983 for fabrication of evidence in violation of the Fourteenth Amendment;

- Count IV, brought by Plaintiff Mark Schand against all Individual Defendants, Reid, Muise, McMahon, Scammons, and Assad, asserting a claim under § 1983 for malicious prosecution in violation of the Fourth Amendment;

- Count V, brought by Plaintiff Mark Schand against all Individual Defendants, asserting a claim under § 1983 for failure to intercede;

- Count VI, brought by Plaintiff Mark Schand against all Individual Defendants, asserting a claim under § 1983 for conspiracy to violate constitutional rights;

- Count VIII, brought by Plaintiff Mark Schand against the City of Springfield, asserting a § 1983 Monell claim;

- Count XI, brought by Plaintiff Mark Schand against the Individual Defendants, asserting a state law claim for malicious prosecution;

- Count XII, brought by Plaintiff Mark Schand against the Individual Defendants, asserting a state law claim for common law conspiracy;

- Count XIII, brought by Plaintiff Mark Schand against the Individual Defendants and the City of Springfield, asserting a state law claim for negligent investigation;

- Count XIV, brought by Plaintiff Mark Schand against the City of Springfield, asserting a state law claim for negligent training and supervision;

- Count XV, brought by all Plaintiffs against the Individual Defendants, asserting a state law claim for intentional infliction of emotional distress;

- Count XVI, brought by Plaintiffs Mark Schand and Mia Schand against the Individual Defendants, asserting a state law claim for loss of consortium;

- Count XVII, brought by Plaintiffs Mark Schand, Jr., Quinton Schand, and Kiele Schand against the Individual Defendants, asserting a state law claim for loss of parental consortium; and

- Count XVIII, brought against the City of Springfield, asserting a state law claim of respondeat superior.

As noted above, Defendants have filed two motions for summary judgment (one by Defendant McMahon and one by the remaining Defendants jointly) and a motion to strike. The discussion below will begin with the motion to strike, Dkt. 119, and then move on to the two motions for summary judgment, Dkts. 86 and 92.

### III.  DISCUSSION

A.  Motion to Strike, Dkt. 119

Michael Hosten was a key identification witness for the Commonwealth both at the July 1987 suppression hearing and at Plaintiff's November 1987 trial. Hosten was present at the botched drug deal outside the After Five Lounge in a good position to see the shooter, and he repeatedly identified Mark Schand as the man with the gun.

In the summer of 2005, almost eighteen years after the trial, one of Plaintiff's attorneys approached Hosten while he was an inmate at a correctional facility in Shirley, Massachusetts. Hosten apparently imparted some information to this attorney helpful to Plaintiff. See Dkt. 120, Ex. C (letter thanking Hosten for agreeing to "do the right thing at this point"). In May of 2006, a second attorney for Plaintiff visited Hosten, who was still incarcerated, and later drafted an affidavit purportedly embodying what Hosten told him at that time. Id., Ex. D. This attorney then sent the draft affidavit to Hosten with an envelope containing a return address. Later, this same attorney received the envelope back with the affidavit enclosed, now with an unwitnessed signature appearing to be Hosten's, dated June 24, 2006. Id. Nineteen days later, on July 13,

2006, Hosten died of complications relating to AIDS.  Dkt.
119, Ex. A.

The affidavit contains a description of a meeting
Hosten had after the shooting, in September or October
1986, at the York St. Jail in Springfield, with "Heavy"
(i.e., Charles) Stokes, David Stokes, and Anthony Cooke.
Dkt. 105, Ex. 24 at ¶23.  During this conversation, the
four agreed to "help the police identify Vickie's killer in
exchange for the dismissal of [their] open criminal cases."
Id. at ¶24.  According to the affidavit, on October 30,
1986, unidentified Springfield plainclothes police officers
spoke to Hosten in a room at the Hall of Justice in
Springfield.  They told him they had found the man who had
killed Victoria Seymour and threw a single photograph on
the table.  The photograph depicted Plaintiff wearing
sunglasses and thick chains, evidence from which a jury
could find that the photo was one of the Polaroids taken of
Plaintiff by the Hartford police.  The two officers then
slipped this photo into a group of other photos and told
Hosten to pick out "the guy who [he] had seen standing over
Heavy Stokes outside the After Five on September 2, 1986."
Id. at ¶27.  According to his affidavit, Hosten knew

immediately, but did not tell the officers, that Plaintiff was not the shooter.  Nevertheless, he identified the photo of Plaintiff anyway, because "[he] got the impression that if [he] picked [Schand], the police would help [him] in some way."  Id. at ¶29.  Nothing in the record suggests that either of the unidentified officers gave him any explicit promise of assistance.  Afterward, Hosten identified Plaintiff as the shooter both at the suppression hearing and at Plaintiff's trial.  Subsequent to that, he received favorable treatment on several criminal cases outstanding against him.  Id. at ¶42.

Defendants have moved to strike Hosten's affidavit.  It is well settled, and the parties agree, that it would be improper for the court to consider the affidavit in assessing the pending motions for summary judgment if it would be inadmissible at trial.  Fed. R. Civ. P. 56(c)(2).

It cannot be denied that Plaintiffs will face significant hurdles getting the affidavit into evidence at the eventual trial in this case.  It was drafted by an attorney for Plaintiff, and it was not witnessed.  It refers to two Springfield police officers who are not named.  Apart from the circumstantial evidence related to

the contacts with Hosten in 2005 and 2006, the signature on the affidavit is not authenticated. The affidavit itself bears a heading suggesting it may have been intended as a filing in one of three numbered cases pending in the Hampden County Superior Court, but no other information regarding any of these cases, if they existed, can be found in the record. Defendants, of course, have never had an opportunity to cross-examine Hosten about the averments contained in the affidavit or the circumstances under which it was obtained. It obviously contradicts Hosten's repeated, sworn testimony.

Assuming that the circumstantial evidence of the conversations with Hosten, the mailing of the affidavit with the return envelope to him, and the return of the affidavit in the envelope supplied to him are enough to authenticate the unwitnessed signature on the affidavit as Hosten's -- a dicey proposition -- the substance of the document is obviously hearsay and may only be admissible under one of the recognized exceptions to the basic evidentiary rule excluding hearsay. Plaintiffs rely on two provisions of the Federal Rules of Evidence to help them over this difficulty, Rule 804(b)(3)(A), pertaining to

statements against interest, and Rule 807, the so called "residual" exception.  Neither of these exceptions meshes terribly well with the circumstances here.

Rule 804(b)(3)(A) supports the admissibility of certain hearsay statements, where the declarant is unavailable, if "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability."  Plaintiffs' arguments suggesting that Hosten faced criminal liability based on his admitted perjury and participation in a conspiracy to frame Plaintiff have some force, but also weaknesses.  Hosten signed the affidavit almost twenty years after the suppression hearing and trial.  Massachusetts law establishes a six-year statute of limitations for all crimes not specifically exempted. Mass. Gen. Laws ch. 277, § 63.  Neither perjury nor conspiracy are exempted.  Plaintiffs' speculative argument, unsupported by any citation to law, that perjury in a capital case might fall within an exemption to the six-year limitation is wobbly at best.  Moreover, any conspiracy here would have achieved its goal as of 1987 when Plaintiff

was convicted, far outside the statutory limit. Plaintiffs' argument that the conspiracy somehow persisted until 2013, when Schand was finally released and the conspiracy was "thwarted," floats on no authority.[5]

Plaintiffs' Rule 807 argument stands on equally spongy footing. Admissibility under this rule requires that the statement possess "circumstantial guarantees of trustworthiness" equal to those anchoring the exceptions specifically recognized in rule 803 or 804. It is very hard to see on this record what those equivalent guarantees might be. Whatever may have motivated Hosten to provide the 2006 affidavit, whether truthful or false, is now unknowable.

Based on all this, it is clear that Defendants' motion to strike the Hosten affidavit has some traction. The court will nevertheless deny it without prejudice, for two reasons. First, in the context of the motion for summary judgment, its impact does not drive the court's ruling.

---

[5] Defendants' suggestion that Hosten's imminent death might undermine any argument that he feared civil or criminal consequences is speculative and has not been considered. Nothing in the record suggests that Hosten knew he was close to dying.

The record already contains admissible evidence that, if believed, would justify a jury in concluding that improper identification techniques were employed in the Seymour murder investigation. Hosten's affidavit is frosting on the cake in the summary judgment context, even if it may be rather thick frosting. Second, the trial in this matter will be overseen by a judge other than the undersigned. It is preferable to allow the trial judge to determine whether a voir dire is needed and to make his or her own decision regarding the admissibility of the Hosten evidence.

B.  Motion for Summary Judgment for Defendants Other Than McMahon, Dkt. 92

This motion offers several theories that, Defendants argue, support summary judgment on all counts.  The discussion below will be structured to address, first, the arguments related to two specific defendants, Assad and the City of Springfield, who are clearly entitled to judgment. Second, the court will address two specific causes of action, the § 1983 claim for malicious prosecution and the § 1983 claim for failure to intercede, as to which the individual officers clearly enjoy qualified immunity. Finally, it will examine the remaining federal and state

law counts as they pertain to Defendants Scammons, Muise, and Reid.

It is well established that a party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Mass. Mut. Life Ins. Co. v. DLJ Mortg. Capital, Inc., 251 F.Supp.3d 333, 335 (D. Mass. 2017). "A genuinely disputed issue concerns a material fact if the fact carries with it the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993). "On summary judgment, the facts and all reasonable inferences that might be drawn from them are viewed in the light most favorable to the non-moving party." Baggett v. Ashe, 41 F.Supp.3d 113, 117 (D. Mass. 2014) (citing Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004)).

As will be seen, applying the Rule 56 standard to the factual record now before the court is fatal to some, but not all, of Plaintiffs' asserted causes of action.

1. Defendant Assad

Defendant Joseph Assad is entitled to summary judgment because nothing in the record suggests that he engaged in conduct that could possibly subject him to liability. He participated in the preliminary interview of the teenagers, Dixon and Cooke, and he assisted in the transportation of the confidential informant, Whitted, to Hartford on September 17, 1986. Defs' SOF at ¶¶16 & 19, Dkt. 93. No impropriety is alleged with regard to either of these events. Plaintiffs do not dispute Defendants' assertion that Assad was not "actively involved" in the After Five Lounge shooting after September 17, but they insist on retaining Assad as a defendant based on the theory that a conspirator can sometimes be liable for the acts of his or her co-conspirators even after he or she withdraws from a conspiracy. Pls' SOF at ¶19, Dkt. 106. This can, of course, be true in the right circumstances, but the supposed conspirator must still have done something from which a jury could infer an intent to further the purposes of the conspiracy. Here, neither the unremarkable interview nor the neutral act of assisting to transport a witness qualifies. Indeed, the absence of allegations against Assad supporting any actionable conduct makes

Plaintiffs' counsel's insistence on retaining him as a defendant mystifying.  This decision is of a piece with Plaintiffs' counsel's very aggressive pleading strategy. See Dkt. 49 (memorandum and order dismissing claims against Defendant City of Hartford and "John Doe" Hartford supervisory personnel based on flatly insufficient support in the record).

### 2.  City of Springfield

The general requirements for a § 1983 claim against a municipality such as Springfield are well established.  A municipality cannot be found liable on a theory of respondeat superior for the acts of its employees that violate a plaintiff's constitutional rights.  However, liability may be anchored on violations arising from "a policy statement, ordinance, regulation, or decision officially adopted or promulgated by [the municipality's] officers."  Monell v. Dep't of Soc. Serv., 436 U.S. 658, 690 (1978).  Where, as here, no official policy has been identified, a plaintiff may also obtain judgment based on practices by the municipality "so permanent and well settled as to constitute a 'custom or usage' with the force

of law." Id. at 691 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)).

A city's failure to train police officers, as Plaintiffs contend here, may provide the basis of a § 1983 claim where the failure is so obvious that it amounts to deliberate indifference on the part of city policymakers "to the rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). In this situation, however, municipal liability may attach "'where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." Id. at 389 (citing Pembauer v. Cincinnati, 475 U.S. 469, 483-84 (1986)). This element of conscious or deliberate choice may be found based on the existence of a custom and practice, such as a failure to train, that is so "'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005) (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)).

Judgment for a plaintiff based on deliberate indifference expressed through a conscious policy choice may, of course, only be the basis of an award of damages "if it actually causes injury." City of Canton, Ohio, 489 U.S. at 390. On the issue of causation, the Supreme Court, and the First Circuit, have repeatedly emphasized that a municipal policy may ground liability only where it is the "moving force" behind the alleged constitutional injury, Id. at 389; Haley v. City of Boston, 657 F.3d 39, 51 (1st Cir. 2011).

The existence of the unconstitutional custom or usage, and the actual or constructive notice of it, may be demonstrated by evidence of a pattern of past violations. Where this pattern evidence exists, the burden of demonstrating the existence of the unconstitutional custom or usage may not be excessively onerous. See, e.g., Hutchins v. McKay, 285 F.Supp.3d 420, 428-29 (D. Mass. 2018) (denying summary judgment on a Monell claim against the City of Springfield); Cox v. Murphy, Civ. No. 12-11817, 2016 WL 4009978, at *10-11 (D. Mass. Feb. 12, 2016) (ruling the same against the City of Boston).

In the case of a failure-to-train claim, the requirements of proof are rather stringent. To ground liability, "a training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." Young v. City of Providence, 404 F.3d 4, 27 (1st Cir. 2005). Moreover, as noted above, the Court of Appeals has recently emphasized that "[i]t is not enough to show that the Town's training regimen was faulty; [the plaintiff] must also show that the Town knew or had reason to believe that such a regimen had unconstitutional effects." Gray v. Cummings, 917 F.3d 1, 14 (1st Cir. 2019). The way to do this, the court said, is to offer "evidence of past violations sufficient to put the Town on notice of such effects." Id.

Plaintiffs' suggestion that Gray v. Cummings overlooked the Supreme Court's decision in City of Canton, Ohio v. Harris, 489 U.S. 378 (1989), is unpersuasive. Canton addressed the nature and quantum of evidence needed to demonstrate the existence of a constitutionally deficient training regimen. The Court noted, as Plaintiffs point

out, that in certain cases "the need for more or different training [may be] so obvious" that policymakers may be found to be indifferent to the need, so that the failure to train "may fairly be said to represent a policy for which the city is responsible." Id. at 390. Gray v. Cummings appears to address a different question from the one being discussed in Canton, specifically the requirement that evidence of past incidents put the municipality on notice that its policy was actually having "unconstitutional effects." As the Hutchins and Key cases make clear, past pattern evidence of this sort will generally be enough to carry a municipal liability claim beyond summary judgment to trial. Here, the record contains no such past pattern evidence.

Against this doctrinal backdrop, several reasons emerge requiring entry of summary judgment in favor of Springfield.

As a preliminary matter, First Circuit authority appears to suggest that the city's sub-par training regimen prior to 1986 was not so deficient as "to indicate that the city was deliberately indifferent to the rights of its citizens." Whitfield, 431 F.3d at 12. In DiRico v. City

of Quincy, 404 F.3d 464, 469 (1st Cir. 2005), the First Circuit held that even if the training regimen was "wanting," the level of deficiency was not enough to demonstrate deliberate indifference. Id. at 469. DiRico cited Santiago v. Fenton, 891 F.2d 373 (1st Cir. 1989), which held that "four hours of training, without more, does not amount to a 'conscious' policy to train inadequately." Id. at 382. Here, all Defendant officers testified that they received training significantly above this minimal level. Given this, the city's training regimen does not appear to have dropped to a level of deficiency adequate to support a jury verdict for Plaintiffs on their failure-to-train claim, as a constitutional matter.

The fudge phrase "does not appear" is deliberate. If the court's ruling depended entirely on the adequacy of the training provided to the officers prior to 1986, Reiter's report would make the decision on the failure-to-train claim close, and the fairer and more prudent course might well be to permit this issue to go to the jury. However, two more powerful considerations make allowance of summary judgment for the city on this point inevitable.

First, assuming a sufficiently pronounced failure by Springfield prior to 1986 to properly train the Defendant officers, nothing in the record suggests that this dereliction was the "moving force" behind any constitutional violation suffered by Plaintiff. The record is clear that Defendant officers generally knew how to conduct proper identification procedures, including photo arrays and lineups. If Plaintiffs' evidence is accepted, Defendant officers just deliberately twisted those procedures to frame Mark Schand. Defendant Muise stated that he did not mix a Polaroid of Plaintiff into any photo array of mugshots he showed potential witnesses, because he knew -- presumably from his training and experience, or quite possibly just from common sense -- that such a practice would be improperly suggestive. If he, or the other officers, used the Polaroids improperly (and Muise lied about it), then the problem was that they were deliberately engaging in an unprofessional act in order to obtain Plaintiff's conviction. Poor training had nothing to do with it.

The situation is similar to the one addressed by Judge Frank Coffin in Santiago. Addressing a § 1983 claim for

Springfield's failure to train police officers as of the year 1983, he found the record insufficient because it did not "support an inference that it was a lack of <u>awareness</u> of citizen constitutional rights that was the cause of the deprivation." 891 F.2d at 382 (emphasis in original). Given this, the record in that case did not "sufficiently implicate the [failure-to-train] policy as the 'moving force [behind] the constitutional violation.'" <u>Id.</u> (quoting <u>Monell</u>, 436 U.S. at 694).

The crudeness of the police tactic alleged in this case, accepting Plaintiffs' evidence, undercuts their claim that it was poor training that drove the constitutional violation. A training program was not necessary to inform a police officer that showing a witness a color Polaroid, telling him that the subject had been arrested for the murder, inserting the color Polaroid into an array of black-and-white mugshots, and then telling the witness to choose the person he saw with the gun (as the Hosten affidavit describes) is improperly suggestive. No reasonable jury could conclude that this conduct was driven by poor training. It was simply straightforward police misconduct.

The reaction of at least three of the key identification witnesses to the police tactics corroborates this point. Charles Stokes, Cooke, and Hosten were not influenced by any improper identification procedures. They knew Schand was not the shooter immediately. Accepting Plaintiffs' evidence, a jury could only conclude that these witnesses just lied once they knew, or thought they knew, what the officers wanted. Their minds were not tainted. No deficient training played any part -- certainly nothing approaching a "moving force" -- in their intentional perjury.

The final, and perhaps strongest, argument supporting summary judgment in favor of Springfield is the absence of any evidence of a pattern of police misconduct prior to 1986 that would put the city on notice of some significant risk that, driven by the inadequate training, constitutional violations would occur. As the First Circuit's Gray decision emphasizes, on this point expert testimony regarding defects in the training regimen is not enough. Actual or constructive notice through a past history of constitutional violations is required.

Plaintiffs' argument that their constitutional claims go beyond failure to train does not help.  First, the opposition to Defendants' motion for summary judgment makes it clear that failure to train is the heart of Plaintiffs' Monell claim.  Second, even if some of Plaintiffs' claims fell into some other analytical pigeon hole, the requirement for prior pattern evidence would be the same for all, and none is to be found on the record.

In summary, the evidence in the record that the deficiencies in Springfield's police training regimen were sufficiently extreme to support a finding of deliberate indifference on the part of the city's policymakers is marginal at best and probably insufficient.  More importantly, the evidence would not support a jury in concluding that the city's failure to train -- as distinct from the intentional malfeasance of the officers or the willingness of key witnesses to deliberately lie -- was the "moving force" behind any constitutional violation suffered by Plaintiff.  Finally, the record contains no evidence of any pattern leading up to 1986 that would give the city notice that its training or policy inadequacies were

generating a risk that its citizens would suffer violations of their constitutional rights.

For these reasons, Defendants' motion for summary judgment on Count VIII will be allowed.

### 3. Qualified Immunity: Counts IV and V

Defendant officers argue that they are protected from liability under at least two of Plaintiffs' § 1983 theories -- Count IV asserting malicious prosecution and Count V asserting failure to intercede -- by the doctrine of qualified immunity. It is well established that public officials, including police officers, may not be found liable for civil damage claims under § 1983 unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The analytical architecture shaping the court's inquiry into a claim of qualified immunity is well laid out in this circuit. The court examines, first, whether the record makes out a violation of a constitutional right and, second, whether that right was "clearly established" at the time of a defendant's alleged violation. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). In

approaching the second portion of the analysis, the court must focus rather carefully on the specific facts of the case and probe "whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." Id. The Supreme Court has recently emphasized the importance of this element of the inquiry, stating that "the clearly established right must be defined with specificity." City of Escondito, Cal. v. Emmons, __ U.S. __, 139 S. Ct. 500, 503 (2019) (per curiam). Trial courts in weighing the question of qualified immunity should not "define clearly established law at a high level of generality." Id. (quoting Kisela v. Hughes, 585 U.S. __, 138 S. Ct. 1148, 1152 (2018) (per curiam)).

Application of the qualified immunity doctrine to the record of this case is, as Defendants argue, fatal to Plaintiffs' § 1983 claims for malicious prosecution and failure to intercede.

The First Circuit has noted that, at least prior to 1994, the law was not clearly established that a claim based upon malicious prosecution, anchored (as here) on the Fourth Amendment, could be asserted via § 1983. In that

year, in Albright v. Oliver, 510 U.S. 266, 274 (1994), the Court, in dicta, suggested that the Fourth Amendment might permit assertion of such a claim.  See Hernandez-Cuevas v. Taylor, 723 F.3d 91, 98-99 (1st Cir. 2013) (involving the alleged use of an improperly suggestive photo array).  As late as 2003, the First Circuit observed that it was "an open question whether the Constitution permits the assertion of a section 1983 claim for malicious prosecution on the basis of an alleged Fourth Amendment violation." Rodriguez-Mateo v. Fuentes-Agostini, 66 Fed. App'x 212, 214 (1st Cir. 2003) (quoting Nieves v. McSweeney, 241 F.3d 46, 54 (1st Cir. 2001)).  The same point had been made in 1989 in Santiago, which held that "there was no clearly established constitutional counterpart to an action for malicious prosecution" as of 1989.  891 F.2d at 388.  See also Echavarria v. Roach, Civ. No. 16-11118, 2017 WL 3928270, at *8 (D. Mass. Sept. 7, 2017).  But see, Cosenza v. City of Worcester, 355 F.Supp.3d 81, 97-98 (D. Mass. 2019).  Given the fact that, as of 1986, the law did not clearly establish that malicious prosecution could form the basis of a § 1983 claim, Defendants are entitled to summary judgment based on qualified immunity on Count IV.

The analysis of Count V, the § 1983 claim for failure to intercede, is equally straightforward.  This court agrees with the recent decisions of two judges of this district that the duty to intercede, in a context <u>not</u> involving allegations of excessive force, is not -- even as of this date -- sufficiently clearly established to deprive Defendants of the protection of qualified immunity. <u>Cosenza</u>, 355 F.Supp.3d at 100-101; <u>Echavarria</u>, 2017 WL 3928270, at *11.  Thus, Defendants are entitled to summary judgment on Count V.

4.    <u>Remaining Federal Counts</u>

    a.    <u>Count I (Improper Identification Procedures)</u>

Defendants initially based their argument in favor of summary judgment as to this count on the statute of limitations.  In their reply brief, however, they conceded that <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), foreclosed this contention.  In <u>Heck</u>, the Court held that a "§ 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."  <u>Id.</u> at 489-90.  The parties agree that the applicable limitations period is three years.  The Commonwealth's <u>nolle prosequi</u> issued on

October 16, 2013; the complaint was filed on August 20, 2015.  That ends any statute of limitations argument.

Nor are any other arguments available to Defendants sufficient to support judgment on this count.

First, Defendants do not enjoy qualified immunity.  The law was clearly established by 1986 that police officers faced liability for use of deliberately suggestive identification procedures resulting in a wrongful conviction.  See, e.g., Neil v. Biggers, 409 U.S. 188, 198 (1972); Cosenza, 335 F.Supp.3d at 94-96 (canvassing decisional law).  Moreover, little inquiry is needed into the narrower question whether Defendants were on notice that their specific actions violated the constitution. Defendant Muise stated (while denying that he acted improperly) that, if he had used a Polaroid mixed with mug shots, the identification procedure would, in fact, have been unduly suggestive.

Second, Defendants' arguments based on collateral estoppel are unavailing because neither the state court, nor for that matter the federal court in the subsequent habeas proceedings, addressed the claim under § 1983 that Defendants employed improper identification procedures to

obtain Plaintiff's wrongful conviction.  It is well
established that federal courts "must give to state-court
judgments the same preclusive effect as would be given by
the courts of the state from which the judgments emerged."
Johnson v. Mahoney, 424 F.3d 83, 93 (1st Cir. 2005).  In
Massachusetts, the doctrine of issue preclusion requires
that the issue be "actually litigated and determined by a
valid and final judgment" before it can be "conclusive in a
subsequent action between the parties whether on the same
or different claim."  Cosenza, 355 F.Supp.3d at 92 (quoting
Jarosz v. Palmer, 436 Mass. 526, 530 (2002)).

Here, as noted above, the state trial court, the
Massachusetts Supreme Judicial Court, and the federal
habeas proceedings never addressed improperly suggestive
identification procedures.  Since this issue was never
actually litigated, Plaintiff is not collaterally estopped
from raising it issue now.  See Echavarria, 2017 WL
3928270, at *9-10 (distinguishing between an issue
litigated and one not litigated for purposes of collateral
estoppel).  As will be seen below, the decision regarding
the applicability of issue preclusion will be different in
the case of the claims against McMahon based on the

Scammons Report and the Hartford material.  Those claims
were thoroughly litigated.

Given that the controlling law manifestly recognizes
the claim set forth in Count I, and the facts of record
would support a verdict in Plaintiffs' favor, the motion
for summary judgment will be denied on Count I.

### b.   Counts II (Suppression of Exculpatory Evidence) and III (Fabrication of Evidence)

These counts, asserting suppression of exculpatory
evidence and fabrication of false evidence are directed
only at Defendant McMahon.  His arguments in favor of
summary judgment are addressed below.

### c.   Counts IV (Malicious Prosecution) and V (Failure to Intercede)

Summary judgment will enter for Defendants on these two
counts, § 1983 claims for malicious prosecution and failure
to intervene respectively, based on qualified immunity, for
the reasons outlined above.

### d.   Count VI (Conspiracy)

Summary judgment will be denied on this count.  The
elements for a claim of conspiracy to violate Plaintiff's
civil rights include "an agreement between the parties to
inflict a wrong against or injury upon another, and an

overt act that results in damages." Estate of Bennett v.
Wainwright, 548 F.3d 155, 178 (1st Cir. 2008).  Defendants'
argument that insufficient evidence exists of any agreement
ignores the reasonable inferences that might be drawn by a
jury regarding coordination among Defendants to obtain
Schand's conviction through improper identification
procedures.  The First Circuit has noted that "the
agreement that rests at the heart of a conspiracy is seldom
susceptible of direct proof: more often than not such an
agreement must be inferred from all the circumstances."
Earle v. Benoit, 850 F.2d 836, 843 (1st Cir. 1988); see
also Santiago, 891 F.2d at 389 (reversing district court's
directed verdict on conspiracy claim where a reasonable
jury could have found that officers conspired to unlawfully
arrest the plaintiff).  Here, viewing the facts in the
light most favorable to Plaintiffs, a jury could infer the
existence of a conspiratorial agreement, overt acts, and
resulting injury to Schand.

Defendants have not specifically raised a statute of
limitations argument in support of summary judgment on this
count.  To the extent that they might have offered this

objection, or have done so implicitly, <u>Heck</u> is fatal to any such contention.

The motion for summary judgment will therefore be denied as to this count.

### e.   Count VII (Hartford Doe Defendants)

The court has dismissed this count.  <u>See</u> Dkt. 49.

### f.   Count VIII (Municipal Liability)

Summary judgment will be allowed in favor of the City of Springfield as to this count for the reasons set forth in the discussion above.

### g.   Count IX (Hampden County)

Hampden County does not exist as a suable entity, as Plaintiffs recognized in dismissing this count voluntarily. <u>See</u> Dkt. 41.

### h.   Count X (Monell Claim Against Hartford)

The court has previously dismissed this count.  <u>See</u> Dkt. 49.

### 5.   Remaining State Law Counts

### a.   Count XI (Common Law Malicious Prosecution)

The parties agree that Defendants cannot claim the protection of qualified immunity for this common law malicious prosecution claim, as they have, successfully,

for the claim for a civil rights violation under § 1983
based on malicious prosecution in Count IV.  The elements
of this state law claim are: "1) that [Defendants]
initiated a criminal action against him; 2) that the
criminal prosecution ended in [Plaintiff's] favor; 3) that
there was no probable cause to initiate the criminal
charge; and 4) that [Defendants] acted maliciously."
Santiago, 891 F.2d at 387.  A jury could find that
Defendants, acting in conspiracy or at least jointly,
essentially "initiated" the criminal action.  Moreover, the
issuance of the 2013 nolle prosequi evidences a termination
of the action in Plaintiff's favor.  Defendants' citation
of Wynne v. Rosen, 391 Mass. 797 (1984), does not assist
them on this point.  The Wynne standard has been satisfied
in this case, because the District Attorney's nolle
prosequi was not issued merely "on the basis of a
procedural or technical defect."  Id. at 801.  It is true
that the District Attorney's statement accompanying the
nolle prosequi understandably disclaimed any suggestion
that it constituted an opinion that Schand was innocent or
that prosecutorial misconduct occurred.  Even so, it cannot
be said that the dismissal of the charges against Schand

was "inconsistent with innocence." Id. The requirement of a favorable termination eliminates any statute of limitations problem with this claim, since the complaint was filed well within three years following the District Attorney's action.

Defendants' most powerful argument is that Plaintiffs cannot bear their burden of showing the absence of probable cause and the existence of malice, both of which are required to prevail on a claim for common law malicious prosecution. The argument has force. It is undisputed that Defendants sought an arrest warrant for Schand based upon the eye witness identification of Michael Bernard, who selected Schand's mugshot from a photo array at least once, possibly twice (the record is unclear), and confirmed that he was one hundred percent certain that Schand was the gunman. To support probable cause an officer does not need proof beyond a reasonable doubt. Rather, probable cause arises "when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been . . . committed and that the suspect is implicated in its commission." Morelli v. Webster, 552 F.3d 12, 21 (1st Cir. 2009).

Plaintiffs' response to Defendants' argument is (in essence) that, viewing the evidence in the light most favorable to them, a jury could find that Defendants lacked probable cause and acted maliciously because they knew at the time they sought the warrant that Bernard's identification was tainted and unreliable as a result of the improperly suggestive identification procedures they had intentionally employed. The record support for this is Bernard's testimony at the pretrial suppression hearing that he was shown a photo of Schand "with chains" at the West Springfield lockup prior to Schand's arrest. The inference that Plaintiffs are entitled to ask the jury to draw is that (a) this photo must have been one of the Polaroids and (b) it was deliberately displayed to Bernard in a sufficiently suggestive manner as to contaminate his identification of Schand and undermine probable cause to arrest him.

How easy it will be to convince a jury on this point remains to be seen; the evidence is not overwhelming and, according to Defendants at least, Bernard is no longer available to testify. Under Rule 56, however, Plaintiffs are entitled to make their attempt. For this reason,

Defendants' motion for summary judgment on this count will be denied

b. Count XII (Common Law Civil Conspiracy)

Defendants seek summary judgment on this count based upon the absence of evidentiary support in the record and upon the three-year statute of limitations.  The issue of the sufficiency of the evidence has already been addressed, unfavorably to Defendants, in the discussion above relating to Count VI, the federal civil rights analogy.  The more difficult question is whether this common law claim is barred by the statute of limitations.

The basics are clear.  Massachusetts law establishes a three-year limitations period for filing tort claims of this sort.  Mass. Gen. Laws ch. 260, § 2A.  The limitations period starts to run when a plaintiff "knows, or reasonably should have known" of an injury caused by defendant's conduct.  Doe v. Harbor Schs., Inc., 446 Mass. 245, 246 (2006) (citations omitted).  The complaint was filed on August 20, 2015.  Schand clearly knew, or should have known, that he had been injured by the conspiratorial activity of Defendants, long before August 20, 2012.  At the latest, he received more than adequate notice of his

injury and its cause by 1992, during the proceedings connected with his first motion for a new trial.

The question before the court, then, is whether Massachusetts courts currently recognize, or if presented with the issue would recognize, a state version of the Heck rule that would toll the statute of limitations for common law tort claims until a plaintiff's release from prison. The quandary is obvious. On the one hand, placing the responsibility to file a lawsuit upon a prisoner who is subject to an apparently lawful conviction and is still under lock and key seems both grossly unfair and impractical. On the other hand, this case offers a good example of the burden placed on defendants at having to defend an emotionally charged lawsuit decades after the events that underlie it, with all the problems of lost documents, faded memories, and unavailable or deceased witnesses.

Ironically, as this memorandum is being drafted, the Supreme Court is facing this very issue in a slightly different context. On April 17, 2019, the Court heard argument in the case of McDonough v. Smith, No. 18-485, to address a circuit split on when the statute of limitations

begins to run on a claim that a prosecutor fabricated evidence.  Is it when the plaintiff became aware of the fabrication (i.e., while actively being tried or in prison), or when the prosecution is ultimately resolved the plaintiff's favor?  See McDonough v. Smith, 898 F.3d 259 (2nd Cir. 2018), cert. granted, 139 S. Ct. 915 (2019).  The Second Circuit found that the limitations period began to run when the plaintiff had reason to know of his injury -- as early as during pretrial proceedings -- and not when the prosecution ultimately terminated in his favor.  Id. at 266.  In making this ruling, the Second Circuit acknowledged that three other circuits had found that the statute accrued only upon the termination of criminal proceedings.  Id. at 267.  It is anyone's guess where the Supreme Court will come down.

In this case, although the limitations issue is not simple, a few guideposts seem to mark a path to a defensible resolution.  First, Plaintiffs have not pointed to any state authority that suggests that Massachusetts courts would adopt a Heck-type rule to expand the three-year limitation period for common law tort actions where the plaintiff is on trial or in prison.  The court's own

research has failed to unearth any such authority. Second, it is a bedrock principle of federalism that United States district court judges, in applying state law, do not formulate rules based on their own sense of what might be wise, but rather try "to ascertain, as best [they] can, the rule that the state's highest tribunal would likely follow." Kotler v. Am. Tobacco Co., 926 F.2d 1217, 1224 (1st Cir. 1990) (citations omitted), vacated on other grounds, 505 U.S. 1215 (1992). When predicting state law, a federal trial court should not precipitously "blaze new and unprecedented jurisprudential trails." Id.

Here, a rule crafting a Heck-type exception to the well-established Massachusetts rule regarding the statute of limitations, specifically covering common law claims brought by plaintiffs alleging wrongful convictions, seems like an unprecedented overstep. If a change like this in fundamental state law is to happen, that change should come from the Commonwealth's highest court. For this reason, the court will allow Defendants' motion for summary judgment on Count XII. As will be seen, this conclusion will have ramifications for some of Plaintiffs' other common law claims.

Two considerations in this admittedly uncertain legal environment offer some consolation.

First, Plaintiffs will still have their § 1983 claims for unduly suggestive identification procedures in Count I and for conspiracy in Count VI, as well as the claim for common law malicious prosecution in Count XI. These causes of action, though not entirely congruent, will offer avenues for recovery if Plaintiffs prevail.

Second, perhaps recognizing the legal quandary posed by the statute of limitations issue in this context, the Commonwealth of Massachusetts has enacted a program for compensating victims of wrongful conviction outside the arena of traditional litigation. Mass. Gen. Laws ch. 258D. Plaintiff may qualify for some relief under that statute.

### c. Count XIII (Common Law Negligence)

The court will allow Defendants' motion for summary judgement as to this count for two reasons. To the extent that it is directed at the individual Defendants, they are protected by the Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258. The MTCA bars negligence actions against public employees and permits them to go forward only against the public employer pursuant to a carefully

outlined procedure.  See Parker v. Chief Justice for Admin. & Mgmt. of the Trial Court, 67 Mass. App. Ct. 174, 178 (2006).

To the extent that this count is directed at the City of Springfield, the presentment letter required under the MTCA was sent far too late.  With regard to this subspecies of the statute of limitations, there is no doubt.  The MTCA requires written presentment of a claim no later than two years after the accrual date.  In this case, Plaintiffs' letter was dated December 9, 2014.  Dkt. 1, Ex. 1.  For the reasons set forth previously, this was many years outside the two-year limitation period.  The First Circuit has noted that while the Supreme Judicial Court has sometimes tolled the larger three-year limitations period, it has "held that a plaintiff's inability to bring a suit does not toll the running of the presentment period."  Haley v. City of Boston, 657 F.3d 39, 54 (1st Cir. 2011).  As Judge Bruce Selya noted, "an impediment to bringing suit does not necessarily denote an inability to give notice, and a municipality should not be deprived of its right to conduct a timely investigation and build an effective defense where notice is feasible."  Id. at 55.

Given the MTCA bar as to the individual defendants and the impact of the presentment rule as to the city, summary judgment must be granted on this count.

### d.  Count XIV (Negligent Training)

Summary judgment will be allowed as to this count, for the reasons stated above, based on the failure to make timely presentment under the MTCA.

### e.  Counts XV through XVII

These counts offer claims for common law intentional infliction of emotional distress, for loss of spousal consortium, and for loss of consortium by Plaintiff's three children.  Summary judgment must be granted as to all these claims based on the statute of limitations, for the reasons set forth in connection with the discussion of Count XII above.

### f.  Count XVIII (Respondeat Superior)

This count is simply a re-casting of Plaintiffs' negligence claims and another example of counsel's kitchen-sink approach to pleading.  It is barred, as with the other negligence counts against the City of Springfield, based on the failure to make a timely presentment under the MTCA.

## C.  Motion for Summary Judgment as to Defendant McMahon, Dkt. 86

### 1.  Count I (Improper Identification Procedures)

Since it is undisputed that McMahon had no role in
presenting the supposedly suggestive photo arrays to the
witnesses, Plaintiffs must find support for this claim
against McMahon in their allegations of misconduct by him
in the composition of the December 15, 1986 lineup he
organized for the witnesses Dixon, Chase, Charles Stokes
and Gadson.  All the generic defenses to this count --
statute of limitations, qualified immunity, and collateral
estoppel -- have been addressed above, in the discussion of
this same count as to the other individual Defendants and
found wanting.  Heck is fatal to the statute of limitations
defense; Defendant does not enjoy qualified immunity, since
the constitutional prohibition against suggestive
identification procedures was clearly established by 1986;
collateral estoppel does not apply because the issue of
identification procedures was never actually litigated.

Defendant's best defense on this count is the absence
of facts sufficient to support a verdict for Plaintiffs.
On this, the question is close.  Defense counsel was
present at the lineup and did not object.  His request that
the lineup participants wear hats was honored.  Only the

two teenagers, Dixon and Chase, identified Schand from the lineup. The photograph of the lineup, at least in the undersigned's opinion, offers no overpowering evidence of manipulation.

In the end, however, the fairness of the lineup seems a quintessential jury question. At least, it is premature to judge the issue at the summary judgment stage. It may be revisited, at the discretion of the presiding judge, at the close of Plaintiffs' case at trial, or, if Plaintiffs obtain a verdict, on a post-trial motion. For the time being, Defendant's motion for summary judgment on this count will be denied.

### 2. Counts II (Suppression of Exculpatory Evidence) and III (Fabrication of Evidence)

These counts are offered against McMahon only and focus on the failure to provide defense counsel the exculpatory Hartford material that might have pointed at a different suspect and the doctored and suppressed Scammons Report. The court will allow Defendant's motion for summary judgment on these counts, for two reasons.

First, re-litigation of the issues raised in the two counts is barred by collateral estoppel. Plaintiffs argue repeatedly that the entry of the <u>nolle prosequi</u> entirely

expunged any effects derivable from Schand's criminal
prosecution.  The argument is well formed and appears to be
supported by some out of circuit authority, but it ignores
plainly controlling First Circuit precedent.

Johnson v. Mahoney, 424 F.3d 83 (1st Cir 2005), is
precisely on point.  Johnson was convicted in state court
of first-degree murder and appealed his conviction to the
Massachusetts Supreme Judicial Court, contending that the
prosecution failed to provide him exculpatory evidence.
The SJC affirmed his conviction, condemning the police
misconduct but finding that Johnson had suffered no
prejudice flowing from it.  Five years into his sentence,
Johnson was released when the prosecutor nolle prossed his
conviction based on new evidence.  Johnson sued the
defendant police officers under § 1983 in federal court
based on their misconduct in failing to produce the
exculpatory evidence.  The First Circuit held that
Johnson's claim was barred by collateral estoppel.  Id. at
93-94.  The court was unmoved by the argument that
collateral estoppel was precluded by the difference between
the civil and prior criminal case, concluding that "issues
decided in criminal prosecutions may preclude their later

relitigation in a civil action." <u>Id.</u> at 94. <u>Johnson</u> remains good law. <u>See</u>, <u>e.g.</u>, <u>Echavarria</u>, 2017 WL 3928270, at *9.

The very claims now asserted by Plaintiffs were addressed extensively by Judge Murphy's memorandum regarding Schand's 1992 motion for new trial, by Justice Greaney in the SJC opinion affirming Judge Murphy's decision, and by Judge Frank Freedman in the subsequent habeas proceeding in federal court. Plaintiffs are barred from re-asserting them here. As already noted, the outcome on the collateral estoppel issue is different for the claims relating to the lineup, because that issue was never substantially addressed in the prior litigation.

Defendant McMahon is also entitled to summary judgment on these two counts because the record simply does not provide adequate support for them. Even viewing the facts in the light most favorable to Plaintiffs, no reasonable jury could conclude that McMahon was responsible for the failure to turn over the exculpatory Hartford material. This case is no longer at the dismissal stage, like <u>Echavarria</u> and <u>Cosenza</u>, where the court was prepared to give the plaintiffs the opportunity to take discovery to

sort out which defendant did exactly what.  This case is now at the put-up-or-shut-up summary judgment stage, where Plaintiffs must point to cognizable evidence supporting a verdict against a particular defendant.  No evidence suggests that McMahon was responsible for whatever did, or did not, happen to the Hartford material.  Similarly, the fact that the doctored Scammons Report was found in a file cabinet in his office is insufficient to justify any jury conclusion that he was responsible either for the whiteout on the report or for the failure to turn both pages of the report over.  The record is clear that other officers used the file cabinet and that documents were often removed or replaced by other parties.  As soon as McMahon was informed of the existence of the document, he placed it into a sealed envelope and turned it over to investigators.  To repeat, no evidence in any way ties him to the alteration of the report or to the failure to turn a complete copy over to the defendant.

For both these reasons, Defendant McMahon's motion for summary judgment on Counts II and III will be allowed.

### 3.    Count IV (Malicious Prosecution) and V (Failure to Intercede)

Defendant McMahon is entitled to summary judgment on these counts, based on the doctrine of qualified immunity for the reasons already discussed in relation to the other individual defendants.

### 4. Counts VI (§ 1983 Conspiracy) and XI (Common Law Malicious Prosecution)

The motion for summary judgment on these counts will be denied for the reasons set forth in connection with these counts as they relate to the other individual defendants.

### 5. Counts XII (Common Law Conspiracy); XIII (Negligent Investigation); Count XV (Intentional Infliction of Emotional Distress); Count XVI (Loss of Spousal Consortium); and Count XVII (Loss of Parental Consortium)

McMahon's motion for summary judgment will be allowed as to all these counts for the same reasons set forth supporting summary judgment for the other individual defendants, based on the statute of the limitations and the MTCA.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Strike (Dkt. 119) is hereby DENIED, without prejudice. The motion of all Defendants except McMahon for summary judgment (Dkt. 92) is hereby ALLOWED, except as to Count I (Suggestive Identification Procedures); Count VI (Conspiracy Pursuant

to § 1983); and Count XI (Common Law Malicious Prosecution), as to Defendants Scammons, Muise, and Reid. It is ALLOWED entirely as to Assad. The motion for summary judgment of Defendant McMahon (Dkt. 86) is hereby ALLOWED, except as to Counts I, VI, and XI as well.

This case will now be transferred to a new judge based on the undersigned's assumption of senior status. Judgment has not entered, so the rulings set forth above are subject to reconsideration based on the discretion of the new presiding judge.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U.S. District Judge