## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK SCHAND, et al., <br><br>         Plaintiffs, <br><br>   v. <br><br> CITY OF SPRINGFIELD, et al., <br><br>         Defendants. | **REQUEST FOR ORAL ARGUMENT** <br><br> Case No. 3:15-cv-30148 <br><br> The Honorable William G. Young |

## MOTION FOR RECONSIDERATION OF MAY 6, 2019 ORDER REGARDING SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, CERTIFYING THAT ORDER FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292

## <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT...........................................................................................1

ARGUMENT......................................................................................................................4

I.    SPRINGFIELD IS NOT ENTITLED TO SUMMARY JUDGMENT UNDER *MONELL*.......4

A.  The Decision Ignored Binding Precedent By Requiring Pattern Evidence.........................4

B.  There Are Triable Issues Of Fact Regarding Springfield's *Monell* Liability......................9

1.    The City Of Springfield's Training Program Was Inadequate.................................9

2.    The Inadequacy of Training Resulted From the City's Deliberate Indifference....13

3.    The Inadequate Training Was The Moving Force Behind Mr. Schand's Injury....14

C.  Mr. Schand Has Also Alleged Disputed Facts Related to Other Areas of Liability Under *Monell* That the Court Failed to Consider.......................17

II.   MR. SCHAND'S CLAIM THAT DEFENDANTS IMPROPERLY WITHHELD EXCULPATORY EVIDENCE IS NOT BARRED BY COLLATERAL ESTOPPEL...........18

III.  ALTERNATIVELY, THIS COURT SHOULD CERTIFY THE ISSUES FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b)...................19

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Bd. of the Cty. Comm'rs v. Brown, 520 U.S. 397 (1997) ...................................................... passim

Brady v. Maryland, 373 U.S. 83 (1963) ...................................................................13

Brown v. Bryan Cty, 219 F.3d 450 (5th Cir. 2000)......................................................16

Camacho v. P.R. Ports Auth., 369 F.3d 570 (1st Cir. 2004)........................................20

City of Canton v. Harris, 489 U.S. 378 (1989) ....................................................... passim

Connick v. Thompson, 563 U.S. 51 (2011) ........................................................5, 7, 14

Cosenza v. City of Worcester, 355 F. Supp. 3d 81 (D. Mass. 2019)............................18

Cox v. Murphy, 2016 U.S. Dist. LEXIS 99890 (D. Mass. Feb. 12, 2016).....................4

Ecchavaria v. Roach, 2017 U.S. Dist. LEXIS 144589 (D. Mass. Sept. 7, 2017) .........19

Gray v. Cummings, 917 F.3d 1 (1st Cir. 2019) ........................................................7, 8

Haley v. City of Boston, 657 F.3d 39 (1st Cir. 2011)..................................................13

Hill v. Walsh 884 F.3d 16 (1st Cir. 2018) ...................................................................8

In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007 (1st Cir. 1988) .............20

Jackson v. Coalter, 337 F.3d 74 (1st Cir. 2003) .................................................3, 18, 19

Johnson v. Mahoney, 424 F.3d 83 (1st Cir. 2005)......................................................19

Kelley v. Laforce, 288 F.3d 1 (1st Cir. 2002)..............................................................18

McCormack v. Town of Whitman, 2013 U.S. Dist. LEXIS 38637 (D. Mass. Mar. 20, 2013) ................................................................................................................6

McKenney v. Mangino, 2017 U.S. Dist. LEXIS 55649 (D. Me. Apr. 12, 2017)............6

Miara v. First Allmerica Fin. Life Ins. Co., 379 F. Supp. 2d 20 (D. Mass. 2005)........20

Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978)....................................................................................................1, 4, 15

Palmer v. Champion Mortg., 465 F.3d 24 (1st Cir. 2006)............................................4

Putnam v. Town of Saugus, 365 F. Supp. 2d 151 (D. Mass. 2005)........................................8, 9, 18

Santiago v. Fenton, 891 F.2d 373 (1st Cir. 1989)....................................................................11, 12

Shadrick v. Hopkins Cty., 805 F.3d 724 (6th Cir. 2015).........................................................5, 6, 13

Stovall v. Denno, 388 U.S. 293 (1967)...........................................................................................13

United States v. Allen, 573 F.3d 42 (1st Cir. 2009)..........................................................................4

Welch v. Ciampa, 542 F.3d 927 (1st Cir. 2008).............................................................................18

Young v. City of Providence, 404 F.3d 4 (1st Cir. 2005)......................................................... passim

Zeneca Ltd. v. Pharmachemie B.V., 37 F. Supp. 2d 85 (D. Mass. 1999).......................................18

## STATUTES AND RULES

28 U.S.C. § 1292.............................................................................................................1, 3, 19, 20

42 U.S.C. § 1983.................................................................................................................... passim

Fed. R. Civ. P. 59..............................................................................................................................4

## MISCELLANEOUS

Fourteenth Amendment ....................................................................................................................1

Plaintiffs respectfully request that this Court reconsider and reverse certain rulings contained in the May 6, 2019 decision by Judge Michael A. Ponsor on Defendants' Motions for Summary Judgment (the "Decision") [Dkt. 135].  Alternatively, Plaintiffs request that the Court certify the Decision for interlocutory appeal pursuant to 28 U.S.C. § 1292.

## PRELIMINARY STATEMENT

By dismissing Plaintiff Mark Schand's claim against the City of Springfield under Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), the Decision deprives Mr. Schand of his right to present his most important claim to a jury: that Springfield failed to implement the training, policies, or procedures necessary to protect Mr. Schand's constitutional rights, resulting in his wrongful conviction and 27-year imprisonment.  Further, by letting the City out of the lawsuit on erroneous grounds, the Decision caps Mr. Schand's damages for his 27-year wrongful imprisonment to that which can be recovered from four retired police officers.  The unjustness of this outcome is manifest.

In 1987, Mr. Schand was convicted for a murder he did not commit.  No physical evidence connected Mr. Schand to the murder.  Instead, his conviction was obtained solely on the testimony of a handful of eyewitnesses, most of whom have now recanted their identifications. Ultimately, Mr. Schand's innocence was brought to light in 2013, when multiple men—some who had never previously testified in Mr. Schand's appeals or motions for new trial—admitted in court that they were involved in the crime and that Mr. Schand was not.

Despite these compelling facts, Defendants moved for summary judgment.  On May 6, 2019, Judge Ponsor issued the Decision in which he denied Defendants' motion on three counts, including: Count I, a claim under 42 U.S.C. § 1983 for unduly suggestive, biased, and otherwise improper identification procedures in violation of the Fourteenth Amendment; Count VI, a claim

under 42 U.S.C. §1983 for conspiracy to violate constitutional rights; and Count XI, a common law malicious prosecution claim.  See Decision at 50-51, 75-84, 96-97.  These claims are all against individual defendants and are now proceeding to trial.   Judge Ponsor otherwise granted Defendants' motion.   For purposes of this motion, Plaintiffs only seek reconsideration of two narrow yet very challenging issues of law.[1]

First, the Decision takes Mr. Schand's Monell claim against the City of Springfield away from the jury, based primarily on the belief that Mr. Schand is ***required*** to prove a pattern of similar constitutional violations before he can get to a jury.  See Decision at 70.  But this belief is in clear conflict with Supreme Court law, including City of Canton v. Harris, 489 U.S. 378 (1989), Bd. of the Cty. Comm'rs v. Brown, 520 U.S. 397 (1997), and their progeny, all of which established that a plaintiff can pursue a Monell claim by showing ***either*** (i) a pattern of similar constitutional violations ***or*** (ii) a "single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation…."  Brown, 520 U.S. at 409.  Thus, pattern evidence is not required in those "narrow range of circumstances [where] a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  Id.

Here, Mr. Schand has discovered extensive evidence from which a jury could conclude that his wrongful conviction was a highly predictable consequence of Springfield's failure to train and manage the conduct of its officers.  For example, the record shows that:

---

[1] Plaintiffs reserve their right to appeal these claims at the appropriate time.

- The individual Defendants uniformly testified that they did not recall receiving any formal training from the SPD on how to compile photo arrays. See PSOF ¶ 71.[2]

- The City deponents all testified that officers did not receive formal, new recruit training on how to assemble photo arrays that did not violate a suspect's constitutional rights. Id.

- The SPD did not have written policies and procedures on how to conduct a photo array free from constitutional violations. Id.

The question of whether this total and complete lack of training and policies on identification procedures could obviously lead to Mr. Schand's constitutional injuries—such that Springfield can be considered "deliberately indifferent"—is a question that squarely falls within the purview the jury. Young v. City of Providence, 404 F.3d 4, 28 (1st Cir. 2005).

Second, the court dismissed Mr. Schand's claims under § 1983 for the suppression and fabrication of evidence, finding that Mr. Schand was collaterally estopped from raising claims that were addressed in his criminal proceedings. However, it is "hornbook law that a vacated judgment has no preclusive force either as a matter of collateral or direct estoppel or as a matter of the law of the case." Jackson v. Coalter, 337 F.3d 74, 85 (1st Cir. 2003). Because Mr. Schand's conviction was vacated in 2013, he cannot, as a matter of law, be bound by any former rulings in his criminal proceedings. The Decision calls this argument "well formed" but does nothing to resolve the tension between this hornbook law and the application of collateral estoppel to Mr. Schand's case.

Accordingly, as set forth more fully below, Plaintiff Mark Schand respectfully requests that this Court reverse the Decision with respect to Count II, Count III, and Count VIII. Alternatively, Plaintiff Schand requests that this Court issue an order certifying the Decision for an immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

---

[2] The facts of this case have been set forth extensively in Plaintiffs' summary judgment briefing and Rule 56.1 statements ("PSOF") [Dkt. 104-08], as well as in the Decision, and are incorporated by reference herein.

**ARGUMENT**

A court has considerable discretion in granting or denying a motion for reconsideration.[3] Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006).  A motion for reconsideration is appropriate "if the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust."  United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009).  Notably, in this case, Judge Ponsor invited this Court to reconsider the Decision.  See Decision at 97.

## I.    SPRINGFIELD IS NOT ENTITLED TO SUMMARY JUDGMENT UNDER *MONELL*

### A.  The Decision Ignored Binding Precedent By Requiring Pattern Evidence

In Monell, the Supreme Court held that a municipality can be held liable for constitutional violations resulting from the actions of its employees when those employees' "execution of a government's policy or custom…inflicts the injury," and is the "moving force" behind the constitutional violation.  436 U.S. at 694.  Under Monell, a plaintiff must prove that: "(1) the municipality had a custom, policy, or practice of failing to investigate, discipline, supervise, or train its officers; (2) this custom, policy or practice was such that it demonstrated a 'deliberate indifference' to the rights of those citizens with whom its officers came into contact; and (3) the custom, policy, or practice was the direct cause of the alleged constitutional violation."  Cox v. Murphy, 2016 U.S. Dist. LEXIS 99890, at *20 (D. Mass. Feb. 12, 2016) (Saylor, J.) (citing Canton, 489 U.S. at 388).

In Canton, the Supreme Court noted that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  Canton, 489 U.S. at 388.  The

---

[3] Motions for reconsideration are generally governed by Fed. R. Civ. P. 59, which provides that a motion to alter or amend must be filed no later than 28 days after the decision was entered.  See Fed. R. Civ. P. 59(e).

Court explained that where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390.  Thus, with respect to Mr. Schand's failure-to-train claim, the key inquiry is whether the City's failure to train its officers with regard to identification procedures and the handling of exculpatory evidence amounts to a "deliberate indifference" to Mr. Schand's rights. Id. at 388.  In order to satisfy this "deliberate indifference" standard, a plaintiff can meet its burden of proof in one of two ways.

First, a plaintiff can show "[a] pattern of similar constitutional violations by untrained employees" and the City's "continued adherence to an approach that [it] know[s] or should know has failed to prevent tortious conduct by employees," thus establishing "the conscious disregard for the consequences of [its] action—the 'deliberate indifference'—necessary to trigger municipal liability." Connick v. Thompson, 563 U.S. 51, 62 (2011) (quoting Brown, 520 U.S. at 407).

Second, a plaintiff can establish "a single violation of federal rights, accompanied by a showing that [the defendant] has failed to train its employees to handle recurring situations presenting an obvious potential" for a constitutional violation. Brown, 520 U.S. at 409.  The Supreme Court has observed that this second mode of proof is available "in a narrow range of circumstances" where a federal rights violation "may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." Id.; see also Shadrick v. Hopkins Cty., 805 F.3d 724, 739 (6th Cir. 2015) (finding that plaintiff "can establish 'a single violation of federal rights, accompanied by a showing that [defendant] has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation[.]" (quoting Brown, 520 U.S. at 409)).

In <u>Canton</u>, the Supreme Court provided an example of when a single incident could suffice: "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," and having armed the police officers with guns to accomplish the task, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." <u>Id.</u> at 390 n.10.  Significantly, this proof does not require a plaintiff to show that the defendant had actual or constructive notice that its officers were deficiently trained.  <u>Shadrick</u>, 805 F.3d at 739 (citing <u>Connick</u>, 563 U.S. at 62-63).  Rather, the relevant factor is "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights... [.]"  <u>Brown</u>, 520 U.S. at 409.  "The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable."  <u>Id.</u> at 409-10.

The First Circuit has adhered to <u>Canton</u>'s holding regarding single-incident liability.  In <u>Young</u> v. <u>City of Providence</u>, 404 F.3d 4 (1st Cir. 2005), the court held that "[a] finding of deliberate indifference requires also that the City have disregarded a known or obvious risk of serious harm from its failure to develop a training program."  <u>Id.</u> at 28.  The court further found that while "[s]uch knowledge can be imputed to a municipality through a pattern of prior constitutional violations," a jury could nonetheless find deliberate indifference by virtue of a single incident of liability under the framework of <u>Canton</u> and <u>Brown</u>.  <u>Id.</u>; <u>see</u> <u>also</u> <u>McCormack</u> v. <u>Town of Whitman</u>, 2013 U.S. Dist. LEXIS 38637, at *37-38 (D. Mass. Mar. 20, 2013) (Saris, J.); <u>McKenney</u> v. <u>Mangino</u>, 2017 U.S. Dist. LEXIS 55649 (D. Me. Apr. 12, 2017) (denying summary judgment against municipality under single-incident liability theory and collecting cases from other circuits concluding the same).

Against this backdrop, it is clear that the Decision was premised on a clear error of law. Judge Ponsor concluded that Mr. Schand was **_required_** to present a pattern of past violations in order to show that the City was on notice that constitutional violations would occur. According to the court, the "perhaps strongest[] argument supporting summary judgment in favor of Springfield is the absence of any evidence of a pattern of police misconduct prior to 1986 that would put the city on notice of some significant risk that, driven by inadequate training, constitutional violations would occur…Actual or constructive knowledge through a past history of constitutional violations is required." Decision at 70. In support, Judge Ponsor relied on the recent First Circuit decision in Gray v. Cummings, 917 F.3d 1 (1st Cir. 2019), in which the First Circuit noted that "a plaintiff typically must show a pattern of similar constitutional violations by untrained employees to demonstrate deliberate indifference for purposes of failure to train." 917 F.3d at 14. But, what is "typical" does not equate with what is "required," and Gray did not purport to upend decades of Supreme Court precedent by imposing pattern evidence as a requirement. Indeed, Gray cites favorably to both Connick and Brown, which acknowledge that the unconstitutional consequences of a training failure "could be so patently obvious that a city would be liable under § 1983 without proof of a pre-existing pattern of conditions." Connick, 563 U.S. at 64; Brown, 520 U.S. at 409.

In attempting to reconcile his reading of Gray with the Canton "single incident" line of cases, Judge Ponsor opined that "Canton addressed the nature and quantum of evidence needed to demonstrate the existence of a constitutionally deficient training regimen" whereas, in Judge Ponsor's estimation, Gray "appears to address a different question from the one being discussed in Canton, specifically the requirement that evidence of past incidents put the municipality on notice that its policy was actually having 'unconstitutional effects.'" Decision at 65-66. This distinction, however, does not bear out. Both Gray and Canton are focused on the same "deliberate

indifference" standard.  <u>Compare Gray</u>, 917 F.3d at 14 (noting that "[a] plaintiff typically must show a pattern of similar constitutional violations by untrained employees…to demonstrate ***deliberate indifference*** for purposes of failure to train") (emphasis added), <u>with</u> <u>Canton</u>, 489 U.S. at 390 ("[T]he need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been ***deliberately indifferent*** to the need.") (emphasis added); <u>see also</u> <u>Hill</u> v. <u>Walsh</u> 884 F.3d 16, 24 (1st Cir. 2018) (stating that municipal liability may be established by "a pattern of similar constitutional violations…unless the need for more or different training is so obvious and the inadequacy [is] so likely to result in the violation of constitutional rights").

<u>Young</u> is instructive on this point.  In that case, the First Circuit stated that "[a] finding of deliberate indifference requires also that the City have disregarded a known or obvious risk of serious harm from its failure to develop a training program," and noted that "[s]uch knowledge could be imputed to a municipality through a pattern of prior constitutional violations."  <u>Young</u>, 404 F.3d at 28.  However, the First Circuit also found that "a jury could find deliberate indifference by virtue of" single-incident liability because the violation was "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." <u>Id.</u>  To that end, the First Circuit reversed the grant of summary judgment on municipal liability where a single-incident of liability was alleged because "[t]he jury could find that there was, at best, very minimal training on these issues, and no real program training on them at all."  <u>Id.</u>

As this Court noted in its decision in <u>Putnam</u> v. <u>Town of Saugus</u>, 365 F. Supp. 2d 151 (D. Mass. 2005) (Young, J.), "this Court cannot simply disregard its sworn oath to comply with the binding opinions of the Supreme Court.  Accordingly, this Court is bound to apply the rule of decision of the Supreme Court that under appropriate circumstances, a government official's single

act of misconduct may give rise to municipal liability."  Id. at 181.  In short, although proof of

pattern evidence is a way—and perhaps the most typical way—to show that a municipality was

deliberately indifferent to inadequate training, a plaintiff is also permitted to rely on a single

incident where "a violation of [a] federal right[]" is "a highly predictable consequence of a failure

to equip law enforcement officers with specific tools to handle recurring situations."  Young, 404

F.3d at 28 (quoting Brown, 520 U.S. at 409).

**B.  There Are Triable Issues Of Fact Regarding Springfield's _Monell_ Liability**

Against the proper legal framework, it is clear that the record, when viewed in the light

most favorable to Mr. Schand, contains extensive facts from which a reasonable jury could find

that the potential risk of constitutional violations by the Springfield Police Department ("SPD")

officers due to their inadequate training was "so obvious" that the City's failure to address this

deficiency amounted to deliberate indifference.  Canton, 489 U.S. at 390.

1.  The City Of Springfield's Training Program Was Inadequate

The evidence reveals that the City and the SPD did not just have an inadequate system of

training in place; they had **_no_** training or policies on several important areas.

a.  Photo Arrays. The City's 30(b)(6) witnesses uniformly testified that the officers did

not receive **_any_** training on how to assemble photo arrays in a way that did not violate their

constitutional rights.  See, e.g., Ex. 22, Kennedy Dep. 48:9-12; Ex. 21, Fitzgerald Dep. 81:15-19,

105:11-106:3; Ex. 33, Sicard Dep. 39:21-40:2, 40:6-12.[4]  Sergeant Donald Sicard, who was

responsible for training all of the defendant officers, stated that training on photo arrays was limited

to the following: "They talked about [photo arrays] very briefly but they basically just explained

---

[4] For the Court's convenience, Plaintiffs are reattaching to this Motion those exhibits cited directly herein, but with the same numbering as in Plaintiffs' Opposition to Summary Judgment and Rule 56.1 statement to avoid any confusion.  See Declaration of Joshua D. Weedman, dated May 21, 2019 ("Weedman Decl.").

what a photo array was.  They didn't go into detail on how to set one up and do it because those were for detective officers." Ex. 33, Sicard Dep. 65:13-19.  And, despite the fact that the SPD had a written manual of rules and regulations that was given to each officer and was periodically updated with changes in the law, there were no written policies on how to conduct a photo array, nor were there any general orders or amendments to SPD's policies relating to assembling photo arrays.  Ex. 42, Fitchet Dep. 42:7-20; Ex. 22, Kennedy Dep. 43:13-19, 45:20-46:1; Ex. 43, Keating Dep. 41:16-20; see also Ex. 45, 1981 SPD Rules and Regulations.

        b.   Lineups. The SPD Defendant officers did not receive training on how to compose police lineups.  Ex. 22, Kennedy Dep. 62:22-63:10; Ex. 21, Fitzgerald Dep. 81:20-82:5; Ex. 33, Sicard Dep. 40:3-5, 120:5-9.  There were also no written policies addressing procedures for lineups. Ex. 42, Fitchet Dep. 42:21-43:1; Ex. 21, Fitzgerald Dep. 126:5-16; Ex. 22, Kennedy Dep. 43:20-22, 61:17-23.

        c.   Exculpatory Evidence. There was no training on the procedures for handling exculpatory evidence, Ex. 33, Sicard Dep. 40:13-23, 60:6-12; Ex. 22, Kennedy Dep. 65:20-23, nor were there any written policies or general orders promulgated by the SPD as to how to handle exculpatory evidence, Ex. 22, Kennedy Dep. 43:23-44:3, 64:12-20, 67:14-19; Ex. 21, Fitzgerald Dep. 126:23-127:9; Ex. 42, Fitchet Dep. 40:3-5, 43:2-5; Ex. 43, Keating Dep. 42:1-4.  The same was true for investigating and interviewing potential alibi witnesses.  Ex. 21, Fitzgerald Dep. 178:20-179:4, 179:17-21; Ex. 22, Kennedy Dep. 75:23-76:2, 77:17-20.

        d.   Expert Testimony. Plaintiffs submitted evidence from Mr. Lou Reiter, a renowned expert in police practices and procedures, who concluded that:

> the training, policies, practices and supervisory oversight of detectives in the Springfield Police Department were egregious departures from generally accepted police practices at the time of the arrest and conviction of Mr. Schand.  As a result of these agency

> failures, Springfield Police Department employees utilized faulty
> photo identification procedures and tainted lineup practices during
> Mr. Schand's investigation, and also conducted an unreasonable
> follow-up investigation.

Ex. 46, Expert Report of Lou Reiter ("Reiter Report") ¶ 14; see also PSOF ¶¶ 238-46; Santiago v.

Fenton, 891 F.2d 373, 382 (1st Cir. 1989) (stating that plaintiff alleging failure to train claim should

show that "training was inferior by the standards of the profession").

     e.  The Record Evidence. Although Judge Ponsor concluded that "all defendant

officers testified that they received training significantly above [a] minimal level," (Decision at

67), his conclusion improperly weighs the evidence and disregards triable issues of disputed fact.[5]

With respect to photo arrays:

- Defendant McMahon did not recall receiving any training on the preparation of photo arrays. Ex. 1, McMahon Dep. 190:12-14;

- Defendant Scammons testified that the only training he received related to photo arrays dealt with the number of photos that needed to be in an array.  Ex. 9, Scammons Dep. 34:11-19;

- Defendant Reid testified that he never had any training related to the procedure for conducting photo arrays. Ex. 30, Reid Dep. 54:12-16.  He also testified that the manual provided by the SPD did not have any instructions on the proper technique for conducting photo arrays.  Id. at 47:14-21;

- Defendant Assad also testified that he did not receive training on how to compile a photo array.  Ex. 29, Assad Dep. 88:23-89:2; and

- Defendant Muise testified that he never saw any written policy at the SPD providing direction on how to assemble a photo array.  Ex. 31, Muise Dep. 37:9-11.

With respect to lineups:

- Defendant Reid testified that he did not recall receiving training on how to conduct a police lineup, nor was there any information in the manual the SPD provided to officers

---

[5] Defendants argue that officers received on-the-job training.  But Defendants own expert acknowledged that on-the-job training was inadequate.  See Ex. 52, Powers Dep. 109:24-110:14.

that explained the technique for conducting a lineup.  Ex. 30, Reid Dep. 47:22-48:5, 202:13-203:4;

- Defendant Muise testified that he did not receive any training on how to conduct a proper lineup from the SPD.  Ex. 31, Muise Dep. 38:3-8; and

- Defendant McMahon did not recall receiving any training about the preparation of lineups.  Ex. 1, McMahon Dep. 190:15-16.

With respect to handling exculpatory evidence:

- Defendant Assad testified that he did not have any training on exculpatory evidence Ex. 29, Assad Dep. 80:10-14;

- Defendant Reid testified that, throughout his entire time with the SPD, he did not receive any training regarding what to do with exculpatory evidence.  Ex. 30, Reid Dep. 57:20-58:12; and

- Defendant Scammons could not recall receiving any training on how to deal with exculpatory evidence.  Ex. 9, Scammons Dep. 27:21-28:7.

In sum, Mr. Schand—the non-moving party—presented a wealth of evidence on which the jury could reasonably find that the City inadequately trained its police officers.[6]  As the First Circuit found in <u>Young</u>, this is more than sufficient to present Mr. Schand's claim to a jury.  404 F.3d at 28-29 (reversing grant of summary judgment on failure-to-train claim and finding "there are substantial unresolved issues of fact with respect to the amount of training that the PPD actually gave to officers…The jury could find that there was, at best, very minimal training on these issues, and no real program of training on them at all").

---

[6] The Decision cited <u>Santiago</u>, 891 F.2d at 382, which held that "four hours of training, without more, does not amount to a 'conscious' policy to train inadequately."  Decision at 67.  <u>Santiago</u> is easily distinguishable.  In this case, as opposed to <u>Santiago</u>, there is a total absence of training or policies provided by the SPD on photo arrays, lineups, exculpatory evidence or investigating alibi witnesses, as shown above.  Moreover, the First Circuit in <u>Santiago</u> also noted that "Appellant did not specify how this training…was inadequate.  Nor did appellant suggest that this training was inferior by the standards of the profession."  <u>Id.</u> at 382.  In this case, Plaintiffs have submitted extensive evidence of both, particularly through Reiter's report.  <u>See generally</u> Ex. 46.

2.  <u>The Inadequacy of Training Resulted From the City's Deliberate Indifference</u>

The evidence also demonstrates that the SPD's inadequate training and supervision of its officers resulted from its own deliberate indifference to the constitutional rights of its citizens, including Mr. Schand's.  As should have been obvious to the City, the SPD's failure to implement training and policies protecting citizens' constitutional rights created SPD officers who were "ignorant of the constitutional standards" governing photo arrays, lineups, and exculpatory evidence.  <u>Shadrick</u>, 805 F.3d at 743; <u>Brown</u>, 520 U.S. at 409 (finding that inadequate training could lead to the "highly predictable consequence" that constitutional violations could occur).

The SPD was also on notice that it needed to protect citizens' (like Mr. Schand's) due process rights with respect to identification procedures.  It was well-established prior to Mr. Schand's arrest that unduly suggestive identification procedures could impact one's right to due process, thus necessitating formal training on how to conduct proper identification procedures. <u>See</u>, <u>e.g.</u>, <u>Stovall</u> v. <u>Denno</u>, 388 U.S. 293, 302 (1967).  Similarly, the SPD was on notice of the obligation of its officers to turn over exculpatory evidence.  <u>See</u>, <u>e.g.</u>,  <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83, 87 (1963); <u>see also</u> <u>Haley</u> v. <u>City of Boston</u>, 657 F.3d 39, 51-53 (1st Cir. 2011) (denying motion to dismiss Haley's § 1983 claim based on failure-to-train regarding disclosure of exculpatory evidence "[g]iven the volume of cases involving nondisclosure of exculpatory information and the instant failure to disclose statements that clearly would have undermined the prosecution's theory of the case…").

Additionally, it is undisputed that the City had actual notice of its inadequate police training.  In the 1980s, the SPD was "woefully underfunded" and "[t]he City's finances were a disaster…so [they] really didn't have the financial resources to do much of anything."  <u>See</u> Ex. 42, Fitchet Dep. 58:3-6, 59:9-60:1; Ex. 21, Fitzgerald Dep. 184:4-18.  A report commissioned by the SPD and prepared by outside consultants, Wasserman Associates, in the early 1990s, confirmed

that members of the SPD "want[ed] to receive the training and resources they need to do their job" but felt in certain cases that they were being "denied the opportunity to participate in training" or had other complaints about "[a]ccess to training." Ex. 58, Wasserman Report at 42-43. The Report further noted that "superior officers do not receive the training and guidance required for policing a diverse community in the 1990s. Police officers all spoke of a desire for more meaningful in-service training and education." Id. at 3.

Taking the evidence in the light most favorable to Mr. Schand, a reasonable juror could find that all of the deficiencies in training that the witnesses testified to were the result of the SPD's deliberate indifference to the need to train its officers in these important investigatory obligations. Without such training, there was an "obvious" risk that the constitutional rights of citizens would be violated. Canton, 489 U.S. at 390; see also Connick, 563 U.S. at 64 ("[I]n the absence of training, there is no way for novice officers to obtain the legal knowledge they require.").

### 3. The Inadequate Training Was The Moving Force Behind Mr. Schand's Injury

There is sufficient evidence for a jury to conclude that the deficiencies in training identified by Mr. Schand caused the investigative procedures that were the moving force behind Mr. Schand's constitutional injuries. Young, 404 F.3d at 10 (finding that where a jury could reasonably find for or against plaintiff on causation in a failure to train claim, the error in the court's summary judgment decision "lay in taking the case away from the jury"). As Judge Ponsor found, Mr. Schand's expert, Lou Reiter, established that the training for conducting identification procedures through the use of photo arrays and lineups was deficient, as was the training on how to handle exculpatory evidence. Decision at 37-38, 67; Ex. 46, Reiter Report ¶¶ 55-65 (photo arrays); 66-73 (lineups); 74-81 (exculpatory evidence). Judge Ponsor also credited the extensive evidence submitted by Mr. Schand to show that Defendants had engaged in improper investigation

techniques and noted that a jury could reasonably find for Plaintiffs on these facts.   Specifically,

Judge Ponsor acknowledged that:

- "The record already contains admissible evidence that, if believed, would justify a jury in concluding that improper identification techniques were employed in the Seymour murder investigation." Id. at 59.
- "[A] jury could conclude that Schand's attorney, Roy Anderson, was given only the first page of the Scammons Report as part of the Commonwealth's document disclosure prior to Plaintiff's trial.   He never received the second page with the arguably exculpatory comment by Stokes that his assailant had 'bad teeth.'" Id. at 26.
-  "A jury could find that this Hartford material [about potential suspect Randy Weaver] was never shared with Schand's defense attorney, who might have used it at the criminal trial as evidence that Weaver, not Schand, was the gunman at the After Five Lounge shooting." Id. at 27-28.

Based on these facts, a reasonable jury could infer that the constitutional injuries inflicted on Mr.

Schand were the direct result of the deficient training that the Defendants received with regard to

the investigative techniques at issue here.  See Monell, 436 U.S. at 694; Brown, 520 U.S. at 409-

10 ("The high degree of predictability may also support an inference of causation—that the

municipality's indifference led directly to the very consequence that was so predictable.").  Indeed,

the lack of sufficient training was so obvious that it should have been clear to the SPD that its

officers would run the risk of engaging in constitutionally infirm investigation procedures relating

to the use of photo arrays and lineups and failing to disclose exculpatory evidence.  See Ex. 46,

Reiter Report ¶ 62 ("The failure to implement adequate policies on photo arrays and the failure to

train and supervise police officers with regard to photo arrays led to instances where Springfield

police officers egregiously misused this investigative technique."); see also id. ¶ 63 (identifying

the unduly suggestive identification practices employed with witness Michael Hosten as one of

the results of the failure to train on the use of photo arrays).

Judge Ponsor opined that because defendant officers "deliberately twisted…those

[identification] procedures to frame Mark Schand", "[n]o reasonable jury could conclude that this

conduct was driven by poor training." Decision at 68-69. To support this assertion, Judge Ponsor relied solely on the testimony of one defendant, Raymond Muise, who testified that he did not "mix a Polaroid of Plaintiff into any photo array of mugshots he showed to potential witnesses, because he <u>knew</u>—presumably from his training and experience, or quite possibly just from common sense—that such a practice would be improperly suggestive." <u>Id.</u> at 68. Thus, according to Judge Ponsor, the reason behind the unduly suggestive identifications could therefore not be inadequate training because Muise had "deliberately engag[ed] in an unprofessional act in order to obtain Plaintiff's conviction." <u>Id.</u> But Muise's self-serving testimony alone cannot establish that some individual "bad acts"—as opposed to training inadequacies—were the driving force behind the *other* defendants' failures to follow proper identification procedures.[7] This is particularly true where other defendant officers and representatives of the SPD testified that there was no training or departmental policy or training on the use of Polaroids in photo arrays— testimony which conflicts with Muise's own testimony. <u>See</u> <u>supra</u> Section I.B.1. Muise's testimony simply does not support an inferential leap as to the absence of causation—especially when the evidence supports the opposite. <u>Brown</u>, 520 U.S. at 409-410; <u>see</u> <u>also</u> <u>Brown</u> v. <u>Bryan Cty</u>, 219 F.3d 450 (5th Cir. 2000) (finding causation on failure-to-train claim where plaintiffs presented expert and factual testimony to support inference).

Judge Ponsor also relied on the fact that certain eye witnesses testified that they knew Mr. Schand was not the shooter, but identified him anyway. Decision at 70. But the fact that some witnesses knew that Mr. Schand was not the shooter cannot be dispositive where, as Judge Ponsor also acknowledged, other witnesses did *__not__* know that Mr. Schand was not the shooter, but they

---

[7] Nor does Muise's testimony on photo arrays shed any light on whether the failure to train on other investigative techniques such as the use of lineups and the disclosure of exculpatory evidence caused constitutional injuries to Mr. Schand.

identified him anyway after a tainted identification process.  See, e.g. Decision at 29 (finding that "the evidence, though disputed, is sufficient to permit a jury to conclude that [Michael] Bernard was shown one of the Polaroids of Schand on or about this time [October 1986]").  That these witnesses selected Mr. Schand despite being unsure that he was the shooter is precisely the consequence that would have been avoided had the individual Defendants been trained to conducted photo arrays and lineups that did not suggest that Mr. Schand was the suspect.  Young, 404 F.3d at 64 (finding causation where "[a] jury could find training would have made a difference here, unlike in other situations where it would have been unlikely to stop unconstitutional conduct").

When viewed in the light most favorable to Mr. Schand, the evidence could clearly lead a reasonable jury to conclude that the need for training on proper identification procedures was so clear and so obvious, it was inevitable that SPD officers would engage in improper investigative techniques that would cause—and did cause—Mr. Schand's constitutional injuries.  It is therefore improper to keep this claim from a jury.

C. **Mr. Schand Has Also Alleged Disputed Facts Related to Other Areas of Liability Under _Monell_ That the Court Failed to Consider**

As discussed above, in addition to evidence of inadequate training, Mr. Schand also submitted extensive evidence demonstrating that the City had no policies, procedures, and practices regarding identification procedures or the proper handling of exculpatory evidence.  See, e.g., Ptfs' Opp. to Sum. J. ("Opp.") [Dkt. 104] at 33-41;[8] PSOF ¶¶ 70-71, 238-46.  Each of these deficiencies in policy and procedure, which the Plaintiffs alleged separately in their complaint,

---

[8] Judge Ponsor stated that Plaintiffs' "opposition to Defendants' motion for summary judgment makes it clear that failure to train is the heart of Plaintiffs' Monell claim."  Decision at 71. However, the record reflects otherwise: Plaintiffs also raised issues with respect to the SPD's deficient policies on identification procedures and exculpatory evidence.  Opp. at 33-41.

provides a separate ground for <u>Monell</u> liability.   <u>See</u> Compl. ¶ 302 (alleging "deliberately indifferent failure to supervise, recruit, and discipline employees in such a way as to protect the constitutional rights of individuals accused of criminal activity"); ¶ 303 (alleging that City implemented "poor and inadequate policies" regarding the avoidance of unduly suggestive identification procedures, making seizures without probable cause, and suppressing exculpatory evidence, and fabricating evidence).

Contrary to the Decision's suggestion, these inadequate policy and procedure claims do not require the "pattern" evidence.  <u>Kelley</u> v. <u>Laforce</u>, 288 F.3d 1, 9 (1st Cir. 2002) ("[P]olicy or custom… may be established by a single decision by municipal policymakers under appropriate circumstances"); <u>Welch</u> v. <u>Ciampa</u>, 542 F.3d 927, 942 (1st Cir. 2008); <u>Putnam</u>, 365 F. Supp. 2d at 178-79 ("[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.   A different interpretation of the word 'policy'…would be contrary to the fundamental purpose of § 1983.").

## II.   MR. SCHAND'S CLAIM THAT DEFENDANTS IMPROPERLY WITHHELD EXCULPATORY EVIDENCE IS NOT BARRED BY COLLATERAL ESTOPPEL

The Decision also incorrectly concluded that Mr. Schand's claims for the fabrication and suppression of evidence were barred by collateral estoppel.   Under First Circuit precedent, a vacated judgment has no preclusive effect.  <u>Jackson</u>, 337 F.3d at 85 ("[I]t is hornbook law that '[a] vacated judgment has no preclusive force either as a matter of collateral or direct estoppel or as a matter of the law of the case."); <u>Zeneca Ltd.</u> v. <u>Pharmachemie B.V.</u>, 37 F. Supp. 2d 85, 92 (D. Mass. 1999) (Collings, J.) (same); <u>Cosenza</u> v. <u>City of Worcester</u>, 355 F. Supp. 3d 81, 93 (D. Mass. 2019) (Hillman, J.) (collecting cases).   This legal principle makes sense, as it would be unjust to hold an individual to factual determinations that resulted in a conviction where that conviction is ultimately overturned.   Here, the court's decision to vacate Mr. Schand's conviction and grant him

18

a new trial in 2013, followed by the prosecutor's decision to issue a *nolle prosequi*, terminated Mr. Schand's conviction, rendering it vacated.  S.J. Opp. at 12 n.7; Decision at 80–81.  Thus, collateral estoppel cannot apply to Mr. Schand's claims.  See Jackson, 337 F.3d at 85.[9]

While the Decision acknowledges the tension between collateral estoppel and a vacated judgment, the court concluded that Mr. Schand only offered "out of circuit" support for this argument and concluded that he was bound to find that collateral estoppel applied here because of Johnson v. Mahoney, 424 F.3d 83 (1st Cir. 2005).  Decision at 93.  Specifically, Judge Ponsor relied on the finding in Johnson that "issues decided in criminal prosecutions may preclude their later relitigation in a civil action."  Id. at 93 (quoting Johnson, 424 F.3d at 94).  This may be so, but it is not the relevant question here, and Johnson does not address the binding precedent which finds that vacated judgments cannot have any preclusive effect.  Jackson, 337 F.3d at 85.[10]  Because his judgment has been vacated, collateral estoppel simply cannot apply.

III.    **ALTERNATIVELY, THIS COURT SHOULD CERTIFY THE ISSUES FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b)**

While Plaintiffs believe that the Decision merits reconsideration and reversal by this Court, Plaintiffs alternatively request that the Court certify the order to the Court of Appeals for interlocutory review if it does not grant Plaintiffs' motion for reconsideration.  A district court shall certify an order to the Court of Appeals for interlocutory review when the district judge believes that the order involves "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially

---

[9] Plaintiffs raised Jackson in their opposition to Defendants' motion for summary judgment and also directed Judge Ponsor to the Jackson case at oral argument.  Pls. Mem. Opp. To Defs.' Mot. Summ. Judgment, 25-26, ECF No. 104; Hr'g Tr. at 29:8-30:18.   Judge Ponsor does not address this decision or its progeny in his opinion.

[10] For this reason, Ecchavaria v. Roach, 2017 U.S. Dist. LEXIS 144589 (D. Mass. Sept. 7, 2017) (Burroughs, J.), which the Decision cites, is also inapposite.

advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  The challenging issues of (i) whether pattern evidence is required in order to satisfy the standard for municipal liability and (ii) whether a vacated judgment has a preclusive force as a matter of collateral estoppel are "sufficiently…important," In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1010 n.1 (1st Cir. 1988), and "constitute[]…open question[s] and…the litigation would benefit from prompt resolution of that question," Camacho v. P.R. Ports Auth., 369 F.3d 570, 573 (1st Cir. 2004).  Based on the discussion herein, it is evident that there is a "substantial ground for difference of opinion" and this matter would "benefit from prompt resolution" of these unsettled issues, given that Plaintiffs' claims "will survive or, in effect, be terminated and leave [Plaintiffs] without recourse."  Miara v. First Allmerica Fin. Life Ins. Co., 379 F. Supp. 2d 20, 68 (D. Mass. 2005) (Young, J.) (citing Camacho, 369 F.3d at 573).

This matter will particularly benefit from prompt resolution, as the issue of whether pattern evidence is required for municipal liability under Monell will involve evidence that will largely overlap with the claims against the individual Defendants.  Certification of these issues for interlocutory appeal is appropriate at this stage and in the interest of judicial economy, as it will avoid the need for the parties to essentially have two trials on the same underlying factual issues.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court reconsider and reverse the Decision as set forth above or, in the alternative, certify the Decision for interlocutory appeal pursuant to 28 U.S.C. § 1292, and issue such further relief as the Court deems just and proper.

Respectfully submitted,

Dated: May 21, 2019

By: /s/ *Joshua D. Weedman*
Heather K. McDevitt (*pro hac vice*)
Joshua D. Weedman (*pro hac vice*)
Jacqueline L. Chung (*pro hac vice*)
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Phone: (212) 819 8200
Fax: (212) 354 8113
hmcdevitt@whitecase.com
joshua.weedman@whitecase.com
jacqueline.chung@whitecase.com


Kevin Adam, BBO # 684955
WHITE & CASE LLP
75 State Street, 24th Floor
Boston, MA 02109
Phone: (617) 979 9300
Fax: (617) 979 9301
kevin.adam@whitecase.com

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua D. Weedman, Esq., herby certify that a correct copy of the forgoing Motion for Reconsideration was filed electronically on May 21, 2019.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/  *Joshua D. Weedman*
Joshua D. Weedman